Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle E. Leonard (SBN 218201)
Alice X. Wang (SBN 335224)
Robin S. Tholin (SBN 344845)
Talia Stender (SBN 341654)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

Attorneys for Plaintiffs
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-08302-VC |
| Plaintiffs, | **DECLARATION OF THOMAS ANDREW HUDDLESTON** |
| v. | |
| UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al., | |
| Defendants. | |

**DECLARATION OF THOMAS ANDREW HUDDLESTON**

I, Thomas Andrew Huddleston, declare as follows:

1.    I am over 18 years of age and competent to give this declaration.  This declaration is based on my personal knowledge, information, and belief.

2.    I am the Director of Advocacy for the American Federation of Government Employees, AFL-CIO ("AFGE"), a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.  I have been the Director of Advocacy since August 2025.  Between 2019 and August 2025, I served as the Director of Communications for AFGE.

3.    In my roles as Director of Advocacy and Director of Communications, I am responsible for overseeing and directing AFGE's press and public relations strategy.  In this role, I review and collect information regarding actions by the President and federal agencies and press reporting that may impact AFGE and its members.

4.    A true and correct copy of the September 24, 2025 OMB memorandum, known hereinafter as "OMB's Lapse Memorandum," was downloaded from the link https://www.politico.com/f/?id=00000199-7e8f-ddde-a199-fedf6c5d0000, and is attached hereto as **Exhibit A**.

5.    A true and correct copy of the article *White House to agencies: Prepare mass firing plans for a potential shutdown*, published by Politico on September 24, 2025, downloaded from the link https://www.politico.com/news/2025/09/24/white-house-firings-shutdown-00579909, is attached hereto as **Exhibit B**.  The article reports that the OMB issued a memorandum on September 24, 2025, "instructing federal agencies to prepare reduction-in-force plans for mass firings during a possible government shutdown."  *Id.* at 1.

6.    A true and correct copy of the document titled *Guidance for Shutdown Furloughs*, published by the United States Office of Personnel Management ("OPM"), downloaded from the link https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-shutdown-furloughs-sep-28-2025/, is attached hereto as **Exhibit C.**  Section R was added on September 28, 2025, and provides guidance on reductions in force during the shutdown furlough.  *Id.* at 53, 67.

7.     A true and correct copy of the document titled *Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025*, dated September 28, 2025, published by OPM, downloaded from the link https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/special-instructions-for-agencies-affected-by-a-possible-lapse-in-appropriations-starting-on-10-1-2025/, is attached hereto as **Exhibit D.**  The document cites the OMB Lapse Memorandum and provides instructions on administering the RIF process.  *Id.* at 9-10.  The document states:  "OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities."  *Id.* at 10.

8.     A true and correct copy of the article  *'Put them in trauma': Inside a key MAGA leader's plans for a new Trump agenda*, published by Government Executive on October 28, 2024, downloaded from the link https://www.govexec.com/management/2024/10/inside-key-maga-leaders-plans-new-trump-agenda/400607/, is attached hereto as **Exhibit E**.  The article quotes United States Office of Management and Budget ("OMB") Director Russell Vought as stating in speeches before officially joining the Trump administration: "We want the bureaucrats" (referring to federal employees) "to be traumatically affected."  "When they wake up in the morning," he stated, "we want them to not want to go to work because they are increasingly viewed as the villains…  We want to put them in trauma."  *Id.* at 1.

9.     A true and correct copy of the news wire report *US health secretary Kennedy says he brought back 722 CDC employees, 220 at NIH*, published by Reuters on June 24, 2025, downloaded from the link https://www.reuters.com/business/healthcare-pharmaceuticals/us-health-secretary-kennedy-says-he-brought-back-722-cdc-employees-220-nih-2025-06-24/, is attached hereto as **Exhibit F.**

10.     A true and correct copy of article  *'Pain on the bureaucracy': Russ Vought's crusade upends the shutdown fight*, published by Politico on September 26, 2025, downloaded from the link https://www.politico.com/news/2025/09/26/russ-vought-shutdown-layoffs-00581412, is attached hereto as **Exhibit G**.  In that article, OMB Director Russell Vought, is quoted as calling the shutdown

deadline "a very critical juncture" and saying that Republicans have Democrats "in a very good position." *Id.* at 3.

11.     A true and correct copy of the article *The Man Behind Trump's Push for an All-Powerful Presidency*, published by the New York Times on September 29, 2025, downloaded from the link https://www.nytimes.com/2025/09/29/us/politics/russell-vought-trump-budget.html, is attached hereto as **Exhibit H**.  In that article, OMB Director Vought is quoted as stating, "We have ... embarked on deconstructing this administrative state." *Id.* at 5.  Director Vought was also quoted as stating, "We want to make sure that the bureaucracy can't reconstitute itself later in future administrations." *Id.* at 6.

12.     A true and correct copy of the article *White House: Government layoffs coming if Democrats don't prevent shutdown*, published by The Hill on September 29, 2025, downloaded from the link https://thehill.com/homenews/administration/5526761-white-house-warns-democrats-layoffs/, is attached hereto as **Exhibit I**.  The article reports that, when asked whether there would be layoffs as a result of a government shutdown, White House Press Secretary Karoline Leavitt stated, "There will be if Democrats don't keep the government open." *Id.* at 2.

13.     A true and correct copy of the article *Trump floats cutting benefits during shutdown, warns Democrats are taking a risk*, published by The Hill on September 30, 2025, downloaded from the link https://thehill.com/homenews/administration/5529071-trump-floats-cutting-benefits-during-shutdown-warns-democrats-are-taking-a-risk/, is attached hereto as **Exhibit J**.  In that article, President Donald J. Trump is quoted as stating, "You all know Russell Vought, he's become very popular recently because he can trim the budget to a level that you couldn't do any other way.  So they're taking a risk by having a shutdown." *Id.* at 2.

14.     A true and correct copy of the article *Trump says there may be 'a lot' of federal workers laid off in government shutdown*, published by The Hill on September 30, 2025, downloaded from the link https://thehill.com/homenews/administration/5528527-federal-government-shutdown-threat/amp/, is attached hereto as **Exhibit K**.  The article reports that "President Trump said Tuesday there may be a lot of layoffs in the federal government if Congress doesn't act to prevent a shutdown by the end of the day, blaming the Democrats for a potential lapse in funding." *Id.* at 1.

15.    A true and correct copy of the document titled *EOP Contingency Plan for a Shutdown Furlough*, dated September 30, 2025, authored by the Executive Office of the President is attached hereto as **Exhibit L.**

16.    A true and correct copy of the article *Vought: Mass firings will begin 'in a day or two'*, published by Politico on October 1, 2025, downloaded from the link https://www.politico.com/live-updates/2025/10/01/congress/russ-vought-mass-layoffs-firings-timeline-shutdown-00589875, is attached hereto as **Exhibit M**.  The article reports that "OMB chief Russ Vought told House Republicans on a private call Wednesday that the administration will start mass reduction in force moves, or firings, of federal workers 'in a day or two.'"  *Id.* at 1.  The article also quotes Press Secretary Leavitt as stating that, "because the Democrats shut down the government, the president has directed his cabinet, and the Office of Management and Budget is working with agencies across the board to identify where cuts can [b]e made… And we believe that layoffs are imminent."  *Id.* at 3.

17.    A true and correct copy of the article *White House: Shutdown layoffs are just days away*, published by Government Executive on October 1, 2025, downloaded from the link https://www.govexec.com/workforce/2025/10/white-house-shutdown-layoffs-are-just-days-away/408534/, is attached hereto as **Exhibit N**.

18.    A true and correct copy of a post authored by President Trump and published on the Truth Social platform on October 2, 2025 was downloaded from the link https://truthsocial.com/@realDonaldTrump/posts/115304455138824245, and attached hereto as **Exhibit O**.  The post states:  "I have a meeting today with Russ Vought, he of PROJECT 2025 Fame, to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut, and whether or not those cuts will be temporary or permanent. I can't believe the Radical Left Democrats gave me this unprecedented opportunity. They are not stupid people, so maybe this is their way of wanting to, quietly and quickly, MAKE AMERICA GREAT AGAIN! President DJT."  *Id.*

19.    The Trump Administration has added messages to federal agency websites.  A true and correct copy of a screenshot, taken on October 2, 2025, of the message that appears on the website of the U.S. Department of Housing and Urban Development, https://www.hud.gov/#openModal, is

1    attached hereto as **Exhibit P**.  The message states: "The Radical Left in Congress shut down the

2    government."  *Id.* at 1.

3        20.    A true and correct copy of news wire report *US government layoffs could be in the*

4    *thousands, White House says*, published by Reuters on October 2, 2025, downloaded from the link

5    https://www.reuters.com/world/us/us-government-layoffs-could-be-thousands-white-house-says-

6    2025-10-02/, is attached hereto as **Exhibit Q**.  Reuters reports:  "U.S. government layoffs could be in

7    the thousands, White House spokeswoman Karoline Leavitt said on Thursday as the federal

8    government began the second day of a shutdown."  *Id.*

9        21.    A true and correct copy of the article *Trump Doubles Down Amid Government*

10   *Shutdown as Layoffs Loom: 'Cry All You Want'*, published by Time on October 2, 2025, downloaded

11   from the link https://time.com/7322551/trump-government-shutdown-warning-layoffs-democrats-at-

12   risk/, is attached hereto as **Exhibit R**.  The article states that President Trump told reporters in the

13   Oval Office: "We'd be laying off a lot of people that are going to be very affected, and they're

14   Democrats. They're gonna be Democrats."  *Id.* at 3.

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23

24

25

26

27

28

22.     A true and correct screenshot of an excerpt from the "grim reaper" video posted by Donald Trump to his Truth Social account on October 3, 2025 pertaining to OMB Director Vought is pasted below.  The video can be accessed at this link: https://truthsocial.com/@realDonaldTrump/posts/115307915499158903.  The screenshot was taken at the 00:31 time stamp.



23.     A true and correct copy of the document *US Environmental Protection Agency Contingency Plan*, dated March 2025, published by the Untied States Environmental Protection Agency, is attached hereto as **Exhibit S**.

24.     A true and correct copy of an excerpted portion (Section 124) of the document *Circular No. A-11: Preparation, Submission, and Execution of the Budget*, dated July 2024, published by the Office of Management and Budget, is attached hereto as **Exhibit T.**

25.     A true and correct copy of the document *Shutdown Plan Contingency Plan for Periods of Lapsed Appropriations*, dated March 11, 2025, published by the United States Merit Systems Protections Board, is attached hereto as **Exhibit U.**

26.     I have been told by others, consistent with the statements in the media and on social media, that OMB, including OMB Director Vought, have directed all federal agencies to impose RIFs during the government shutdown.  As the shutdown approached, OMB instructed all agencies to plan these RIFs.

27.     I have also been told that OMB is requiring all federal agencies to submit plans for RIFs for OMB approval, and has been collecting RIF plans from all agencies and providing approvals, and that OMB Director Vought is overseeing agency RIFs, including controlling the timing of sending RIF notices during the shutdown.

28.     I further understand that RIF notices will be sent at multiple agencies as early as Monday, October 6, 2025.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed October 4, 2025, in Washington, D.C.


Thomas Andrew Huddleston

# EXHIBIT A

BOAC/GCs/DepSecs:

Thank you for your agency's efforts to date to prepare for an orderly shutdown in the event of a lapse in appropriations. As required by Section 124 of OMB Circular A-11, OMB held its first lapse planning call with agencies earlier this week, and we will continue to provide lapse updates as we approach the end of the fiscal year.

Over the past 10 fiscal years, Congress has consistently passed Continuing Resolutions (CRs) on or by September 30 on a bipartisan basis. Unfortunately, congressional Democrats are signaling that they intend to break this bipartisan trend and shut down the government in the coming days over a series of insane demands, including $1 trillion in new spending.

Last week, the House of Representatives passed H.R. 5371, a clean CR that would fund the government at current levels through November 21. The Administration supports Senate passage of H.R. 5371, but congressional Democrats are currently blocking this clean CR due to their partisan demands.

As such, it has never been more important for the Administration to be prepared for a shutdown if the Democrats choose to pursue one. Thankfully, H.R. 1 provided ample resources to ensure that many core Trump Administration priorities will continue uninterrupted.

Programs that did not benefit from an infusion of mandatory appropriations will bear the brunt of a shutdown, and we must continue our planning efforts in the event Democrats decide to shut down the government. If Congress successfully passes a clean CR prior to September 30, the additional steps outlined in this email will not be necessary.

With respect to those Federal programs whose funding would lapse and which are otherwise unfunded, such programs are no longer statutorily required to be carried out.  Therefore, consistent with applicable law, including the requirements of 5 C.F.R. part 351, agencies are directed to use this opportunity to consider Reduction in Force (RIF) notices for all employees in programs, projects, or activities (PPAs) that satisfy all three of the following conditions: (1) discretionary funding lapses on October 1, 2025; (2) another source of funding, such as H.R. 1 (Public Law 119-21) is not currently available; and (3) the PPA is not consistent with the President's priorities.

RIF notices will be in addition to any furlough notices provided due to the lapse in appropriation. RIF notices should be issued to all employees working on the relevant PPA, regardless of whether the employee is excepted or furloughed during the lapse in appropriations.

Once fiscal year 2026 appropriations are enacted, agencies should revise their RIFs as needed to retain the minimal number of employees necessary to carry out statutory functions. Any proposed RIF plan must be submitted to OMB.

As a reminder, updated agency lapse plans were due to OMB on August 1. OMB has received many, but not all, of your submissions. Please send us your updated lapse plans ASAP. As previously communicated, we want to reiterate what we are expecting to see in these plans:

- Agency plans should not "repurpose" balances or assume use of transfer authorities.  Any exceptions must be requested of OMB, and will be considered on a case-by-case basis.

- In cases where agencies received appropriations under H.R. 1, agencies' lapse plans should assume this funding is obligated consistent with OMB-approved spend plans. If you have already submitted your lapse plan to OMB for review, we will be reaching out to you the coming days to update your plans in line with this guidance as needed.

We remain hopeful that Democrats in Congress will not trigger a shutdown and the steps outlined above will not be necessary. The President supports enactment of a clean CR to ensure no discretionary spending lapse after September 30, 2025, and OMB hopes the Democrats will agree.

# EXHIBIT B



**EXCLUSIVE**

## White House to agencies: Prepare mass firing plans for a potential shutdown

In memo, the Trump administration says the Reduction-in-Force plans would go beyond standard shutdown furloughs.



Office of Management and Budget Director Russ Vought testifies during an appropriations hearing on Capitol Hill, June 4, 2025. | Francis Chung/POLITICO

By **SOPHIA CAI**
09/24/2025 08:27 PM EDT
Updated: 09/24/2025 10:56 PM EDT

   

The White House budget office is instructing federal agencies to prepare reduction-in-force plans for mass firings during a possible government shutdown, specifically targeting employees who work for programs that are not legally required to continue.

The Office of Management and Budget move to permanently reduce the government workforce if there is a shutdown, outlined in a memo shared with POLITICO ahead of release to agencies tonight, escalates the stakes of a potential shutdown next week.

Advertisement



In the memo, OMB told agencies to identify programs, projects and activities where discretionary funding will lapse Oct. 1 and no alternative funding source is available. For those areas, OMB directed agencies to begin drafting RIF plans that would go beyond standard furloughs, permanently eliminating jobs in programs not consistent with President Donald Trump's priorities in the event of a shutdown.

The move marks a significant break from how shutdowns have been handled in recent decades, when most furloughs were temporary and employees were brought back once Congress voted to reopen government and funding was restored. This time, OMB Director Russ Vought is using the threat of permanent job cuts as leverage, upping the ante in the standoff with Democrats in Congress over government spending.

"Programs that did not benefit from an infusion of mandatory appropriations will bear the brunt of a shutdown," OMB wrote in the memo. Agencies were told to submit their proposed RIF plans to OMB and to issue notices to employees even if they would otherwise be excepted or furloughed during a lapse in funding.

Programs that will continue regardless of a shutdown include Social Security, Medicare, veterans benefits, military operations, law enforcement, Immigration and Customs Enforcement, Customs and Border Protection and air traffic control, according to an OMB official granted anonymity to share information not yet public.

The guidance comes as Republicans and Democrats on Capitol Hill are locked in an impasse over funding, with just days before the fiscal year ends Sept. 30. The House passed a stopgap spending measure to float federal operations through Nov. 21, but Democrats in the Senate have refused to advance it, demanding that Republicans come to the table to negotiate a bipartisan package that could include an extension of expiring Affordable Care Act subsidies.

Advertisement

AD

The OMB letter notes that if Congress successfully passes a clean stopgap bill prior to Sept. 30, the additional steps outlined in this email will not be necessary.

The memo appears to vindicate warnings issued by some Democrats — most prominently Senate Minority Leader Chuck Schumer — during the last shutdown standoff in March. Schumer at the time moved to allow a GOP-written spending bill to pass, arguing that a shutdown would be a "gift" allowing Trump and his deputies "to destroy vital government services at a significantly faster rate than they can right now."

Schumer says he has since revised that view, saying this month that the administration's attacks on federal agencies "will get worse with or without [a shutdown], because Trump is lawless."

He made a similar point Wednesday after POLITICO published details of the memo, calling it an "attempt at intimidation."

"This is nothing new and has nothing to do with funding the government," he said. "These unnecessary firings will either be overturned in court or the administration will end up hiring the workers back, just like they did as recently as today."

But House Minority Leader Hakeem Jeffries struck a different note in an X post that appeared to take the threat seriously. He addressed it to voters in federal-worker-rich Virginia, who will soon elect a governor and other state officials.

"Their goal is to ruin your life and punish hardworking families already struggling with Trump Tariffs and inflation," he said. "Remember in November."

**FILED UNDER:** DONALD TRUMP, SHUTDOWN, RUSS VOUGHT



### West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

\* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service . You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here . This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT

# EXHIBIT C

# Guidance for Shutdown Furloughs





**SEPTEMBER 2025**

# Overview

The U.S. Office of Personnel Management (OPM) has prepared human resources guidance for agencies and employees on shutdown furloughs (also called emergency furloughs). A shutdown furlough occurs when there is a lapse in annual appropriations. Shutdown furloughs can occur at the beginning of a fiscal year, if no funds have been appropriated for that year, or upon expiration of a continuing resolution, if a new continuing resolution or appropriations law is not passed.

In a shutdown furlough, an affected agency would have to shut down any activities funded by annual appropriations that are not excepted by law. Typically, an agency will have very little to no lead time to plan and implement a shutdown furlough.

This guidance has been updated to incorporate the requirements of the Government Employee Fair Treatment Act of 2019 (Public Law 116-1, January 16, 2019). That Act amended section 1341 of title 31, United States Code, to provide retroactive pay for Federal employees affected by a lapse in appropriations as soon as possible after the lapse in appropriations ends, regardless of scheduled pay dates, and subject to the enactment of appropriations Acts ending the lapse.

NOTE: This guidance applies to activities that are funded by annual appropriations. Some agency functions have alternative funding sources and, as a result, are not directly affected by a lapse in annual appropriations. Employees performing those functions will generally continue to be governed by the normal pay, leave, and other civil service rules. Agencies should consult with their legal counsel if they have further questions concerning this distinction. Employees should consult with their Human Resources office.

# Table of Contents

Overview ................................................................................................................... i

Table of Contents ................................................................................................... ii

Frequently Asked Questions ................................................................................. 1

    A.   General ............................................................................................... 1

    B.   Employee Coverage ......................................................................... 2

    C.   Working, and Work Schedules, During Furlough ............................ 5

    D.   Pay ..................................................................................................... 7

    E.   Performance Awards and Within-Grade Increases ........................ 13

    F.   Leave and Other Time Off ............................................................. 14

    G.   Holidays ........................................................................................... 27

    H.   Benefits ............................................................................................ 29

           Federal Employees Health Benefits Program—General ................ 30

           FEHB Program—Open Season Enrollments/Changes .................... 30

           Other Insurance Programs ............................................................. 31

    I.   Employee Assistance ...................................................................... 33

    J.   Service Credit for Various Purposes .............................................. 34

    K.   Federal Employees on Military Duty .............................................. 34

    L.   Retirement ...................................................................................... 36

    M.   Retirement Services: Government Closure ................................... 37

    N.   Payments upon Separation from Federal Service .......................... 38

    O.   Benefits under the Federal Employees' Compensation Act (FECA) ..................... 39

    P.   Procedures ...................................................................................... 40

    Q.   Labor Management Relations Implications .................................. 48

    R.   Reductions in Force ....................................................................... 50

Sample Shutdown Furlough Decision Notice Due to a Lapse in Appropriations ........... 52

Sample Notice of Furlough During Holiday to Excepted Employee Due to a Lapse in Appropriations ............................................................... 56

Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee Due to a Lapse in Appropriations ........................................... 60

Table of Recent Changes ...................................................................................... 64

# Frequently Asked Questions

Note: Certain Q's and A's in this document, "Guidance for Shutdown Furloughs," assume coverage under provisions of law or regulation specified in the given Q and A. To the extent that a particular employee is not covered by those specified provisions, the guidance in the Q and A may not be applicable.

## A. General

1. **What is a furlough?**

   **A.** A furlough is the placing of an employee in a temporary nonduty, nonpay status because of lack of work or funds, or other nondisciplinary reasons.

2. **What is a shutdown furlough and why is a shutdown furlough necessary?**

   **A.** In the event that funds are not available through an appropriations law or continuing resolution, a "shutdown" furlough occurs. A shutdown furlough is necessary when an agency no longer has the necessary funds to operate and must shut down those activities which are not excepted pursuant to the Antideficiency Act (31 U.S.C. 1341-1342). (See guidance from the Office of Management and Budget (OMB) and the Department of Justice (DOJ) for further information on appropriation matters.)

3. **May an employee use government equipment during a shutdown furlough?**

   **A.** Yes, an employee may use government equipment for reasons such as:

   - Accessing their personal employee records;

   - Completing a background investigation;

   - Checking the status of the shutdown furlough;

   - Checking for any Reduction in Force (RIF) updates, or providing additional RIF information;

   - Updating personal contact information;

   - Completing or submitting Federal Employee Health Benefit changes; and

   - Completing or submitting a retirement application.

## B. Employee Coverage

1. **Who are "excepted" employees?**

    **A.**  In the context of shutdown furloughs, the term "excepted" is used broadly to refer to employees whose work is funded through annual appropriations but who are not furloughed because they are performing tasks that, by law, are allowed to continue during a lapse in appropriations. Those tasks are referred to as "excepted work." Such tasks may include emergency work involving the safety of human life or the protection of property or the performance of certain other types of "excepted work activities" as defined in DOJ and OMB guidance.

    In addition to emergency work involving the safety of human life or the protection of property, work performed "by necessary implication" as described in DOJ and OMB guidance is considered to be excepted work. For example, an employee's performance of authorized orderly shutdown activities (as described in OMB and DOJ guidance) is considered excepted work. In addition, work necessary to implement a funded function, where the suspension of such work during the lapse would prevent or significantly damage the execution of the terms of the applicable statutory authorization or appropriation is considered "excepted work" (e.g., cutting the checks for a benefit program for which funding remains available during the lapse and from which the law requires payments to be made).

    Agency legal counsel, working with senior agency managers, determine which employees are designated to be handling "excepted" and "non-excepted" functions. (See Shutdown Furlough Guidance for copies of the applicable OMB and DOJ issuances, which provide guidance on the application of these criteria.)

    An employee may be required to perform excepted work activities during part of a lapse period and furloughed for the rest of the time. The use of paid leave is also permissible in certain situations, if taken pursuant to 31 U.S.C. 1341(c)(3). (See Questions D.1a. and F.2. for more information.)

    (Note: Presidential appointees who are not covered by the leave system in 5 U.S.C. chapter 63 are not "excepted" as discussed above. However, they are not subject to furlough because their salary is an obligation incurred by the year, without consideration of hours of duty required, so they cannot be placed in a nonduty, nonpay status.)

1a. **To the extent that agencies need employees to be available to help process Form 931s, Request for Wage and Separation Information, or other requests from State unemployment offices, can agencies except employees who are furloughed due to the lapse in annual appropriations to assist with this?**

2

**A.** Yes. Agencies can except employees who have previously been furloughed due to the lapse in annual appropriations in order to come back into work to assist with processing Form 931s and other related unemployment issues. It is up to the discretion of the agency to identify which employees and the number of employees that are needed to be called back into work for this purpose.

2. **Are all employees who qualify as "emergency employees" for the purpose of weather emergencies considered to be "excepted employees" for the purpose of a shutdown furlough?**

   **A.** Not necessarily. "Emergency employees" are those employees who must report for work in emergency situations—e.g., severe weather conditions, air pollution, power failures, interruption of public transportation, and other situations in which significant numbers of employees are prevented from reporting for work or which require agencies to close all or part of their activities. Emergency employees are not automatically deemed excepted employees for purposes of shutdown furloughs. Each agency must determine which employees are excepted employees based on the law.

3. **Who are "exempt" employees?**

   **A.** Employees are "exempt" from furlough if they are not affected by a lapse in appropriations. This includes employees whose functions are not funded by annually appropriated funds. Employees performing those functions will generally continue to be governed by the normal pay, leave, and other civil service rules.

4. **What about employees whose work is neither "excepted" nor "exempt"?**

   **A.** Employees whose work is funded through annual appropriations but is not designated as excepted work are barred from working during a shutdown, other than to perform minimal activities as necessary to execute an orderly suspension of agency operations related to non-excepted activities. These employees will be furloughed.

5. **How will employees be notified whether they have been designated to be handling "excepted" functions or not?**

   **A.** Each agency will determine the method and timing of notifying employees of whether their work has been determined to be excepted.

6. **Why are leave-exempt Presidential appointees not subject to furlough?**

   **A.** Individuals appointed by the President, with or without Senate confirmation, who are not covered by the leave system in 5 U.S.C. chapter 63, or an equivalent

3

formal leave system, are not subject to furlough. An exemption from the chapter 63 leave system may be based on 5 U.S.C. 6301(2)(x) or (xi). (See also OPM regulations at 5 CFR 630.211.) These leave-exempt Presidential appointees are not subject to furloughs because they are considered to be entitled to the pay of their offices solely by virtue of their status as an officer, rather than by virtue of the hours they work. In other words, their compensation is attached to their office, and, by necessary implication of the President's authority to appoint such employees, their service under such an appointment creates budgetary obligations without the need for additional statutory authorization. Based on opinions of the Office of Legal Counsel, Department of Justice, the Antideficiency Act prohibition on creating a budgetary obligation before an appropriation is made is not applicable if the obligation is otherwise "authorized by law." (See 31 U.S.C. 1341 and 36 Op. O.L.C. 1, April 8, 2011.)

A leave-exempt Presidential appointee cannot be placed on nonduty status. Thus, the appointee's pay cannot be reduced based on placement in nonduty status, including via the mechanism of a furlough. As explained above, a leave-exempt Presidential appointee is entitled to the established pay of the position based on the holding of the office, not on the hours of duty.

Presidential appointees who are covered by the chapter 63 leave system are not considered to be entitled to pay based solely on their status as officers; thus, these individuals are subject to furlough in the same manner as other Federal employees. (See 5 U.S.C. 5508.) Any Presidential appointee who is a member of the Senior Executive Service (SES) or in a senior level (SL/ST) position paid under 5 U.S.C. 5376 is not exempt from the chapter 63 leave system (unless specifically designated for exemption under 5 U.S.C. 6301(2)(xi) and 5 CFR 630.211). All SES and SL/ST employees covered by the chapter 63 leave system are subject to furlough on the same basis as other employees. (The furlough of career SES members is subject to the procedures in 5 CFR 359, subpart H, and the furlough of SL/ST employees is subject to the procedures in 5 CFR 752, subpart D, or 5 CFR part 351, as applicable.)

While employees may be subject to furlough, the applicable procedures depend on the type of employee in question. For example, all Presidential appointees are excluded from the adverse action procedures in 5 U.S.C. chapter 75, based on 5 U.S.C. 7511(b)(1) and (3). In addition, Presidential appointees subject to Senate confirmation are excluded from reduction in force procedures, based on 5 CFR 351.202(b). If a Presidential appointee is subject to furlough but not subject to adverse action or reduction in force procedures, the agency should follow any administrative procedures required by any applicable internal personnel policies.

Note: A former career Senior Executive Service (SES) appointee who receives a

Presidential appointment that would normally convey an exemption from the leave system may be eligible to elect to retain SES leave benefits under 5 U.S.C. 3392(c). If SES leave benefits are so elected, such a Presidential appointee would be subject to furlough under 5 CFR 359, subpart H.

## C. Working, and Work Schedules, During Furlough

1. **May an employee volunteer to do his or her job on a nonpay basis during a shutdown furlough?**

   **A.** No. Unless otherwise authorized by law, an agency may not accept the voluntary services of an employee. (See 31 U.S.C. 1342.)

2. **What happens to employees scheduled for training during a shutdown furlough?**

   **A.** Employees who are neither excepted nor exempt and are scheduled for training during a shutdown furlough must be placed in a furlough status and ordered not to attend the scheduled training.

3. **May employees take other jobs while on furlough?**

   **A.** While on furlough, an individual remains an employee of the Federal Government. Therefore, executive branch-wide standards of ethical conduct and rules regarding outside employment continue to apply when an individual is furloughed (specifically, the executive branch-wide standards of ethical conduct (the standards), at 5 CFR part 2635). In addition, there are specific statutes which prohibit certain outside activities, and agency-specific supplemental rules that require prior approval of, and sometimes prohibit, outside employment. Therefore, before engaging in outside employment, employees should review these regulations and then consult their agency ethics official to learn if there are any agency-specific supplemental rules governing the employee.

4. **If an employee receives a temporary appointment in another agency while furloughed, what happens to his/her benefits (e.g., retirement, health benefits, life insurance, leave)?**

   **A.** Retirement, health benefits, and life insurance are handled as if the employee had actually transferred to the new agency. Leave balances are transferred as if the employee had actually transferred. (See Comptroller General opinion B-167975, September 1, 1970.)

5. **How should an agency determine the number of furlough hours for alternative work schedule (AWS) employees during a shutdown furlough? Can an employee**

5

**reschedule a non-workday that occurred during the furlough?**

**A.** Employees are furloughed based on the number of hours they are scheduled to work on the days for which there is a shutdown furlough. There are two types of alternative work schedules —a flexible work schedule and a compressed work schedule. Normally, once a compressed work schedule is established, the days and hours are fixed and cannot be changed; however, changes in an employee's flexible work schedule may be made under agency policies and collective bargaining agreements (if applicable). For example, in appropriate circumstances, the AWS day off for an employee with a flexible work schedule may be changed to a different day in the same biweekly pay period.

Once a lapse in appropriations begins, a furloughed employee must not be permitted to reschedule an AWS day off under a flexible work schedule that was scheduled to occur during the lapse—except when rescheduling is related directly to the timing of the employee's orderly shutdown activities. Thus, if the lapse ends in the middle of a pay period, a furloughed employee may not move an AWS day off that was scheduled to occur during the portion of the pay period covered by the lapse.

However, if a furloughed employee's AWS day off was scheduled to occur during the portion of the pay period that falls after the lapse in appropriations has ended, it may be possible for the employee to move the AWS day off to a later date in that same pay period. For example, an employee may want to move an AWS day off scheduled to occur after the lapse has ended to a later date because the employee needs more time to reestablish child- care arrangements after the lapse ended. Any changes to an employee's AWS day off are subject to agency policies and collective bargaining agreements, as applicable.

After the lapse in appropriations has ended, retroactive pay at the standard rate of pay is based on each employee's established (standard) schedule. No retroactive pay is provided for an AWS day off. An employee cannot move an AWS day off in order to obtain retroactive pay for a normal day off under the employee's established schedule. (See section D (Pay) for additional information on retroactive pay after a lapse of appropriation ends.)

**5a. What happens to employees on detail during a shutdown furlough?**

**A.** Detailed employees remain officially assigned to their permanent position of record during the detail. During a shutdown furlough, each agency will determine the status of their employees on detail, either within the agency or to another agency. This determination is driven by the funding source of the work performed by the detailed employees.

In the case of any detailee under an authorized non-reimbursable agreement whose permanent work the home agency designates as excepted and whose home agency agrees to continue the detail, the home and receiving agencies should carefully consult with one another about what, if any, activities are appropriate for the detailee to perform during a lapse. Any such activities must be consistent with the reasons why the home agency designated the employee's work as excepted. This communication is especially important in the event that the activities of the receiving agency are not subject to the lapse.

6. **How are personnel working for Federal agencies under mobility agreements pursuant to the Intergovernmental Personnel Act (IPA) treated in a shutdown furlough?**

   **A.** The specific authority for furloughing personnel who are working under mobility agreements pursuant to the IPA, either inside the Federal Government or with other organizations, will depend upon the nature of individual agreements, the status of the appointments, and/or the funding arrangements for the assignments. As a general rule, the following principles are applicable in determining whether to furlough personnel on IPA mobility assignments:

   - Personnel from non-Federal organizations on appointments to the Federal Government are subject to furlough in the same manner as other employees if the Federal agencies hosting them are paying their salaries and benefits.

   - Personnel from non-Federal organizations on detail to Federal agencies may continue working and are not subject to furlough, provided that the non-Federal organizations are paying the total costs of their details.

   - Personnel on detail to Federal agencies from non-Federal organizations that share part of the costs of the detail may continue to work if the Federal portion of the costs was previously obligated from amounts available at the time of the IPA mobility agreements. In the event that a shutdown furlough takes place during a time for which no funds are available, the assignment should be terminated.

   - Personnel on detail to Federal agencies from non-Federal organizations that do not pay or share the costs of the detail are subject to furlough in the same manner as other employees because the Federal agency is covering the costs of the detail.

## D. Pay

1. **Will employees performing excepted work be paid for performing such work**

7

**during a shutdown furlough? If so, when will excepted employees receive such payments?**

**A.** Yes. After the lapse in appropriations has ended, employees who were required to perform excepted work during the lapse will receive retroactive pay for those work periods. (See 31 U.S.C. 1341(c)(2).) Retroactive pay is provided at the employee's "standard rate of pay." If the retroactive pay cannot be provided on the normal pay date for the given pay period, it must be provided at the earliest date possible after the lapse ends.

(Note: Presidential appointees who are not covered by the leave system in 5 U.S.C. chapter 63 are not subject to furlough, but are also barred from receiving pay during a lapse in appropriations. These Presidential appointees will be paid after the lapse in appropriations has ended. See Question B.6.)

### 1a. How is the "standard rate of pay" computed for employees whose work is excepted?

**A.** Employees who perform excepted work during a lapse in appropriations must receive retroactive pay for that work at the employee's "standard rate of pay" (31 U.S.C. 1341(c)(2)). The "standard rate of pay" for excepted hours of work is the pay to which the employee normally is entitled for actual hours of work under the applicable pay rules. For example, if an excepted employee performs authorized overtime work beyond the normal requirements for his or her job, he/she will be paid for that actual authorized overtime work. All excepted hours of work are treated as time in a pay status for pay, leave, and benefit purposes.

Excepted employees who elect to use paid leave under 31 U.S.C. 1341(c)(3) to cover an authorized absence from work during a lapse in appropriations will receive pay for that leave under the normal leave rules when the lapse ends. (See Question F.2.) Consistent with the normal leave rules, an excepted employee may not use paid leave during periods when the employee is found to be absent without leave (AWOL). The standard rate of pay during AWOL periods is zero. If an otherwise excepted employee has an authorized absence from work during the lapse and elects not to use paid leave under 31 U.S.C. 1341(c)(3), the employee will be placed in furlough status during the authorized absence. The employee will be paid for the furlough time when the lapse ends as described in Questions D.3. and D.4. The employee will not be charged paid leave or other paid time off for authorized periods of absence from duty during the lapse, except as provided under 31 U.S.C. 1341(c)(3). (See Question F.2.)

### 2. May an employee who performs excepted work be permitted to earn premium pay

8

(e.g., overtime pay, Sunday premium pay, night pay, availability pay) during the furlough period?

**A.** Yes. An employee who performs excepted work and who meets the conditions for overtime pay, Sunday premium pay, night pay, availability pay, and other premium payments will be entitled to receive payment in accordance with applicable rules, subject to any relevant payment limitations, once the lapse ends. Premium pay may be earned during the lapse but cannot be paid until Congress passes and the President signs a new appropriation or continuing resolution.

3. **Will employees who are furloughed get paid?**

   **A.** Yes. After the lapse in appropriations has ended, employees who were furloughed as the result of the lapse will receive retroactive pay for those furlough periods. (See 31 U.S.C. 1341(c)(2).) Retroactive pay will be provided on the earliest date possible after the lapse ends, regardless of scheduled pay dates. (See 31 U.S.C. 1341(c)(2).) If retroactive pay cannot be provided by the normal pay date for the given pay period, it will be provided as soon as possible thereafter. Retroactive pay is provided at the employee's "standard rate of pay." (See Question D.4. Note that retroactive pay may be zero if an employee was scheduled (before the lapse took effect) to be in a nonpay status during the period when the lapse was in effect.)

4. **How is the "standard rate of pay" computed for furloughed employees?**

   **A.** For periods of time during which an employee was furloughed during the lapse in appropriations, the "standard rate of pay" is the pay the employee would have received for the furlough hours had the lapse in appropriations not occurred and had the employee performed work. Therefore—

   - An employee is entitled to receive his or her rate of basic pay for the furlough time to the extent that he or she would have been in a basic pay status but for the lapse in appropriations. (See 31 U.S.C. 1341(c)(2).)

   - An employee receives retroactive pay for furlough time without being charged paid leave or other paid time off, since a lapse in appropriations generally prevents the use of paid leave or other paid time off. (However, an excepted employee may seek approval of paid leave under 31 U.S.C. 1341(c)(3). See Questions D.1a and F.2.)

   - All furlough hours for which retroactive pay is received are treated as time in a pay status for pay, leave, and benefit purposes. For example, for the purpose of applying General Schedule waiting periods associated with within-grade increases, the furlough time during the lapse in appropriations is treated as time

9

in pay status.

- A furloughed employee who, during the lapse in appropriations, had been regularly scheduled to perform overtime work or to perform work at night or during a period for which any other form of premium pay would otherwise be payable is entitled to receive overtime pay, night pay, or other premium pay as if the work had been performed.

- Allowances, differentials, and other payments otherwise payable on a regular basis (e.g., administratively uncontrollable overtime pay and law enforcement availability pay) must be paid as if the furloughed employee actually continued to work.

- All periods of time during which a furloughed employee would, but for the lapse in appropriations, have been in a pay status (including regularly scheduled overtime hours and standby duty) must be considered "hours of work" for pay administration purposes under the Fair Labor Standards Act.

- A furloughed employee is not entitled to retroactive pay for furlough periods if the employee had been previously scheduled (i.e., scheduled before the lapse) to be in nonpay status during those periods. For example, an employee may have scheduled leave without pay (LWOP) for an extended period or be in a suspension status (i.e., pay suspended based on an adverse action). In effect, those already-in-place periods of nonpay status override the furlough status. The "standard rate of pay" for such previously scheduled periods of nonpay status is zero. In addition, an employee who was directed to perform excepted work during a lapse in appropriations but failed to report to duty could have been placed in absent-without-leave (AWOL) status for missed work hours, in accordance with agency policy and procedures. For such an employee, the "standard rate of pay" for AWOL hours is also zero.

### 4a. Are intermittent employees entitled to retroactive pay following a lapse in appropriations?

**A.** Intermittent employees—i.e., employees without a regularly scheduled tour of duty (see 5 CFR 340.401)—may be furloughed during a lapse in appropriations. Intermittent employees are covered by the definition of "furlough" in the adverse action regulations at 5 CFR 752.402. Under 31 U.S.C. 1341(c)(2), an employee who is furloughed as the result of a lapse in appropriations must be paid for furlough periods that occurred during the lapse. After the lapse ends, retroactive pay is provided at the employee's "standard rate of pay." (See Question D.4.)

If an agency furloughs an intermittent employee, the agency must provide

10

retroactive pay at the employee's standard rate of pay for the period of the lapse. This should be based on an estimate of the hours the intermittent employee would have worked had the lapse not occurred. Agencies should use their best judgment to determine the hours the intermittent employee would have worked. They may use the employee's recent work history and/or any agency plans for the lapse period.

5. **Will employees receive a paycheck for hours worked prior to a lapse in appropriations?**

   **A.** Yes. Although the payroll for the last pay period before the lapse will be processed potentially during the lapse, the minimum number of payroll staff necessary for this process will be excepted for the minimum time required to issue the checks, including checks for the last pay period before the lapse. (See OMB M-96-01, Planning for Agency Operations (Nov. 9, 1995); and OMB, Bulletin No. 80-14, Shutdown of Agency Operations Upon Failure by the Congress to Enact Appropriations (Aug. 28, 1980).)

6. **When an employee's pay is insufficient to permit all deductions to be made because a lapse in appropriations occurs in the middle of a pay period and the employee receives a partial paycheck, what is the order of withholding precedence?**

   **A.** Agencies will follow the guidance on the order of precedence for applying deductions from the pay of their civilian employees when gross pay is insufficient to cover all authorized deductions.

7. **If an employee's pay is insufficient to permit all deductions to be made because a lapse in appropriations occurs in the middle of a pay period and the employee receives a partial paycheck, will the amount of the deductions taken from the employee's partial paycheck be the same as normal?**

   **A.** Some deductions that are based on the amount of an employee's gross pay (or basic pay) will be reduced in size. For example, deductions for the Federal Employees Retirement System (FERS) Basic Benefit are a percentage of basic pay paid to an employee. Other deductions, such as health insurance premiums, may be a fixed dollar amount and will not be affected. Consequently, the amount of money an employee normally sees in their paycheck will be different than what they might expect.

8. **If an employee's pay is insufficient to permit deductions for health or other insurance premiums or deductions for flexible spending accounts because the**

employee receives a partial paycheck or no pay during a lapse in appropriations, will this affect the employee's enrollment or coverage in these benefit programs?

**A.**  An employee's enrollment and coverage under such programs generally will not be affected if the employee is unable to make the required deductions for insurance and other benefits due to receiving a partial paycheck or no pay during a lapse of appropriations. The one exception is that if an employee is enrolled in a health care flexible spending account through FSAFEDS, they can't be reimbursed for eligible health care claims until they return to pay status and payroll deductions can be made. (See section H. Benefits for additional information on how missed insurance premiums and flexible spending account deductions will be paid after the lapse of appropriations ends.)

9. **If an employee receives a partial paycheck during a lapse in appropriations, may the employee's agency or payroll provider defer deductions for allotments previously designated by the employee to be taken from retroactive pay when the lapse of appropriations ends in order to provide the employee with a larger partial paycheck?**

   **A.**  Any changes in an allotment amount or cancelation of an allotment that was previously designated by an employee to be taken from their pay must be personally authorized by the employee under 5 CFR 550.312. Additionally, any changes to an allotment for dues to a labor organization must be taken under regulations prescribed by the Federal Labor Relations Authority (see 5 CFR 550.321) and any applicable collective bargaining agreements.

10. **How will deductions for allotments be affected if an employee's pay is insufficient to permit such deductions because the employee receives a partial paycheck or no pay during a lapse in appropriations?**

    **A.**  Employees should consult their agency or payroll provider for information on how missed allotment deductions will be handled. Employees may want to review their allotments to determine whether they need to make alternative arrangements (e.g., if using allotments to pay loans, alimony, etc.).

    Any allotment for dues to a labor organization previously designated by an employee and which was deferred by the agency or payroll provider during the lapse in appropriations because the employee's pay was insufficient to cover the dues allotment deduction would be taken from retroactive pay when the lapse in appropriations ends.

11. **How will deductions for court-ordered garnishments be affected if an employee's pay is insufficient to permit garnishment deductions because the employee**

receives a partial paycheck or no pay during a lapse in appropriations?

**A.** Employees should consult their agency or payroll provider for information on how missed garnishment deductions will be handled and may need to make alternative arrangements. If a payroll provider is unable to effectuate the garnishment, it should provide a notice to that effect to affected employees and indicate how the provider intends to handle the missed garnishments going forward. We should note that some payroll providers will need to confer with counsel about how much to collect at any given time in any make-up payments.

## E. Performance Awards and Within-Grade Increases

1. **If agency performance management policies and practices require the payment of performance awards to employees, can the payment be delayed until after the shutdown furlough?**

   **A.** Yes. Neither law nor regulation requires agencies to pay performance awards granted under 5 U.S.C. chapters 43 and 45 and 5 CFR 451.104(a)(3). If agency performance management policies and practices require the payment of performance awards, agencies may delay payment until after the furlough when funds are available.

2. **Are agencies required to pay performance awards to Senior Executive Service (SES) career appointees during a shutdown furlough?**

   **A.** No. The applicable law (5 U.S.C. 5384) and regulation (5 CFR 534.405) do not specify when an SES performance award must be paid to a career appointee, nor do they provide a basis to pay awards when no appropriated funds are available for that purpose. Therefore, if a shutdown furlough intervenes, an agency may defer payment of SES performance awards until after the furlough, when funds are available.

3. **May agencies deny or delay within-grade or step increases for General Schedule and Federal Wage System employees who are furloughed during a lapse in appropriations?**

   **A.** Once the lapse in appropriations ends and retroactive pay is payable, employees will be considered to be in pay status during the furlough period. Thus, the effective date of within-grade or step increases for eligible General Schedule and Federal Wage System employees based on service is not affected by time in a furlough status. Quality step increases cannot be retroactively approved and made effective as of a retroactive date absent a nondiscretionary agency policy or collective bargaining agreement that requires a specific effective date.

13

## F. Leave and Other Time Off

1. **May a furloughed employee take previously approved paid time off (e.g., annual leave, sick leave, paid parental leave, disabled veteran leave, court leave, military leave, or leave for bone marrow/organ donor leave, or compensatory time off, including religious compensatory time off) during a lapse in appropriations?**

   **A.** No, a furloughed employee may not use previously approved paid time off during a lapse in appropriations. Consistent with the Constitution, the Antideficiency Act does not allow authorization of any expenditure before an appropriation is made. Also, the Antideficiency Act does not allow the Government to incur budgetary obligations before an appropriation is made—unless authorized by law (31 U.S.C. 1341(a)(1)(B)). Based on law and OMB and DOJ guidance, certain types of obligations (but not expenditures) are allowed during a lapse in appropriations. The use of previously approved paid time off during a lapse in appropriations would create an obligation or a debt owed by the Government that is not authorized by the Antideficiency Act or other law during a lapse (except under a special provision for excepted employees in 31 U.S.C. 1341(c)(3)), and is thus prohibited. (See Question F.2. regarding paid time off for excepted employees.)

2. **May an excepted employee take previously approved paid time off or be granted new requests for paid time off during a shutdown furlough?**

   **A.** A lapse in appropriations cancels an excepted employee's previously approved paid leave or other paid time off, for the same reasons that apply to furloughed employees. (See Question F.1.) This does not mean that an excepted employee cannot seek approval to be excused from duty during a lapse. An agency may excuse an excepted employee from duty and place the employee in furlough status for approved periods. An agency may allow an excepted employee to be off duty during periods when the employee was previously scheduled to be on paid leave. That off-duty time may be accommodated by workplace arrangements. (See Question F.2a. for information on use of workplace flexibilities.)

   If that off-duty time cannot be accommodated by workplace flexibilities, the excepted employee will be placed in a furlough status for any approved absence unless the employee requests to use paid leave under 31 U.S.C. 1341(c)(3). We expect that excepted employees generally will not choose to use paid leave under 31 U.S.C. 1341(c)(3) because 31 U.S.C. 1341(c)(2) provides retroactive pay for furlough periods without charge to leave. Under either approach, any payment will be delayed until after the lapse ends.

   If an excepted employee chooses to request leave under 31 U.S.C. 1341(c)(3) instead

14

of the default approach of being placed in a furlough status, the employee may make new requests to use paid leave under 5 U.S.C. chapter 63 (or under other applicable law governing the use of leave if chapter 63 is not applicable). Such "paid leave" does not include the various types of paid time off found outside chapter 63 (e.g., compensatory time off, time off award, credit hours). Use of paid leave is subject to the normal rules for the applicable leave program, including leave request and approval procedures. While the paid leave can be used (i.e., resulting in a Government obligation of funds), compensation for the leave cannot be paid until after the lapse ends.

An excepted employee cannot use paid leave under 31 U.S.C. 1341(c)(3) to cover an unauthorized period of absence. If an excepted employee is directed to perform excepted work but fails to report to duty, the employee may be placed in absent without leave (AWOL) status for missed work hours, in accordance with agency policy and procedures. For such an excepted employee, the "standard rate of pay" for AWOL hours is zero. In other words, no retroactive pay is provided for AWOL hours after the lapse in appropriations ends.

### 2a. Are excepted employees allowed to have intermittent absences from work during a shutdown furlough?

**A.** Yes. As explained in Question F.2., an excepted employee may be excused from duty for intermittent periods during a shutdown furlough. While excused from performing excepted duties, the employee will be placed in furlough status (default approach) unless the employee elects to use paid leave under 31 U.S.C. 1341(c)(3). (See Question F.7. for specific guidance on employees scheduled to take leave under the Family and Medical Leave Act.)

However, if an excepted employee needs to be absent from work for brief periods, agencies are encouraged to explore the use of workplace flexibilities such as alternative work schedules and telework (subject to applicable laws, regulations, agency policies, and collective bargaining agreements) to accommodate the employee's need to be absent. (See Question C.5. for guidance on alternative work schedules.) If use of workplace flexibilities is not appropriate for the situation, excepted employees must be furloughed for any brief absence or allowed to request paid leave under 31 U.S.C. 1341(c)(3), as explained in Question F.2. (See Question F.2b. for guidance on excepted employees who must be furloughed during an approved absence from work. Also see Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee.)

In making determinations regarding whether to grant requests for time off that result in placement in furlough status, agencies are encouraged to consider the

same principles that guide the granting of various types of paid leave during normal periods of funded operations, while keeping in mind any special work requirements for excepted employees during the lapse in appropriations.

**2b. If an agency is willing to approve intermittent absences from work for an excepted employee and use of workplace flexibilities is not appropriate, does the excepted employee have to be placed in a furlough status for these intermittent absences?**

**A.** Generally, when excepted employees are authorized to be absent from work they must be furloughed. As explained in Question F.2, however, excepted employees have the option to request approval to use paid leave under 31 U.S.C. 1341(c)(3). We expect that in most circumstances excepted employees will choose to have the default furlough status applied to any approved absence because that status provides retroactive pay without charge to leave. These furlough periods must be documented by a shutdown furlough notice with applicable appeal rights. Any time an excepted employee is absent from work must be properly documented by a shutdown furlough notice that spells out whatever appeal rights are applicable.

One option would be for the agency to issue a furlough notice for the period of time when the employee will be absent, and then recall the employee when the employee is once again available to come to work and perform excepted activities.

Another option, which may be easier to administer for an employee who will have multiple intermittent absences over a period of time, would be for the agency to issue a modified shutdown furlough notice, which states that the employee is excepted from furlough except for those periods of time they are not working but would otherwise be scheduled to work. (See Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee.) The periods of time an employee is not working should be listed and clearly identified in the modified shutdown furlough notice. As with any modified furlough notice, agencies should issue such notices as soon as practicable.

The above options are examples of two approaches to consider to ensure appropriate procedural rights are provided to furloughed employees. If agency officials elect to pursue an alternative approach in providing a furlough notice to excepted employees approved to be absent from work intermittently, they should consult with their legal counsel to ensure appropriate procedural rights are provided to furloughed employees.

**3. May an employee work during the furlough period to accumulate religious compensatory time off hours for religious observances?**

16

**A.** An employee who is not "excepted" may not work during the furlough period, even to accrue religious compensatory time. However, an excepted employee may work additional hours to earn compensatory time off for religious purposes if the employee is performing excepted activities, though the employee may not use those hours until after the lapse in appropriations is over.

4. **If an employee is scheduled to take approved unpaid leave during a shutdown furlough, should the agency provide the employee with a furlough notice?**

    **A.** It depends. If the employee is not expected to work during the furlough period (e.g., a 1-year period of leave without pay to accompany a military spouse overseas), then agencies are not required to provide the employee with a furlough notice. If, however, the employee is scheduled to return from unpaid leave to Federal service during the furlough period, the employee should be provided with a furlough notice (effective on the date of scheduled return), unless the employee is expected to be at work performing an excepted activity.

    In the case of an employee who was on preapproved leave without pay (LWOP) during the lapse in appropriations, the employee must continue to be charged LWOP for all periods of such preapproved LWOP that occurred during the lapse.

5. **If an employee is scheduled to take unpaid leave under the Family and Medical Leave Act (FMLA) during a shutdown furlough, should the agency provide the employee with a furlough notice?**

    **A.** It depends. If the employee is not expected to work during the furlough period (e.g., has requested 12 weeks of unpaid leave (leave without pay (LWOP) under the FMLA), the agency is not required to provide the employee with a furlough notice. If, however, the employee is scheduled to return from LWOP to Federal service during the furlough period, the employee should be provided with a furlough notice (effective on the date of scheduled return), unless the employee is expected to be at work performing an excepted activity. An employee scheduled to take FMLA LWOP throughout the furlough period continues to be charged LWOP. However, the LWOP will not be treated as FMLA leave to the extent it occurs during a furlough period unless the employee chooses to use leave under 31 U.S.C. 1341(c)(3). (As stated in Question F.2., we expect that employees generally will not choose to use leave under 31 U.S.C. 1341(c)(3) since 31 U.S.C. 1341(c)(2) provides retroactive pay for furlough periods without charge to leave.) Thus, the days of LWOP during a furlough period will not count against the employee's 12-week FMLA leave limit. The employee is not entitled to receive retroactive pay for scheduled LWOP periods that occur during a furlough period, since the standard rate of pay for LWOP is zero.

17

6. **Does leave under FMLA that is scheduled to be taken during a shutdown furlough period count toward the employee's 12-week FMLA leave entitlement?**

   **A.** No. OPM considers any previously scheduled FMLA leave that occurs during a lapse in appropriations to be canceled—unless the employee is an excepted employee who elects to use leave under 31 U.S.C. 1341(c)(3). (See Question F.2.) Any LWOP that was previously scheduled to be used under FMLA during a period when there is a lapse in appropriations will remain as LWOP, but the LWOP will not be considered FMLA leave and will not count against the FMLA 12-week limit. If an employee had previously scheduled to substitute qualifying paid leave for unpaid FMLA leave during a period covered by a lapse, the paid leave must be canceled (see Questions F.1. and F.2.) and converted to a furlough period—unless the employee performs excepted work or elects to use leave under 31 U.S.C. 1341(c)(3). We anticipate that excepted employees generally will not choose to use paid leave under 31 U.S.C. 1341(c)(3) since 31 U.S.C. 1341(c)(2) provides retroactive pay for furlough periods without charge to leave. Under either approach, any payment will be delayed until after the lapse ends. The canceled FMLA unpaid leave periods (converted to regular LWOP) and the canceled periods of paid leave substitution (converted to furlough time) will not be considered FMLA leave and will not count against the FMLA leave 12-week limit.

7. **If an employee is scheduled to take appropriate paid leave under FMLA during a shutdown furlough, should the employee be furloughed? Will the employee be paid for the periods scheduled to be in paid leave status by substituting paid leave under FMLA?**

   **A.** During the lapse in appropriations, affected employees who would otherwise be in pay status must be (1) furloughed or (2) at work performing excepted activities—unless an excepted employee elects to seek approval to use paid leave during the lapse under 31 U.S.C. 1341(c)(3). (See Question F.2.) Any previously scheduled paid leave (including paid leave substituted for FMLA LWOP) during the furlough period must be automatically canceled. Thus, any periods of scheduled paid leave or other paid time off must be documented as furlough periods.

   For any hours during the lapse in appropriations for which an employee was previously scheduled to be in FMLA LWOP status, the employee will remain in LWOP status, but will not be considered to be using FMLA leave. (See Questions F.5. and F.6.) For any hours during the lapse in appropriations for which the employee was scheduled to be in paid leave status by substituting paid leave for FMLA LWOP, the employee will be provided retroactive pay and will not be charged paid leave, consistent with the treatment of other employees who had previously scheduled paid leave that was canceled due to the lapse in appropriations. (See Question F.14.

18

regarding employees who had scheduled use of donated annual leave substituted for FMLA LWOP.)

**7a. What should an agency do if an excepted employee faces FMLA-qualifying circumstances?**

**A.**  During a lapse in appropriations, an excepted employee must either be (1) working (i.e., excepted from furlough) —unless he or she elects to seek approval to use paid leave during the lapse under 31 U.S.C. 1341(c)(3), or (2) in a furlough status,  as referenced in Question F.7. An excepted employee may face circumstances that would normally qualify him or her for unpaid leave under FMLA. The employing agency should allow such an excepted employee to be placed in a furlough status (a form of unpaid leave) for appropriate periods, consistent with his or her rights under FMLA.

**8.  Are employees who are not excepted from the furlough allowed to take paid leave or other paid time off during periods when other employees are performing work necessary for an orderly suspension of agency operations?**

**A.** No. For such employees, all paid leave or other paid time off is canceled during a period when a lapse in appropriations is in effect. There is no authority to obligate funds for paid time off during a lapse in appropriations. Employees who are not excepted from the furlough are allowed to perform minimal activities as necessary to execute an orderly suspension of agency operations related to non-excepted activities. Being on paid leave is not an activity necessary to execute an orderly shutdown of agency operations. Agencies should determine on a case-by-case basis whether it is necessary to require employees who had been scheduled to take paid time off to report to duty to perform orderly suspension activities or whether to direct such employees to conduct their orderly shutdown activities on the first day after they had originally planned to return to work.

**9.  May an excepted employee be permitted to earn compensatory time off and credit hours (under flexible work schedules) during the shutdown period?**

**A.**  Yes. With agency approval, excepted employees may earn compensatory time off and/or credit hours subject to requirements found in 5 U.S.C. 5543 and 6120–6133; 5 CFR 550.114, 551.531, and part 610, subpart D; or other applicable authority. Each agency is responsible for approving the number of hours an excepted employee can work related to the performance of excepted activities. Employees will not be permitted to use earned compensatory time off or credit hours during the shutdown period.

10. **If an employee has properly scheduled "use-or-lose" annual leave before the start of the third biweekly pay period prior to the end of the leave year, but is unable to use some or all of the scheduled leave because of the furlough, does the furlough constitute an "exigency of the public business" that would permit an agency to restore the leave after the beginning of the new leave year?**

**A.** Yes. Employees in this situation should make every effort to reschedule "use-or-lose" annual leave for use before the end of the current leave year. However, OPM and OMB have determined that a lapse in appropriations qualifies as an exigency of the public business for purposes of annual leave restoration. (See OPM CPM 2019-02, Restoration of Annual Leave for Employees Affected by the Lapse in Appropriations (January 9, 2019).) Therefore, as long as the leave was properly scheduled in advance, agencies must restore any annual leave that was forfeited because of the lapse in appropriations—regardless of whether the affected employees were furloughed or excepted from the furlough.

In order for forfeited annual leave to be considered for restoration under 5 U.S.C. 6304(d)(1)(B), it must have been scheduled in writing before the start of the third biweekly pay period prior to the end of the leave year, in accordance with 5 CFR 630.308(a). Employing agencies are responsible for determining whether an employee met the advance scheduling requirement, based on OPM regulations and agency policies and procedures. As allowed by those agency policies and procedures, the "in writing" requirement may be met in various ways, including electronic communications such as email, electronic calendar scheduling, or submissions to a time and attendance system.

11. **If an employee has properly scheduled use of "restored annual leave" that is due to expire at the end of the leave year (because it is the end of the 2-year restoration period) but that leave is canceled and lost due to lapse in appropriations, may the employing agency restore that leave again?**

**A.** Unfortunately, no—unless Congress enacts legislation providing otherwise. There is nothing in existing law or regulation that allows restored annual leave to be restored a second time. In fact, the Comptroller General has determined that unused restored annual leave may not be restored after expiration of the 2-year period. (See B-188993, December 12, 1977.) Any previously restored annual leave that was due to expire at the end of the leave year, and was subsequently forfeited, may not be restored again—even if the forfeiture was due to the lapse in appropriations.

12. **Does a shutdown furlough affect the accrual of annual leave and sick leave?**

**A.** No. Under 31 U.S.C. 1341(c)(2), after the lapse in appropriations has ended, an

20

employee is entitled to be paid the employee's standard rate of pay during any furlough period. If the employee was scheduled to be in a pay status but for the furlough, the employee will receive the employee's regular pay for furlough periods, and there will be no effect on the accrual of annual and sick leave. However, if an employee was previously scheduled to be in a nonpay status without regard to the furlough, the employee's standard rate of pay will be zero, and the employee will remain in the scheduled nonpay status, which can affect the accrual of annual and sick leave under normally applicable rules governing the treatment of nonpay status periods.

Excepted employees earn pay and accrued leave during the periods they perform excepted work activities—even though no payments can be made during the lapse. With the payment of retroactive pay, agencies should ensure that excepted employees' leave accrual is properly credited.

**13. How are employees affected if, during a shutdown furlough, their Federal office is closed or announces a change in operating status due to an emergency, severe weather condition, natural disaster, and other incident causing disruption of agency operations?**

**A.** Furloughed employees will not be affected if their Federal office is closed or announces a change in operating status during a shutdown furlough and will remain in furlough status.

Exempt employees are not affected by a shutdown furlough and will follow normal operating status announcements and emergency procedures.

Excepted employees will follow normal operating status announcements and emergency procedures during a Federal office closure or change in operating status, which may result in excepted employees being placed in furlough status for any hours of work not performed. This is because during a shutdown furlough, excepted employees must be either (1) working (i.e., excepted from furlough) — unless he or she elects to seek approval to use paid leave during the lapse under 31 U.S.C. 1341(c)(3) or (2) in a furlough status. Furlough of an excepted employee must be documented by a shutdown furlough notice with applicable appeal rights. (See Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee.) Excepted employees who are required to and do perform work on a day their Federal office is closed during a shutdown furlough (e.g., employees required to report even during an emergency or telework) will be paid after Congress passes and the President signs a new appropriations bill or continuing resolution. If necessary due to a disruption of agency operations, a furlough may be documented after the fact. However, a written notice of decision to furlough must be provided as

21

soon as possible after the furlough begins. (See Question P.2.)

**14. What effect does a Government shutdown based on a lapse in appropriations have on an employee who had scheduled use of donated annual leave?**

**A.** Just as with other paid leave, any donated annual leave that is scheduled to be used during a lapse in appropriations must be canceled and converted to furlough status time—unless the employee performs excepted work or elects to use leave under 31 U.S.C. 1341(c)(3). If the employee is furloughed during periods when the employee had been scheduled to use donated annual leave, the employee is entitled to retroactive pay for the furlough periods under 31 U.S.C. 1341(c)(2). (This is a change from previous OPM policy.)

**15. What happens to compensatory time off in lieu of overtime that expires during a shutdown furlough?**

**A.** Although there is no authority to extend the use of compensatory time off in-lieu-of overtime not used within the 26 pay period limitation, payment for the unused compensatory time off must be made at the overtime rate in effect when earned in the following circumstances:

- For FLSA-exempt (i.e., not covered) employees, under 5 CFR 550.114(d)(2), payment must be made if an exigency of the service beyond the employee's control prevented the employee from using the compensatory time off within the regulatory time limits. A lapse in appropriations is considered an exigency of the service beyond the employee's control; thus, if an agency determines that the lapse prevented the employee from using the compensatory time off that would otherwise be forfeited, the agency must provide payment for the unused compensatory time off. (See OPM CPM 2019-06, Pay and Benefits for Employees Affected by the Lapse in Appropriations (January 27, 2019).)

- For FLSA-nonexempt (i.e., covered) employees, under 5 CFR 551.531(d), if, for any reason, earned compensatory time off is not taken within 26 pay periods during which it was earned, the employee must be paid for the overtime work.

**16. What happens to compensatory time off for travel that expires during a shutdown furlough?**

**A.** If an employee fails to use his or her accrued compensatory time off for travel before the end of the 26th pay period after the pay period during which it was earned due to an exigency of the service beyond the employee's control under 5 CFR 550.1407(e), the head of an agency, at his or her sole and exclusive discretion,

may extend the time limit for using compensatory time off for travel for up to an additional 26 pay periods.

OPM considers a shutdown furlough to be an exigency of the service beyond the employee's control.

### 17. What happens to credit hours in excess of 24 credit hours that were earned in the days prior to shutdown that could not be used because of the shutdown?

**A.** Unfortunately, any credit hours earned by an employee in the days prior to the lapse in appropriations that were in excess of 24 credit hours cannot be carried over into the next pay period and are lost. Under 5 U.S.C. 6126(a), the number of credit hours an employee may carry over from a biweekly pay period to a succeeding biweekly pay period is limited to 24 hours for a full-time employee. There is no authority to provide payment for excess credit hours. The law does not provide for any exceptions.

### 18. How are advanced annual and sick leave treated during a shutdown furlough?

**A.** Advanced annual and advanced sick leave are automatically canceled during a lapse in appropriations. Since employees would have been scheduled to be in a pay status during any advanced leave period, they will receive retroactive pay under 31 U.S.C. 1341(c)(2) during any such period once the lapse has ended.

### 19. Can agencies grant administrative leave to employees who are not able to return to work on the next workday immediately following the end of a shutdown?

**A.** Agencies are encouraged to be as flexible as possible for employees returning to work following the end of a shutdown. Some employees may face extenuating circumstances or personal challenges that impact their ability to return to work on their next workday immediately following the end of a lapse in appropriations. Accordingly, we encourage managers to take these individual challenges into consideration, and to the extent possible, provide appropriate flexibility to employees who are facing difficulties that may delay their return to work.

Agencies have the flexibility to grant limited amounts of excused absence (administrative leave) for nonwork periods after the lapse is over if deemed necessary based on extenuating personal circumstances that delay the employee's return to duty.

**20. Does a shutdown furlough cancel all leave scheduled before the lapse in appropriations, even if the leave occurs after the lapse is over?**

**A.** No. Approval remains in effect for leave approved before a lapse in appropriations that is scheduled for use on a date occurring after the lapse is over. Only paid leave scheduled to be taken during the lapse is canceled.

However, an agency may cancel previously approved leave prospectively under its normal authority. An employee may also cancel a leave request prospectively.

**21. How does a shutdown furlough affect an employee who is scheduled to take approved paid parental leave (PPL) in substitution for unpaid FMLA leave? Does PPL that is scheduled to be taken during a shutdown furlough period count toward the employee's entitlement to 12 weeks of FMLA leave and 12 weeks of PPL in an applicable 12-month period?**

**A.** In order to receive paid parental leave (PPL), an employee must invoke unpaid leave under the Family and Medical Leave Act (FMLA) for the birth of a child or placement of a child with the employee for adoption or foster care. PPL is a form of paid leave provided via substitution for FMLA unpaid leave.

During the lapse in appropriations, affected employees who would otherwise be in pay status must be (1) furloughed or (2) at work performing excepted activities— unless an excepted employee elects to seek approval to use paid leave during the lapse under 31 U.S.C. 1341(c)(3). (See Question F.2.) Any previously scheduled paid leave (including PPL substituted for FMLA LWOP) during the furlough period must be automatically canceled. Thus, any absences on days of scheduled PPL, other paid leave, or other paid time off are documented as furlough days.

For any hours during the lapse in appropriations for which the employee was scheduled to be in paid leave status by substituting PPL for FMLA LWOP, the employee will be provided retroactive pay and will not be charged paid leave, consistent with the treatment of other employees who had previously scheduled paid leave that was canceled due to the lapse in appropriations. (See Question F.14. regarding employees who had scheduled use of donated annual leave substituted for FMLA LWOP.) For any hours during the lapse in appropriations for which an employee was previously scheduled to be in FMLA LWOP status, the employee will

24

remain in LWOP status, but will not be considered to be using FMLA leave. (See Questions F.5. and F.6.)

If an employee had previously scheduled to substitute PPL for unpaid FMLA leave during a period covered by a lapse, the paid leave must be canceled (see Questions F.1. and F.2.) and converted to a furlough period—unless the employee performs excepted work or elects to use leave under 31 U.S.C. 1341(c)(3). We anticipate that employees generally will not choose to use paid leave under 31 U.S.C. 1341(c)(3) since 31 U.S.C. 1341(c)(2) provides retroactive pay for furlough periods without charge to leave. Under either approach, any payment will be delayed until after the lapse ends. The canceled periods of paid leave substitution (converted to furlough time) will not be considered FMLA leave and will not count against the FMLA leave 12-week limit in a 12-month period.

22. **In order to be eligible for FMLA leave (and to substitute paid parental leave (PPL) or other paid leave for FMLA unpaid leave), an employee must have 12 months of creditable Federal civilian service as specified in 5 U.S.C. 6381(1)(B). Does time spent in furlough status count towards this 12 months of required Federal service?**

A. Yes, furlough time counts toward the FMLA 12-months-of-Federal-service eligibility requirement in 5 U.S.C. 6381(1)(B). Neither the title 5 FMLA law or regulations provide for excluding furlough time or any other nonpay status time in determining whether an employee has 12 months of creditable service for purposes of FMLA eligibility. A Federal employee who is furloughed continues to be employed; the placement of the employee in a temporary nonduty, nonpay status does not terminate the employment relationship. (See also Question J.1. for more information on the creditability of nonpay status periods for various purposes.) We note that under 31 U.S.C. 1341(c)(2) furlough periods are generally retroactively converted to pay status periods once the lapse has ended.

23. **Under the title 5 paid parental leave (PPL) law, an employee who has substituted PPL for unpaid FMLA leave is required to work for the applicable employing agency (i.e., the agency employing the employee at the time paid parental leave concludes) for 12 weeks after the day on which use of PPL concludes. Does time spent in furlough status count towards the required 12 weeks of work?**

A. No. By definition, a furlough period is a period on non-duty status. It does not count as a period of work meeting the 12-week work obligation. See the definition of "work" in the PPL regulations at 5 CFR 630.1705(b)(2).

24. **Will the 12-month period following the birth or placement of a child during which an employee may use paid parental leave in substitution of unpaid FMLA leave be**

**extended due to the furlough?**

**A.** The 12-month period following the birth or placement during which paid parental leave (PPL) may be used in substitution of unpaid FMLA leave is established by statute and regulations (see 5 U.S.C. 6382(a)(2) and 5 CFR 630.1703(b)(1)). PPL must be used during the 12-month period beginning on the date of birth or placement. There is no authority to extend this 12-month period.

PPL must be substituted for unpaid leave granted under the Family and Medical Leave Act (FMLA). FMLA unpaid leave is limited to 12 weeks in any 12-month period. The commencement of a 12-month FMLA period is triggered by the use of FMLA unpaid leave, and that period may or may not correspond to the 12-month period for using PPL (which commences based on the birth or placement of a child), since FMLA unpaid leave may be used for other purposes. A lapse-related furlough does not affect the running of the 12-month clock for a 12-month FMLA period.

For more information on how a lapse-related furlough affects administration of PPL, see Questions F.21., F.22., and F. 23.

25. **Will the 12-month eligibility period during which disabled veteran leave may be used be extended due to the furlough?**

**A.** The 12-month eligibility period for the use of disabled veteran leave (DVL) is established by statute and regulations (see 5 U.S.C. 6329(a), 5 CFR 630.1303, 630.1304(a) and 630.1308(a)). DVL must be used during this 12-month eligibility period. There is no authority to extend this 12-month period.

26. **Will the advanced scheduling of annual leave requirement in 5 CFR 630.308(a) for annual leave restoration purposes be waived/suspended in the event of a shutdown furlough?**

**A.** No. In order for forfeited annual leave to be considered for restoration under 5 U.S.C. 6304(d)(1), it must have been scheduled in writing before the start of the third biweekly pay period prior to the end of the leave year, in accordance with 5 CFR 630.308(a). An agency may consider restoring annual leave that was forfeited due to an exigency of the public business or sickness of the employee **only** if the annual leave was scheduled in writing before the start of the **third biweekly pay period prior to the end of the leave year**. OPM maintains a listing of pertinent leave year dates on our website.

Employing agencies are responsible for determining whether an employee met the advance scheduling requirement, based on OPM regulations and agency policies and procedures. As allowed by those agency policies and procedures, the "in

26

writing" requirement may be met in various ways, including electronic communications such as email, electronic calendar scheduling, or submissions to a time and attendance system. As provided in CPM 2019-02 issued on January 9, 2019, OPM and the Office of Management and Budget determined that a lapse in appropriations qualifies as an exigency of the public business for purposes of annual leave restoration. Therefore, as long as the leave was properly scheduled in advance, agencies must restore any annual leave that was forfeited because of the lapse in appropriations—regardless of whether the affected employees were furloughed or excepted from the furlough.

## G. Holidays

1. **Will an employee "exempt" from furlough be paid for a holiday that occurs during a shutdown based on a lapse in appropriations?**

   **A.** Employees are "exempt" from furlough if the work they perform has a separate source of funding and is not affected by a lapse in appropriations. For that reason, an "exempt" employee will be paid for a holiday according to the normal rules governing holidays.

2. **Will employees affected by a lapse in appropriations be paid for a holiday that occurs during the lapse?**

   **A.** Lapse-affected employees—whether excepted or furloughed—will not receive pay for a holiday that occurs during a lapse in appropriations until after the lapse had ended. After the lapse has ended, an employee affected by the lapse will, except as otherwise provided below, receive his or her regular holiday pay for a holiday (or an "in lieu of" holiday, if applicable) and, if applicable, an excepted employee will receive holiday premium pay for work performed during his or her normal hours of duty on the holiday, and overtime pay for work in excess of the normal hours of duty on the holiday. (See 31 U.S.C. 1341(c)(2).) Also, if an employee was regularly scheduled to work on a holiday and was instead furloughed, the employee is now entitled to holiday premium pay, as discussed in Question D.2.

   An employee who was on preapproved LWOP during the lapse in appropriations must continue to be charged LWOP for the duration of the period approved as LWOP. If such an employee was on LWOP on both the last workday before a holiday and the first workday after the holiday, he or she will not be paid for the holiday. This rule is consistent with OPM's longstanding guidance and a Comptroller General decision (56 Comp. Gen. 393 (1977)).

**3.  What is the status of an "excepted" employee who does not perform work on a holiday that occurs during a lapse in appropriations?**

**A.** An "excepted" employee who does not perform work on a holiday during a lapse must be placed in a furlough status for the holiday and must be provided written notice of the agency's decision to furlough in accordance with the guidance in section P (Procedures). This is because during a lapse in appropriations all affected employees must be (1) at work performing excepted activities or (2) furloughed. This applies with respect to any period of time that is part of an affected employee's regularly scheduled administrative workweek, including a holiday. (See Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee.)

**4.  Will an "excepted" employee who does not work on a holiday that occurs during a lapse in appropriations be paid for the holiday?**

**A.** Yes, after the lapse has ended. (See 31 U.S.C. 1341(c)(2).) An "excepted" employee who does not work on a holiday that occurs during a lapse will be placed in a furlough status for the holiday and will receive retroactive pay for the holiday as soon as possible after the lapse ends. (See Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee Due to a Lapse in Appropriations.)

**5.  Can an "excepted" employee voluntarily report to work on the holiday?**

**A.** No. Each agency must determine which excepted activities must be performed on a holiday, and which employees are needed to perform those functions. Employees who are not otherwise needed to perform excepted functions on the holiday must be placed in furlough status for that day.

**6.  Can "excepted" employees be required to perform work on a holiday that occurs during a lapse in appropriations?**

**A.** Yes. Each agency is responsible for determining which excepted activities must be performed on a holiday in order to carry out functions related to such excepted activities. Failure to report to duty on a holiday is no different than failure to report to work on any other day (see Question F.2).

**7.  What pay entitlements will accrue to an "excepted" employee who performs work on a holiday during a shutdown furlough?**

**A.** The Federal Government will be obligated to pay an excepted employee who performs work on a holiday according to the normal rules governing pay for work on a holiday. For example, under 5 U.S.C. 5546(b), a covered employee would

28

receive his or her rate of basic pay, plus holiday premium pay at a rate equal to the employee's rate of basic pay. In addition, if such an employee performs officially ordered or approved overtime work on a holiday (i.e., work in excess of his or her basic non-overtime work requirement for that day), the employee would receive overtime pay (or compensatory time off) for that work. As explained under Question G.2., an excepted employee cannot receive payment for working on a holiday until an appropriations act or a continuing resolution is enacted. Please note, holiday premium pay and overtime pay are not applicable to certain employees, such as heads of agencies and members of the Senior Executive Service.

8. **How do the "in lieu of" holiday rules apply during a lapse in appropriations?**

    **A.** Under normal circumstances, all full-time employees, including those on flexible or compressed work schedules, are entitled to an "in lieu of" holiday when a holiday falls on a nonworkday. See OPM guidance on "in lieu of" holidays.

    During a shutdown furlough, generally—

    - The normal "in lieu of" holiday rules apply to employees "exempt" from furlough.

    - The "in lieu of" holiday rules do not apply to furloughed employees (i.e., employees do not receive an "in lieu of" holiday if they are in a furlough status on a holiday).

    - When scheduling holidays for "excepted" employees, the normal "in lieu of" holiday rules apply. However, as explained in Questions G.4., G.5., and G.6., otherwise excepted employees must be furloughed on the "in lieu of" holidays unless they are working.

## H. Benefits

1. **What happens if agency employees responsible for processing Federal Employees Health Benefits (FEHB) or Federal Employees' Group Life Insurance (FEGLI) transactions are furloughed?**

    **A.** Agencies will continue to process FEHB and FEGLI transactions during a lapse in appropriations. Employees responsible for processing FEHB or FEGLI transactions must be excepted to perform this work because the law designates the processing of these transactions as emergency services that must continue under the Antideficiency Act. (See 5 U.S.C. 8702(d), 8905(i); 5 CFR 870.106, 890.113.)

*Federal Employees Health Benefits Program—General*

2. **Will an enrolled employee continue to be covered under the FEHB Program during a lapse in appropriations if the agency is unable to make its premium payments on time?**

   **A.** Yes. The employee's FEHB coverage will continue even if an agency does not make the premium payments on time. Following the lapse, each employee who returns to pay status will automatically begin to repay their share of FEHB premium that accumulated during the lapse through payroll withholding. If FEHB premiums are not withheld from retroactive pay, one additional payment in addition to the current pay period amount will be withheld in each subsequent pay period until the employee's accumulated share of premiums have been paid.

3. **What happens if an employee wants to terminate FEHB coverage while in a non-pay status in order to avoid the expense?**

   **A.** Unlike other types of non-pay status, employees in a non-pay status due to a lapse in appropriations (shutdown furlough) will not have the opportunity to terminate or cancel FEHB coverage outside of Open Season or experiencing a qualifying life event. The employee will remain covered; the enrollee's share of their FEHB premium will accumulate and be withheld from pay upon return to pay status.

4. **Can an employee who has been furloughed enroll or make changes to their FEHB enrollment during a furlough due to a lapse in appropriations?**

   **A.** Yes. An employee who is furloughed and experiences a qualifying life event can enroll or make changes in enrollment in the FEHB Program. (See 5 CFR 890.301.) Employees can also enroll or make changes during the annual Open Season. Employees are encouraged to contact appropriate agency human resources staff to ensure they follow the proper processes.

*FEHB Program—Open Season Enrollments/Changes*

5. **Would a lapse in appropriations alter the effective date of an FEHB Open Season enrollment change if an enrollment request was fully processed by an agency and submitted to the health plan prior to the lapse?**

   **A.** No. If an enrollment change request was submitted to the health plan and processed, the effective date of an FEHB Open Season change would still be the first day of the first full pay period in January.

6.  **An employee is in a non-pay status due to a shutdown furlough and is enrolled in a new FEHB plan effective at the beginning of the plan year because their current plan is terminating participation in the FEHB Program. Which carrier is responsible for providing benefits for covered services in January?**

    **A.** It depends upon the date in January that services are needed. Coverage under the new plan begins on the first day of the first pay period that begins on or after January 1. Before that coverage effective date, the terminating plan is responsible for providing benefits for covered services.

*Other Insurance Programs*

7.  **What happens to an employee's Federal Employees' Group Life Insurance (FEGLI) Program coverage if furloughed?**
    **A.** The employee can maintain their FEGLI coverage for up to 12 months in a non-pay status. When the lapse ends, the employee will receive retroactive pay under 31 U.S.C. 1341(c)(2) and retroactive FEGLI premiums may be withheld from that pay. If FEGLI premiums are not withheld from retroactive pay, no more than one additional payment will be withheld in each subsequent pay period until all premiums have been paid.

8.  **What happens to an employee's Flexible Spending Account (FSAFEDS) coverage if furloughed?**

    **A.** Payroll deductions will cease for any employee that does not receive pay. The employee remains enrolled in FSAFEDS, but claims for eligible health care expenses incurred during a non-pay status will not be reimbursed until the employee returns to a pay status following the lapse and allotments are successfully restarted. The remaining allotments are recalculated over the remaining pay periods to match the participant's election amount. However, any claim submitted with dates of service prior to an employee entering non-pay status will be paid in accordance with existing procedures, up to the balance of the employee's annual election.

    Eligible dependent care expenses incurred during a non-pay status may be reimbursed up to whatever balance is in the employee's dependent care account— as long as the expense incurred during the non-pay status allows the employee (or spouse if married) to work, look for work, or attend school full-time.

9.  **Will the effective date of my FSAFEDS enrollment be affected?**
    **A.** No.

31

34

10. **What happens to an employee's Federal Long Term Care Insurance Program (FLTCIP) coverage if furloughed?**

    **A.** FLTCIP coverage will continue for enrollees who are furloughed or excepted from furlough and working without pay during a shutdown furlough based on a lapse in appropriations. In addition, FLTCIP coverage may not be canceled as a result of non-payment of premiums or other periodic charges due to a lapse in appropriations. (See 5 CFR 875.302.) Employees paying premiums via Direct Bill or Automatic Bank Withdrawal will continue to be billed, but the insurer will not terminate for non-payment of premium during the lapse in appropriations. Regarding claims eligibility requests for FLTCIP during a shutdown furlough, claim benefits will not be reimbursed to the enrollee until all past due premiums are paid. At the end of the shutdown, FLTCIP premiums will be paid from retroactive pay provided under 31 U.S.C. 1341(c)(2) or may be paid back from another source (i.e., automatic bank withdrawal) for FLTCIP enrollees who elected to make payments directly to the Carrier.

    If missed premium payments are unable to be collected via automatic bank withdrawal or deductions from the enrollee's payroll or annuity/pension, enrollees will be billed directly for the premium amount due. After the shutdown, if the enrollee elected to pay their premium via automatic bank withdrawal, past due premiums will be collected by withdrawing up to two months of premiums from the enrollee's bank account each month until it is current. For enrollees who did not elect to make payment directly, FLTCIP premiums will be paid to the Carrier from enrollees' retroactive pay made available as soon as practicable upon the end of the lapse.

11. **What happens to an employee's Federal Employees Dental and Vision Insurance Program (FEDVIP) coverage if furloughed?**

    **A.** Coverage will continue for an individual enrolled in FEDVIP who is furloughed or excepted from furlough and working without pay during a lapse in appropriations, and an enrollment may not be canceled as a result of nonpayment of premiums or other periodic charges due to a lapse. (See 5 CFR 894.405.) Payroll deductions will temporarily cease for any employee that does not receive pay.

    Employees are entitled to retroactive pay under 31 U.S.C. 1341(c)(2) for excepted work performed during the lapse and for furlough periods at the standard rate of compensation. At the end of the shutdown, the accumulated FEDVIP premium for this period will be withheld from their pay. If FEDVIP premiums are not withheld from retroactive pay, no more than one additional payment will be withheld in each subsequent pay period until all premiums have been paid.

32

12. **Will the effective date of my FEDVIP Open Season enrollment be affected?**

**A.** No.

## I.  Employee Assistance

1. **Are employees entitled to unemployment compensation while on furlough?**

**A.**  It is possible that furloughed employees may become eligible for unemployment compensation. State unemployment compensation requirements differ. Some States require a 1-week waiting period before an individual qualifies for payments. In general, the law of the State in which an employee's last official duty station in Federal civilian service was located will be the State law that determines eligibility for unemployment insurance benefits. (See the Department of Labor website "Unemployment Compensation for Federal Employees.") Agencies or employees should submit questions to the appropriate State (or District of Columbia) office.

The Department of Labor's website provides links to individual State offices (See Department of Labor's website at Unemployment Benefits Finder | CareerOneStop). States will require you to provide your Agency's Federal Identification Code when you file your application.

2. **Can I take a Thrift Savings Plan (TSP) loan while I'm furloughed?**

**A.**  A lapse in appropriations does not prevent TSP participants from requesting a new TSP loan. The established eligibility requirements continue to apply. TSP participants can go to TSP loans or read the TSP Loans booklet for more information about eligibility requirements.

2a. **Where can agencies and employees find information on Thrift Savings Plan (TSP) accounts, loans, and loan payments during a lapse in appropriations?**

**A.**  Should there be a lapse in appropriations, TSP communications will be posted on the TSP website.

3. **What resources are available if a Federal employee needs financial assistance during a Government shutdown?**

**A.**  Some agency employee assistance programs (EAP) include financial consultation services. In addition, employees may want to contact their financial institution, credit union, or learn about their options through the Thrift Savings Plan.

33

4. **How will Federal employees access Employee Assistance Program (EAP) services in the event of a Government shutdown?**

**A.** EAP services can be helpful in providing confidential counseling and coaching with experienced, licensed counselors—including legal and financial consultation. Federal employees are advised to contact their agency's EAP office to determine whether services will be available in the event of a lapse in appropriations. Employees may use OPM's website to find more information on EAPs. Many Federal agency EAPs are serviced by Federal Occupational Health (FOH), a division of the Department of Health and Human Services (HHS). Employees who know that their agency uses FOH as a provider may contact FOH's toll free EAP phone number, (800) 222-0364 (TTY (888) 262-7848), to find out how to access EAP services during a lapse in appropriations. Agency websites can also be consulted to identify the contact information of other EAP providers and to receive program details.

## J. Service Credit for Various Purposes

1. **Is furlough or leave without pay (LWOP) considered a break in service?**

**A.** No. Both terms mean that the employee continues to be employed but in a nonpay, nonduty status for those days/hours. Under normal circumstances, an extended period of nonpay status could affect the calculation of creditable service for certain purposes. However, under 31 U.S.C. 1341(c)(2), furlough periods are generally retroactively converted to pay status periods once the lapse has ended. (An employee who was in a scheduled nonpay status (e.g., LWOP, AWOL, suspension status) during a furlough period will not be placed in a pay status. Also, an employee who refused to perform excepted work during a furlough period may be placed in AWOL status.) For all employees who are retroactively placed in a pay status during a furlough period, the time will be fully creditable service.

2. **To what extent does nonpay status affect Federal employee benefits and programs?**

**A.** See answer to Question J.1.

## K. Federal Employees on Military Duty

1. **Can employees who have previously scheduled military leave under 5 U.S.C. 6323 for days covered by a lapse in appropriations take this leave during the lapse?**

**A.** No. As with other types of paid leave, paid military leave must be canceled for days covered by the furlough. An employee who had previously scheduled

34

military leave under any of the provisions in 5 U.S.C. 6323 for absences during a lapse in appropriations would have been in a pay status but for the lapse. Accordingly, such an employee is entitled to receive retroactive pay at the employee's "standard rate of pay" after the lapse in appropriations ends.

For employees on active military duty, their status as Absent-Uniformed Service (formerly Leave Without Pay-Uniformed Service (LWOP-US)) is unchanged by periods of intermittent annual or military leave, per the guidance in the [Frequently Asked Questions on Military Leave](#).

2. **Will employees continue to receive a reservist differential payment (5 U.S.C. 5538) while on active duty when they are furloughed from their Federal civilian employment?**

    **A.** No. The reservist differential payments are intended to make up the difference between the employee's customary civil service compensation and his or her military pay, and are made from the funds of the employing agency appropriated for the payment of employees' salaries. Since funds are not available for employees' salaries during a furlough, no funds may be obligated towards any type of payment for reservist differential. However, after the lapse in appropriations ends and employees receive retroactive pay for the period of the furlough pursuant to 31 U.S.C. 1341(c)(2), it will be necessary for the agency to calculate any reservist differential payments that may be owed.

3. **Will there be an impact on an employee's General Schedule or Federal Wage System within-grade increase (WGI) waiting period due to an employee being in an Absent-Uniformed Service status during a shutdown furlough?**

    **A.** No. The furlough has no impact on an employee's General Schedule or Federal Wage System WGI waiting period if the employee is in an Absent-Uniformed Service status. An absence for the purpose of engaging in military service is creditable service in the computation of waiting periods for successive WGIs when the employee returns to a pay status through the exercise of a restoration right provided by law, Executive order, or regulation. (See 5 CFR 531.406(c)(1)(i) and 5 CFR 532.417(c)(4).)

4. **Can employees retroactively substitute military leave under 5 U.S.C. 6323 for Absent-US LWOP (absent uniformed services leave without pay) on a day before or after a holiday during a lapse in appropriations in order to receive pay for the holiday?**

    **A.** No. Employees may not retroactively substitute military leave for LWOP during

the furlough period since furloughed employees generally may not be charged any other form of paid leave (i.e., annual leave, sick leave, or other paid leave), compensatory time off in lieu of overtime, compensatory time off for travel, religious compensatory time off, or credit hours under a flexible work schedule during the furlough period. (See Questions F.1. and F.4.) Any military leave that had been scheduled (before the lapse in appropriations) for use during the lapse is canceled during the lapse, and the employee generally would be furloughed during the time the employee was scheduled to be on military leave. After the lapse in appropriations ends, employees are entitled to retroactive pay at the standard rate of pay pursuant to 31 U.S.C. 1341 for any furlough period. Thus, if an employee was scheduled to use military leave on the day before or after a holiday but the military leave was canceled due to a lapse in appropriations, and the employee was instead furloughed on the holiday, the employee will receive retroactive pay for that holiday equal to the normal paid time off for a holiday. However, if an employee was scheduled to be on Absent-US LWOP on the workdays before and after a holiday, the employee will not receive retroactive pay for the holiday.

5. **Must agencies recredit military leave canceled during a shutdown?**

   **A.** Yes. As a result of the cancellation of scheduled military leave during the lapse in appropriations, agencies must recredit an employee's military leave account. This recredited military leave may be used after the end of the lapse in appropriations.

# L. Retirement

1. **If a shutdown furlough occurs during the employee's highest years of salary, what effect will time in a furlough status have on an employee's high-3 average pay?**

   **A.** Once the lapse in appropriations ends, employees who would have been in pay status but for the lapse will receive retroactive pay for furlough periods pursuant to 31 U.S.C. 1341(c)(2). Thus, there will be no effect on such an employee's high-3 average pay.

2. **Are the retirement rules concerning the effect of a shutdown furlough the same for employees under the Civil Service Retirement System (CSRS) and the Federal Employees Retirement System (FERS)?**

   **A.** Yes.

3. **What will happen to employees who would have retired during a shutdown**

36

**furlough?**

**A.** For employees who, on or before the requested retirement date, submitted some notice of their desire to retire, agencies should, when the lapse in appropriations ends, make the retirement effective as of the date requested. The retirement request may be informal (such as a letter requesting retirement), and can be either mailed or personally submitted to the agency. Any additional required paper work, such as the formal retirement application form, may be completed when the agency reopens. No time spent by the retiree in such actions after the effective date of the retirement may be considered as duty time, since the individual would no longer be an employee of the agency.

4. **If an employee is scheduled to retire before the end of the leave year with an annual leave balance of over the maximum leave ceiling (e.g., 240, 360, or 720 hours, as applicable) and the furlough prevents the employee's retirement from getting processed until January, does the employee lose his or her annual leave above the maximum leave ceiling?**

   **A.** No. The employee's retirement would be retroactively applied to a date prior to the end of the leave year, and the employee would receive the full amount of accumulated and accrued annual leave in a lump-sum payment.

## M. Retirement Services: Government Closure

1. **I'm a Federal retiree. Will I still receive my monthly annuity payment during a Government shutdown?**

   **A.** Yes. Federal retirees under the CSRS and FERS retirement systems will still receive their scheduled annuity payments on the first business day of the month.

2. **How can I make updates or changes to my retirement benefits?**
   **A.** OPM's Retirement Services is available to assist you with your retirement benefits. As always, you can make many of these changes online through Services Online or by calling Retirement Services at (888) 767-6738. Due to the volume of calls, we recommend that you first use the online services site to make immediate updates and changes. You can also find general information online.

3. **How do I report the death of a family member during a Government shutdown?**

   **A.** You can refer to our website Annuitant Death Index - RS Reporting (opm.gov) for information on reporting the death of a current retiree and applying for any benefits, or by calling us directly at (888) 767-6738. If the family member was a Federal employee at the time of death, survivors must contact the agency for which

37

40

the deceased worked. If the employing agency is closed, you may need to wait until after the shutdown ends to begin the process.

**4. I recently retired from Federal service. Will my retirement application be delayed by a Government shutdown?**

**A.** If your agency or payroll center submitted your retirement application to OPM, you will begin receiving interim annuity payments while OPM Retirement Specialists process your application. Because OPM Retirement Services is funded by the trust fund it manages, OPM Retirement Services employees will still be working normal operating hours during a Government shutdown.

If your agency or payroll center has not yet submitted your retirement application or the application is incomplete, you will likely experience some delay as OPM must wait on other agencies to submit all the information needed to process your retirement. Some functions of these agencies may not be operating during a Government shutdown.

**5. I applied for disability benefits. Will my application still be processed?**

**A.** Employees in Retirement Services at OPM will continue working on your application. If the application requires additional information from other agencies, expect delays during a Government shutdown.

**6. Can I submit a court order that awards a retirement benefit to OPM during a Government shutdown?**

**A.** Yes. OPM employees will continue working to process court ordered retirement benefits.

## N. Payments upon Separation from Federal Service

**1. If there is a shutdown furlough, how does this impact a separating employee's lump-sum payment for their unused annual leave?**

**A.** In the event of a shutdown furlough, any payments incurred by the agency for an employee's lump-sum payment will be delayed until funds are available.

**2. How are separated employees' entitlements to severance pay affected by a shutdown furlough?**

**A.** Funds for severance pay are obligated on a day-to-day basis as the recipient accrues continuing entitlement to severance pay by not being reemployed by the Government of the United States. (Severance pay is suspended or terminated when the individual is reemployed by the Federal Government.) Severance pay is paid at

the same pay period intervals as if the recipient were still employed. Any severance payment (on a payroll payday) is linked to the corresponding pay period during which the recipient accrued continuing entitlement to severance pay. If the recipient is reemployed by the Federal Government during a pay period, he or she is entitled to a prorated severance payment covering the days in the period prior to reemployment (e.g., 2/5 of one week's pay if the recipient was reemployed on the third workday of the pay period).

Thus, in the case of a shutdown furlough, accrued but unpaid severance pay represents an obligation to be paid from funds available before the lapse in appropriations occurred. Just as payroll checks for work performed prior to a lapse in appropriations can be processed as part of the orderly suspension of nonexcepted activities, severance pay checks covering days before the lapse may also be processed.

No funds may be authorized for severance payments for days during the lapse until an appropriation is enacted.

See additional information on severance pay (including eligibility criteria and payment formulas).

## O. Benefits under the Federal Employees' Compensation Act (FECA)

### 1. How is Continuation of Pay (COP) under the Federal Employees' Compensation Act affected by a Government shutdown?

**A.** The Department of Labor's Office of Workers' Compensation Programs, which administers the Federal Employees' Compensation Act (FECA), advises that, in the event of a Government shutdown, an employee who is disabled due to his or her injury is to be maintained in COP status during the shutdown unless the agency does not have monies available to pay the salary of that employee. When funding is restored, COP can be retroactively paid, but it cannot be paid for the same period as retroactive salary is paid. In the event an agency is legally unable to pay COP to an employee because of a lapse in appropriations, the employee may file a claim for regular FECA wage loss compensation for that period.

Employees in COP status will not receive retroactive pay under the Government Employee Fair Treatment Act of 2019 (31 U.S.C. 1341(c)(2)). They are already receiving pay for the time periods under the workers' compensation program. Even if agencies coded employees in COP status as being in furlough status, or gave them a furlough notice, the COP status was unaffected and thus excused absences do not apply.

39

2. **Are employees who are injured while on furlough or LWOP eligible to receive workers' compensation?**

   **A.** No. Workers' compensation is paid to employees only if they are injured while performing their duties. Employees on furlough or LWOP are not in a duty status for this purpose. An employee who is receiving workers' compensation payments will continue to receive workers' compensation payments during a furlough and will continue to be charged LWOP.

**Note to Section O:** Any additional questions regarding Federal workers' compensation benefits should be directed to the [Division of Federal Employees', Longshore and Harbor Workers' Compensation](#), Office of Workers' Compensation Programs, U.S. Department of Labor.

## P. Procedures

1. **How is a shutdown furlough documented?**

   **A.** Unlike an administrative furlough, agencies should *not* prepare an SF-50, "Notification of Personnel Action" (or a List Form of Notice for a group of employees who are to be furloughed on the same day or days each pay period) at the outset of a shutdown furlough. Instead, employees will receive a shutdown furlough notice citing the reasons for the furlough because the ultimate duration of a shutdown furlough is not known by agencies at the outset of the furlough. Once an appropriation has been signed by the President, agencies will be instructed on the appropriateness of preparing documentation consistent with Chapters 15 and 16 of *The Guide to Processing Personnel Actions*.

1a. **In addition to a shutdown furlough notice, what other documentation should be provided to furloughed employees?**

   **A.** Agencies should provide each furloughed employee a Form SF-8 (Notice to Federal Employee about Unemployment Insurance). This form provides information on filing unemployment compensation claims, including the agency's mailing address and Federal identification code. Employees may be asked to provide or refer to this form when they file a claim with their State unemployment insurance agency.

2. **In the event of a shutdown furlough, can an employee be furloughed without first receiving a written notice of decision to furlough?**

   **A.** While an employee must ultimately receive a written notice of decision to furlough, it is not required that such written notice be given prior to effecting the emergency furlough or in person, although it is recommended. Advance written

40

notice (including through email) is preferable, but when prior written notice is not feasible, then any reasonable notice (e.g., telephonic, oral, personal email, or by mail promptly after the furlough) is permissible when the furlough decision is made. However, a written notice of decision to furlough must be provided as soon as possible after the furlough begins. See Question P.2a. for providing electronic notice of a furlough action.

**2a. May employees conduct orderly shutdown activities remotely? May an agency provide an employee electronic notice of a furlough action?**

**A.** In many cases, orderly shutdown activities (including the distribution of furlough notices and, where necessary, the adjustment of voicemail and email messages to reflect the agency's operating status) may be conducted remotely. Agencies that issue furlough notices should consult with their legal counsel to ensure each step of the process is consistent with legal requirements. If an agency determines it will electronically notify affected employees of a furlough action, OPM recommends that the agency include each employee's name, address, and/or e-mail address on the decision notification so that it is clear that an employee is receiving personal notification. Agencies should also consider including in the body of the electronic correspondence, the requirement that the employee provide an email acknowledgement of receipt. If an agency does not receive a requested acknowledgement of receipt of an e-mail notification, it should consider delivering a paper copy of the decision notification to the employee at his or her home address by registered mail with a return receipt requested. Similarly, agencies must deliver hard copy furlough notices to those employees without email access.

Additionally, OPM recommends that agencies consider informing employees as soon as practicable whether or not an employee is subject to the furlough and provide a contact person who can answer questions related to this issue. Finally, agencies with bargaining unit employees are reminded that they must provide notice and opportunity to bargain over negotiable procedures and appropriate arrangements to any unions representing their employees.

**2b. What are an agency's regulatory obligations in providing an appellant the Merit Systems Protection Board (MSPB) appeal information in the adverse action furlough decision notice?**

**A.** An agency must satisfy the obligation to provide a copy of the MSPB appeal form when issuing a decision notice. (5 CFR 1201.21). Providing a link to the MSPB appeal form electronically will typically satisfy the requirement of ensuring that employees subject to a decision appealable to MSPB will have effective access to the MSPB regulations and appeal form. However, if the employee informs the agency

41

that he or she lacks Internet access, the agency is required to take steps to ensure that the employee has actual access to the MSPB's regulations and the appeal form, including providing the employee with a hard copy of these documents upon the employee's request. See Sample Notice for sample decision notice language.

**2c. What is the treatment of employees who are serving, or about to serve, a suspension during a lapse in appropriations?**

**A.** If an employee is serving a suspension or scheduled to serve a suspension when a shutdown furlough becomes effective, agencies have the option of holding the suspension in abeyance during the period of shutdown, or delaying the commencement of suspension until after the shutdown ends. During the shutdown, such employees should be properly designated by the agency as exempt, excepted, or non-excepted and treated accordingly. If the employee is subject to furlough, the employee should receive the appropriate shutdown adverse action furlough notice.

**2d. What is the treatment of employees who are in AWOL status at the beginning of the lapse in appropriations?**

**A.** If an employee is AWOL at the beginning of the lapse in appropriations, and the employee is otherwise subject to furlough during the shutdown, he or she should be provided a furlough notice and placed in a temporary non-duty, non-pay status because of the lack of appropriated funds. Thus, the employee cannot be AWOL during this time, despite any belief the employee would not have otherwise reported to work. The employee should be coded the same as all other employees who are furloughed during this time. If the employee fails to report to work following the end of the shutdown, he or she will be considered AWOL, and subject to any consequences that may follow from being AWOL after the end of the shutdown. Conversely, if the employee is *excepted* from furlough, ordered to report to work during the shutdown yet failed to do so, he or she would be considered AWOL during this time, and subject to any consequences that may follow from being AWOL.

**3. What information should be included in the notice of decision of a shutdown furlough when no advance notice is issued?**

**A.** The notice must specify the reason for the furlough and state that the usual 30 calendar days advance notice was not possible due to the emergency requiring curtailment of agency operations. If some employees in a competitive level will not be furloughed because they are performing one of the excepted activities defined by OMB standards, OPM recommends a statement such as the following:

"If employees are being retained in your competitive level, they are required for

orderly suspension of agency operations, or they are performing one of the excepted activities defined by law."

For career members (except reemployed annuitants) of the Senior Executive Service (SES), the written notice must provide the reason for the furlough; the expected duration of the furlough and the effective dates; the basis for selecting the appointee when some but not all SES appointees in a given organizational unit are being furloughed; the location where the appointee may inspect the regulations and records pertinent to the action; and, if the notice period is less than 30 calendar days, the reason for the shortened period. For an SES probationer, the notice should also explain the effect (if any) on the duration of the probationary period. See Question P.6a. regarding noncareer, limited term, or limited emergency appointees and reemployed annuitants holding career appointments.

All notices must include a statement of applicable appeal and grievance rights. An agency must satisfy the obligation to provide a copy of the MSPB appeal form when issuing a decision notice. Providing a link to the MSPB appeal form electronically will typically satisfy the requirement of ensuring that employees subject to a decision appealable to MSPB will have effective access to the MSPB regulations and appeal form. However, if the employee informs the agency that he or she lacks Internet access, the agency is required to take steps to ensure that the employee has actual access to the MSPB's regulations and the appeal form including providing the employee with a hard copy of these documents upon the employee's request.

See "Sample Shutdown Furlough Decision Notice Due to Lapse in Appropriations." This sample can be used for SES and non-SES employees.

### 3a. How should the decision letter for a shutdown furlough be framed if the specific number of furlough days is unknown?

**A.** While it is desirable when possible to inform the affected employee of a specific number of furlough days in the decision letter, the agency needs only to set out the maximum time that may be involved, so employees have as much information as possible.

### 3b. What procedural rights apply to employees who are veterans covered under 5 U.S.C. chapter 75 and 5 CFR part 752 for a shutdown furlough?

**A.** For a shutdown furlough of a covered veteran employee, the law (5 U.S.C. 7513) gives a covered veteran employee the same procedural rights as other covered employees. Employees should consult with their agency Human Resources office to determine whether they are covered by 5 U.S.C. 7513 and what procedures may apply to them.

43

**3c. If an employee decides to challenge a shutdown furlough, from what point would the time for appeal to the Merit Systems Protection Board run?**

**A.** Employees must file an appeal within 30 days after the effective date of their first furlough day, or 30 days after the date of their receipt of the decision notice whichever is later.

**4. In addition to statutory and regulatory procedural requirements, what other forms of communication should an agency consider when implementing a shutdown furlough?**

**A.** Considering the uncertain and changing circumstances surrounding a shutdown furlough, agencies should make efforts to ensure that employees are provided with up-to-date and accurate information. If time permits before a furlough starts, this may be done through effective union-management communication, employee briefings, periodic bulletins, and newsletters. Once a furlough begins, agencies can also consider using toll-free hotlines and emails to home email accounts.

**5. How does the length of a shutdown furlough affect the procedures that are used to implement the furlough of employees?**

**A.** The length of a shutdown furlough does not affect the procedures that are used.

For most employees, shutdown furloughs lasting 30 calendar days or less (22 workdays) are covered by OPM regulations under 5 CFR part 752, adverse action procedures. Shutdown furloughs lasting 30 calendar days or less (22 workdays) for career appointees in the Senior Executive Service (except reemployed annuitants) are covered under 5 CFR part 359, subpart H. See Question P.6a. regarding noncareer, limited term, or limited emergency appointees in the SES and reemployed annuitants holding career appointments.

Shutdown furloughs lasting more than 30 calendar days (22 workdays) are also covered by OPM regulations under 5 CFR part 752, adverse action procedures or 5 CFR part 359, subpart H, as applicable. When the shutdown furlough goes beyond 30 days, agencies should treat it as a second shutdown furlough and issue another adverse action or furlough notice.

**Note:** Reductions in force (RIF) furlough regulations and SES competitive furlough requirements are not applicable to emergency shutdown furloughs because the ultimate duration of an emergency shutdown furlough is unknown at the outset and is dependent entirely on Congressional action, rather than agency action. The RIF

44

furlough regulations and SES competitive furlough requirements, on the other hand, contemplate planned, foreseeable, money-saving furloughs that, at the outset, are planned to exceed 30 days.

**6.  What procedures and appeal rights are applicable for noncareer, limited term and limited emergency employees in the SES and reemployed annuitants holding career SES appointments?**

**A.**  Noncareer, limited term, and limited emergency SES appointees and reemployed SES annuitants holding career appointments are not covered by 5 CFR part 359, subpart H, and they may be furloughed under agency designated procedures, which should include certain minimum features, e.g., whenever possible, a written notice at least 1 day before the furlough that states the reason for, duration of, and effective dates of the furlough.

**6a.  What impact does the shutdown have on employees whose probationary period ended during the lapse in appropriations? Can the probationary period be extended?**

**A.**  Placement of a probationary employee in a non-duty status due to a shutdown furlough does not extend the probationary period (for either non-SES or SES employees). This is because the Government Employee Fair Treatment Act of 2019 (31 U.S.C. 1341(c)(2)) ensures that all furloughed and excepted employees "shall be paid" for the period of the lapse, and in accordance with regulations, periods of absence while in a pay status count toward completion of probation. Once an individual completes the probationary period, s/he is covered by relevant adverse action procedural and appeal rights.

**6.b.  What impact does a shutdown have on the probationary or trial period certification required under 5 CFR 11.5?**

**A.**  Agencies are not relieved from completing certifications for continued employment of their employees serving a probationary or trial period. Where an agency decides not to issue a certification, the probationary or trial period employee's employment will terminate before the end of the tour of duty on the last day of their probationary or trial period.  Where an agency has not processed its certification of a probationary or trial period employee, it may do so as part of its orderly shutdown activities. For employees not certified before the end of their probationary or trial period and where the agency wants to retain them, they should furlough the employees and petition the Director of OPM to reinstate the employees under 5 CFR 11.5. Petitions should be submitted to probationaryappeal@opm.gov.

45

**6.c. Is the processing of certifications, terminations, and petitions to the Director of OPM under 5 CFR 11.5 permitted during a shutdown?**

**A.** Yes, agencies may process certifications, terminations, and petitions under this rule as part of their orderly shutdown procedures. This includes providing advance written notice of the effective date of termination if the agency did not previously provide this notice.

**7. How do agencies implement a shutdown furlough for Administrative Law Judges?**

**A.** The Antideficiency Act applies to Administrative Law Judges (ALJs). Accordingly, they should be furloughed unless they are performing functions that are not funded by annual appropriations or meet one of the Antideficiency Act's exceptions. The Merit Systems Protection Board (MSPB) has adopted procedures for implementing furloughs for ALJs, which are described in 5 CFR 1201.137–141. Those procedures, however, do not specifically address the unique issues raised by an emergency furlough necessitated by a Government shutdown. Accordingly, agencies should consult their legal counsel about how to implement a furlough of ALJs.

**8. What happens to new employees who are scheduled to report to work for the first time during a shutdown furlough?**

**A.** By law, individuals do not become Federal employees until they report for work and are sworn in. Agencies should consider delaying the entrance-on-duty (EOD) date for new employees who are scheduled to report to work for the first time during a shutdown furlough.

**9. At the time of an appropriations lapse, an employee who is funded through a lapsed appropriation is on temporary duty assignment away from the employee's normal duty station. The agency notifies the employee to return to the employee's normal duty station. Can the employee elect to delay the return? If the employee decides to delay the return, and as a result the employee incurs additional travel costs, who is liable for those additional travel costs?**

**A.** Employees who are notified to return home should do so as soon as practicable. When an employee returns promptly, the travel expenses that the employee incurs in the return are properly-incurred obligations of the agency (as part of the agency's orderly-shutdown activities), and the agency will reimburse these travel costs after appropriations are enacted and are available for that purpose. If, however, an employee elects not to return promptly and, as a result of this decision, the employee incurs additional travel expenses, those additional travel expenses are not obligations of the agency, and will not be reimbursed (instead, the employee is

personally liable for the additional travel expenses); while the employee will be personally liable for the additional travel expenses, the agency will continue to incur the obligation for those travel costs that would have been incurred if the employee had returned promptly, and the agency will reimburse such "prompt return" travel costs after appropriations are enacted and are available for that purpose. Finally, in the case of those employees who are notified by their agency that they are to remain on travel, because the continuation of their travel is in direct support of an excepted agency activity, their travel expenses are properly-incurred obligations of the agency (as part of the agency carrying out an excepted activity), and the agency will reimburse the travel costs after appropriations are enacted and are available for that purpose.

**10. What happens to current Federal employees who are scheduled to transfer to a new agency during a shutdown furlough?**

**A.** Agencies should consider delaying the entrance-on-duty date for employees who are scheduled to transfer to a new agency during a shutdown furlough. Such employees would remain on the rolls of their former agency until the new transfer effective date can be redetermined by the former agency and the new employing agency once the lapse in appropriations has ended.

**11. Will the Merit Systems Protection Board (MSPB) be addressing furlough related appeals during the shutdown?**

**A.** Please consult the MSPB website for additional information on the processing of appeals during any lapse in appropriations.

**12. If a Government shutdown occurs, how will furloughed employees be informed when it is over?**

**A.** Employees should follow their agency procedures, including any applicable collective bargaining agreements, which may include monitoring OPM's website and media outlets for notification that a continuing resolution or appropriation has been signed by the President.

**13. When a Government shutdown ends, when are furloughed employees expected to return to work?**

**A.** If a shutdown were to occur, guidance concerning when furloughed employees should come back to work at the conclusion of the shutdown would have to be tailored to the specific situation. In the absence of such guidance, agencies should apply a rule of reason in requiring employees to return to work as soon as possible, taking into account the disruption in the lives and routines of furloughed

47

employees that a shutdown causes.

## Q. Labor Management Relations Implications

1. **When a lapse in appropriations requires a shutdown furlough, what is an agency's obligation to bargain?**

   **A.** The decision whether to furlough employees and which activities are excepted from a furlough are management rights that are not subject to bargaining. (See 5 U.S.C. 7106(a).) However, when an agency determines that a shutdown furlough is necessary, agencies have a duty to notify their exclusive representatives and, upon request, bargain over any negotiable impact and implementation proposals the union may submit, unless the matter of furloughs is already "covered by" a collective bargaining agreement.

   In the event of unforeseeable circumstances, such as sudden emergencies requiring immediate curtailment of activities due to a Government shutdown, whatever bargaining that can occur prior to taking action should occur to the extent possible before furlough actions are necessary. However, if agreement is not reached in the time allowed, the agency should tell the union what actions it will take and offer to continue bargaining on a post implementation basis.

2. **Do agencies have an obligation to bargain before it is known whether a lapse in appropriations will occur?**

   **A.** The law requires an agency to bargain during the term of a collective bargaining agreement on negotiable union-initiated proposals concerning matters that are not expressly contained in, or otherwise covered by, the collective bargaining agreement, unless the union has waived its right to bargain about the subject matter involved. Accordingly, there may be a bargaining obligation if a union makes negotiable proposals in advance of a shutdown that address procedures and appropriate arrangements for affected employees. Agencies should evaluate the circumstances of their situation to determine whether there is a duty to bargain on union proposals concerning furlough procedures.

3. **What is the agency's obligation in responding to a union request under 5 U.S.C. 7114 seeking the agency's furlough plan and a list of excepted and nonexcepted employees?**

   **A.** An agency is required to provide data that is normally maintained, reasonably available and necessary to perform the representational duties of a union. A union requesting information must establish a particularized need for the information by articulating, with specificity, why it needs the requested information, including the

48

uses to which the union will put the information and the connection between those uses and the union's representational responsibilities under the statute. The union must establish that the requested information is required in order for the union to adequately represent its members. An agency denying a request for information must assert and establish any countervailing anti-disclosure interests. An agency may not satisfy its burden by making conclusory or bare assertions; its burden extends beyond simply saying "no." With this in mind, agencies will have to evaluate the circumstances of their situation to determine whether they should provide the requested information.

**4. Can union officials perform representational work on "official time" during a shutdown?**

**A.** Exempted employees (i.e., employees not affected by a lapse in appropriations—see Question B.3. explaining "exempt" employees) serving as union officials may continue to be granted official time to the same extent and in the same manner as they would under non-shutdown conditions. In general, other employees serving as union officials may not work on official time during a shutdown, because they would be authorized to work official time only while they are in a duty status. Union officials, like other employees, may utilize up to four (4) hours to participate in the orderly suspension of operations.

There may be a narrow set of circumstances where exercise of a union's statutory rights could itself constitute an excepted activity and thereby fall within the Antideficiency Act's exceptions. If an agency official who is excepted (i.e., an individual paid by annual appropriations who is excepted from furlough because he or she is performing work that may continue to be performed during a lapse in appropriations—see Question B.1. explaining "excepted" employees) has determined, for example, that an investigation or the initiation of a personnel action is necessary to protect life and property, and must be undertaken prior to the enactment of appropriations, such an action could also fall within excepted activity. If this excepted activity triggers union representational rights under 5 U.S.C. chapter 71 (e.g., a formal discussion, a *Weingarten* interview, or the representation of an employee in connection with an adverse personnel action), a union's representational function would be required in order for the Agency to move forward with such an action and would, itself, in that narrow circumstance, constitute excepted activity. In such a case, therefore, official time should be granted to employees to serve in this representational function. With this in mind, agency officials should consult with Human Resources representatives and their legal counsel to evaluate whether contemplated management actions are necessary during the shutdown and whether they will trigger statutory representation rights.

49

5. **Will union officials have access to their union offices if they are in furlough status?**

   **A.** Generally, access to facilities during a furlough may be restricted based on funding, security, or other issues. Depending on agency operations, a particular facility, or portions of a facility, may be fully or partially operational.

   If a facility is operational and accessible, and a union official is either an exempt employee or is engaged in an excepted activity (in accordance with the requirements discussed in Question Q.4.), he or she would have access to the union office to engage in representational work in an official time capacity.

## R. Reductions in Force

**Reminder to agencies:** Agencies are encouraged to prepare decisional documents to document and support RIF-related decision-making. OPM encourages agencies to consult with their legal staff regarding what documents are necessary and what information they should contain.

1. **What is the difference between a reduction in force (RIF) and a furlough?**

   **A.** A reduction in force is a process to separate or reassign employees when positions have been abolished. A furlough is the placing of an employee in a temporary non-duty, non-pay status because of lack of work or funds, or other non-disciplinary reasons.

2. **Can an agency run a RIF during a shutdown furlough?  If so, can an agency issue RIF notices during the period of orderly shutdown before a shutdown furlough?**

   **A.** Yes, an agency can run a RIF and may issue RIF notices (prepared in accordance with the requirements in 5 CFR part 351, subpart H) when preparing for a shutdown furlough. OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities.

3. **What happens if the RIF effective date occurs during a shutdown furlough?**

   **A.** The RIF notice period continues during a lapse in funding (i.e., the effective date of release occurs as planned).  OMB has determined that agencies are authorized to direct employees to perform the work necessary to administer the RIF process during the lapse in appropriations as excepted activities.

4. **Is a furlough notice different than a RIF notice?**

   **A.** Yes, furlough notices and RIF notices require different information.

50

A furlough notice provides information about the reason for the furlough, information about appeal rights and a Form SF-8 (Notice to Federal Employee about Unemployment Insurance). This form provides information on filing unemployment compensation claims, including the agency's mailing address and Federal identification code. Employees may be asked to provide or refer to this form when they file a claim with their State unemployment insurance agency.

A RIF notice provides information about the RIF, how the employee is impacted, the benefits available to the employee and appeal rights. RIF notices must be created in accordance with 5 CFR 351 Subpart F. Sample templates for RIF notices are available on OPM's website at RIF Resources and Templates.

**5. Are there any additional notice requirements for RIFs of 50 or more employees in a competitive area?**

**A.** Yes, when an agency separates 50 or more employees by RIF from a competitive area, the agency must provide additional notification in accordance with 5 CFR 351.803(b) and the Workforce Investment Act of 1998.

**6. Are there any restrictions on establishing or changing competitive area definitions?**

**A.** Yes. An agency must establish competitive areas at least 90 days prior to the RIF effective date. Establishment or changes to competitive areas within 90 days of the RIF effective date must be approved by OPM. To request an exception to the 90-day competitive area requirement, please send a completed request template to the OPM Workforce Policy and Innovation's RIF Policy Advisory Team at WPIntake@opm.gov.

# Sample Shutdown Furlough Decision Notice Due to a Lapse in Appropriations

[Ensure that an SF-8 is attached to this notice]

This notice would be used for a "shutdown" furlough, where the agency no longer has the necessary funds to operate and must curtail those activities not excepted by OMB standards. In such instances there is no advance written notice proposing the action (see 5 CFR 752.404(d) and 359.806(a)), although a written furlough decision notice should be given as soon as possible after the furlough starts.

**NOTICE**

In the absence of either a Fiscal Year (FY) [state year] appropriation, or a continuing resolution for [agency name], no further financial obligations may be incurred by [agency name], except for those related to the orderly suspension of [agency's name] operations or performance of excepted activities as defined in the Office of Management and Budget (OMB) memorandum for Heads of Executive Departments and Agencies dated November 17, 1981. Because your services are no longer needed for orderly suspension of operations and you are not engaged in one of the excepted functions, you are being placed in a furlough status effective [enter date]. This furlough, i.e., nonduty, nonpay status, is an action of 30 days or less under 5 CFR part 752. Therefore, this furlough notice expires on [enter date]. You should monitor public broadcasts and the Internet. When a continuing resolution or an FY [state year] appropriation for [agency name] is approved, you will be expected to return to work on your next regular duty day.

This action is being taken because of a sudden emergency requiring curtailment of the agency's activities; therefore, no advance notification is possible. The customary 30-day advance notice period and opportunity to answer are suspended under the provisions of 5 CFR 752.404(d)(2). The 30 day-advance notice otherwise required by 5 CFR 359.806(a) for Senior Executive Service (SES) career appointees (other than reemployed annuitants) may be shortened or waived.

If employees are being retained in your competitive level or competitive area, they are required for orderly suspension of agency operations or they are performing one of the excepted activities defined in the OMB memorandum.

During the furlough period, you will be in a nonduty, nonpay status and you may not work at your workplace or other alternative worksite unless and until recalled. You will

not be permitted to work as an unpaid volunteer. Any paid leave (annual, sick, court, etc.) approved for use during the furlough period is canceled. After the lapse ends, you will receive your "standard rate of pay" for the furlough period in accordance with 31 U.S.C. 1341(c) as soon as possible. (This means that employees who would have been in pay status but for the lapse in appropriations will receive their full regular pay for any furlough period.)

Employees who have completed a probationary or trial period or 1 year of current continuous employment in the competitive service under other than a temporary appointment may appeal this action to the Merit Systems Protection Board (MSPB). Employees in the excepted service who have veterans preference may appeal to MSPB if they have completed 1 year of current continuous service in the same or similar positions as the one they now hold. Employees in the excepted service who do not have veterans preference and who are not serving a probationary or trial period under an initial appointment pending conversion to the competitive service may appeal to MSPB if they have completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less.

Career SES appointees (except reemployed annuitants) who believe requirements of 5 CFR part 359, subpart H, or the agency's procedures have not been correctly applied may also appeal to MSPB. Career SES appointees may inspect the regulations and records pertinent to this action at the following location: [identify location and times, as appropriate].

The process to exercise your appeal, grievance, and complaint rights are set forth below. Carefully read the explanations for how to exercise your options and the effects of an election as you may elect only **one** avenue for redress.

**MSPB Appeal:** If you have the right of appeal to MSPB and wish to appeal this action to MSPB, you must file the appeal within 30 calendar days after the effective date of your furlough, or 30 days after the date of your receipt of this decision notice, whichever is later. If you wish to file an appeal, you may obtain information about the appeals process and a copy of the appeals form from the MSPB website at http://www.mspb.gov/appeals/appeals.htm. If you cannot access the internet, please notify [insert name and contact information] and a paper copy of MSPB's appeal form and regulations will be provided to you. MSPB requires an appeal to be filed with the MSPB regional or field office serving the area where your duty station was located

53

when the action was taken. Based upon your duty station, the appropriate field office is [identify appropriate regional office]. You may wish to check MSPB's website for its operating status during this time. MSPB encourages employees to file electronically with MSPB's e-Appeal electronic filing system at https://e-appeal.mspb.gov/. Employees have a right to representation in this matter and may be represented by an attorney or other person of their choosing. MSPB requires that attorney representatives register as e-filers with MSPB and file all pleadings using MSPB's e-Appeal. If you submit an appeal to MSPB, the agency official to whom MSPB should send the Acknowledgment Order and copy of the appeal is [insert the official's name or title, physical mailing address, email address, telephone, and fax number].

**Grievance Under Collective Bargaining Agreement:** Bargaining unit employees may grieve this action in accordance with the applicable negotiated agreement [provide citation to negotiated agreement] or may appeal to MSPB in accordance with the procedures outlined above, but not both. An employee is deemed to have exercised an option when the employee timely files a notice of appeal under the applicable appellate procedures or timely files a grievance in writing in accordance with the provisions of the negotiated grievance procedure, whichever event occurs first. Inquiries about pursuing the grievance process cannot alter the MSPB deadlines referenced above. However, the election of the negotiated grievance procedure will not prejudice the employee's right to request MSPB review of the final decision with respect to allegations of discrimination as defined in 5 U.S.C. 2302(b)(1). To obtain information on filing a grievance under the negotiated grievance procedure, contact [name of exclusive union representative].

**Discrimination Complaint:** If you believe this action involves discrimination based on race, color, religion, sex, national origin, handicapping condition, or age, you have the right to file a complaint under the provisions of 29 C.F.R. Part 1614. To do so, you must contact an Equal Employment Opportunity (EEO) counselor within forty-five (45) calendar days of your receipt of this letter. For further information or assistance, you may contact [insert name, address, e-mail address, and phone number of agency's EEO contact]. Use of the pre-complaint process described in 5 C.F.R. § 1614.105 does not constitute an election, but the filing of a complaint does.

**Office of Special Counsel Complaint:** You may file a prohibited personnel action complaint to seek corrective action through the Office of Special Counsel in accordance with subchapters II and III of 5 U.S.C. chapter 12. However, your appeal rights to MSPB will be limited to protected whistleblower disclosures under 5 U.S.C.

54

§ 2302(b)(8) or retaliation for engaging in certain protected activities under 5 U.S.C. § 2302(b)(9). Visit https://osc.gov/ for more information.

Attached is the SF-8, *Notice to Federal Employee about Unemployment Insurance*. Please be aware that you may be required to repay any unemployment insurance payments once an appropriations bill is enacted and you receive pay for the period of the furlough. Additional information about unemployment insurance is available at https://www.careeronestop.org/LocalHelp/service-locator.aspx.

We recognize the difficult financial implications of any furlough, no matter how limited its length. We will make every effort to keep you informed as additional information regarding the agency funding level becomes available. If you have questions, contact [contact name, phone number, and email address].

_____          _____
Deciding Official                                    Date


I acknowledge receipt of this decision.


_____          _____
Employee's signature                              Date


Attachment: SF-8

# Sample Notice of Furlough During Holiday to Excepted Employee Due to a Lapse in Appropriations

[Ensure that an SF-8 is attached to this notice]

In the absence of either a Fiscal Year (FY) [state year] appropriation, or a continuing resolution for [agency name], no new financial obligations may be incurred by the Agency for functions funded through annual appropriations, except with respect to certain personnel who are otherwise authorized to continue to work.

As you are aware, as an employee who has been excepted from furlough and continued to work during the shutdown, you are required to work on those days you would normally be scheduled to work. The upcoming [state holiday] on [state date], is not a day you would normally be scheduled to work, and we are not requiring you to work on that day. Because of the operation of the shutdown furlough rules, we must place you in a furlough status for the [state holiday] holiday. As an excepted employee, you are expected to return to work on your next regularly scheduled workday following the [state holiday] holiday. For the vast majority of you, this means you would return to work on [state date].

If you have a work schedule that does not include [state date], as a workday, you will follow the normal holiday rules for an "in lieu of" holiday. All full-time employees, including those on flexible or compressed work schedules, are entitled to an "in lieu of" holiday when a holiday falls on a non-workday. For example, if you have a Monday through Friday alternative work schedule (AWS), and [state holiday] is your regularly scheduled AWS day off, you will do as you have generally done for previous holidays and take your "in lieu of" holiday the work day immediately preceding Monday. For example, if the holiday is Monday, [insert date], your "in lieu of" holiday would be Friday, [insert date]. You would be in furlough status on Friday instead of Monday in this example. You would return to work on Tuesday, [insert date], because your regular day off is on Monday, [insert date].

This can be a bit confusing, so if you do not fall in the category above of working a Monday through Friday schedule and/or are unclear of when your "in-lieu of" holiday is to occur, please consult with your supervisor. In the event your supervisor is unavailable, please call or email [state agency] Human Resources.

This action is being taken because of a sudden emergency requiring curtailment of the agency's activities; therefore, no advance notification is possible. The customary

30-day advance notice period and opportunity to answer are suspended under the provisions of 5 CFR 752.404(d)(2). The 30 day-advance notice otherwise required by 5 CFR 359.806(a) for Senior Executive Service (SES) career appointees (other than reemployed annuitants) may be shortened or waived.

If employees are being retained in your competitive level or competitive area, they are required for orderly suspension of agency operations or they are performing one of the excepted activities defined in the OMB memorandum.

During the furlough period, you will be in a nonduty, nonpay status and you may not work at your workplace or other alternative worksite unless and until recalled. You will not be permitted to work as an unpaid volunteer. Any paid leave (annual, sick, court, etc.) approved for use during the furlough period is canceled. After the lapse ends, you will receive your "standard rate of pay" for the furlough period in accordance with 31 U.S.C. 1341(c) as soon as possible. (This means that employees who would have been in pay status but for the lapse in appropriations will receive their full regular pay for any furlough period.)

Employees who have completed a probationary or trial period or 1 year of current continuous employment in the competitive service under other than a temporary appointment may appeal this action to the Merit Systems Protection Board (MSPB). Employees in the excepted service who have veterans preference may appeal to MSPB if they have completed 1 year of current continuous service in the same or similar positions as the one they now hold. Employees in the excepted service who do not have veterans preference and who are not serving a probationary or trial period under an initial appointment pending conversion to the competitive service may appeal to MSPB if they have completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less.

Career SES appointees (except reemployed annuitants) who believe requirements of 5 CFR part 359, subpart H, or the agency's procedures have not been correctly applied may also appeal to MSPB. Career SES appointees may inspect the regulations and records pertinent to this action at the following location: [identify location and times, as appropriate].

The process to exercise your appeal, grievance, and complaint rights are set forth below. Carefully read the explanations for how to exercise your options and the effects of an election as you may elect only **one** avenue for redress.

**MSPB Appeal:** If you have the right of appeal to MSPB and wish to appeal this action to MSPB, you must file the appeal within 30 calendar days after the effective date of your furlough, or 30 days after the date of your receipt of this decision notice, whichever is later. If you wish to file an appeal, you may obtain information about the appeals process and a copy of the appeals form from the MSPB website at http://www.mspb.gov/appeals/appeals.htm. If you cannot access the internet, please notify [insert name and contact information] and a paper copy of MSPB's appeal form and regulations will be provided to you. MSPB requires an appeal to be filed with the MSPB regional or field office serving the area where your duty station was located when the action was taken. Based upon your duty station, the appropriate field office is [identify appropriate regional office]. You may wish to check MSPB's website for its operating status during this time. MSPB encourages employees to file electronically with MSPB's e-Appeal electronic filing system at https://e-appeal.mspb.gov/. Employees have a right to representation in this matter and may be represented by an attorney or other person of their choosing. MSPB requires that attorney representatives register as e-filers with MSPB and file all pleadings using MSPB's e-Appeal. If you submit an appeal to MSPB, the agency official to whom MSPB should send the Acknowledgment Order and copy of the appeal is [insert the official's name or title, physical mailing address, email address, telephone, and fax number].

**Grievance Under Collective Bargaining Agreement:** Bargaining unit employees may grieve this action in accordance with the applicable negotiated agreement [provide citation to negotiated agreement] or may appeal to MSPB in accordance with the procedures outlined above, but not both. An employee is deemed to have exercised an option when the employee timely files a notice of appeal under the applicable appellate procedures or timely files a grievance in writing in accordance with the provisions of the negotiated grievance procedure, whichever event occurs first. Inquiries about pursuing the grievance process cannot alter the MSPB deadlines referenced above. However, the election of the negotiated grievance procedure will not prejudice the employee's right to request MSPB review of the final decision with respect to allegations of discrimination as defined in 5 U.S.C. 2302(b)(1). To obtain information on filing a grievance under the negotiated grievance procedure, contact [name of exclusive union representative].

**Discrimination Complaint:** If you believe this action involves discrimination based on race, color, religion, sex, national origin, handicapping condition, or age, you have the right to file a complaint under the provisions of 29 C.F.R. Part 1614. To do so, you must

contact an Equal Employment Opportunity (EEO) counselor within forty-five (45) calendar days of your receipt of this letter. For further information or assistance, you may contact [insert name, address, e-mail address, and phone number of agency's EEO contact]. Use of the pre-complaint process described in 5 C.F.R. § 1614.105 does not constitute an election, but the filing of a complaint does.

**Office of Special Counsel Complaint:** You may file a prohibited personnel action complaint to seek corrective action through the Office of Special Counsel in accordance with subchapters II and III of 5 U.S.C. chapter 12. However, your appeal rights to MSPB will be limited to protected whistleblower disclosures under 5 U.S.C. § 2302(b)(8) or retaliation for engaging in certain protected activities under 5 U.S.C. § 2302(b)(9). Visit https://osc.gov/ for more information.

Attached is the SF-8, *Notice to Federal Employee about Unemployment Insurance*. Please be aware that you may be required to repay any unemployment insurance payments once an appropriations bill is enacted and you receive pay for the period of the furlough. Additional information about unemployment insurance is available at https://www.careeronestop.org/LocalHelp/service-locator.aspx.

We recognize the difficult financial implications of any furlough, no matter how limited its length. We will make every effort to keep you informed as additional information regarding the agency funding level becomes available. If you have questions, contact [contact name, phone number, and email address].


_____          _____
Deciding Official                                      Date



I acknowledge receipt of this decision.


_____          _____
Employee's signature                                 Date


Attachment: SF-8

59

62

## Sample Notice of Furlough During Intermittent Absences and Holidays to Excepted Employee Due to a Lapse in Appropriations

[Ensure that an SF-8 is attached to this notice]

In the absence of either a Fiscal Year (FY) [state year] appropriation, or a continuing resolution for [agency name], no new financial obligations may be incurred by the Agency for functions funded through annual appropriations, except with respect to certain personnel who are otherwise authorized to continue to work.

As you are aware, as an employee who has been excepted from furlough and continued to work during the shutdown, you are required to work on those days you would normally be scheduled to work. Because of the operation of the shutdown furlough rules, however, we must place you in a furlough status for the following dates: [state applicable date(s)]. As an excepted employee, you are expected to return to work on your next regularly scheduled workday following [state date]. This means you would return to work on [state date].

This action is being taken because of a sudden emergency requiring curtailment of the agency's activities; therefore, no advance notification is possible. The customary 30-day advance notice period and opportunity to answer are suspended under the provisions of 5 CFR 752.404(d)(2). The 30 day-advance notice otherwise required by 5 CFR 359.806(a) for Senior Executive Service (SES) career appointees (other than reemployed annuitants) may be shortened or waived.

If employees are being retained in your competitive level or competitive area, they are required for orderly suspension of agency operations or they are performing one of the excepted activities defined in the OMB memorandum.

During the furlough period, you will be in a nonduty, nonpay status and you may not work at your workplace or other alternative worksite unless and until recalled. You will not be permitted to work as an unpaid volunteer. Any paid leave (annual, sick, court, etc.) approved for use during the furlough period is canceled. After the lapse ends, you will receive your "standard rate of pay" for the furlough period in accordance with 31 U.S.C. 1341(c) as soon as possible. (This means that employees who would have been in pay status but for the lapse in appropriations will receive their full regular pay for any furlough period.)

Employees who have completed a probationary or trial period or 1 year of current continuous employment in the competitive service under other than a temporary appointment may appeal this action to the Merit Systems Protection Board (MSPB). Employees in the excepted service who have veterans preference may appeal to MSPB if they have completed 1 year of current continuous service in the same or similar positions as the one they now hold. Employees in the excepted service who do not have veterans preference and who are not serving a probationary or trial period under an initial appointment pending conversion to the competitive service may appeal to MSPB if they have completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less.

Career SES appointees (except reemployed annuitants) who believe requirements of 5 CFR part 359, subpart H, or the agency's procedures have not been correctly applied may also appeal to MSPB. Career SES appointees may inspect the regulations and records pertinent to this action at the following location: [identify location and times, as appropriate].

The process to exercise your appeal, grievance, and complaint rights are set forth below. Carefully read the explanations for how to exercise your options and the effects of an election as you may elect only **one** avenue for redress.

**MSPB Appeal:** If you have the right of appeal to MSPB and wish to appeal this action to MSPB, you must file the appeal within 30 calendar days after the effective date of your furlough, or 30 days after the date of your receipt of this decision notice, whichever is later. If you wish to file an appeal, you may obtain information about the appeals process and a copy of the appeals form from the MSPB website at http://www.mspb.gov/appeals/appeals.htm. If you cannot access the internet, please notify [insert name and contact information] and a paper copy of MSPB's appeal form and regulations will be provided to you. MSPB requires an appeal to be filed with the MSPB regional or field office serving the area where your duty station was located when the action was taken. Based upon your duty station, the appropriate field office is [identify appropriate regional office]. You may wish to check MSPB's website for its operating status during this time. MSPB encourages employees to file electronically with MSPB's e-Appeal electronic filing system at https://e-appeal.mspb.gov/. Employees have a right to representation in this matter and may be represented by an attorney or other person of their choosing. MSPB requires that attorney representatives register as e-filers with MSPB and file all pleadings using MSPB's

61

e-Appeal. If you submit an appeal to MSPB, the agency official to whom MSPB should send the Acknowledgment Order and copy of the appeal is [insert the official's name or title, physical mailing address, email address, telephone, and fax number].

**Grievance Under Collective Bargaining Agreement:** Bargaining unit employees may grieve this action in accordance with the applicable negotiated agreement [provide citation to negotiated agreement] or may appeal to MSPB in accordance with the procedures outlined above, but not both. An employee is deemed to have exercised an option when the employee timely files a notice of appeal under the applicable appellate procedures or timely files a grievance in writing in accordance with the provisions of the negotiated grievance procedure, whichever event occurs first. Inquiries about pursuing the grievance process cannot alter the MSPB deadlines referenced above. However, the election of the negotiated grievance procedure will not prejudice the employee's right to request MSPB review of the final decision with respect to allegations of discrimination as defined in 5 U.S.C. 2302(b)(1). To obtain information on filing a grievance under the negotiated grievance procedure, contact [name of exclusive union representative].

**Discrimination Complaint:** If you believe this action involves discrimination based on race, color, religion, sex, national origin, handicapping condition, or age, you have the right to file a complaint under the provisions of 29 C.F.R. Part 1614. To do so, you must contact an Equal Employment Opportunity (EEO) counselor within forty-five (45) calendar days of your receipt of this letter. For further information or assistance, you may contact [insert name, address, e-mail address, and phone number of agency's EEO contact]. Use of the pre-complaint process described in 5 C.F.R. § 1614.105 does not constitute an election, but the filing of a complaint does.

**Office of Special Counsel Complaint:** You may file a prohibited personnel action complaint to seek corrective action through the Office of Special Counsel in accordance with subchapters II and III of 5 U.S.C. chapter 12. However, your appeal rights to MSPB will be limited to protected whistleblower disclosures under 5 U.S.C. § 2302(b)(8) or retaliation for engaging in certain protected activities under 5 U.S.C. § 2302(b)(9). Visit https://osc.gov/ for more information.

Attached is the SF-8, *Notice to Federal Employee about Unemployment Insurance.* Please be aware that you may be required to repay any unemployment insurance payments once an appropriations bill is enacted and you receive pay for the period of the furlough. Additional information about unemployment insurance is available at

https://www.careeronestop.org/LocalHelp/service-locator.aspx.

We recognize the difficult financial implications of any furlough, no matter how limited its length. We will make every effort to keep you informed as additional information regarding the agency funding level becomes available. If you have questions, contact [contact name, phone number, and email address].


_____        _____
Deciding Official                                      Date



I acknowledge receipt of this decision.


_____        _____
Employee's signature                               Date


Attachment: SF-8

63

# Table of Recent Changes

(Changes made on September 28, 2025)

| Question | Change | Description |
|----------|--------|-------------|
| A.3 | New | Use of Government equipment in a shutdown furlough |
| P.6.b. | New | Probationary and trial period certifications and petitions |
| P.6.c. | New | Certifications, terminations, and petitions under 5 CFR 11.5 |
| R.1 – R.6 | New | Reductions in force |

(Changes made by Addendum dated January 29, 2024)

| Question | Change | Description |
|----------|--------|-------------|
| D.4a | New | Intermittent employees and retroactive pay |
| D.6 | Revised | Order of precedence for deductions when pay is insufficient to cover all deductions |
| D.7 | New | Amount of deductions taken from an employee's partial paycheck |
| D.8 | New | Effect on insurance and flexible spending account enrollment and coverage |
| D.9 | New | Changes to allotments previously designated by the employee |
| D.10 | New | Amount of deductions taken for allotments |
| D.11 | New | Effect on deductions for court-ordered garnishments |
| F.6 | Revised | Previously scheduled FMLA leave and 12-week entitlement |
| F.7 | Revised | Employee scheduled to take paid leave under FMLA |
| F.21 | New | Employee scheduled to take paid parental leave in substitution for unpaid FMLA leave |
| F.22 | New | Furlough time and FMLA service time eligibility requirement |

64

| F.23 | New | Furlough time and required weeks of work for purposes of paid parental leave |
| F.24 | New | Effect on 12-month period following the birth or placement of a child for paid parental leave |
| F.25 | New | Effect on 12-month eligibility period for disabled veteran leave |
| F.26 | New | Advanced scheduling of annual leave for annual leave restoration purposes |
| I.1 | Revised | Unemployment compensation |
| I.2 | Revised | TSP loans during furlough |
| I.2a | New | TSP information |

| Question | Change | Description |
| --- | --- | --- |
| M.2 | Revised | Making updates or changes to retirement benefits |
| M.3 | Revised | Reporting the death of a family member |
| M.4 | Revised | Retirement applications |
| M.6 | Revised | Submitting court order that awards a retirement benefit |
| Note to Section O | Revised | Federal workers' compensation benefits |
| Sample Notice | Revised | Notice of furlough |
| Sample Notice | Revised | Notice of furlough during holiday for excepted employee |
| Sample Notice | Revised | Notice of furlough during intermittent absences and holidays for excepted employee |

Note: This table of changes does not include minor language revisions, editorial corrections, and URL revisions.



**U.S. Office of Personnel Management**

**Workforce Policy & Innovation (WPI)**
1900 E Street NW, Washington DC 20415

OPM.gov

# EXHIBIT D

## Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025

**NOTE:** These instructions are based on laws currently in effect at the time of issuance. As is always the case, Congress may enact legislation that changes existing statutory provisions.  Any future change in law would supersede these instructions.

In the event an agency and its employees are affected by a lapse in appropriations by Wednesday, October 1, 2025, the following special instructions apply. This information supplements (and should be read with) general guidance issued by the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) for administering an agency shutdown of operations due to a lapse in appropriations, consistent with the Antideficiency Act (ADA) (31 U.S.C. 1341-1342) and the pay, leave, and other relevant statutory authorities that apply to lapse-affected employees. It highlights certain matters of particular relevance to the current situation.

For the purpose of these instructions, lapse-affected employees include "furloughed employees" and "excepted employees." "Excepted employees" may perform activities legally permitted as an exception to the ADA's prohibitions on performing work during a lapse in appropriations, but may not be paid for that work until after the lapse is over. Specific guidance regarding lapse-affected employees under the Deferred Resignation Program, Reduction-in-Force, and other similar workforce realignment situations is provided at the end of this document.

Employees designated as "exempt" from furlough—which is distinct from "excepted employees"—are not affected by a lapse in appropriations because there is an other-than-annual source of funds (e.g., supplemental appropriation, carryover) that can be used for those functions in the absence of annually appropriated funds. "Exempt" employees will generally continue to be governed by the normal pay and leave rules during a lapse in appropriations and are not covered by these special instructions. (Note: "Exempt" employees may be placed on "administrative furlough" necessitated by downsizing, reduced funding, lack of work, or a budget situation other than a lapse in appropriations.  See OPM's administrative furlough guidance for additional information.)

### General

- Agencies should review OPM's Guidance for Shutdown Furloughs and any addendums to this guidance posted on OPM's shutdown furlough webpage, as well as guidance provided by OMB.

1

- In preparation for a shutdown due to a lapse in appropriations, each agency should update its database of employee contact information to facilitate communications with employees when in furlough status and ensure employee contact information is current.

**Payroll implications**

- In the event of a lapse commencing on Wednesday, October 1, the Federal civilian paychecks for the September 7 – September 20 pay period would not be delayed, as Federal payroll providers will have already completed processing for this pay period. Paychecks for this pay period should be issued at the normal time (generally, in the September 26 – October 2 time range).

- To minimize potential delays if a lapse lingers, agencies should coordinate with their Chief Human Capital Officer (CHCO) office and payroll provider to submit employee timekeeping data for the September 21 – October 4 pay period as part of orderly shutdown activities. Assuming the lapse is in effect during the time that timekeeping is being finalized, the paychecks may not include pay for any work performed during the period from Wednesday, October 1, through Saturday, October 4. Agencies should document work performed during the September 21 – September 30 period, as well as any other later excepted work performed during the lapse, following any special instructions from their time and attendance and payroll provider.

- Lapse-affected employees may not receive any pay for periods of time during a lapse in appropriations (beginning on October 1, 2025), including when excepted work is performed. The appropriate retroactive pay for periods of furlough and excepted work will be provided after the lapse ends, as required by law.

- If the lapse in appropriations continues during the October 5 – October 18 pay period, any excepted work performed during the lapse should continue to be documented following any special instructions from the agency's time and attendance and payroll provider. No pay may be provided for excepted work performed during the October 5 – October 18 pay period until the lapse in appropriations has ended. Under 31 U.S.C. 1341(c), after the lapse in appropriations has ended, both excepted and furloughed employees will receive retroactive pay at the employee's standard rate of pay.

**Leave**

- During the lapse, agencies must cancel all previously scheduled paid leave and other paid time off (including paid holiday time off) for lapse-affected employees.

- Intermittent absences are permitted for excepted employees, subject to supervisory approval. An agency may allow an excepted employee to be absent from duty on days the employee was previously scheduled to take leave or be in holiday time off status. An agency may also use work schedule flexibilities (for example, flexible starting and stopping times under a flexible work schedule) to accommodate an employee's personal needs without requiring an absence from duty or furloughing the employee.

- If an excepted employee is excused from duty during the lapse, the employee must either be placed in (1) furlough status or (2) paid leave status under 31 U.S.C. 1341(c)(3) (with leave payments deferred until after the lapse has ended), if requested by the employee. Generally, we anticipate that excepted employees will use the available work schedule flexibilities described above or be furloughed when excused from duty. Because excepted employees are entitled to retroactive pay for furlough periods without charge to leave, we do not anticipate that excepted employees will request to use paid leave. (See more information in the "Excepted employees" section below.)

**Holidays**

- Lapse-affected employees—whether excepted or furloughed—will not be paid for a holiday until after the lapse in appropriations has ended.

- Holiday premium pay rules apply to excepted work performed on a holiday during a lapse in appropriations. Thus, if the lapse is in effect on a holiday, an excepted employee who is required to perform work on the holiday during the employee's regular hours may earn holiday premium pay; however, payment cannot be made until after the lapse has ended (31 U.S.C. 1341(c)(2)). Excepted employees who are not otherwise scheduled to work on a holiday are not required to work. If an excepted employee does not perform work on a holiday, the employee must be placed in a furlough status for the holiday. See the section on "Excepted employees" below for additional information.

**Orderly shutdown**

- Agencies should provide clear instructions to employees who will be furloughed due to a lapse in appropriations regarding when they are expected to report to work to perform any necessary orderly shutdown activities.

- With respect to the issuance of furlough notices, agencies should follow OPM's Guidance for Shutdown Furloughs and any addendums to this guidance posted on OPM's shutdown furlough webpage, including the sample furlough notices for excepted employees who are furloughed on a holiday or for other intermittent absences.

- As a general rule, agencies may allow an employee whose work is not otherwise excepted to perform up to 4 hours of orderly shutdown activities, as necessary, which may include the time required to receive a furlough notice (in person, electronically, or otherwise, as determined by an agency). Unless the agency directs otherwise, employees are expected to perform any necessary orderly shutdown activities (including receipt of a furlough notice) on the first workday the employee was scheduled to work after the lapse commences. Employees generally should not be allowed to perform orderly shutdown work on a day off (for example on a weekend day for employees with a Monday-Friday schedule, an alternative work schedule (AWS) day off, or a holiday). OMB's general guidance addresses orderly shutdown activities. OMB expects agencies to minimize orderly shutdown activities.

- An agency generally should not direct an employee to perform orderly shutdown work on a day on which the employee had been scheduled to be on leave. If an employee was scheduled to be on leave on the workdays immediately after the lapse commences, the employee is not required to report to duty to perform orderly shutdown activities on a scheduled leave day, even though the leave has been canceled. An agency may allow such an employee to perform any necessary orderly shutdown activities (including receipt of a furlough notice) on the first workday on which the employee had been scheduled to return to duty. Employees may not, however, perform any non-excepted agency work prior to conducting an orderly shutdown. For example, if an employee with a Monday-Friday schedule was scheduled to take leave on Wednesday, October 1, and return to work on Thursday, October 2, an agency could require the employee to report to duty to perform any necessary orderly shutdown activities on October 2. (Note: The employee may have performed certain shutdown activities prior to going on leave,

4

which would limit the need to perform orderly shutdown activities after the commencement of the lapse. Additionally, agencies should make every effort to ensure that employees who will not be conducting orderly shutdown activities for several days following the commencement of the lapse are aware of their furlough status during that period.)

- If the employee described in the previous paragraph has a flexible work schedule and a scheduled AWS day off on Wednesday, October 1, the employee could be allowed to perform orderly shutdown activities on their next workday, Thursday, October 2, or to move the AWS day off, so that the employee performs any required orderly shutdown activities on Wednesday, October 1.

- An agency should avoid directing an employee to perform orderly shutdown activities outside of their "regular" work schedule. If an agency directs an employee to perform orderly shutdown activities on a non-workday, a holiday, or the employee's AWS day off, any hours performing orderly shutdown activities would count as hours in applying applicable premium pay rules (for example for holiday premium pay or overtime pay). (Since retroactive pay will be provided for furlough hours, furlough hours will count as hours of work in applying overtime rules.)

**Excepted employees**

- A lapse-affected employee is allowed to perform work only to perform orderly shutdown of agency operations related to non-excepted activities or other work that has been identified as excepted under guidance issued by OMB. Agencies must apply OMB guidance to determine what work activities and employees are "excepted" during the lapse.

- If an agency authorizes an excepted employee's absence from duty, the agency should place the employee in furlough status. For example, if an excepted employee is excused from duty on a holiday, the agency should place the employee in furlough status on that day. After the shutdown has ended, excepted employees are entitled to retroactive pay at the employee's standard rate of pay for furlough periods—without charge to leave, as provided in 31 U.S.C. 1341(c)(2).

- Pursuant to 31 U.S.C. 1341(c)(3), an excepted employee has the option of requesting leave under 5 U.S.C. chapter 63 (or other applicable law) to cover an authorized absence during a lapse in appropriations, but even then, the payment for that leave will not be made until after the lapse has ended.

However, excepted employees are still entitled to retroactive pay for furlough periods without charge to leave, so we do not anticipate that excepted employees will request to use their leave during a lapse. If an excepted employee receives paid leave to cover a period of absence during a lapse, the employee may not also receive retroactive pay under 31 U.S.C. 1341(c)(2) for that period. (Note: An excepted employee cannot request to use paid leave for an authorized absence on a holiday. An excepted employee must be placed in a furlough status when absent on a holiday.)

- If an excepted employee is directed to perform excepted work during a lapse in appropriations but fails to report for duty, the agency may place the employee in absent-without-leave (AWOL) status for missed work hours, in accordance with agency policy and procedures—instead of placing the employee in furlough status. No retroactive pay will be provided for AWOL hours, since the standard rate of pay for AWOL hours is zero.

- The sample furlough notices for excepted employees in OPM's shutdown furlough guidance may be modified so that a single notice can be provided to cover any holidays or other approved absences on a regular workday during the lapse in appropriations. Unless the employee's agency specifically directs otherwise, excepted employees should generally report for duty on the next day on which they are scheduled to work.

- Agencies should take into consideration an excepted employee's previously scheduled leave or scheduled holiday time off that takes place during the lapse in appropriations and allow the employee to be furloughed (or approve paid time off under 31 U.S.C. 1341(c)(3), if requested by the employee) during the period the employee had been scheduled to be excused from duty—unless the agency determines there is a need for the employee to report to work to perform excepted activities.

- If an agency directs an excepted employee to work on a holiday or the employee's AWS day off, any hours performing work would count as hours in applying applicable premium pay rules (for example, for overtime pay or holiday premium pay). Excepted employees will be paid for any earned overtime pay or other premium pay when Congress restores appropriations.

**Deferred Resignation Program (DRP), Reduction-in-Force (RIF), and similar workforce realignment situations**

**NOTE:** Some employees under DRP, RIF, or other similar workforce realignment situations may be designated as "exempt" from furlough because their functions

are not funded by annual appropriated funds. Such employees will generally continue to be governed by the normal pay and leave rules during a lapse in appropriations and are not covered by the following shutdown furlough guidance.

- If lapse-affected employees were scheduled to be in an administrative leave status for DRP, RIF, or similar workforce realignment purposes on or after October 1, 2025, the employing agency must cancel that administrative leave and place those employees in a furlough status during the lapse of appropriations. Such employees do not need to perform any orderly shutdown activities as they should have already transitioned their work to other agency staff and should not have access to Federal Government equipment or systems. To the extent any agency employees have not already transitioned their work to other agency staff, they should follow their agency's determination as to their excepted or furloughed status during the lapse. Agencies should coordinate with their CHCO office to provide furlough notices to such employees using their personal contact information on record.

- Lapse-affected employees whose administrative leave for DRP, RIF, and similar workforce realignment purposes is canceled and who are furloughed may not receive any pay during the lapse (beginning on October 1, 2025). The timekeeping and paycheck processing guidance in the "Payroll implications" section above applies to such employees. The appropriate retroactive pay for periods of furlough will be provided after the lapse ends, as required by 31 U.S.C. 1341(c). Agencies should coordinate with their CHCO office and their payroll provider for any special time-keeping instructions for such employees during and after the lapse in appropriations.

- After the shutdown has ended, furloughed employees who would otherwise be on DRP, RIF, or similar workforce realignment administrative leave will receive retroactive pay at the employee's standard rate of pay under 31 U.S.C. 1341(c). The standard rate of pay for such employees is the pay the employee would have received had he or she remained on administrative leave and not been furloughed. Should such an employee leave Federal employment due to voluntary resignation, involuntary separation, or retirement during the lapse of appropriations, the employee will receive retroactive pay only through the effective date of separation from Federal service. Service credit and retirement and insurance benefit provisions that apply to other lapse-affected employees (as discussed in OPM's Guidance for Shutdown Furloughs and any addendums to this guidance posted on OPM's shutdown furlough webpage)

generally apply in the same manner to such lapse-affected employees.

- Employees under a DRP agreement with a voluntary resignation or retirement date of September 30, 2025, are not affected by a lapse in appropriations commencing on October 1. Such employees will no longer be employed in the Federal Government after September 30, should not be continued on administrative leave, furloughed, or placed in an excepted status upon a lapse in appropriations, and will not be entitled to any retroactive pay under 31 U.S.C. 1341(c) after the lapse ends. OMB has advised that agency human resources and payroll provider staff affected by a lapse in appropriations may be placed in an excepted status to perform work necessary to off-board DRP employees resigning or retiring on September 30 as orderly shutdown activities, including to submit retirement applications to OPM.

- Lump-sum annual leave and severance payments for eligible employees who separate from Federal service under a DRP, RIF, or other workforce realignment initiative may be delayed or paused during a lapse. Affected employees will receive any delayed or paused payments (including any retroactive severance payments that should have been paid during the lapse) once appropriated funds are restored. For additional information, see OPM's Guidance for Shutdown Furloughs and any addendums to this guidance posted on OPM's shutdown furlough webpage.

**Probationary Employees**

Some employees affected by a lapse in appropriations may be near the end of their probationary period (for competitive service employees) or trial period (for excepted service employees). Such employees are subject to the requirements of Executive Order 14284, Civil Service Rule 11, and OPM guidance of August 7, 2025, as summarized below:

- Agencies are required to certify that finalizing a probationary employee's appointment advances the public interest. To prevent automatic termination, such certification must be made during the 30-day period prior to the date on which the probationary or trial period ends.

- If an agency fails to make a certification under Civil Service Rule 11 due to administrative error, the agency head may petition the Director of OPM within 30 days from the date of termination to reinstate the employee. If the petition is approved, the employee will be reinstated retroactively and receive retroactive pay. The deadlines for issuing a certification, effecting a termination, or submitting a petition as described above are not affected by a lapse in appropriations. To the extent possible, agencies should issue

certifications, process terminations, and submit petitions no later than September 30, 2025. OMB has determined that, during a lapse in appropriations, agencies may direct employees to process certifications, terminations, and petitions within the applicable timeframes as excepted activities. If necessary, employees who would otherwise be furloughed may be put in excepted duty status to process certifications, terminations, or petitions to ensure the applicable deadline is met. For example, if October 31, 2025, is the end of a probationary/trial period, the 30-day period before that date would be October 1-30. Thus, an agency may decide to process the certification on October 1 (the first day of the lapse) because of the uncertainty regarding the length of the lapse. If the 30-day window to issue a certification starts during the lapse in appropriations, an agency may place employees in excepted duty status as necessary to ensure timely processing of the certification.

- If an agency fails to issue a timely certification due to administrative error, and the 30-day window to submit a petition to OPM overlaps with a lapse in appropriations (e.g., the window begins on October 4, 2025), an agency may place employees in excepted duty status as necessary to ensure timely processing of the petition. A timely certification ensures that the employee remains in employment status and will be paid for periods of furlough or excepted work after the lapse ends in accordance with 31 U.S.C. 1341(c). Petitions should be submitted to probationaryappeal@opm.gov. If OPM approves an agency petition to reinstate an employee who was terminated at the end of a probationary/trial period for lack of a timely certification, the employee would be retroactively placed in employment status. To the extent periods of a lapse are implicated by that retroactive action, the employee would be placed retroactively in furlough status and would be paid for the furlough time in accordance with 31 U.S.C. 1341(c).

**Simultaneous Reduction in Force in Process**

Some employees affected by a lapse in appropriations may have also received a notice of reduction in force (RIF) with a future effective date. In connection with a possible October 1, 2025, lapse in appropriations, OMB has directed agencies to consider issuing RIF notices to all employees in programs, projects, or activities (PPAs) that satisfy the following conditions (1) discretionary funding lapses on October 1, 2025; (2) another source of funding, such as H.R. 1 (Public Law 119-21) is not currently available; and (3) the PPA is not consistent with the President's priorities.

A RIF process is conducted separately from the process for administering a shutdown due to a lapse in appropriations, as separate notices must be issued and each process is subject to applicable rules and procedures. This is so even where the RIF process may occur simultaneously with a lapse in appropriations.

Agencies are encouraged to prepare a decisional memorandum that documents and supports RIF-related decision-making. OPM recommends consultation with your agency's legal staff regarding such decisional memoranda.

If a RIF notice is issued for employees in a competitive area, the notice is issued to all impacted employees in the competitive area. This may include both employees who are excepted from the furlough and furloughed employees. Once fiscal year 2026 appropriations are enacted, agencies may consider revising their RIFs as needed to retain the minimal number of employees necessary to carry out statutory functions. Any proposed RIF plan must be submitted to OMB.

Any RIF notice issued shortly before or after the lapse in appropriations that commences on October 1, 2025, will generally provide for a full 60-day notice period during which employees will retain employment status. Thus, if the lapse in appropriations ends during the RIF notice period, the employee will be entitled to any retroactive pay payable to furloughed and excepted employees under 31 U.S.C. 1341(c).

OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities.

An agency that is conducting a RIF that will separate 50 or more employees from a competitive area has additional notice requirements to the bargaining unit representative, the State program authorized by the Workforce Investment Act (dislocated worker program), the chief elected government official of the local government(s), and OPM.

# EXHIBIT E

**Government Executive**

# 'Put them in trauma': Inside a key MAGA leader's plans for a new Trump agenda

By Molly Redden, Andy Kroll, and Nick Surgey

October 28, 2024

A key ally to former President Donald Trump detailed plans to deploy the military in response to domestic unrest, defund the Environmental Protection Agency and put career civil servants "in trauma" in a series of previously unreported speeches that provide a sweeping vision for a second Trump term.

In private speeches delivered in 2023 and 2024, Russell Vought, who served as Trump's director of the Office of Management and Budget, described his work crafting legal justifications so that military leaders or government lawyers would not stop Trump's executive actions.

He said the plans are a response to a "Marxist takeover" of the country; likened the moment to 1776 and 1860, when the country was at war or on the brink of it; and said the timing of Trump's candidacy was a "gift of God."



ProPublica and Documented obtained videos of the two speeches Vought delivered during events for the Center for Renewing America, a pro-Trump think tank led by Vought. The think tank's employees or fellows include Jeffrey Clark, the former senior Justice Department lawyer who aided Trump's attempts to overturn the 2020 election result; Ken Cuccinelli, a former acting deputy secretary in the Department of Homeland Security under Trump; and Mark Paoletta, a former senior budget official in the Trump administration. Other Trump allies such as former White House adviser Steve Bannon and U.S. Reps. Chip Roy and Scott Perry either spoke at the conferences or appeared on promotional materials for the events.

Vought does not hide his agenda or shy away from using extreme rhetoric in public. But the apocalyptic tone and hard-line policy prescriptions in the two private speeches go further than his earlier pronouncements. As OMB director, Vought sought to use Trump's 2020 "Schedule F" executive order to strip away job protections for nonpartisan government workers. But he has never spoken in such pointed terms about demoralizing federal workers to the point that they don't want to do their jobs. He has spoken in broad terms about undercutting independent agencies but never spelled out sweeping plans to defund the EPA and other federal agencies.

Vought's plans track closely with Trump's campaign rhetoric about using the military against domestic protesters or what Trump has called the "enemy within." Trump's desire to use the military on U.S. soil recently prompted his longest-

serving chief of staff, retired Marine Gen. John Kelly, to speak out, saying Trump "certainly prefers the dictator approach to government."

Other policies mentioned by Vought dovetail with Trump's plans, such as embracing a wartime footing on the southern border and rolling back transgender rights. Agenda 47, the campaign's policy blueprint, calls for revoking President Joe Biden's order expanding gender-affirming care for transgender people; Vought uses even more extreme language, decrying the "transgender sewage that's being pumped into our schools and institutions" and referring to gender-affirming care as "chemical castration."

Since leaving government, Vought has reportedly remained a close ally of the former president. Speaking in July to undercover journalists posing as relatives of a potential donor, Vought said Trump had "blessed" the Center for Renewing America and was "very supportive of what we do," CNN reported.

Vought did not respond to requests for comment.

"Since the Fall of 2023, President Trump's campaign made it clear that only President Trump and the campaign, and NOT any other organization or former staff, represent policies for the second term," Danielle Alvarez, a senior adviser to the Trump campaign, said in a statement. She did not directly address Vought's statements.

Karoline Leavitt, his campaign's national press secretary, added there have been no discussions on who would serve in a second Trump administration.

In addition to running his think tank, Vought was the policy director of the Republican National Committee's official platform committee ahead of the nominating convention. He's also an architect of Project 2025, the controversial coalition effort mapping out how a second Trump administration can quickly eliminate obstacles to rolling out a hard-right policy agenda.

As ProPublica and Documented reported, Project 2025 has launched a massive program to recruit, vet and train thousands of people to "be ready on day one" to serve in a future conservative administration. (Trump has repeatedly criticized Project 2025, and his top aides have said the effort has no connection to the official campaign despite the dozens of former Trump aides and advisers who contributed to Project 2025.)

Vought is widely expected to take a high-level government role if Trump wins a second term. His name has even been mentioned as a potential White House chief of staff. The videos obtained by ProPublica and Documented offer an unfiltered look at Vought's worldview, his plans for a Trump administration and his fusing of MAGA ideology and Christian nationalism.

**A Shadow Government in Waiting**

In his 2024 speech, Vought said he was spending the majority of his time helping lead Project 2025 and drafting an agenda for a future Trump presidency. "We have detailed agency plans," he said. "We are writing the actual executive orders. We are writing the actual regulations now, and we are sorting out the legal authorities for all of what President Trump is running on."

Vought laid out how his think tank is crafting the legal rationale for invoking the Insurrection Act, a law that gives the president broad power to use the military for domestic law enforcement. The Washington Post previously reported the issue was at the top of the Center for Renewing America's priorities.

"We want to be able to shut down the riots and not have the legal community or the defense community come in and say, 'That's an inappropriate use of what you're trying to do,'" he said. Vought held up the summer 2020 unrest following George Floyd's murder as an example of when Trump ought to have had the ability to deploy the armed forces but was stymied.

2

Vought's preparations for a future Trump administration involve building a "shadow" Office of Legal Counsel, he told the gathered supporters in May 2023. That office, part of the Justice Department, advises the president on the scope of their powers. Vought made clear he wants the office to help Trump steamroll the kind of internal opposition he faced in his first term.

Historically, the OLC has operated with a degree of independence. "If, all of a sudden, the office is full of a bunch of loyalists whose only job is to rubber-stamp the White House's latest policy directive, whose only goal is to justify the ends by whatever means, that would be quite dangerous," said an attorney who worked in the office under a previous Republican administration and requested anonymity to speak freely.

Another priority, according to Vought, was to "defund" certain independent federal agencies and demonize career civil servants, which include scientists and subject matter experts. Project 2025's plan to revive Schedule F, an attempt to make it easier to fire a large swath of government workers who currently have civil service protections, aligns with Vought's vision.

"We want the bureaucrats to be traumatically affected," he said. "When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains. We want their funding to be shut down so that the EPA can't do all of the rules against our energy industry because they have no bandwidth financially to do so.

"We want to put them in trauma."

Vought also revealed the extent of the Center for Renewing America's role in whipping up right-wing panic ahead of the 2022 midterms over an increase in asylum-seekers crossing at the U.S.-Mexico border.

In February 2022, Arizona Attorney General Mark Brnovich released a legal opinion claiming the state was under "invasion" by violent cartels and could invoke war powers to deploy National Guard troops to its southern border. The legally dubious "invasion" theory became a potent Republican talking point.

Vought said in the 2023 speech that he and Cuccinelli, the former top Homeland Security official for Trump, personally lobbied Brnovich on the effort. "We said, 'Look, you can write your own opinion, but here's a draft opinion of what this should look like,'" Vought said.

The nonpartisan watchdog group American Oversight later obtained an email in which Vought pitched the "invasion" framework to Brnovich.

Brnovich wrote in an email to ProPublica that he recalled multiple discussions with Cuccinelli about border security. But he added that "the invasion opinion was the result of a formal request from a member of the Arizona legislature. And I can assure you it was drafted and written by hard working attorneys (including myself) in our office."

In the event Trump loses, Vought called for Republican leaders of states such as Florida and Texas to "create red-state sanctuaries" by "kicking out all the feds as much as they possibly can."

**'Nothing Short of a Quiet Revolution'**

The two speeches delivered by Vought, taken together, offer an unvarnished look at the animating ideology and political worldview of a key figure in the MAGA movement.

Over the last century, Vought said, the U.S. has "experienced nothing short of a quiet revolution" and abandoned what he saw as the true meaning and force of the Constitution. The country today, he argued, was a "post-constitutional regime," one that no longer adhered to the separation of powers among the three branches of government as laid out by the framers.

He lamented that the conservative right and the nation writ large had become "too secular" and "too globalist." He urged his allies to join his mission to "renew a consensus of America as a nation under God."

And in one of his most dramatic flourishes, he likened the 2024 election to moments in America's history when the country was facing all-out war.

"We are here in the year of 2024, a year that very well [could] — and I believe it will — rival 1776 and 1860 for the complexity and the uncertainty of the forces arrayed against us," Vought told his audience, referring to years when the colonies declared independence from Britain and the first state seceded over President Abraham Lincoln's election. "God put us here for such a time as this."

Vought said that independent agencies and unelected bureaucrats and experts wield far too much power while the traditional legislative process is a sham. He extended that critique to agencies like the Department of Justice and the Federal Reserve, whose independence from the White House had long been protected by both political parties.

"The left in the U.S. doesn't want an energetic president with the power to motivate the executive branch to the will of the American people consistent with the laws of the country," he said in the 2024 speech. "They don't want a vibrant Congress where great questions are debated and decided in front of the American people. They don't want empowered members. They want discouraged and bored backbenchers."

He added, "The all-empowered career expert like Tony Fauci is their model, wielding power behind the curtains." Fauci was one of the top public health experts under Trump at the start of the COVID-19 pandemic and a key figure in coordinating the national response.

What sets Vought apart from most of his fellow conservative activists is that he accuses powerful organizations on the right of being complicit in the current system of government, singling out the Federalist Society for Law and Public Policy Studies, the conservative and libertarian legal network co-chaired by activist Leonard Leo. The society is widely seen as an instrumental force in cultivating young conservative lawyers and building a bench of future judges whose embrace of legal theories like originalism and textualism have led to decisions overturning abortion rights, environmental protections and social welfare policies.

Yet in his 2024 speech, Vought accused the Federalist Society and "originalist judges" of being a part of the problem, perpetuating the "post-constitutional structure" that Vought lamented by not ruling more aggressively to weaken or dismantle independent regulatory agencies that Vought and his allies view as illegitimate or unconstitutional.

It was "like being in a contract quietly revoked two decades ago, in which one party didn't tell the other," he said. "At some point, reality needs to set in. Instead, we have the vaunted so-called Federalist Society and originalist judges acting as a Praetorian Guard for this post-constitutional structure."

Echoing Trump's rhetoric, Vought implicitly endorsed the false claim of a stolen 2020 election and likened the media's debunkings of that claim to Chinese Communist propaganda.

"In the aftermath of the election, we had all these people going around saying, 'Well, I don't see any evidence of voter fraud. The media's not giving enough [of] a compelling case,'" he said. "Well, that compelling case has emerged. But does a Christian in China ask and come away saying, 'You know, there's no persecution, because I haven't read about it in the state regime press?' No, they don't."

Vought referred to the people detained for alleged crimes committed on Jan. 6, 2021, as "political prisoners" and defended the lawyers Jeffrey Clark and John Eastman, who have both faced criminal charges for their role in Trump's attempts to overturn the 2020 election. Federal law enforcement agencies, he added, "are keeping political opponents in jail, and I think we need to be honest about that."

4

The left, Vought continued, has the ultimate goal of ending representative democracy altogether. "The stark reality in America is that we are in the late stages of a complete Marxist takeover of the country," he said, "in which our adversaries already hold the weapons of the government apparatus, and they have aimed it at us. And they are going to continue to aim it until they no longer have to win elections."

When Democrats called Trump an "existential threat to democracy," they were not merely calling for his defeat at the ballot box, he said, but were using "coded language the national security state uses overseas when they are overthrowing other governments" to discourage the military from putting down anti-Trump protests should he win.

"They're making Trump out to be a would-be dictator or an authoritarian," he said. "So they're actively working now to ensure, on a number of levels, that the military will perceive this as dictatorial and therefore not respond to any orders to quell any violence."

Trump, Vought insisted, has the credibility and the track record to defeat the "Marxist" left and bring about the changes that Vought and his MAGA allies seek. In his view, the Democratic Party's agenda and its "quiet revolution" could be stopped only by a "radical constitutionalist," someone in the mold of Thomas Jefferson or James Madison. For Vought, no one was in a better position to fill that role than Trump.

"We have in Donald Trump a man who is so uniquely positioned to serve this role, a man whose own interests perfectly align with the interests of the country," Vought said. "He has seen what it has done to him, and he has seen what they are trying to do to the country.

"That," he added, "is nothing more than a gift of God."

*ProPublica is a Pulitzer Prize-winning investigative newsroom.*

[[Related Posts]]

By Molly Redden, Andy Kroll, and Nick Surgey

October 28, 2024

https://www.govexec.com/management/2024/10/inside-key-maga-leaders-plans-new-trump-agenda/400607/

# EXHIBIT F

Learn more about  LSEG

## US health secretary Kennedy says he brought back 722 CDC employees, 220 at NIH

By **Ahmed Aboulenein**

June 24, 2025 9:41 AM PDT · Updated June 24, 2025

 



[1/3] U.S. Health and Human Services (HHS) Secretary Robert F. Kennedy Jr. testifies before a House Energy and Commerce Health Subcommittee hearing on U.S. President Donald Trump's budget request for the... Purchase Licensing Rights ⎘ **Read more**

WASHINGTON, June 24 (Reuters) - U.S. health secretary Robert F. Kennedy Jr. said on Tuesday that he has rehired 942 employees who were laid off from the Centers for Disease Control and Prevention and the National Institutes of Health.

Kennedy has vowed to remake the nation's health agencies, including cutting 10,000 jobs at the Food and Drug Administration, CDC and NIH, but acknowledged that some of those let go were needed.

> Keep up with the latest medical breakthroughs and healthcare trends with the Reuters Health Rounds newsletter. Sign up here.

"I brought 722 people back to CDC, I brought 220 people back to NIH because we were not able to perform our job," Kennedy told the U.S. House of Representatives Committee on Energy and Commerce's Subcommittee on Health in a hearing on his department's 2026 budget request.

1

Discover the key points from this story with Reuters AI

Try Reuters AI

Tuesday's hearing is meant to review Kennedy's health-related spending plans under President Donald Trump's budget proposal, including an $18 billion cut to NIH funding and $3.6 billion from the CDC.

Kennedy had previously said he planned to cut 2,400 CDC employees and 1,200 at NIH before the partial reversals.

Democrats and other critics have portrayed the cuts as a gutting of the country's public health infrastructure.

Kennedy said in his opening statement that the staff reductions would save taxpayers $1.8 billion per year and make his Department of Health and Human Services, which oversees the other agencies, more efficient.

(This story has been refiled to correct the day to Tuesday, from Wednesday, in paragraphs 1 and 4)

Reporting by Ahmed Aboulenein; Additional reporting by Puyaan Singh in Bengaluru; Editing by Chizu Nomiyama and Bill Berkrot

Our Standards: **The Thomson Reuters Trust Principles.** 🔗

Suggested Topics:

Healthcare & Pharmaceuticals    Health    Regulatory Oversight    Regulatory    Public Health

Purchase Licensing Rights



**Ahmed Aboulenein**
Thomson Reuters

Washington-based correspondent covering U.S. healthcare and pharmaceutical policy with a focus on the Department of Health and Human Services and the agencies it oversees such as the Food and Drug Administration, previously based in Iraq and Egypt.

  

## Read Next

Healthcare & Pharmaceuticals
**US FDA slaps new requirements for Indonesia's shrimp and spices after radioactive contamination**
8 hours ago



Healthcare & Pharmaceuticals
**India probes possible cough syrup link to deaths of nine children**
6 hours ago



Healthcare & Pharmaceuticals
**AbbVie trims annual profit forecast after expected $2.7 billion R&D hit**
17 hours ago



Try Reuters AI

2

# EXHIBIT G



**POLITICO California Playbook**

Inside the Golden State political arena

SUBSCRIBE NOW

## 'Pain on the bureaucracy': Russ Vought's crusade upends the shutdown fight

The White House budget director could have a prime opportunity to further execute on his small-government ideology.



A top Democrat called Russ Vought a "malignant political hack" in the hours after the threatened mass federal layoffs Wednesday. | Francis Chung/POLITICO

By **JENNIFER SCHOLTES** and **MEGAN MESSERLY**
09/26/2025 04:45 AM EDT

  

Russ Vought careened into the escalating government shutdown fight this week, threatening mass layoffs of federal workers if Democrats don't capitulate to President Donald Trump and fellow Republicans.

For those who know the White House budget director's long history in Washington, it was only a matter of time.

Top Stories from POLITICO

Read More

00:00                                                            02:00

"You could have anticipated what was coming," Bill Hoagland, a former longtime top Senate GOP budget aide, said in an interview. "He is clever. But he has a clear intent here, which I think is to strangle the beast. And he knows how to play the game."

With the layoffs threat Wednesday, Vought has cast himself as a main character in the shutdown standoff ahead of the Tuesday midnight funding deadline. It's a role he is no doubt comfortable playing, having navigated dozens of spending fights as a congressional aide, think-tank operative and Trump official.

Now Vought, 49, is well positioned to further execute his long-held views on government spending if federal cash stops cold, after months of groundwork undermining bipartisan funding negotiations and upending the federal bureaucracy.

His ideological allies are already excited by what Vought might have in store at the Office of Management and Budget if the government does in fact shut down at midnight Sept. 30.

Paul Winfree, who served as Trump's director of budget policy during his first term, called Vought's threat a "brilliant" move.

During the last shutdown under Trump, which ended in early 2019, Vought served in an understudy role. Administration officials at the time sought to play down the impact on most Americans, Winfree noted.

"This time, Russ is putting the pain on the bureaucracy," he said.

Democrats, meanwhile, are stewing and eager to make Vought a bogeyman of the partisan fight after sparring with him for years.

Soon after POLITICO published the OMB memo Wednesday, House Minority Leader Hakeem Jeffries called him a "malignant political hack."

"We will not be intimidated by your threat to engage in mass firings," Jeffries wrote on social media. "Get lost."

Connecticut Rep. Rosa DeLauro, who has long criticized the OMB chief as the House's top Democratic appropriator, said in a statement Thursday that the layoffs threat was "Russ Vought's trademark chaos."

Advertisement

An OMB spokesperson did not respond to requests for comment about Vought's approach to the potential shutdown. But what is clear from Vought's history and his own statements is that he sees a method to the madness.

Speaking on Steve Bannon's "War Room" podcast last week, he called the shutdown deadline "a very critical juncture" and said that Republicans have Democrats "in a very good position, where they should be with us to fund the government."

The OMB director's latest move fits neatly into the playbook he articulated during vetting earlier this year for Senate confirmation, after helping write the Heritage Foundation's controversial "Project 2025" recommendations during Trump's campaign for a second presidency.

Put simply, he thinks Congress can set a ceiling for agency funding but a president can spend less.

One first-term Trump administration official said no one familiar with the administration's strategy was surprised by Vought's memo to agencies this week. Shutdowns "create a natural inflection point between essential and nonessential," said the person, who was granted anonymity to speak candidly about White House thinking.

"If the government can function with only essential employees and not inflict pain on the American people … then why would we not want that?" the former official added. "It proves the point the administration has been making from the campaign all the way to day one: That there is bloat and excess within the government."

In the roughly 45 years Congress has been letting federal funding lapse amid partisan standoffs, OMB directors have frequently used their power to either lessen the impact of a government shutdown or maximize it, depending how the White House wanted to sway the negotiations.

Vought is now taking those powers to a new level. Threatening to terminate federal jobs during a funding lapse goes far beyond the usual discretion of a budget chief to determine "essential" and "nonessential" work during government shutdowns, further demonstrating how a motivated ideologue can torpedo norms in Congress as well as the executive branch by testing the limits of a typically bureaucratic and process-focused role.

Not every Trump ally understands the calculus, however. Another official who served in the first Trump administration, also granted anonymity to speak frankly about Vought's moves, said it could be "just a really heavy-handed way of spooking Democrats."

There is no obvious advantage to firing large swaths of federal workers during a government shutdown, besides applying pressure on Democrats, because the White House has already been executing those "reduction-in-force" layoffs, the former official said. And after the administration fired federal workers under the Department of Government Efficiency initiative earlier this year, the Trump administration has since rescinded many of those terminations.

Advertisement

AD

"Most people I've talked to just assume it's a scare tactic," the person said. "Everyone was like: Well, why are they hiring all of these DOGE fires back, and then suddenly want to do another RIF? Why do you need a shutdown to do a RIF?"

Democrats so far are showing no sign of retreat. Rep. Glenn Ivey, who represents droves of federal workers in suburban Maryland, said in an interview Thursday that Vought is "clearly the bad cop" in the government shutdown standoff.

"We figured that out a long time ago, and also the fact that he's not paying attention to following the law or the Constitution," Ivey said. "So I think for Democrats on the Hill, we understand we've got to fight back. And this is the time to do it."

Over the past eight months, Vought has been far bolder in testing the bounds of his role as budget director than he was during his initial stint leading the budget office during Trump's first presidency, when OMB withheld aid to Ukraine in 2019, contributing to the president's first impeachment.

He has since openly questioned the constitutionality of the federal law requiring presidents to get congressional approval before canceling federal cash — asserting that funding for programs Trump considers "woke and weaponized" can't be spent in a way that's consistent with the president's agenda. Last month, he orchestrated a legally dubious move to unilaterally cancel billions of dollars in approved spending without the consent of lawmakers.

Over the summer, Vought told reporters he wants government funding negotiations on Capitol Hill to be "less bipartisan," infuriating lawmakers of

4

both parties who have long led those delicate talks.

"He becomes enemy No. 1 on the Democrat side," Rep. Steve Womack (R-Ark.), a senior appropriator, said in an interview this month.

"If you're a Democrat — even just like a mainstream Democrat — your predisposition might be to help negotiate with Republicans on a funding mechanism," Womack said. "Why would you do that if you know that whatever you negotiate is going to be subject to the knife pulled out by Russ Vought? That's a challenge for us."

*Meredith Lee Hill, Nicholas Wu and Sophia Cai contributed to this report.*

**FILED UNDER:** CONGRESS, WHITE HOUSE, OMB, ROSA DELAURO, SHUTDOWN, GOVERNMENT SHUTDOWN, STEVE WOMACK, OFFICE OF MANAGEMENT AND BUDGET, HAKEEM JEFFRIES, RUSS VOUGHT, GLENN IVEY

### Inside Congress

Your first read on Capitol Hill politics and policy.

**EMAIL**

Your Email

**EMPLOYER**

Employer

\* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service . You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here . This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT



**Kate Middleton's Emotional Announcement About Prince George**

TipHero



**Barack Obama Admits to "Deep Deficit" in Marriage with Michelle**

TipHero



**Donald Trump's Golf Footage Sparks Curiosity About His Legs**

TMSPN

# EXHIBIT H

Russell T. Vought spent years drawing up plans to expand presidential power and shrink federal bureaucracy. Now he is moving closer to making that vision a reality, threatening to erode checks and balances.

 ▶ **Listen to this article · 16:39 min** Learn more

---

 **By Coral Davenport**
Reporting from Washington

Sept. 29, 2025

Russell T. Vought, the White House budget director, was preparing the Trump administration's 2026 budget proposal this spring when his staff got some surprising news: Elon Musk's cost-cutting team was unilaterally axing items that Mr. Vought had intended to keep.

Mr. Vought, a numbers wonk who rarely raises his voice, could barely contain his frustration, telling colleagues that he felt sidelined and undermined by the haphazard chaos of the Musk-led Department of Government Efficiency, according to six people with knowledge of his comments who, like others interviewed for this article, spoke on the condition of anonymity for fear of retribution.

"We're going to let DOGE break things, and we'll pick up the pieces later," Mr. Vought told his staff during one flash of irritation, according to three of those people. Mr. Vought's spokeswoman, Rachel Cauley, denied that he made those comments, and that he felt frustrated by Mr. Musk.

This had not been Mr. Vought's plan.

Mr. Vought, who also directed the White House Office of Management and Budget in President Trump's first term, had spent four years in exile from power. He worked through Joseph R. Biden Jr.'s presidency from an old rowhouse near the Capitol, where he complained of pigeons infesting his ceiling and coordinated with other Trump loyalists to draw up sweeping, detailed plans for a comeback.

He had carefully analyzed mistakes from the first term. And he had laid out steps to achieve the long-sought conservative goal of a president with dramatically expanded authority over the executive branch, including the power to cut off spending, fire employees, control independent agencies and deregulate the economy.

Mr. Musk, who spent more than $250 million to help elect Mr. Trump, had celebrity, access to the president and political capital that the budget director could never hope for.

But Mr. Vought (pronounced "vote") had something Mr. Musk did not: He had done his homework.

In the months since Mr. Musk fell out with the president, Mr. Vought has at last begun to put his plans into action — remaking the presidency, block by block, by restoring powers weakened after the Nixon administration. His efforts are helping Mr. Trump exert authority more aggressively than any modern president, and are threatening an erosion of the longstanding checks and balances in America's constitutional system.

Now, as the government heads toward a shutdown when federal funding lapses on Tuesday, Mr. Vought, 49, is leveraging the moment to further advance his goals of slashing agencies and purging employees, with his office telling agencies to prepare for mass firings unless Congress can strike a deal to keep the government open.

The ultimatum follows a string of achievements for Mr. Vought.

This summer, he pressured lawmakers to enact his plan to cancel $9 billion for foreign aid and public broadcasting that they had previously approved — an unusual bow by Congress to the White House. The new law claimed another prize for conservatives: the death of the Corporation for Public Broadcasting. And a deal Mr. Vought cut with House Republicans helped secure passage of Mr. Trump's domestic policy law that slashed spending on Medicaid and food stamps.

2



Representative Jim McGovern of Massachusetts, left, and Representative Virginia Foxx of North Carolina, right, conferring during a House committee meeting to advance a bill to claw back $9 billion for foreign aid and public broadcasting.  Haiyun Jiang/The New York Times

He has spearheaded a push to erase hundreds of regulations on the environment, health, transportation and food and worker safety, telling Mr. Trump at an August cabinet meeting that his efforts had led to 245 deregulatory initiatives this year. He has asserted White House power over independent agencies like the Federal Reserve, championing an executive order that forced them to submit their regulatory actions to his office for approval.

As the acting head of the Consumer Financial Protection Bureau, the agency charged with enforcing rules to protect people from predatory financial practices, he halted nearly all of the agency's work, and sought to fire 90 percent of its staff.

At the heart of Mr. Vought's plan, associates say, is the intentional engineering of a legal battle over Congress's power to decide how government money is spent, potentially creating a new legal precedent for the president to block spending on any programs and policies he dislikes.

3

The next step in the fight is a legally untested maneuver in which the Trump administration would cancel another $4.9 billion in foreign aid spending — this time without congressional approval. The gambit, known as a "pocket rescission," involves the White House eliminating the spending unless Congress votes to stop it by Sept. 30, the end of the fiscal year.

The threat has enraged many lawmakers, including some Republicans: Senator Susan Collins, the chairwoman of the Appropriations Committee, called it illegal. But as the deadline has neared, they have done nothing to stop it. Mr. Vought is confident that the White House would win a Supreme Court battle over the moves to stop spending, according to his associates.

"He is lining up the billiards shots, getting each ball in place, one by one, for each consecutive move," said Grover Norquist, the anti-tax activist.



Mr. Vought has laid out how the White House budget director could use the levers of spending to preserve for a conservative president the "boldness to bend or break the bureaucracy to the presidential will."  Eric Lee/The New York Times

For the leaders of Mr. Trump's "Make America Great Again" movement, Mr. Vought is seen as the disciplined architect who channeled the passion of MAGA into an actionable policy blueprint. The slain activist Charlie Kirk, whose podcast was one of many where Mr. Vought regularly shared his views with the Republican base, called Mr. Vought "an absolute rock star."

---

**What you should know.** The Times makes a careful decision any time it uses an anonymous source. The information the source supplies must be newsworthy and give readers genuine insight.

Learn more about our process.

---

To many legal experts, Mr. Vought's work is a threat to the foundations of democracy.

"One of the main sources of power that Congress has over the executive branch is the budget," said Eloise Pasachoff, a law professor at Georgetown University. "If the executive branch isn't controlled by the power of the purse, then there is very little that will control the President."

She added: "It's a fundamental challenge to liberty for every single person in America."

Mr. Vought, who declined through his spokeswoman to be interviewed, sees it differently. He said in a speech earlier this month that his mission was to bring to heel an unelected federal bureaucracy he likened to a "cartel working behind closed doors."

"We have now been embarked on deconstructing this administrative state," he said. "Step after step, it's to move quickly, trying to think through what the founders would have done in the circumstances, and be aggressive."

Over the years, Mr. Vought has made clear how he views his targets. He has said the Education Department promotes "woke-rot" propaganda like "grooming minors for so-called gender transition." That the Federal Reserve has "been wrong

for decades." That the State Department and the U.S. Agency for International Development "actively embarrass the United States." That the Internal Revenue Service targets "struggling families in a craven effort to sustain the broader bureaucracy's radical progressive agenda." And, in a remark captured on video unearthed by ProPublica that stung many in Washington, he said he wanted federal employees to be "in trauma."

Once the budget director has the power to starve those government agencies, Mr. Vought has said, they can wither away. "We want to make sure that the bureaucracy can't reconstitute itself later in future administrations," he said on Mr. Kirk's podcast.

## MAGA's 'Bulldog'



Mr. Vought near the Capitol in 2008.  Jay Westcott

10/2/25, 3:27 PM
Case 3:25-cv-08302-VC
The Man Behind Trump's Plan for an All-Powerful Presidency - Russell Vought - The New York Times
Document 17-3
Filed 10/04/25
Page 119 of 209

Mr. Vought started envisioning a blueprint to slash the federal government long before Mr. Trump was a Republican.

He grew up the youngest of seven children in a religious blue-collar family in Trumbull, Conn. His father, a Marine Corps veteran, was a union electrician, and his mother was a public school teacher.

In Mr. Vought's telling, he grew up watching his parents dragged down by big government.

"My parents worked really long hours to put me through school," he said at his first Senate confirmation hearing. "But they also worked long hours to pay for the government in their lives, and I have often wondered what they would have been free to build and give without such a high burden."

After graduating from Wheaton College, an evangelical Christian school in Illinois, Mr. Vought went to Washington to work for Senator Phil Gramm of Texas, a Republican champion of fiscal austerity.

Mr. Gramm recalled his young staff member as prodigiously hardworking, attending law school by night while working by day to help his boss shrink the government.

"Russ worked for me as a child, and I'm proud of what he's doing now," said Mr. Gramm, who retired from the Senate in 2002.

Mr. Vought went on to direct budget policy for House Republicans during the rise of the Tea Party movement, when populist demand for smaller government propelled a wave of hard-line conservatives into Washington.

Case 3:25-cv-08302-VC    Document 17-3    Filed 10/04/25    Page 120 of 209



Over the years, Mr. Vought formed potent friendships with some of the most prominent House Republicans, including Mick Mulvaney, who also served as the White House chief of staff under Mr. Trump.    Hilary Swift for The New York Times

It was not a given that he would join the first Trump administration. Mr. Vought, who friends say is deeply driven by his faith and often leads adult Bible study classes at his Baptist church, considered opting out of Washington to attend seminary and become a pastor. In 2017, he heeded the call of the White House.

During Mr. Trump's first term, Mr. Vought argued that the president had the power to block federal spending Congress had approved. He was part of a group of White House officials who froze military spending for Ukraine in defiance of Congress, paving a path to the president's impeachment.

He also helped come up with the idea of using emergency powers to build a border wall without Congressional approval, and pushed an executive order that could have enabled the president to easily fire tens of thousands of career civil servants.

The budget office was eventually forced to restore the Ukraine money, and the other moves were reversed by the Biden administration.



Lawmakers voted to impeach Mr. Trump for abuse of power and obstruction of Congress in December 2019. Erin Schaff/The New York Times

After the 2020 election, Mr. Vought started the Center for Renewing America, a think tank devoted to sustaining Mr. Trump's policies.

The clawing of either rats or pigeons in his office walls was so loud that it distracted visitors, according to a recent book, "Mad House." But Mr. Vought remained focused on his mission.

In 2022, he released a 104-page "shadow budget," a prescription to remove "the scourge of woke and weaponized bureaucracy aimed at the American people": deep cuts to Medicaid, foreign aid, scientific research and other programs.

Outraged when Kevin McCarthy, the Republican House speaker, cut a deal with Mr. Biden to raise the debt ceiling, Mr. Vought pushed House Republicans to take the extraordinary step of ousting their leader.

Mr. Vought was a constant presence in the group text thread of the House Freedom Caucus, the hard-line conservatives who toppled Mr. McCarthy — bucking them up and pushing them to take what felt like an enormous political risk, said former

Representative Matt Gaetz of Florida, who led the effort.

"When people got scared or concerned about political impact, committee assignments, he was always there, strongly encouraging them," Mr. Gaetz said. "He was instilling backbone in people."



Matt Gaetz, former congressman of Florida, credits Mr. Vought's relationships with members of the House Freedom Caucus as being instrumental to the effort to remove Kevin McCarthy as House speaker.  Haiyun Jiang/The New York Times

Mr. Vought's public comments began to take on a more hard-line tilt. His think tank published papers establishing a rationale for why it would be lawful to deploy troops on U.S. soil, and advocating the elimination of the post-Watergate norm of Justice Department independence.

Stephen K. Bannon, the former Trump adviser whose "War Room" podcast is popular with the base, declared him "MAGA's Bulldog."

Case 3:25-cv-08302-VC    Document 17-3    Filed 10/04/25    Page 123 of 209

# Back to the White House



Mr. Vought during his Senate confirmation hearing in January.   Tom Brenner for The New York Times

After Mr. Trump won a second term, Mr. Vought devoted himself to preparing for a do-over — one that was bigger, bolder and, crucially, lasting.

Eyeing his next role, Mr. Vought described how the White House budget director would be critical in transforming the federal government. "Presidents use the O.M.B. to tame the bureaucracy, the administrative state," he told conservative commentator Tucker Carlson days after the 2024 election.

Mr. Vought's research was featured in Project 2025, the policy blueprint prepared by the conservative Heritage Foundation for Mr. Trump's return to office. Mr. Vought also drafted potential executive orders.

But tensions emerged soon after Mr. Musk parachuted into Washington with a mandate to upend the federal bureaucracy.

Mr. Vought was outraged when DOGE sowed chaos by sending out an email requiring federal workers to detail five accomplishments each week or lose their jobs, said three people with knowledge of the matter. Mr. Vought supported purging federal workers, but complained that the email had skirted the legal process for personnel matters, creating what he saw as needless liability.



In the months since Elon Musk left Washington after falling out with Mr. Trump, Mr. Vought has begun to realize the vision he meticulously mapped out.  Doug Mills/The New York Times

While Mr. Vought has called for the abolition of the Education Department, he was annoyed when DOGE moved to dismantle the agency's data office, which tracks student academic performance, according to two people familiar with the events. The administration needed the data to inform efforts to discourage race-based college admissions, cut certain programs for poor and disabled students, and promote charter schools, these people said.

Mr. Vought's spokeswoman, Ms. Cauley, called the accounts of those episodes "false." Mr. Musk and his representatives did not respond to requests for comment.

Mr. Vought later restored portions of the office, but with limited staffing. The Education Department has posted job openings to refill some of the positions.

"DOGE would have been far more effective from day one had they bothered to ask Russ and team how to achieve their goals," said Joe Grogan, a friend of Mr. Vought's who led the White House Domestic Policy Council in the first Trump administration.

Now, in the post-Musk era, Mr. Vought appears to be relishing his moment.

He works long hours and weekends in his suite in the Eisenhower Executive Office Building next to the White House, where he oversees a staff of more than 500.

On the wall is a photo of his favorite president, Calvin Coolidge, the farm boy and small-town mayor historians say most purely embodied the conservative principles of small government and fiscal austerity.

Around his home in a Virginia suburb, his neighbors — including former federal workers who lost their jobs under the Trump administration — have planted lawn signs that read "We Support Our Federal Employees."




Mr. Vought's neighbors have employed lawn signs and sidewalk chalk as public signs of pushback to his policies in the Virginia suburb where he lives. Photographs by The New York Times

13

10/2/25, 3:27 PM
Case 3:25-cv-08302-VC   Document 17-3   Filed 10/04/25   Page 126 of 209
The Man Behind Trump's Quest for an All-Powerful Presidency - Russell Vought - The New York Times

In the White House, Mr. Vought is not seen as a part of Mr. Trump's inner circle, according to four people with knowledge of the dynamics. He regularly quotes the Bible and never curses — a sharp contrast with a president who sometimes refers to Christians in the third person. But people familiar with the relationship between the two men say that the president recognizes in Mr. Vought something that he highly values: a seasoned loyalist who knows how to use the federal budget to deliver what Mr. Trump wants.

"Russ knows exactly how to dismantle the Deep State and end weaponized government," Mr. Trump wrote in a statement when nominating Mr. Vought.

Now Mr. Vought is building the case to achieve one of his primary objectives: securing the president's authority to block congressionally approved spending on programs he dislikes.

To that end, Mr. Vought is laying the groundwork for a legal battle over the Impoundment Control Act of 1974, enacted by Congress in the wake of President Richard Nixon's moves to block agency spending he opposed.

Mr. Vought, who says the law is unconstitutional, would like to see it overturned.

That goal has driven him to his current "pocket rescissions" package.



Protesters interrupted a hearing as Mr. Vought addressed the Senate Appropriations Committee in June.   Tierney L. Cross/The New York Times

Mr. Vought's friends say that his actions are designed to provoke a lawsuit from the Government Accountability Office, the congressional watchdog, which has said the pocket rescission is illegal and "would cede Congress's power of the purse."

"Russ absolutely believes he is on sound legal footing and that he will be vindicated at the Supreme Court," Mr. Grogan said.

Edda Emmanuelli Perez, the general counsel of the Government Accountability Office, disagreed, saying in an interview: "In order to not spend the money, the laws would have to be changed. And the president does not have the unilateral power to change the laws."

Rob Fairweather, who spent 42 years at the Office of Management and Budget and wrote a book about how it operates, said there is reason for Mr. Vought to have confidence in a legal victory.

"What he's doing is radical, but it's well thought out," Mr. Fairweather said. "He's had all these years to plan. He's looked clearly at the authorities and boundaries that are there, and is pushing past them on the assumption that at least some of it will hold up in the courts."

Mr. Vought is already looking forward to that outcome, declaring on Glenn Beck's show this spring: "We will have a much smaller bureaucracy as a result of it."

Case 3:25-cv-08302-VC    Document 17-3    Filed 10/04/25    Page 129 of 209



Mr. Vought, second from right, in the Oval Office with President Trump, Interior Secretary Doug Burgum and Homeland Security Secretary Kristi Noem.  Kenny Holston/The New York Times

17

Stacy Cowley and Charlie Savage contributed reporting. Kitty Bennett and Teresa Mondría Terol contributed research.

**Coral Davenport** covers energy and environment policy, with a focus on climate change, for The Times.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Ticking Boxes on His Checklist To Make Trump All-Powerful

# EXHIBIT I

 **THE HILL**

TRENDING:     LIVE UPDATES: SHUTDOWN LAYOFFS     GOVERNMENT SHUTDOWN     SUPER BOWL ICE

ADMINISTRATION

# White House: Government layoffs coming if Democrats don't prevent shutdown

BY ALEX GANGITANO - 09/29/25 10:37 AM ET



# THE HILL





Listen to audio version of this article

Advertisement

🎙 Instaread

White House press secretary Karoline Leavitt warned Monday that government layoffs are coming if Democrats don't prevent a shutdown by Tuesday, days after President Trump's budget office directed agencies to prepare for mass firings.

"There will be if Democrats don't keep the government open," Leavitt said when asked if there will be layoffs as a result of a shutdown.

ADVERTISEMENT

✕

2



Trump is set to meet with the four top congressional leaders at the White House later Monday. Senate Minority Leader Chuck Schumer (D-N.Y.) and House Minority Leader Hakeem Jeffries (D-N.Y.) have both said they're hopeful they can prevent a shutdown.

"There is nothing to negotiate when you have a clean CR [continuing resolution]," Leavitt told reporters Monday morning. "We are nearing a government shutdown; we are nearing a funding deadline. The president wants to make this deadline. He wants to keep this government open."

Leavitt told Fox News's "Fox & Friends" that the White House's position ahead of the meeting is demanding "a commonsense, clean funding resolution, a continuing resolution to keep the government open."



# THE HILL

the White House today to try to talk about this, and now is not the time to try to get political points against Donald Trump," she said.

The Office of Management and Budget (OMB) sent a memo last week to agencies directing them, in the event of a government shutdown, to "use this opportunity to consider reduction in force (RIF) notices for all employees in programs, projects, or activities."

---

**Sign up for the Morning Report**

The latest in politics and policy. Direct to your inbox.

| Email address | | SUBSCRIBE |
|---|---|---|

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

---

Shutdowns typically result in furloughs of government workers, who are temporarily put on leave before receiving back pay when they eventually return to work. The OMB appears to be suggesting permanent layoffs this time around.

ADVERTISEMENT

4

# EXHIBIT J



# THE HILL

ADMINISTRATION

## Trump floats cutting benefits during shutdown, warns Democrats are taking a risk

BY ALEX GANGITANO - 09/30/25 1:11 PM ET







Listen to audio version of this article    Advertisement



Instaread

The T-shirt you've been
waiting for—comfort and…
lininco

President Trump suggested Tuesday that his administration can make cuts to programs during a potential government shutdown, warning that Democrats are taking a risk by not voting for the GOP continuing resolution to fund the government through Nov. 21.

"We don't want it to shut down," Trump told reporters in the Oval Office. "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them. Like cutting vast numbers of people out, cutting things that they like, cutting programs that they like."

"You all know [White House budget director] Russell Vought, he's become very popular recently because he can trim the budget to a level that you couldn't do any other way. So, they're taking a risk by having a shutdown. Because of the shutdown, we can do things medically and other ways, including benefits, we can cut large numbers of people out. We don't want to do that, but we don't want fraud, waste and abuse," Trump said.

The president did not elaborate on what benefits and programs would be cut. Earlier on Tuesday, he said there may be "a lot" of layoffs in the federal government during a shutdown after his budget office directed agencies to prepare for mass firings.

The president told reporters in the Oval Office that there will "probably likely" be a shutdown before funding lapses at the end of the day Tuesday, but said "nothing is inevitable."



# THE HILL



He claimed Democrats want to give health care to immigrants in the country illegally, a debate that Trump has sought to make central to the shutdown fight, though the only demands from Democrats have been centered on an extension of enhanced Affordable Care Act (ACA) benefits that are set to expire at year's end.

Despite Trump's claims, the ACA benefits set to expire are not available to immigrants lacking legal status.

---

### Sign up for the Morning Report

The latest in politics and policy. Direct to your inbox.

| Email address | **SUBSCRIBE** |
|---|---|

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

---

"We cannot allow them to charge tremendous amounts of money for health care for people who aren't even citizens," Trump said. "We have a big fight over that."

The Democratic stopgap measure includes a permanent extension of the expiring ACA subsidies, overturning cuts to Medicaid via the tax and spending megabill, and a restoration of rescissions cuts.

When pressed on the fact that the ACA subsidies at the center of the fight wouldn't go to such immigrants, Trump said "we just, as a country, cannot afford to take care of millions of people."

Later Tuesday, Democrats will bring up their proposal to fund the government through Oct. 31, to permanently extend the Affordable Care Act's enhanced health insurance premium subsidies and to restore nearly $1 trillion in Medicaid cuts.

That measure, which failed to advance in September, needs 60 votes and is expected to fail as well.

Senate Majority Leader John Thune (R-S.D.) will then move to the House-passed continuing resolution to fund the government through Nov. 21. That bill also failed in September, and will likely be blocked by a Democratic filibuster.

**TAGS**  AFFORDABLE CARE ACT   BUDGET CUTS   JOHN THUNE   OBAMACARE   RUSSELL VOUGHT   SHUTDOWN

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# EXHIBIT K



ADMINISTRATION

# Trump says there may be 'a lot' of federal workers laid off in government shutdown

BY <u>ALEX GANGITANO</u> 09/30/25 09:26 AM ET



President Trump said Tuesday there may be a lot of layoffs in the federal government if Congress doesn't act to prevent a shutdown by the end of day, blaming the Democrats for a potential lapse in funding.

"Well, we may do a lot, and that's only because of the Democrats," Trump said when asked how many federal workers he plans to lay off in the event of a shutdown.

1



Trump also blamed Democrats for illegal immigration, repeating his arguments that Democrats want to give health care benefits to migrants. Trump has sought to make this debate central to the shutdown fight, though the only demands from Democrats have been centered on an extension of enhanced Affordable Care Act benefits to U.S. citizens that are set to expire at year's end.

"As you know, they want to be able to take care of people that are coming to our country illegally, and no system can handle that," Trump said. "Our country can't handle people who come into our country illegally, and they want to give them full health care benefits. They want to open the wall again, can you believe it? I can't even believe it."

The White House also warned Monday that government layoffs are coming if Democrats don't prevent a shutdown, days after Trump's budget office directed agencies to prepare for mass firings.



The president met later Monday with the four top congressional leaders at the White House, after which Vice President Vance warned that the government is heading for a shutdown because of Democrats, while Senate Democratic Leader Chuck Schumer (N.Y.) said Trump appeared completely oblivious to the demands for funding from his side of the aisle.

The Democratic stopgap measure includes a permanent extension of the expiring Affordable Care Act subsidies, overturning the GOP's Medicaid cuts via the "big, beautiful bill" and a restoration of rescissions cuts.

Schumer said he warned Trump that some families could see their health insurance premiums increase by as much as $400 per month if the enhanced insurance premium subsidies are allowed to expire at the end of the year and that dozens of smaller hospitals around the country could close as the result of Medicaid cuts.

Categories: Administration, Business

**SPONSORED CONTENT**                U.S. Privacy

California Residents With Credit Card Debt Could Be In For Loan-Free Relief

Americans with over $20k in unsecured debt could reduce their eligible debt payments by 30% or more by doing…

Forbes | Sponsored                                          Learn More

# EXHIBIT L

# THE WHITE HOUSE

### WASHINGTON

September 30, 2025

The Honorable Russell Vought
Assistant to the President and Director of the Office of Management and Budget
Executive Office of the President
Washington, DC 20503

Re: EOP Contingency Plan for a Shutdown Furlough

Dear Director Vought,

Enclosed is the Executive Office of the President's Contingency Plan for Shutdown Furlough, which would be implemented in the event of a lapse in appropriations for Fiscal Year 2026. If you have any questions concerning the enclosed information, I would be happy to address them at your convenience.

Sincerely,

Joshua Fisher
Assistant to the President
Director of Management and Administration
Director of the Office of Administration

Enclosure

1

September 30, 2025

EXECUTIVE OFFICE OF THE PRESIDENT
Updated Contingency Plan
For Shutdown Furlough·

A.  Summary of Contingency Plan

Should Congress not pass a Fiscal Year 2026 ("FY2026") appropriation or continuing
resolution ("CR") by September 30, 2025, the Executive Office of the President ("EOP")
would be without authority to incur any financial obligations in FY2026, with very
limited exceptions, and would therefore implement a contingency plan for shutdown
furlough (the "Contingency Plan").  The Contingency Plan entails placing an estimated
554 of the 1,733 EOP staff in furlough status ("Non-Excepted Staff"), while an estimated
1,179 EOP staff would continue to report to duty because they are (i) designated as
excepted to perform emergency or excepted functions; (ii) Presidentially Appointed,
Senate Confirmed staff; (iii) otherwise exempt from the Antideficiency Act; (iv)
alternatively funded during a government shutdown (collectively, the "Excepted
Staff").  Any EOP personnel that are other government employees ("OGEs" or
"Detailees") would be furloughed or continue to repo1t to duty at the discretion of their
respective home agencies.

B.  Implementation of Contingency Plan

Once it becomes clear that neither an appropriations bill nor a CR will be enacted prior to
September 30, 2025, the White House Office of Management & Administration
("M&A") will notify EOP components to begin an orderly shutdown of unfunded
functions. Non-Excepted Staff will receive shutdown and furlough notices. Detailees will
be notified by their home agencies whether they are to be furloughed.

On Wednesday, October 1, 2025, Excepted Staff will report to duty. Non-Excepted Staff
will also report on October 1, 2025, to complete orderly shutdown procedures as
instructed, either in person or via telework for no longer than four hours and for the sole
purpose of engaging in orderly shutdown activities. Each EOP component will issue
instructions to their employees for orderly shutdown.

C.  Specifics of EOP Component Contingency Plan

Each EOP component has carefully considered the number of personnel required not
only to complete orderly shutdown activities but also to ensure that the emergency or
excepted operations of each EOP component can be carried out during shutdown. The
chart below summarizes component-by-component the Excepted Staff that will be

- 2 -

2

required to sustain minimal emergency or excepted operations.

| Lapse Plan Summary Overview | |
|---|---|
| Estimated time (to nearest half day) required to complete shutdown activities: | *0.5 day* |
| Total number of agency employees expected to be on board before implementation of the plan: | *1,733* |
| Total number of agency employees expected to be furloughed under the plan (unduplicated count) | *554* |
| **Total number of employees to be retained under the plan for each of the following categories (includes duplicate counts):** | |
| Compensation is financed by a resource other than annual appropriations: | *119* |
| Necessary to perform activities expressly authorized by law: | *8* |
| Necessary to perform activities necessarily implied by law: | *863* |
| Necessary to the discharge of the President's constitutional duties and powers: | *183* |
| Necessary to protect life and property: | *6* |

| **Brief summary of significant agency activities that will continue during a lapse:** |
|---|
| The EOP is made up of several offices and agencies ("components"), which support the President and Vice President of the United States in carrying out their respective duties as the heads of the Executive Branch. In the event of a lapse in appropriations, each component will: <br> 1) engage in those functions which are necessary to protect against imminent threats to the safety of human life or for the protection of property, including robustly monitoring potential pandemics, developing strategic responses, and providing cybersecurity and information technology services; <br> 2) support the President and Vice President in executing their constitutional responsibilities, including supporting the President's conduct of foreign relations and advancing national security, reviewing and coordinating legislative proposals pending before Congress that may be presented to the President, and facilitating certain Presidential appointments; <br> 3) carry out activities authorized by law to continue in the absence of an appropriation; and <br> 4) perform functions that may continue by necessary implication of the other excepted activities, including supporting the distribution of mandatory spending under the Inflation Reduction Act and activities by certain Presidential appointees who are exempt from the provisions of the Annual and Sick Leave Act, *see* 5 U.S.C. 6301 (2)(x)-(xi), 5 C.F.R. §630.211. Within the component-specific sections below, each component provides a summary of significant component activities that will continue upon a lapse in appropriations. |

| **Brief summary of significant agency activities that will cease during a lapse:** |
|---|

To the extent that an EOP component has statutory or regulatory responsibilities that do not implicate the President or Vice President's constitutional responsibilities, such activities will cease unless it otherwise falls into an excepted category. Within the component-specific sections below, each component provides a summary of significant agency activities that will cease upon a lapse in appropriations.

**Table 1**
**Numerical Breakdown of Retained and Furloughed Employees**

| RETAINED (EXEMPT/EXCEPTED) AND FURLOUGHED EMPLOYEES | | | | | |
|---|---|---|---|---|---|
| Component | Total On Board | Exempt | Excepted | Total Retained | Total Furloughed |
| **WHO** | 373 | 0 | 175 | 175 | 198 |
| **EXR** | 82 | 0 | 40 | 40 | 42 |
| **OVP** | 18 | 0 | 15 | 15 | 3 |
| **OVP Res** | 1 | 0 | 1 | 1 | 0 |
| **NSpC** | 0 | 0 | 0 | 0 | 0 |
| **CEA** | 25 | 0 | 9 | 9 | 16 |
| **CEQ** | 21 | 9 | 2 | 11 | 10 |
| **NSC** | 31 | 0 | 30 | 30 | 1 |
| **ONCD** | 32 | 0 | 15 | 15 | 17 |
| **OA** | 268 | 0 | 177 | 177 | 91 |
| **OMB** | 530 | 49 | 388 | 437 | 93 |
| **ONDCP** | 56 | 0 | 8 | 8 | 48 |
| **OSTP** | 23 | 0 | 9 | 9 | 14 |
| **USTR** | 227 | 16 | 191 | 207 | 20 |
| **IPEC** | 1 | 0 | 0 | 0 | 1 |
| **DOGE** | 45 | 45 | 0 | 45 | 0 |
| **Total** | **1,733** | **119** | **1,060** | **1,179** | **554** |

Note: "Excepted" category includes officials who are not subject to the provisions of the Annual and Sick Leave Act under 5 U.S.C. § 6301(2)(x) and (xi). *See Authority to Employ White House Officials Exempt from the Annual Sick and Leave Act During Appropriations Lapse,* 36 O.L.C. 40 (2011).

# EXHIBIT M

# POLITICO



CARE THAT DOESN'T **CLOCK OUT**
COALITION TO STRENGTHEN AMERICA'S HEALTHCARE
PROTECTING 24/7 CARE



1 DAY AGO

## Vought: Mass firings will begin 'in a day or two'

The Trump administration has threatened to inflict maximum pain on Democrats during the shutdown.



**MEREDITH LEE HILL**
10/01/2025, 1:49PM ET
UPDATED: 10/01/2025, 6:51PM ET



OMB chief Russ Vought told House Republicans on a private call Wednesday that the administration will start mass reduction in force moves, or firings, of federal workers "in a day or two," according to four people granted anonymity to describe the call.

Vought and President Donald Trump have both threatened to inflict maximum pain on Democrats during the shutdown as Senate Republicans hope to peel off additional Democrats in the coming days to vote for the GOP-led stopgap to end the standoff. A bipartisan group of senators also discussed several early off-ramp ideas on the floor earlier

1

Wednesday.

Advertisement



Hill GOP leaders have been wary of embracing Trump's promises to slash federal workers and "benefits" during the shutdown, especially given the blowback some Republicans in competitive districts will face.

Some Republicans in safe red districts raised concerns Wednesday. Rep. Blake Moore of Utah, a member of Johnson's leadership team who also represents an Air Force base in his district, raised concerns on the call about firing federal workers, especially given the recent need for the administration to re-hire some fired under DOGE. Rep. Brian Babin of Texas, who chairs the House Committee on Science, Space and Technology, echoed similar concerns, and noted the potential impact to the scientific community and national research labs.

Vought also warned that money is about to run out for both the nutrition program for low-income moms and babies, known as WIC, and for pay for active-duty members of the military.

Troops are set to miss paychecks starting Oct. 15 if the government remains closed. Lawmakers in both chambers are preparing legislation to pay troops amid the shutdown, but GOP leaders will wait before making a call to put such a bill to a vote, given it lessens their leverage on Democrats, according to three other people with direct knowledge granted anonymity. Leaders are so far sticking to the argument that Democrats need to approve the clean, seven week stopgap if they want to pay troops.

Vought also said billions in infrastructure money for New York, the home state of both Democratic leaders, is being "reviewed."

Speaker Mike Johnson told Republicans on the call that because of fraud, serious reforms are needed for the Affordable Care Act tax credits Democrats are demanding an extension of in the shutdown standoff. In response to a question from Rep. Rick Allen (R-Ga.), Johnson said that Vice President JD Vance said at the White House briefing that there is a time to

2

negotiate health care, but now is not that time.

Allen railed against any ACA extension deal, detailing how how expensive it would be. He also pushed to bring back efforts to repeal and replace Obamacare altogether.

Overall, Vought didn't provide a lot of details for House Republicans during the call. "He was surprisingly vague on everything," said another person with direct knowledge of it.

Also on Wednesday, White House press secretary Karoline Leavitt told reporters at a briefing that the federal layoffs would happen "very soon." Democrats, she claimed, are forcing the administration's hand — and are at fault for the upcoming upheaval.

"Unfortunately, because the Democrats shut down the government, the president has directed his cabinet, and the Office of Management and Budget is working with agencies across the board, to identify where cuts can me made," she said. "And we believe that layoffs are imminent. They are unfortunately a consequence of this government shutdown."

As the shutdown approached, congressional Democrats refused to bend to White House pressure over its reduction-in-force plans. Now, the administration insists it will follow through.

"If they're so worried about the effect this is having on the American people, and they should be, what they should do is reopen the government," Vice President JD Vance told reporters at the briefing. "Not complain about how we respond to the fact that Chuck Schumer and the Democrats have shut down the government in the first place."

*Gregory Svirnovskiy contributed to this report.*

Lead Art: Office of Management and Budget Director Russ Vought prepares to testify during an appropriations hearing on Capitol Hill, on June 4, 2025. | Francis Chung/POLITICO

Continue on to view the day's latest updates

# EXHIBIT N

**Government Executive**

# White House: Shutdown layoffs are just days away

By Eric Katz

October 1, 2025

Federal agencies will begin issuing mass layoffs in the coming days, White House officials said on Wednesday, suggesting the forthcoming cuts would be a direct result of the current government shutdown.

The Trump administration already has a plan in place to carry out the reductions in force, Vice President J.D. Vance and White House Press Secretary Karoline Leavitt said, though they stressed final decisions on specific personnel have not yet been made. The layoffs would mark an extraordinary escalation in the management of shutdowns, which have never previously led to permanent staffing reductions.

"Two days, imminent, very soon," Leavitt said in describing the timing of the RIFs. She added President Trump has directed his entire cabinet to develop layoff plans and the Office of Management and Budget is working with agencies "across the board to identify where cuts can be made."

Vance added the layoffs would "have to" take place if the shutdown continues for a couple days or longer. He suggested the cuts were necessary to ensure essential services can continue while agencies operate without annual appropriations, though such an approach has never been pursued in previous shutdowns.

"We are going to have to lay some people off if the shutdown continues," Vance said. "We don't like that. We don't want to do it."

Vance hedged slightly, saying the administration has not made any final decisions regarding particular workers and "might have to take extraordinary steps" the longer the funding lapse goes on.

Leavitt suggested OMB is looking over the receipts and budget of the entire government and making decisions about limiting costs, adding that "layoffs are very likely to be a part of it." She noted that OMB Director Russ Vought briefed House Republicans on the layoff plans Wednesday afternoon. Leavitt said she did not have any figures to share in terms of layoff impacts.

Despite the threats, Leavitt also expressed some sympathy for the federal workforce. She noted they are "real Americans who have families at home" and their working without pay is "unfair."

So far, agencies have carried out their shutdown procedures following the standard process. All workers either Tuesday evening or Wednesday morning received notices informing them whether they would be working through the shutdown or placed in an unpaid furlough status. All federal workers—both those working due to the nature of the funding of their positions or the necessity of their work to protect life and property, as well as those furloughed—are guaranteed back pay once the government reopens.

Agencies furloughed around 550,000 employees in total at the outset of the shutdown, a number that will climb as the shutdown drags on and leftover funds expire. Those sent home told *Government Executive* their agencies followed the

standard process of requiring them to check in this morning for "orderly shutdown procedures," including setting out-of-office messages and signing paperwork acknowledging their statuses.

The notices themselves used boilerplate language and were free from the partisan rhetoric the Trump administration deployed in both public-facing and internal messaging in recent days. Agency websites throughout government were rife with notices blaming Democrats for the shutdown. Even messages to federal contractors alerting them of their stop work orders blamed "Democrats' insane policy demands" for the pause, according to one such Interior Department note obtained by *Government Executive.*

While agencies largely proceeded with standard shutdown implementation, at least one agency has already implemented a RIF. The U.S. Patent and Trademark Office laid off 1% of its workforce on Wednesday, according to an email obtained by *Government Executive* and an employee familiar with the matter, amounting to about 140 individuals.

"Know that the decisions behind the changes announced were made after full and careful deliberation and the actions were taken with the utmost consideration for our workforce, stakeholders, and to be in full alignment with both the agency's unique mission and the dynamic future that lies ahead," John Squires, USPTO's director, said in a message to staff.

Which agencies will next pursue layoffs is not yet clear, though Vance and Leavitt suggested they would hit virtually every agency. *Government Executive* reported last week that the Interior Department was taking steps to implement significant RIFs later this month.

The American Federation of Government Employees and Democracy Forward has filed a lawsuit against the administration's plans, suggesting Trump and OMB Director Russ Vought had overstepped their legal authorities in ordering the RIFs.

Any RIF notices issued in the coming days will likely come with a 60-day notice period before employees are actually terminated. While administration officials have suggested the layoffs represent a permanent action, OMB has advised agencies they may revise their layoff plans once the government is reopened.

Democrats in recent days have said any layoffs that result from the shutdown were bound to occur anyway. Lawmakers from states with large populations of federal workers said they are not yet feeling the pressure from their constituents to end the shutdown, as those civil servants were already under assault without the shutdown. All but three Democrats on Wednesday again rejected a House-backed, Republican-supported continuing resolution that would keep agencies funded through Nov. 21.

"Virtually every federal worker I've talked to has said they feel like they've been under threats of RIFs and a slow-moving shutdown since the beginning of the administration," said Mark Warner, D-Va. "Whether that's the same they feel in three weeks, I don't know."

Sen. Tim Kaine, D-Va., noted that due to the timing of pay periods and the distribution of paychecks, federal workers will begin to see part of their pay withheld in mid-October. Paychecks due at the end of the month would be the first to be withheld entirely, but Kaine predicted the shutdown would end before that point. He added that he would not sign onto any deal unless it came with a commitment from the White House that Trump would not take "unilateral actions" to fire federal workers or rescind appropriations throughout the duration of the agreement.

In the meantime, OMB's Vought is already withholding federal funds on a targeted basis. He announced on Wednesday that OMB placed $18 billion for infrastructure projects in New York City on hold, a move Democrats quickly decried. The Government Accountability Office has determined the Trump administration has illegally impounded funds in seven instances.

"That is exactly what our founding fathers worried about," Sen. Chris Murphy, D-Conn., said. "That is exactly why they didn't give the president the power to decide unilaterally where funding goes. And so I think we're just seeing more and more evidence of how our democracy is being undermined every day that the president continues to act without any checks."

Vought also announced he would "cancel" $8 billion in Energy Department funding to more than a dozen Democratically controlled states.

By Eric Katz

October 1, 2025

https://www.govexec.com/workforce/2025/10/white-house-shutdown-layoffs-are-just-days-away/408534/

# EXHIBIT O



### ← Truth Details
5806 replies

 **Donald J. Trump** 🔴 ➕
@realDonaldTrump

I have a meeting today with Russ Vought, he of PROJECT 2025 Fame,  to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut, and whether or not those cuts will be temporary or permanent. I can't believe the Radical Left Democrats gave me this unprecedented opportunity. They are not stupid people, so maybe this is their way of wanting to, quietly and quickly, MAKE AMERICA GREAT AGAIN! President DJT

**12.5k** ReTruths **54k** Likes                          Oct 02, 2025, 4:59 AM



## Truth Social uses cookies

Truth Social uses session cookies to help provide you with a fast and consistent user experience. These cookies are essential for the Truth Social service to work as intended. Truth Social also employs a third-party cookie to protect its website from harmful automated attacks. To learn more about the cookies we use, please visit our Privacy Policy.

Reject all          Customize          Accept

1

# EXHIBIT P



# EXHIBIT Q

Learn more about 



My News

 

## US government layoffs could be in the thousands, White House says

By **Reuters**

October 2, 2025 9:20 AM PDT · Updated 10 hours ago

  



[1/2] White House press secretary Karoline Leavitt speaks to reporters outside the West Wing of the White House in Washington, D.C., U.S., October 2, 2025. REUTERS/Kevin Lamarque Purchase Licensing Rights 

WASHINGTON, Oct 2 (Reuters) - U.S. government layoffs could be in the thousands, White House spokeswoman Karoline Leavitt said on Thursday as the federal government began the second day of a shutdown.

> Read about innovative ideas and the people working on solutions to global crises with the Reuters Beacon newsletter. Sign up here.

Reporting by Doina Chiacu; Editing by Caitlin Webber

Our Standards: **The Thomson Reuters Trust Principles.** ↗

1

# EXHIBIT R

OCT 2, 2025 4:58 AM PT

# Trump Doubles Down Amid Government Shutdown as Layoffs Loom: 'Cry All You Want'

POLITICS    DONALD TRUMP    



EXPLORE                                                    SUBSCRIBE

**Introducing the 2025 TIME100 Next**                          ✕

VIEW MORE  ›



by **Callum Sutherland**

REPORTER

The Brief October 2, 2025

Workers kept on in shutdown raises questions, Trump doubles down as layoffs loom, and more

06:25

1

Length: Long     Speed: 1.0x

AI

President Donald Trump has delivered a pointed message to his critics amid the <u>government shutdown</u> and his renewed threat of impending layoffs for federal workers.

Taking to his social media platform, Truth Social, late Wednesday night, Trump shared an <u>image</u> posted by one of his supporters. The portrait of Trump signing a document in the Oval Office was emblazoned with the statement: "Cry all you want. He's doing exactly what I hired him for."

*Advertisement*

## Trending Shorts





"I knew I had to stand up for myself. Because by standin…

At a press conference Thursday, President Trump…

"You're caus President T

Just moments before the repost, Trump delivered a firm message online, seemingly reaffirming that his Administration intends to seize the shutdown as an opportunity to carry out mass layoffs and reshape the federal workforce.

"Republicans must use this opportunity of Democrat-forced closure to clear out dead wood, waste, and fraud," Trump underlinestated, before going on to claim that "billions of dollars" could be saved.

The President earlier indicated that Democrats would feel the main brunt of the layoffs, telling reporters in the Oval Office: "We'd be laying off a lot of people that are going to be very affected, and they're Democrats. They're gonna be Democrats."

White House Press Secretary Karoline Leavitt said on Wednesday that "layoffs are imminent" and that Trump has "directed his cabinet, and the Office of Management and Budget (OMB) is working with agencies to identify where cuts can be made."

*Advertisement*

Leavitt said more announcements would be made soon regarding the hits to the federal workforce, which are expected to begin within the next two days.

**Read More**: *Who the Trump Administration Says Is 'Essential' in a Shutdown Is Raising Eyebrows*

The action of pursuing layoffs is a step away from the standard procedure of furloughing workers until government funds resume. The Trump Administration's eagerness to pursue further layoffs has received heavy criticism from Democratic lawmakers.

House Democratic Leader Rep. Hakeem Jeffries referred to the impending layoffs as "cruelty" and pointed to the mass federal dismissals and office shutterings that have already taken place since Trump returned to office.

"These are all the things that the Trump Administration has been doing since January 20," Jeffries said, seemingly referencing the widespread layoffs and spending cuts led by the Department of Government Efficiency (DOGE), previously overseen by Elon Musk.

*Advertisement*

DOGE said it cut government spending by $55 billion within the first month of Trump's second term, but a TIME review of the itemized savings posted on DOGE's website found it only accounted for about $16 billion in savings.

Meanwhile, in what appears to be a sign of the lapsed communication between Republicans and Democrats, Jeffries also said that he hasn't heard from the White House since Monday.

The government has been in shutdown—its first in almost seven years—since midnight on Oct. 1, after a bitter stalemate in Congress between the Republicans and Democrats. The political parties are locked in a dispute over spending and enhanced Obamacare subsidies. An eleventh-hour attempt to find common ground failed on Tuesday night when almost all Senate Democrats voted to reject a House-passed Republican bill that would have extended funding until Nov. 21. The bill did not meet the Democrats' core demand that Affordable Care Act subsidies, set to expire at the end of the year, should be extended, nor did it move to

4

reverse the deep cuts to Medicaid that featured in Trump's "Big, Beautiful Bill" that was signed into law on July 4.

*Advertisement*

**Read More**: *Republican and Democratic Lawmakers React to Government Shutdown as Blame Game Ensues*

A blame game has ensued in light of the shutdown, with both political parties holding each other responsible for the halt in government activities.

The President and Congress still get paid during a shutdown, but amid concerns over layoffs and the impact on federal workers and everyday Americans, some lawmakers have pledged to forgo their own paychecks in solidarity, until the government is back up and running.

Republican Rep. Ron Estes of Kansas has requested that his salary be put on hold in response to the shutdown, for as long as the government closure lasts.

"Democrats, led by Chuck Schumer, have pushed Congress into another Schumer shutdown. During a government shutdown, members of Congress still receive their paychecks. This is unfair when some federal employees are furloughed and/or don't receive their paychecks," Estes said via social media on Wednesday morning, sharing a letter requesting his salary be withheld.

*Advertisement*

Democratic Sen. Andy Kim of New Jersey is also among the lawmakers who will refuse to accept his own salary.

"It's wrong that the President and Members of Congress get paid during a government shutdown when our military and public servants don't. I will be refusing my own pay... Government leaders shouldn't be playing with other people's chips," said Kim.

# Must-Reads from TIME

# EXHIBIT S

# US ENVIRONMENTAL PROTECTION AGENCY CONTINGENCY PLAN FOR SHUTDOWN



| Lapse Plan Summary Overview | |
|---|---|
| Estimated time (to nearest half day) required to complete shutdown activities: | *4 hours (0.5 days)* |
| Total number of agency employees expected to be on board before implementation of the plan: | *16,737* |
| **Total number of employees to be retained under the plan for each of the following categories:** | |
| Compensation is financed by a resource other than annual appropriations: | *354* |
| Necessary to perform activities expressly authorized by law: | *24* |
| Necessary to perform activities necessarily implied by law: | *284* |
| Necessary to the discharge of the President's constitutional duties and powers: | *1* |
| Necessary to protect life and property: | *597* |
| **Summary of significant agency activities that will continue during a lapse:** | |

- Protection of EPA land, buildings, equipment, and protection of research (preserving ongoing experiments).
- Law enforcement and criminal investigations.
- Emergency and disaster assistance.
- Superfund response work, where a failure to maintain operations would pose an imminent threat to human life. Sites are evaluated at the time of shutdown.
- Maintenance of laboratory instrumentation, controlled environments (i.e., freezers), lab animals, plants, and unique organisms necessary to preserve property and ensure critical operating requirements are not impaired.
- EPA's emergency response readiness operation.
- Legal counseling, litigation and law enforcement activities as required.
- All obligation actions necessary to support excepted and exempted activities.
- Exempted activities funded by Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) and Pesticide Registration Improvement Act (PRIA) fees.
- Exempted activities funded by the Superfund Tax.
- Make timely payments to contractor and grantees where available funds were or are obligated for the contract or grant and either: (A) the employees necessary to make such payments are excepted for that purpose because, for example, failing to make the payment would prevent or significantly damage the agency's execution of a funded function, and/or would imminently threaten the safety of human life or the protection of property; or (B) where the employees necessary to make such payments are exempted.
- Travel associated with excepted and exempted activities.
- Personnel actions needed to support the furlough of employees and support of excepted and exempted personnel.
- Maintain secure operation of Enterprise IT Infrastructure supporting non-mission critical systems and mission critical systems.
- Full support of mission critical IT systems (systems necessary for excepted and exempted activities).

1

| |
|---|
| • Full support of www.epa.gov/lapse for communicating with furloughed employees and agency stakeholders. |
| **Summary of significant agency activities that will cease during a lapse:** |
| • Issuance of new grants and interagency agreements unless necessary for excepted or exempted activities. <br> • Distributing of payroll beyond the last full/partial pay period for non-exempted employees. <br> • Update of the EPA website and other communication activities unless relevant to excepted or exempted activities. <br> • Conducting research and publication of research results unless necessary for exempted or excepted activities. <br> • Certain Superfund site activities where there is no imminent threat to human health and property, unless exempted. <br> • Civil enforcement inspections, unless necessary for excepted or exempted activities. <br> • Issuance of permits, guidance, regulations, and policies unless necessary for exempted or excepted activities. <br> • Approvals of pending state requests (i.e., authorized/delegated state-issued EPA permits, SIPs, TMDLs, Water Quality Standards). |

Document Change Log

| Date | Brief Summary of Changes |
|---|---|
| August 1, 2019 | Agency data updated Modifications made to address the June 2019 update to Circular A-11 section 124 |
| September 10, 2021 | Biennial agency update |
| September 28, 2023 | Biennial agency update |
| September 11, 2024 | Agency update to include Superfund tax receipts-funded activities to implement the Comprehensive Environmental Response, Compensation and Liability Act. |
| March 6, 2025 | Agency update to remove Infrastructure Investment and Jobs Act and Inflation Reduction Act activities. |

## 1. PURPOSE

This contingency plan provides general guidelines for the orderly handling of US Environmental Protection Agency operations in the event of a lapse in appropriations, which is typically caused by the lack of an enacted annual appropriations bill or continuing resolution. This plan does not apply to specific appropriations action by the Congress to deny a particular program funding. In the event of a "shutdown", when EPA is required to implement this general guidance, supplemental government-wide guidance issued by the Office of Management and Budget, the Office of Personnel Management, and the General Services Administration also apply. This Contingency Plan for Shutdown, or Lapse Plan, applies to all agency employees and locations.

## 2. AUTHORITY & DEFINITIONS

The Antideficiency Act prohibits agencies from incurring financial obligations in excess or in advance of appropriations, as well as prohibits agencies from accepting voluntary services except where authorized by law. 31 U.S.C. §§ 1341, 1342. In the event of a lapse in appropriations, an agency may only incur financial obligations for those activities that are exempted or excepted.

**Exempted**: An agency may "exempt" activities from the shutdown if the activities have funds available. The two main types of exempted activities at EPA are: (1) those that are funded with unexpired appropriations where carryover funds remain unobligated, and (2) activities that are funded with appropriations that are not subject to the annual appropriations process. Approved exempted activities may only continue for as long as there are funds available to support the exempted activities. Where funds supporting an exempted activity are exhausted, the agency may only continue the activity if it also falls into one of the excepted categories.

**Excepted**: "Excepted" activities are those legally authorized to continue despite a lapse in appropriations. An agency may incur obligations in advance of appropriations if the activity is:

    a. **Necessary to perform activities expressly authorized by law**: A statute or other legal requirement expressly authorizes an agency to obligate funds in advance of appropriations.

    b. **Necessary to perform activities necessarily implied by law**: An agency is conducting activities where failing to perform the activity would "prevent or significantly damage" that agency's or another agency's ability to continue performing exempted activities; in such case, the authority to conduct the activity despite the lack of appropriations is "necessarily implied" by the authority to continue conducting the corresponding exempted activity.

        Additionally, the Antideficiency Act "necessarily implies" authority for agencies to incur those obligations necessary to closing their agencies. Such activities are called "furlough activities" when performed during the first working day of the lapse in appropriations, and "shutdown activities" when performed for an extended period.

        1) **Furlough Activities:** In the event of a lapse in appropriations, all personnel will report for duty on their first working day following the expiration of an appropriations act or a continuing resolution unless notified otherwise or unless they are on previously

4

5

approved scheduled leave, alternative work schedule day off, or holiday(s) that take place during the furlough period. Employees will complete orderly shutdown activities on the workday on which the employee had been scheduled to return to work. On that day, personnel will be advised to conduct an orderly termination of their activities. Such "furlough activities" include securing their workspace and documents; identifying any approved travel plans over the next 30 days; and entering their time into the agency's time & attendance system, if required. The EPA estimates that these activities should take less than one-half workday (four hours). Following completion of furlough activities, all employees not designated to carry out exempted or other excepted activities will be furloughed and must depart following their dismissal.

2) **Shutdown Activities:** While most activities necessary for agency closure can be accomplished within four hours, some agency personnel may need to work longer to secure and shutdown EPA property and facilities, including the varied laboratory research facilities and experiments that EPA is conducting. The EPA expects the majority of such extended "shutdown activities" will be completed in less than five days. Personnel designated for the orderly shutdown of the agency will continue to report for duty until their shutdown tasks have been completed and will need to complete them as expeditiously as possible. Shutdown activities should be conducted in a manner whereby expedient reactivation of normal operations and activities may occur when funds are made available. Once the services of these employees are no longer required, shutdown personnel will also be furloughed. Any obligations for shutdown activities will be paid after a new appropriation is provided.

c. **Necessary to the discharge of the President's constitutional duties and powers**: An agency is conducting activities that "assist the President in fulfilling his peculiar constitutional role."

d. **Necessary to protect life and property**: Where suspension of the agency function would imminently threaten the safety of human life or the protection of property.

The policies and procedures detailed in this contingency plan are issued in accordance with OMB Circular A-11, Section 124; OMB Bulletin 80-14, dated August 28, 1980 (as amended by the OMB Director's memorandum of November 17, 1981, and Supplement 1 to Bulletin 80-14, dated August 20, 1982). They are also consistent with OMB's "Frequently Asked Questions During a Lapse in Appropriations" dated September 22, 2023, and opinions issued by the Department of Justice, Office of Legal Counsel.

## 3. GENERAL GUIDANCE

The following guidance applies to all agency appropriation accounts. In general, in the event of a lapse in appropriations, the EPA will stop incurring new obligations other than those supporting excepted or exempted activities. Guidance for specific financial areas is provided below.

a. <u>**Contract Obligations:**</u> Unless necessary for excepted activities or programs funded by exempted resources, no new obligations for contracts, including the exercise of options and/or

modification to add incremental funding, may be entered into beginning with the first day of a fiscal year when an appropriations act or a continuing resolution has not been enacted or on the first day immediately following the expiration of a continuing resolution and no new appropriations act or continuing resolution has been enacted. Options exercised prior to the start of the new fiscal year already contain a "subject to availability of funds" clause to provide for any lack of funding in the new fiscal year.

If a new contract obligation is necessary for an excepted or shutdown activity, Senior Resource Official (SRO) for the national program must consult with other organizations such as the Office of Mission Support (OMS) and the Office of the Chief Financial Officer (OCFO). The EPA may incur obligations necessary to pay costs incurred in conjunction with equitable adjustments for work stoppages on contracts as a shutdown activity.

Regarding preexisting contract obligations, contractors whose contract vehicles were funded prior to the lapse in appropriations that do not require interaction with federal employees who are not otherwise excepted or exempted may continue work until such time government interaction is necessary and/or funding is exhausted.

Consistent with OMB guidance issued on September 22, 2023, payment of contract invoices may occur only where available funds were or are obligated to the contract and either:
> (A) the Contracting Officer Representative (and/or other appropriate EPA employees necessary to make such payments) are excepted for that purpose because:
>> (i)  failing to make the payment would prevent or significantly damage the agency's execution of a funded function;
>> (ii) failing to make the payment would imminently threaten the safety of human life or the protection of property;
>> (iii) failing to make the payment would impair the President's constitutional duties and powers; or
>> (iv) making the payment despite a lapse in appropriations is expressly authorized by law;

or
> (B) the EPA employees necessary to make such payments are exempted.

b. **Financial Assistance Obligations (Grants and Cooperative Agreements)**: Unless necessary for excepted activities or programs funded by exempted resources, no new obligations for financial assistance (i.e. grants or cooperative agreements), including modifications to add incremental funding, may be entered into beginning with the first day of a fiscal year when an appropriations act or a continuing resolution has not been enacted, or on the first day immediately following the expiration of a continuing resolution and no new appropriations act or continuing resolution has been enacted.

Regarding preexisting financial assistance agreements, recipients of funded grants and cooperative agreements can typically continue work on their projects during any EPA shutdown, provided performance does not require interaction with federal employees who are not otherwise excepted or exempted. Grant recipients currently approved to utilize the

6

Automated Standard Application Payment (ASAP) system may make drawdowns of authorized obligated levels during a shutdown.

Consistent with OMB guidance issued on September 22, 2023, in the event EPA-employee involvement is required to effectuate a grant drawdown, that EPA-employee involvement may occur only if either:

    (A) The EPA employees necessary to effectuate the drawdown are excepted for that purpose because:

        (i)  failing to allow drawdown would prevent or significantly damage the agency's execution of a funded function;

        (ii) failing to allow drawdown would imminently threaten the safety of human life or the protection of property;

        (iii) failing to allow drawdown would impair the President's constitutional duties and powers; or

        (iv) allowing drawdown despite a lapse in appropriations is expressly authorized by law;

or

    (B) the EPA employees necessary to effectuate the drawdown are exempted.

Financial assistance recipients must stop work if they reach a point at which they require the involvement or approval of federal employees who are not otherwise excepted or exempted. For example, recipient staff of non-excepted financial assistance agreements who are assigned to EPA facilities will not be allowed access to those facilities. If they can satisfactorily continue work off-site, the project can continue. Senior Environmental Employee (SEE) program enrollees will be notified of the lapse in accordance with their grant procedures. Additional guidance will be provided through the agency's SEE program manager.

Financial assistance recipients should maintain documentation of any allowable costs associated with the work stoppage.

c.  **Interagency Agreements:** Unless necessary for excepted activities or programs funded by exempted resources, no new obligations for interagency agreements (IAs), including modifications to add incremental funding, may be entered into beginning with the first day of a fiscal year when an appropriations act or a continuing resolution has not been enacted, or on the first day immediately following the expiration of a continuing resolution and no new appropriations act or continuing resolution has been enacted.

EPA program offices in conjunction with the Office of Acquisition Solutions (OAS) and in consultation with the other agency will determine if work under any funds-in IAs is necessary for shutdown, excepted, or exempted activities. If not, work on such agreements will stop. Other agencies can continue to work on funds-out IAs where sufficient available funding exists on the IA. However, other agencies must stop work if they reach a point at which funds are exhausted and/or require involvement or approval of EPA employees who are not otherwise exempted or excepted. If the other agency is closed, that agency in consultation with EPA will determine whether activities under funds-out IAs are necessary for excepted or exempted activities. Funds-out IA obligations for EPA's "infrastructure costs" such as rent, telephone

service, and other utilities that support excepted or exempted activities will continue to be incurred until appropriations have been provided. Funds-in and funds-out IAs that support excepted or exempted activities, such as Superfund response work and emergency and disaster assistance, will continue.

d. **<u>Travel</u>:**

General Travel

No travel is allowed during a lapse in appropriations, except for travel required for excepted or exempted activities. All personnel on official travel must return to their duty station as soon as possible, unless continued travel is necessary for excepted or exempted activities.

In order to request and complete travel for exempted or excepted activities during a lapse in appropriations and after carry-over funding has been exhausted, Senior Resource Officials must approve all travel authorizations and vouchers. Exempted or excepted travelers should be prepared to process their own travel authorizations and vouchers, as centralized travel preparers are not likely to be considered exempted or excepted employees.

Up until a lapse in appropriations has occurred and carry-over funding has been exhausted, all travel vouchers and payments will be processed in normal course of business. However, after all carry-over funding has been exhausted, only travel vouchers and payments will be processed for travel required for excepted or exempted activities. All hold-over travel vouchers and payments for non-exempted and non-excepted activities will be completed when the lapse in appropriations has ended. Travelers should complete and submit all travel vouchers as soon as possible to ensure no delays occur with the payment of vouchers.

Travel Cards

Employees are responsible for any charges to the travel card and should again ensure that they are submitting their vouchers within five days of the end of travel. It is anticipated that the General Service Administration will be working with the travel card bank to obtain an extended grace period for payments (this has been customary in past shutdowns). For more information on travel card activities during a shutdown, please go to <u>Frequently Asked Questions (FAQs) for the Federal Government Shutdown | Smartpay (gsa.gov)</u>.

International Travel
In the event of a lapse in appropriations, the Office of International and Tribal Affairs will provide each Deputy Assistant Administrator and Deputy Regional Administrator a list of staff currently on international travel. The list will include a traveler's hotel and emergency contact information for communication purposes.

Employees assigned overseas are not in travel status. Their overseas location is their permanent station. Employees in temporary quarters during the furlough will remain in temporary quarters. If these employees are not designated as excepted or exempted, they would not report to work. Employees on extended temporary duty (TDY) travel where a detail

personnel action (SF52) was issued and funded should follow instructions given by the receiving office. The employee would not return to their home location during a shutdown.

**Time and Attendance and Payroll Functions:** OCFO's Office of Technology Solutions (OTS) must assure delivery of the time and attendance file to the agency's payroll provider to generate the payroll file for electronic transmission to the Department of the Treasury. Additionally, OTS will process the Labor Cost File received biweekly from the agency's payroll provider in the Compass Payroll Cost Allocation Module.

1) OTS will maintain staff to continue time and attendance processing, as well as the payroll cost allocation. The time and attendance and payroll team will continue reconciliation and closeout activities each pay period to ensure exempt employees are paid accurately and on time.

2) If applicable, OTS will work closely with OMS during the duration of the shutdown to maintain the list of exempted/excepted employees who are required to work during shutdown and or furloughed employees whose status changed during shutdown to exempted/excepted and require PeoplePlus access.

3) OTS will process time and attendance records for exempted employees during the shutdown.

4) OTS will provide all employees prior to the initiation of any furlough action with instructions regarding the completion of time and attendance in the agency's electronic time and attendance system, PeoplePlus.

5) OTS will provide exempt and excepted employees guidance on how to complete their timecards during the shutdown.

e. **Financial Transactions:** OCFO's Office of the Controller (OC) will secure cash funds, receivables, collections, and all financial records. The processing of requests for payments from contractors, grantees, and IA recipients will be processed in accordance with OMB guidance.

1) OC staff, in consultation with the Office of General Counsel (OGC), will determine those financial activities that may continue in the absence of an appropriation.

2) Instructions will be provided concerning operations of the agency's core financial management system for excepted or exempted activities prior to suspension of agency operations. The agency's core financial management system will be used to monitor obligations for excepted or exempted activities during a shutdown.

f. **Personnel Activities:** EPA is authorized to incur obligations for its workforce to conduct exempted and excepted activities, including approximately one-half day (four hours) of furlough and shutdown activities estimated not to exceed five days.

## 4.  GUIDANCE ON DETERMINING SHUTDOWN ACTIVITIES

The Assistant Administrator for OMS or designee will keep the EPA Administrator apprised of the agency's shutdown activities. The AA for OMS, and other appropriate offices designated within that office, will coordinate efforts as necessary with regional, headquarters, and field offices.

Each Senior Resource Official (SRO) will submit a list of personnel that would be necessary to perform excepted and exempted activities. When deciding which personnel should be on the list, SROs should consider the specific actions that would be necessary to affect an orderly shutdown of the agency, giving primary consideration to protecting life and safeguarding government property and records. SROs should also seek to consolidate excepted and exempted duties in as few employees as possible. Each SRO is responsible for informing their employees if they are on the list. OMS will maintain this information, including changes, and will be responsible for updating the Contingency Plan and summary information as appropriate.

The excepted and exempted personnel lists are subject to review and approval by OMS and OGC in consultation with OCFO. SROs should use the agency's enterprise Shutdown application to submit each person's name, the function each person will perform during shutdown, and under what category the employee is retained:

- Compensation is financed by a resource other than annual appropriations (exempted),
- Necessary to perform activities expressly authorized by law (excepted),
- Necessary to perform activities necessarily implied by law (excepted),
- Necessary to the discharge of the President's constitutional duties and powers (excepted), or
- Necessary to protect life and property (excepted).

Each SRO must also provide the list of names of the excepted and any exempted personnel to the facility manager at each EPA location. After shutdown activities are completed, only those employees designated as excepted or exempted personnel will be allowed into EPA facilities.

If the lapse in appropriations extends longer than five days, each SRO must periodically evaluate planned activities and reengage personnel when needed. For example, during an extended shutdown, a limited number of personnel may be recalled and tasked to perform additional shutdown activities that were not originally envisioned, such as the cancellation of meetings and events that are not excepted or exempted activities.

Additionally, each SRO from region or program may need to identify additional employees for excepted activities in an emergency that imminently threatens the safety of human life or the protection of property.  These individuals will not be in a pay status prior to being recalled back to work and will be added to the list of excepted personnel after being recalled.

Each SRO is responsible for modifying their list of excepted and exempted personnel in accordance with direction from OGC, OMS, and OCFO. Modified personnel lists should be submitted to OMS as needed. EPA retains the authority to modify the number of personnel working on excepted or exempted activities during any period of shutdown. Changes to the number of excepted or exempted personnel to be retained under the plan will be included in the Lapse Plan Summary Overview. The

10

shutdown personnel needed to be retained more than four hours are included as "necessary to perform activities necessarily implied by law".

By default, any employee not excepted or exempted is furloughed.[1] Under the applicable regulations and OPM policy, employees do not need to be provided advance written notice of a furlough if the furlough is due to a lack of an appropriations act or a continuing resolution. However, the agency will make every effort to notify all employees affected by the furlough in advance and adhere to related collective bargaining agreements.

Furlough decision notices will be distributed to each employee and all personnel receiving furlough notices will be dismissed and directed not to report to work until an Appropriations Act or a continuing resolution is enacted. In addition to the furlough decision notice, employees will be provided a shutdown checklist to support their orderly shutdown and any supplemental information, such as a reminder to monitor www.epa.gov/lapse for updated information on the agency's status. Additionally, supervisors must cancel any approved leave during a furlough. Additional guidance regarding leave with respect to excepted or exempted personnel is provided below.

If a furlough extends beyond 30 calendar days, the agency will issue a second 30-day furlough notice to all personnel not designated to carry out excepted or exempted activities. Furlough notices will be issued in 30-day increments until such time that an appropriation act or a continuing resolution is enacted. The furlough notices will be posted on www.epa.gov/lapse for download by employees. A notification will be issued via the agency's Mass Alert and Notification System (MANS) alerting employees of the second (and subsequent) 30-day furlough notice posted to the website. In accordance with the Antideficiency Act, no employees on furlough will be authorized to work during the shutdown period.

    a.  **Telework Activities and Alternate Work Schedules:** Employees should coordinate with their supervisors regarding telework, remote work, and alternative work schedules. All work must be stopped unless the activity is for an excepted or exempted activity, regardless of location or timing of the work.

    b.  **Information Technology (IT) Systems:** Unless otherwise identified as a system supporting excepted or exempted activities, most agency IT systems should be scaled back to basic operational status, which would include all cybersecurity measures necessary to protect the agency's IT infrastructure and data assets. This will ensure the protection of government records, that information and cyber security controls are in place, and assist in reactivating once the period of the shutdown is over.

      The agency Chief Information Officer will identify which systems will be required for continued operation during the period of a shutdown. OMS will work with the senior information officials in each program and region to identify a list of these systems and provide guidance regarding how continued operation and security of those systems will be accomplished as well as the orderly shutdown and securing of other IT systems and devices.

---

[1] Note that Commissioned officers are employees of the Public Health Service. If the EPA has a lapse in appropriations, PHS officers will continue to work at the EPA because they are authorized by law to continue working.

## 5.  GUIDANCE ON DETERMINING EXEMPTED ACTIVITIES

In the event of a lapse in appropriations, the agency will assess the availability of unexpired multiple and no-year appropriations as well as funds available from other sources. An agency may "exempt" activities from the shutdown if the activities have funds available.

Exempted activities may only continue if there are funds available to support the exempted activities. Personnel who perform exempted activities and who are exempted from the shutdown order will continue to report for duty and conduct their assigned responsibilities until available carryover funds are close to being fully obligated. The agency would proceed with shutdown activities when there are no longer sufficient funds for it to be practicable for the agency to operate.

The two main types of exempted activities at EPA are: (1) those that are funded with unexpired appropriations where carryover funds remain unobligated, and (2) activities that are funded with appropriations that are not subject to the annual appropriations process.

a.  **Exempted Activities Funded by Carryover**:  Where a multi-year or no-year appropriation has carryover available, the activities supported by that appropriation may be exempted until funding is exhausted to the point of being no longer practicable to operate.

1)  Example: Some of EPA's accounts – such as Environmental Programs and Management (EPM) and Science and Technology (S&T) – expire after two fiscal years. So long as there are funds available in such a "multi-year" account, they may continue to be obligated for that program until it is no longer practicable to operate or the account expires, whichever comes first.

2)  Example: Some of EPA's annual accounts – such as the annual Superfund appropriation account – are made available "until expended." Therefore, so long as there are funds available in such a "no-year" account, they may continue to be obligated for that program until it is no longer practicable to operate.

Note that amounts "appropriated" by a continuing resolution do not "carry over" when that continuing resolution expires, even if the continuing resolution funds have been previously apportioned to EPA by OMB. To support an exemption, funds must have been provided by a prior annual or supplemental appropriations act.

b.  **Activities Funded by Permanent Indefinite Appropriations:**  Some of EPA's funds are made available by "permanent indefinite" appropriations which are not subject to the annual appropriations process. Where funds are available in such accounts, they may continue to be obligated until it is no longer practicable to operate.

1)  Example: EPA has the authority in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) § 4 to collect and spend "maintenance" fees paid by pesticide registrants annually to EPA as a condition of maintaining registration for their pesticide(s). Such spending authority is not conditioned on receiving permission annually in the appropriations act. Therefore, so long as there are funds available in that account, the program may continue to

obligate such fee money for the purposes for which it is available until it is no longer practicable to operate. [2]

2) Example: EPA has the authority under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) § 122(b)(3) to enter into settlement agreements with potentially responsible parties that resolve CERCLA liability and may retain and use settlement proceeds in "special accounts" to carry out Superfund response actions at the site consistent with the terms of the settlement agreement. Such spending authority is not conditioned on receiving permission annually in the appropriations act. Therefore, so long as there are funds available in a special account, the program may continue to obligate such money for the purposes for which it is available until it is no longer practicable to operate.

## 6. GUIDANCE ON DETERMINING EXCEPTED ACTIVITIES

Within the guidance established by OMB Circular A-11, Section 124 (2022), agencies must decide what activities are "excepted," meaning legally authorized to continue despite a lapse in appropriations. An agency may incur obligations in advance of appropriations if:

a. **Necessary to perform activities expressly authorized by law**: A statute or other legal requirement expressly authorizes an agency to obligate funds in advance of appropriations.

1) Example: In the event of a lapse in appropriations, the Department of Justice (DOJ) typically expects EPA to continue to provide the legal or technical support necessary to meet any court deadlines or orders, including but not limited to filings, court appearances, and responses to discovery requests. In implementing this Contingency Plan, EPA will consult with DOJ and follow its guidance as to EPA activities that may continue notwithstanding a lapse in appropriations, the authority for which is expressly authorized by court order.

2) Example: If Congress were to enact a statute stating that EPA could incur obligations to carry out a certain activity notwithstanding the Antideficiency Act, EPA could conduct that activity despite a lapse in appropriations. Such authority is rare among civilian agencies.

b. **Necessary to perform activities necessarily implied by law**: An agency is conducting activities where failing to perform the activity would "prevent or significantly damage" that agency's or another agency's ability to continue performing exempted activities; in such case, the authority to conduct the activity despite the lack of appropriations is "necessarily implied" by the authority to continue conducting the corresponding exempted activity.

Example: EPA is partnering with another federal agency who is not affected by the lapse to publish a joint notice of proposed rulemaking. EPA and the other agency determine that if EPA

---

[2] Note that not all fee accounts are necessarily permanent indefinite appropriations as spending authority for fee accounts is often conditioned on receiving permission annually in an appropriations act, which would be absent during a lapse in appropriations. Programs considering spending appropriations derived from fees during a lapse in appropriations should consult with the Office of General Counsel.

staff who would otherwise be furloughed do not continue to work on the joint rulemaking, it would prevent or significantly damage the other, funded agency's ability to continue with the rulemaking. Therefore, the authority to incur necessary obligations for EPA staff to continue working on the joint rulemaking is necessarily implied by the other agency's continued funding.

c. **Necessary to the discharge of the President's constitutional duties and powers**: An agency is conducting activities that "assist the President in fulfilling his peculiar constitutional role".

   1) Example: The Constitution vests the President with the exclusive power to nominate, and by and with the advice and consent of the Senate, appoint officers of the United States. EPA is authorized to incur obligations necessary for employees to prepare for the Senate confirmation hearing of a person nominated to be Administrator, because if the employees were not able to assist, then the President's nomination and appointment power would be infringed.

   2) Example: The Constitution vests the President with certain powers regarding foreign relations. The Department of Justice, Office of Legal Counsel has opined that the conduct of foreign relations "essential to the national security" may continue in the event of a lapse in appropriations so that the President's authority in this area is not infringed.

d. **Necessary to protect life and property**: Where suspension of the agency function would imminently threaten the safety of human life or the protection of property. In order to be excepted under this rationale, there must be (1) an "articulable connection" between the financial obligations being incurred and the safety of life or protection of property; (2) a "reasonable likelihood" that safety of human life or protection of property would be compromised "in some significant degree" if the activity were not performed; and (3) the threat to human life or property must be "reasonably said" to be "demanding of an immediate response." If protection of property is at issue, the property must be (1) government-owned, or (2) property "in which the government has an immediate interest," or (3) property "in connection with which" the government has "some duty to perform."

   1) Example: Sites (e.g., Superfund) where failure to maintain operations, or failure to initiate an emergency removal in response to a release or threat of release of a hazardous substance or pollutant or contaminant would pose an imminent threat to human life.

   2) Example: EPA's emergency response program serves as a safety net to states, local and private first responders for situations involving actual and/or threatened of environmental emergencies. In the event of a shutdown, HQ and regional offices should utilize existing procedures to maintain their phone and response on-duty on-scene coordinator(s) to maintain and ensure prompt support of environmental emergency responses that requires EPA attention and/or action.

3)  Example: Law enforcement personnel involved in activities designed to protect human life and property from imminent threat will be excepted for the time necessary to carry out such activities.

4)  Example: The EPA maintains a variety of laboratories. EPA will take necessary measures to ensure the physical integrity of the EPA's research property is protected where, without these measures, the property would be damaged or destroyed. Personnel will be expected to ensure the physical protection of federal property, that controlled environments (such as freezers) will function and not be damaged, that scientific instrumentation will function and not be impaired, and that lab animals, plants, and other unique test organisms will not be damaged or destroyed.

The specific excepted activities, personnel, and level of support required based on the examples above will be determined by OMS in consultation with OCFO, OGC and appropriate program offices. The determination as to whether an activity qualifies as excepted may change depending on the duration of a shutdown.

Excepted personnel are excluded from furlough during shutdown **but only for the hours/days it takes them to perform their excepted activities.** If a function requires one hour per day, then the excepted employee may work for only one hour per day to perform only that excepted task.


## 7.  GUIDANCE ON RESUMING ORDERLY OPERATIONS

OCFO will notify OMS and agency senior managers of enactment of the necessary funding mechanism (i.e., either a continuing resolution or an appropriations act). OMS will coordinate as necessary with the Office of Public Affairs, to communicate updated status reports and actions necessary to return to normal agency operations and to place status updates on the www.epa.gov/lapse website, and utilize the agency-wide mass alert notification system as appropriate. Once EPA receives notification that an appropriation has been approved or is imminent, OMS will begin contacting program/regional offices to begin calling back their start-up personnel necessary to resume orderly operations. The EPA has identified the following activities to resume orderly operations once appropriations are restored:

a.  **Communications:** OMS will coordinate with all programs and regions to ensure that information is ready upon employees return, including checklists or other aids to assist employees and managers with startup activities. The Office of Public Affairs, OMS, and OCFO will coordinate any special messaging needed to address specific situations that may arise in conjunction with the return of employees to duty.

b.  **Finance**:  OCFO will coordinate with OMS to communicate any necessary information to employees regarding Budget, PeoplePlus/time and attendance, Compass and Concur systems.

c.  **Facilities**:  OMS will oversee and coordinate the following activities.

1)  Building Systems: Coordinate with GSA/lessor to ensure all EPA building systems, including HVAC, are in full, regular operations prior to reopening buildings.

2) Security Guard Force: Coordinate with Federal Protective Services (FPS) or security contractor to ensure security is fully staffed for re-opening.
3) Janitorial/Cleaning Services: Coordinate with GSA/lessor/contractor to ensure all janitorial services resume regular operations.
4) Building Access: Change access control schedules to business hours.
5) Restore Key Contracts: Coordinate with acquisition personnel to lift stop work orders on pertinent contracts.

d. **Information Technology Activities**: OMS will oversee and coordinate the following activities.

1) Infrastructure Start-up: Prepare Enterprise IT Infrastructure to support normal operational workloads.
2) User Support Help Desks: Ensure that all help desks are fully staffed and prepared for Day 1.
3) Communications: Support activities to update web pages and messaging.
4) Restore Key Contracts: Coordinate with acquisition personnel to lift stop work orders on pertinent contracts.

e. **Procurement Operations Activities**: OMS will oversee and coordinate the following activities.

1) Contracting officers will notify contractors of funds availability.
2) Begin cancelling "Stop Work Orders" for agency contracts related to security, facilities operations and maintenance, warehouse and mail services, and the IT activities cited above.
3) Issue guidance for returning to normal operations to agency contracting officers.

f. **Grants/Interagency Agreements Operations Activities**: OMS will oversee and coordinate the following activities.

1) Notify recipients of funds availability.
2) Issue guidance for returning to normal operations to the grants/IA community.

This contingency plan supersedes any other EPA guidance or order prior to this date.

# W. C. McIntosh

Digitally signed by W. C. McIntosh
Date: 2025.03.10 15:43:03 -04'00'

William C. McIntosh
Acting Deputy Administrator

Date

16

17

**PERSONNEL RESPONSIBLE FOR IMPLEMENTING/ADJUSTING PLAN**

Michael Molina, Principal Deputy Assistant Administrator
Kimberly Y. Patrick, Deputy Assistant Administrator for Mission Support
Programs
Yulia Kalikhman, Director, Office of Resources and Business Operations

Office of Mission Support
US Environmental Protection Agency

202-564-4600

# EXHIBIT T

# CIRCULAR NO. A–11

# PREPARATION, SUBMISSION, AND EXECUTION OF THE BUDGET



**EXECUTIVE OFFICE OF THE PRESIDENT**

**OFFICE OF MANAGEMENT AND BUDGET**

**JULY 2024**

## SECTION 124—AGENCY OPERATIONS IN THE ABSENCE OF APPROPRIATIONS

**Table of Contents**

124.1    What types of actions may my agency conduct during a lapse in appropriations?
 (a) Background
 (b) Policies
124.2    What plans should my agency make in anticipation of a lapse in appropriations?
124.3    When should my agency's shutdown plans be implemented?
124.4    How may my agency receive lapse communications updates from OMB?
124.5    Am I automatically apportioned obligational authority for agency operations that are authorized by law to continue in the absence of appropriations?

**Summary of Changes**

Clarifies and expands background information and policies (section 124.1).

Reiterates what agencies should include in lapse plans, clarifies when and how agencies should submit changes, and asks agencies to use a specified landing page to link to the OMB website (section 124.2).

## 124.1    What types of actions may my agency conduct during a lapse in appropriations?

(a) *Background.*

The Antideficiency Act (ADA) prohibits agencies from incurring obligations in advance of, or in excess of, an appropriation, except in certain limited circumstances. The Attorney General issued two opinions in the early 1980s ("Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriations" (1980) and "Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations" (1981)) finding that the language and legislative history of the ADA prohibits agency officials from incurring obligations in the absence of appropriations. The Department of Justice's Office of Legal Counsel issued another opinion in 1995 ("Government Operations in the Event of a Lapse in Appropriations" (1995)) reaffirming and updating its 1981 opinion.

An agency may still incur an obligation in the absence of an appropriation for certain "excepted" functions, including when:

- A statute or court order expressly authorizes or requires an agency to obligate funds in advance of appropriations for the subject function;

- The lawful continuation of funded or unfunded functions necessarily implies that the subject function must also continue because suspension of that subject function would prevent or significantly damage the execution of the other lawfully continuing functions;

- The subject function addresses emergency circumstances such that the suspension of the function would imminently threaten the safety of human life or the protection of property; or

- The subject function is necessary to discharge the President's Constitutional duties and powers.

SECTION 124—AGENCY OPERATIONS IN THE ABSENCE OF APPROPRIATIONS

As discussed in section 124.2, an agency may retain employees who otherwise would be subject to furlough so that those employees may continue to perform "excepted" functions during a lapse in appropriations.

Agency functions that are financed with appropriations that have not lapsed may continue and are "exempt" from any shutdown procedures, even while a lapse has occurred in other appropriations.

(b)  *Policies.*

This section provides policy guidance and instructions for actions to be taken by Executive Branch agencies when the Congress fails to enact regular appropriations, a continuing resolution, or needed supplemental appropriations, resulting in a lapse of appropriations.

This section does not apply to specific appropriations action by the Congress to deny program funding.

When the Congress fails to act on program supplementals and the result is partial funding interruptions, special procedures beyond those outlined in this section may be warranted.   In such cases, you should consult your OMB representative.

Within the guidance established by the opinions issued by the Department of Justice and this Circular, agency heads, in consultation with their general counsels, must decide what agency activities are excepted or otherwise legally authorized to continue during a lapse in appropriations.   Agencies should address questions to OMB, including questions about the interpretation of the Antideficiency Act.   OMB will engage with the agency and the Department of Justice's Office of Legal Counsel, as necessary and appropriate.

## 124.2    What plans should my agency make in anticipation of a lapse in appropriations?

Agency heads, in consultation with their general counsels, must develop and maintain plans for an orderly shutdown in the event of a lapse in appropriations.   Each agency must have an up-to-date lapse plan on file with OMB.

Agencies must submit an updated lapse plan to OMB for review, at minimum, every two years, in the odd-numbered years, on August 1.  Plans should be updated in 2025.  Agencies must also submit an updated lapse plan to OMB for review whenever there is a change in the source of funding for an agency program or any significant modification, expansion, or reduction in agency program activities.  Additional guidance on lapse plan submission and review for each potential lapse will be communicated with agencies, as needed.

When submitting updated lapse plans for review, agencies must specifically identify any changes made based on the most recent lapse plan on file with OMB.  A document containing tracked changes and/or annotated comments is required.  Plans should be submitted to your OMB examiner and with a copy to the following email address: Section124Plans@omb.eop.gov.   Agencies may also contact this email address with questions related to their lapse plans.

Once the updated lapse plan is reviewed by OMB, the agency will publish the final lapse plan using a specified landing page on their agency website.  This landing page will be linked to each respective agency on the OMB website's Agency Contingency Plans page.

*Below are the requirements for each lapse plan.*

Given that the duration of a lapse in appropriations is inherently uncertain, your plan should describe agency actions to be taken during a short-term lapse (1-5 days).   It also should identify anticipated changes if the

lapse extends beyond that time period.    Your plan should also designate personnel responsible for implementing and adjusting the plan to respond to the length of the lapse in appropriations and changes in external circumstances.

You must include the following template at the beginning of your plan:

| Lapse Plan Summary Overview | |
|---|---|
| Estimated time (to nearest half day) required to complete shutdown activities: | *# days* |
| Total number of agency employees expected to be on board before implementation of the plan: | *# employees* |
| Total number of agency employees expected to be furloughed under the plan (unduplicated count): | *# employees* |
| **Total number of employees to be retained under the plan for each of the following categories** (may include duplicated counts**):** | |
| Compensation is financed by a resource other than annual appropriations: | *# employees* |
| Necessary to perform activities expressly authorized by law: | *# employees* |
| Necessary to perform activities necessarily implied by law: | *# employees* |
| Necessary to the discharge of the President's constitutional duties and powers: | *# employees* |
| Necessary to protect life and property: | *# employees* |

| **Brief summary of significant agency activities that will continue during a lapse:** |
|---|
| |

| **Brief summary of significant agency activities that will cease during a lapse:** |
|---|
| |

The plan should then proceed to describe in detail, for each component within your agency, the following:

- To the extent that specific shutdown activities will not be completed within one-half day, specify the nature of each such activity, together with the time and the number of employees necessary to complete the activity;

- The total number of employees in the component to be on-board before implementation of the plan;

- The total number of employees in the component expected to be furloughed under the plan;

- The total number of employees to be retained in the component under the plan for each of the categories listed in the table above (i.e., the employees' compensation is financed by carryover funds or an appropriation provided by permanent law, they are necessary to perform activities expressly authorized by law, they are necessary to perform activities necessarily implied by law, they are necessary to the discharge of the President's constitutional duties and powers, or they

are necessary to protect life and property).   If an employee fits in more than one category, they may be reflected in the count for all applicable categories (i.e., count may be duplicated), in order to ensure the best estimate of the number of employees within each category; and

- The agency's legal basis for each of its determinations to retain categories of employees, including a description of the nature of the agency activities in which these employees will be engaged.

To the extent that any of the information described above is expected to change should a lapse in appropriations extend for a prolonged period of time (i.e., longer than 5 days), the plan should explicitly describe these changes.   In particular, the plan should indicate any points in time when the furlough status of employees may change, how many employees would be affected, and the legal basis for such changes. Agencies should consult with an OMB representative at such points in time during a lapse in appropriations to make OMB aware of any such changes.   In addition, during a lapse in appropriations agencies should make an OMB representative aware of any instances where actions deviate from what is set forth in the plan.

Agency plans should also describe the actions that will be necessary to resume orderly operations once appropriations are restored, including:

- Methods for notifying employees that the shutdown furlough has ended and that they are to return to work on a specified day (normally the employee's next scheduled workday after the furlough has ended);

- Flexibilities available to supervisors if employees have problems returning to work on the day specified by the agency, including the use of accrued annual leave, compensatory time off, or credit hours;

- Procedures for resuming program activities, including steps to ensure appropriate oversight and disbursement of funds.

At the time employees are given furlough notices, agencies should provide them as much information as possible regarding how the agency will go about resuming operations after the furlough has ended.

### 124.3   When should my agency's shutdown plans be implemented?

OMB will monitor the status of congressional actions on appropriations bills and will notify agencies if shutdown plans are to be implemented.   Whenever it appears that a lapse in appropriations might occur, you should review your shutdown plans, and, if revisions are required, promptly submit the revised plan to OMB and post the revised plan on your agency website.   When agencies submit their plans to OMB, they should provide OMB with information on the agency personnel that would serve as a point of contact in the event of a lapse.   While agencies are ultimately responsible for preparing and implementing orderly shutdown plans, all changes to the plans must be submitted to OMB for review in advance of implementing the plan.  See section 124.2.

One week prior to the expiration of appropriations bills, regardless of whether the enactment of appropriations appears imminent, OMB will communicate with agency senior officials to remind agencies of their responsibilities to review and update orderly shutdown plans, and will share a draft communication template to notify employees of the status of appropriations.   OMB will hold follow-up communications on a periodic basis until such time as appropriations are enacted or a lapse in appropriations occurs. Approximately two business days before a potential lapse in appropriations, in coordination with OMB, agencies should notify employees of the status of funding using the OMB-provided employee notification.

OMB will notify agencies when they should begin to inform employees of their individual status (e.g., furloughed or not) under a lapse.

After OMB has communicated that a lapse in appropriations has occurred, OMB will provide guidance to agencies directing the initiation of orderly shutdown activities. Each agency head must determine the specific actions that will be taken; however, all actions must contribute to an orderly shutdown of the agency. All individual employees should have been notified of their status under a lapse by this time. Agency heads will notify OMB immediately once shutdown activities are initiated.

During a lapse in appropriations, agencies should only engage in activities consistent with their shutdown plan.

Agencies must take necessary personnel actions to release employees in accordance with applicable law and regulations of the Office of Personnel Management. You must prepare employee furlough notices and process personnel and pay records in connection with shutdown furlough actions. You should plan for these functions to be performed by employees who are retained for orderly termination of agency activities as long as those employees are available. Agencies should also establish clear protocols for how employees will be provided with furlough notices, contacted to be recalled to work following the end of the lapse in appropriations or should their furlough status change in accordance with their agency's plan, and informed of pertinent pay and leave information during the lapse. Where appropriate, agencies should seek to utilize available technology to allow employees maximum flexibility in returning to work.

OMB will notify you once the lapse in appropriations has ended so that you can begin implementing your plan to orderly resume agency activities.

### 124.4   How may my agency receive lapse communications updates from OMB?

Executive Branch agencies may receive updates on the status of appropriations at the OMB Communications Regarding a Lapse in Appropriations page. Additional resources are provided on this page and all agencies are encouraged to visit the page one week prior to the expiration of annual appropriations Acts, regardless of whether the enactment of appropriations appears imminent.

To receive lapse updates via email, agency employees must join the group by following instructions on the page. Receiving email updates is optional; all updates will be provided on the OMB Communications Regarding a Lapse in Appropriations page.

### 124.5   Am I automatically apportioned obligational authority for agency operations that are authorized by law to continue in the absence of appropriations?

Yes. You are automatically apportioned the amounts necessary to carry out your agency's shutdown plan as required by this section. This automatic apportionment provides authority to incur obligations, but does not provide any authority to liquidate such obligations.

This automatic apportionment does not affect previously approved current-year apportionments for non-continuing resolution (CR) funds, such as multi-year and permanent law appropriations. See sections 120.55 and 123.23 for what happens to apportioned CR funds if the lapse in appropriations follows a CR.

# EXHIBIT U

# U.S. MERIT SYSTEMS PROTECTION BOARD

SHUTDOWN PLAN

CONTINGENCY PLAN FOR PERIODS

OF

LAPSED APPROPRIATIONS

Updated 3/11/2025

| Table 1. Lapse Plan Summary Overview Less Than 5 Days | |
|---|---|
| Estimated time (to nearest half day) required to complete shutdown activities: | Timetable and Actions in Part II B. |
| Total number of agency employees expected to be on board before implementation of the plan: | 177 FTEs |
| Total number of agency employees expected to be furloughed under the plan (unduplicated count): | 175 FTEs |
| **Total number of employees to be retained under the plan for each of the following categories:** | |
| Compensation is financed by a resource other than annual appropriations: | 0 FTEs |
| Necessary to perform activities expressly authorized by law: | 2 FTEs |
| Necessary to perform activities necessarily implied by law: | 0 FTEs |
| Necessary to the discharge of the President's constitutional duties and powers: | 0 FTEs |
| Necessary to protect life and property: | 0 FTEs |
| **Summary of significant agency activities that will cease during a lapse:** | |
| During a lapse in appropriations MSPB will cease all its significant agency activities: protecting the Federal merit system through case adjudication, performing merit systems studies, and reviewing significant actions of the Office of Personnel Management. | |
| **Summary of significant agency activities that will continue during a lapse:** | |
| MSPB activities would be limited to those activities necessary to preserve MSPB property, including property in the form of data. Additionally, MSPB's two Board Members, appointed by the President and confirmed by the Senate, are not covered by the leave system, cannot be placed in a non-pay/non-duty status, and are not subject to a furlough. MSPB has 26 employees who we have been designated as "on call" to support IT and adjudication activities. This includes personnel who may be called upon during a shutdown to perform discrete human resources, budget, and legal counsel tasks. | |

| Table 2. Lapse Plan Summary Overview Greater Than 5 Days | |
|---|---|
| Estimated time (to nearest half day) required to complete shutdown activities: | Timetable and Actions in Part II B. |
| Total number of agency employees expected to be on board before implementation of the plan: | 177 FTEs |
| Total number of agency employees expected to be furloughed under the plan (unduplicated count): | 175 FTEs |
| **Total number of employees to be retained under the plan for each of the following categories:** | |
| Compensation is financed by a resource other than annual appropriations: | 0 FTEs |
| Necessary to perform activities expressly authorized by law: | 2 FTEs |
| Necessary to perform activities necessarily implied by law: | 0 FTEs |
| Necessary to the discharge of the President's constitutional duties and powers: | 0 FTEs |
| Necessary to protect life and property: | 0 FTEs |
| **Brief summary of significant agency activities that will continue during a lapse:** | |
| *See* Table 1, above. | |

3

INTRODUCTION

COVERAGE

Pursuant to the Office of Management and Budget (OMB) Circular No. A-11 (2021), this plan
and its exhibits apply to the orderly shutdown of all Merit Systems Protection Board (MSPB)
functions and activities in the event of a lapse in appropriations for normal agency operations.
The plan does not address other unexpected contingencies. The action items set forth in this
plan may be modified or not implemented based on direction and/or guidance from the
Administration, including direction and guidance administered by OMB and the Office of
Personnel Management (OPM).

DEFINITIONS

- "Chief executive and administrative officer" (CEAO): Chairman, Acting Chairman, or
  other individual heading the agency pursuant to MSPB's Continuity of Operations Plan
  (COOP).
- "Excepted activities": Activities authorized by law to continue during a lapse in
  appropriations and exhaustion of funds.
- "Exhaustion of funds": The point at which all available MSPB funds have been obligated.
- "Lapse in appropriations": The date on which the MSPB has no new funding authority
  due to lack of action by Congress, generally at the beginning of a fiscal year.
- "Shutdown activities": Those activities necessary to complete an orderly shutdown of the
  agency and to limit operations to excepted activities.

OVERVIEW

The MSPB is an independent quasi-judicial agency of the Federal government charged with
protecting the Federal merit system through case adjudication, performing merit systems studies,
and reviewing significant actions of the Office of Personnel Management. In the event of a lapse
in appropriations, MSPB will cease its significant functions, and limit activities solely to the
function of protecting MSPB's own property, including property in the form of data. Unless
otherwise authorized by MSPB's CEAO in consultation with OMB, after the completion of
orderly shutdown activities, MSPB employees will otherwise limit activity to checking email
once per day during the shutdown.

4

PART I

SIGNIFICANT FUNCTIONS TO BE CEASED

A.  The Attorney General's decision of January 16, 1981, and subsequent OMB memoranda provide that only excepted functions are to be continued during any appropriations hiatus. Excepted functions are defined as those necessary to prevent a compromise to the safety of human life or the protection of property. In addition to engaging in these excepted functions during an appropriation hiatus, agencies may engage in activities necessary to "clos[e] down operations funded by accounts that have not received appropriations." OMB Memorandum M-91-02 (October 5, 1992).

B.  Protecting MSPB's own property, including property in the form of data, is the only agency function which appears to meet this definition of excepted activity.

C.  Except for the property-protection function, the agency does not generally perform excepted functions as defined in Section A. Significant agency activities that will cease during a lapse in appropriations include the adjudication of appeals; performing merit systems studies; reviewing significant actions of the Office of Personnel Management (OPM); litigation; responding to congressional, Freedom of Information Act, Privacy Act, or other requests from individuals or entities outside the agency; and any other functions unrelated to protecting property. Part II below describes the actions which will be required to affect such a shut down.

D.  Unless otherwise authorized by MSPB's CEAO in consultation with OMB, after the completion of orderly shutdown activities, MSPB employees will limit activity to checking email. MSPB employees will be expected to check their work email once per day during the shutdown.

PART II

STEPS TO COMPLETE SHUTDOWN ACTIVITIES

A.  INTRODUCTION

Actions are required prior to, during, and immediately following the exhaustion of all available MSPB funds. These actions and the time frames in which they are to be performed are set forth below. The date indicated in the checklist represents:

1.  Workdays prior to no funds (NF – number of workdays)

2.  Date of no funds (NF), and

3.  Workdays following no funds (NF + number of workdays).

B.  TIMETABLE AND ACTIONS

| DATES | ACTIONS |
|---|---|
| NF-6 | The ED issues notice to all employees informing them of possible lapse in funding, unless instructed by OMB or OPM to withhold communications until directed. |
| NF-5 | Pursuant to any direction or guidance issued directly by the Administration or through OMB or OPM, and after consulting with the CEAO, the ED informs offices of which staff will be authorized to perform excepted activities and which excepted activity each employee will perform when all funds are exhausted using the criteria established in Part I.<br><br>The CEAO submits the list of excepted functions to OMB for transmittal to Congress, if necessary. |
| NF-4 | Office Directors and Regional Directors (RDs)/Chief Administrative Judges (CAJs) confirm emergency contact information for their staff, e.g., on wallet cards. |
| NF-3 | The Director of FAM, in consultation with Office Directors and RDs/CAJs, identifies those contracts that should be kept in place or entered into.<br><br>Office Directors and RDs/CAJs require employees in a travel status to return to duty station unless travel is for purposes of shutdown activities. |

6

| NF-1 | Upon clearance from OMB, the ED issues notice to all employees informing them of the exhaustion of all available funds and the possibility employees will have to be furloughed. The notice informs employees of the steps that may be necessary for the orderly suspension of agency activities, that employees will only have up to four hours on the first business day after the lapse in funding to complete the steps, that some of the steps may be completed in anticipation of a possible shutdown, and that with the prior permission of a supervisor the steps may be performed remotely after the commencement of a shutdown.

The ED authorizes FAM/HR to prepare furlough notices for distribution to employees not being retained to perform excepted functions. |
|---|---|
| NF | The ED notifies Office Directors and RDs/CAJs of those employees who will not be furloughed so they can perform excepted activities.

For all other employees, FAM/HR distributes furlough notices to employees using their official agency email address requesting affirmative acknowledgement of receipt from the employee. Employee receipt may be acknowledged by reply email. Employees may receive and acknowledge the furlough notice from home.

FAM/HR's email reminds employees that they may perform only those functions associated with the orderly suspension of agency activities, e.g.:

1. Notify outside parties of agency status, including all courts in which the MSPB has pending litigation.

2. Cancel meetings, etc.

3. Secure all files.

4. Document status of individual cases and projects.

5. Date stamp and secure all mail received but do not process further.

6. Answer telephones, but only to inform callers of our status and not to respond to new business matters unless it is of an emergency nature.

7. Place an out of office message on voicemail and email.

These activities may be performed remotely with the prior permission of a supervisor,

The Office of Regional Operations (ORO), the Office of the Clerk of the |

|  | Board (OCB), the Office of Appeals Counsel (OAC) and OGC terminate appeal, outreach, and mediation proceedings. The Office of Policy and Evaluation (OPE) terminates studies and surveys. |
|  | OGC reminds all employees of the ethics restrictions regarding outside work and of the need to solicit any ethics guidance prior to the beginning of a lapse in appropriations when ethics guidance will not be available. |
|  | Office Directors and RDs/CAJs remind employees to check email once per day during the shutdown. |
|  | Office Directors and RDs/CAJs excuse personnel receiving furlough notices after they complete shutdown activities. |
|  | Director of FAM informs all offices that no obligations can be incurred without his/her or FAM/BO's prior approval. |
|  | CEAO submits list of expected function to OMB for transmittal to Congress, if necessary. |
| NF+1 | The ED consults with OMB and OPM regarding shutdown activities. |
| NF+2 to +28 | Continue excepted activities as defined and authorized by the CEAO. |
| NF+29 | The ED, after consulting the CEAO, authorizes FAM/HR, if necessary, to issue second furlough notices according to MSPB policies and appropriate regulations. |
|  | The ED, after consulting the CEAO, authorizes the Director of FAM to issue termination notices to MSPB contractors and termination notices for contracts with vendors/contractors. |
|  | Continue excepted activities as defined and authorized by the CEAO. |
| NF+30 | Continue excepted activities as defined and authorized by the CEAO. |

PART III

STATEMENT OF TOTAL NUMBER OF AGENCY EMPLOYEES AFFECTED

Approximately 177 agency employees (including the Board members) are expected to be on board before implementation of this plan. MSPB personnel will be divided into two categories: (1) employees in non-work (or furlough) status and (2) those in a work status performing excepted functions. Employees in the non-work category will be furloughed at the time that the agency is required by law to continue only excepted activities. Employees in the work category will be retained, but only authorized to carry on those excepted activities as defined and authorized by the CEAO.

MSPB currently has <u>no employees</u> in the following categories:

    1. Their compensation is financed by a resource other than annual appropriations;

    2. They are necessary to perform activities expressly authorized by law;

    3. They are necessary to perform activities necessarily implied by law;

    4. They are necessary to the discharge of the President's constitutional duties and powers; or,

    5. They are necessary to protect life and property (except for data, and only if that becomes necessary during a lapse in appropriations).

PART IV

RESPONSIBILITIES AND AUTHORITIES OF EACH COMPONENT WITHIN MSPB

## **Chief Executive and Administrative Officer (CEAO):**

    a.  Ensures execution of the Shutdown Plan.

*Before lapse*
    b.  Determines the excepted functions of the agency.
    c.  Submits the list of excepted functions to OMB for transmittal to Congress, if necessary.
    d.  Approves the list of excepted employees and those to be furloughed.

*During lapse*
    e.  Consults with OMB, ED and General Counsel regarding any additional activities that may be considered excepted.

## **Executive Director (ED):**

*Before lapse*
    a.  Assists the CEAO in determining the agency's excepted functions.
    b.  Assists the CEAO with ensuring the implementation of the Shutdown Plan.
    c.  Provides to the CEAO for approval the list of employees to perform any excepted activities.
    d.  Informs offices which employees will be authorized to perform excepted functions.
    e.  Issues notice of general information on agency funding to all employees.
    f.  Sends notice to all employees indicating that all available funds have been exhausted.
    g.  Authorizes FAM/HR to prepare and to provide furlough notices to be issued to furloughed employees.

*During lapse*
    h.  Consults with OMB and OPM regarding shutdown activities.
    i.  Authorizes FAM/HR to prepare and to provide furlough notices, where applicable, to any employees initially retained for excepted functions when their services are no longer needed.
    j.  In consultation with the CEAO, and as necessary, designates employees to perform excepted functions that were not originally identified.
    k.  Authorizes the Director of FAM to prepare and issue notices of extended furloughs if shutdown exceeds 30 days.

**The Office of the General Counsel (OGC):**

*Before lapse*
   a. Assists the CEAO in determining the agency's excepted functions.
   b. Provides the CEAO and MSPB staff with legal advice pertaining to shutdown activities or matters stemming from such activities prior to and during a shutdown.
   c. Drafts legal responses relating to issues arising from an exhaustion of funds.
   d. Defends or provides legal assistance to the Department of Justice to defend the MSPB in judicial proceedings arising from a lapse in appropriations or an exhaustion of funds.
   e. Consults, as necessary, with the employees' Professional Association regarding shutdown actions that may impact bargaining unit employees.
   f. Identifies all pending litigation and notifies courts that the MSPB will be unable to participate in those cases during the duration of the shutdown.
   g. Issues ethics guidance to employees prior to the furlough.

*Orderly Shutdown*
   h. Secures records and documents the status of cases.
   i. Submits final purchase card statement.
   j. Secures/closes office.

**The Office of Financial and Administrative Management (FAM):**

*Before lapse*
   a. Coordinates with OMB and OPM on shutdown preparations and relays any direction or guidance to the CEAO, ED, and OGC at the earliest possible time.
   b. Reviews lists of employees to be excepted and those to be furloughed to assure that each employee's name appears on either the excepted list or the furlough list.

*Orderly shutdown*
   c. Ensures personnel payrolls for periods prior to funding interruption are processed.
   d. Upon authorization of the ED, reviews and ensures issuance of furlough notices to all affected employees and any employee initially retained for excepted functions whose status subsequently changes.
   e. Advises employees to monitor email once a day and notifies employees of their obligation to report for work at the beginning of their next regular tour of duty after such notification.
   f. Directs the processing of personnel records in connection with the issuance of furlough notices.
   g. Identifies to the ED, the FAM/BO, and the Contracting Officer those contracts that should be kept in place or entered into to provide support services (e.g., data backup, telecommunications, email, and cellular device services).

11

h.   Issues "stop work" orders to MSPB contractors for contracts other than those deemed excepted when all funds are expended.
i.   Secures records and documents.
j.   Submits final purchase card statement.
k.   Secures/closes office.

*During lapse*

l.   Takes necessary action to adjust allotments as appropriate during periods of lapsed appropriations.
m.   Ensures that no contractual or other financial obligations are entered into after a lapse in appropriations other than those deemed necessary to the shutdown.
n.   Ensures that funds are not disbursed.
o.   Issues termination notices to MSPB contractors for contracts other than those deemed excepted when shutdown exceeds 30 days.
p.   Issues or directs, upon authorization of the ED, extended furlough notices to appropriate personnel when shutdown exceeds 30 days.

*After lapse*

q.   Takes, in its discretion, additional actions using available resources (e.g., email, MSPB emergency information telephone number, MSPB website) to notify employees of funding approval, their obligation to return to duty at the beginning of their next regular tour of duty, and the availability of workplace flexibilities, if necessary, for employees that are unable to immediately return to work.
r.   Notifies contractors of the availability of funds and cancels "stop work" orders for contractors as soon as practicable.

**The Office of the Clerk of the Board (OCB):**

*Orderly shutdown*

a.   Coordinates and issues a press release on the status of the agency.
b.   Coordinates with IRM to update agency website with relevant shutdown information.
c.   Notifies administrative law judges to "stop work" on pending cases and suspend related activities.
d.   Secures records and documents the status of cases.
e.   Submits final purchase card statement.
f.   Secures/closes office.

12

**The Office of Regional Operations (ORO) & Regional Directors, and the Office of Appeals Counsel (OAC):**

*Orderly shutdown*
    a. Secures/closes offices.
    b. Notifies administrative judges to "stop work" on pending cases and suspend related activities.
    c. Secures records and documents the status of cases.
    d. Submits final purchase card statement.
    e. Cancels mediations and any outreach activities. Reschedules hearings and court reporters if needed.
    f. As necessary, contact parties regarding shutdown.

**The Office of Information Resources Management (IRM):**

*Before lapse*
    a. Provides instructions for changing voicemail and email out-of-office messages.
    b. Determine whether to close e-Appeal Online during the shutdown.

*Orderly shutdown*
    c. Ensures computer operations/shutdown.
    d. Suspends password expirations to facilitate orderly resumption of operations.
    e. Posts the press release, adds banners to the public website, e-Appeal Online and the Extranet.
    f. Secures records and documents.
    g. Secures/closes office.

*During lapse*
    h. Monitors security systems and alerts and maintains systems security patching as necessary.

*After lapse*
    i. Ensures reactivation of idle systems in time for resumption of activities without any data loss or interruption.

**The Office of Equal Employment Opportunity and the Office of Policy and Evaluation:**

*Orderly Shutdown*
    a. Secures records and documents.
    b. Submits final purchase card statement.
    c. Secures/closes office.