STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

EMILY M. HALL
TIBERIUS DAVIS
ELIZABETH HEDGES (DC No. 1657707)
Counsel to the Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Branch Director
BRAD P. ROSENBERG
Special Counsel
R. CHARLIE MERRITT
Senior Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 616-0929
E-mail: elizabeth.t.hedges@usdoj.gov
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Case No. 3:25-cv-08302-SI <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> Hearing Date: October 16, 2025 <br> Time: 10:30 a.m. <br> Judge: Hon. Susan Illston <br> Place: San Francisco Courthouse <br> Courtroom 01 |

1

## TABLE OF CONTENTS

2   INTRODUCTION ........................................................................................................1

3   ISSUES TO BE DECIDED ................................................. **ERROR! BOOKMARK NOT DEFINED.**

4   BACKGROUND ................................................................ **ERROR! BOOKMARK NOT DEFINED.**

5
    I.    Legal Framework ..........................................................**Error! Bookmark not defined.**
6          A.    Agency Authority To Engage In RIFs ...............**Error! Bookmark not defined.**

7          B.    Exclusive Statutory Scheme for Review of Employment and Labor Disputes
                 Involving Federal Employees ...........................................**Error! Bookmark not defined.**
8
           C.    The Antideficiency Act.....................................**Error! Bookmark not defined.**
9
    II.   Factual and Procedural Background ......................... **ERROR! BOOKMARK NOT DEFINED.**
10
    LEGAL STANDARD.............................................................. **ERROR! BOOKMARK NOT DEFINED.**
11
    ARGUMENT ...................................................................... **ERROR! BOOKMARK NOT DEFINED.**
12
    I.    Plaintiffs Will Not Suffer Irreparable Harm Absent A Tro. .......... **ERROR! BOOKMARK NOT
13        DEFINED.**
14
    II.   This Court Lacks Jurisdiction. ................................... **ERROR! BOOKMARK NOT DEFINED.**
15         A.    Plaintiffs' Claims Are Precluded By The CSRA And FSLMRS..... **Error! Bookmark not
                 defined.**
16
           B.    As To The Agencies That Have Not Yet Made RIF Decisions, Plaintiffs'
17               Request For Emergency Relief Is Not Ripe......................**Error! Bookmark not defined.**
18
    III.  Plaintiffs' Claims Are Not Likely To Succeed On The Merits. .... **ERROR! BOOKMARK NOT
19        DEFINED.**
           A.    Plaintiffs Lack A Cause Of Action To Challenge Violations Of The
20               Antideficiency Act. ........................................................**Error! Bookmark not defined.**

21         B.    Potential Future RIF Decisions At Most Of The Defendant Agencies Are Not
                 Final Agency Actions. .....................................................**Error! Bookmark not defined.**
22
    IV.   The Balance Of The Equities Weighs In The Government's Favor........ **ERROR! BOOKMARK
23        NOT DEFINED.**
24
    V.    Any Injunctive Relief Should Be Stayed Pending Appeal And Be Accompanied By A
25        Bond, And No Declaration Should Be Required....... **ERROR! BOOKMARK NOT DEFINED.**

26  CONCLUSION.................................................................... **ERROR! BOOKMARK NOT DEFINED.**

27

28

1

2

3

4

<strong>TABLE OF AUTHORITIES</strong>

5

**Cases**

6

*Alder v. Tennessee Valley Auth.*,
    43 F. App'x 952 (6th Cir. 2002) ........................................................................ 12

7

*Am. Cargo Transp., Inc. v. United States*,
    625 F.3d 1176 (9th Cir. 2010) .......................................................................... 21

8

*Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*,
9
    716 F.3d 633 (D.C. Cir. 2013) .......................................................................... 12

10

*Am. Fed'n of Gov't Emps. v. Trump*,
    No. 25-cv-03698, 2025 WL 1482511 (N.D. Cal. May 22, 2025) ...................... 13

11

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
12
    No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) .......................... 13

13

*Am. Fed'n of Gov't Emps. v. Trump*,
    --- F.4th ---, 2025 WL 2716266 (9th Cir. Sept. 19, 2025) ............................... 13

14

*Am. Fed'n of Gov't Emps. v. Trump*,
15
    606 U.S. __, 2025 WL 1873449 (July 8, 2025) ................................................. 13

16

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ................................................................... *passim*

17

*Am. Foreign Serv. Ass'n v. Trump*,
    No. 25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025) ................................ 13

18

*Axon Enterprise, Inc. v. Fed. Trade Comm'n*,
19
    598 U.S. 175 (2023) .......................................................................................... 14

20

*Bd. of Govs. of the Fed. Res. Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ............................................................................................ 17

21

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................................... 18

22

*Block v. Cmty. Nutrition Inst.*,
23
    467 U.S. 340 (1984) .......................................................................................... 17

24

*Bova v. City of Medford*,
    564 F.3d 1093 (9th Cir. 2009) .......................................................................... 15

25

*Cross v. Dep't of Transp.*,
26
    127 F.3d 1443 (Fed. Cir. 1997) .......................................................................... 3

27

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .......................................................................................... 10

28

*Elgin v. Dep't of the Treasury*,
   567 U.S. 1 (2012) ............................................................................................ *passim*

*FDA v. All.for Hippocratic Med.*,
   602 U.S. 367 (2024) .................................................................................................. 10

*Fed. L. Enf't Offs. Ass'n v. Ahuja*,
   62 F.4th 551 (D.C. Cir. 2023) ................................................................................. 14

*Feldman v. Bowser*,
   315 F. Supp. 3d 299 (D.D.C. 2018) ........................................................................ 16

*Filebark v. U.S. Dep't of Transp.*,
   555 F.3d 1009 (D.C. Cir. 2009) ............................................................................... 13

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) .................................................................................................. 12

*Garcia v. United States*,
   680 F.2d 29 (5th Cir. 1982) ................................................................................. 9, 20

*Global Health Council v. Trump*,
   --- F.4th ---, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) .................................... 17

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) .................................................................................................. 16

*Hartikka v. United States*,
   754 F.2d 1516 (9th Cir. 1985) ................................................................................... 9

*Keim v. United States*,
   177 U.S. 290 (1900) .................................................................................................... 3

*Lewis v. Casey*,
   518 U.S. 343 (1996) .................................................................................................. 21

*Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*,
   5 F.4th 952 (9th Cir. 2021) ...................................................................................... 16

*Lujan v. Nat'l Wildlife Fed'n Affs.*,
   497 U.S. 871 (1990) .................................................................................................. 19

*Lyons v. Dep't of Veteran's,*
   273 F. App'x 929 (Fed. Cir. 2008) .......................................................................... 14

*Markland v. OPM*,
   140 F.3d 1031 (Fed. Cir. 1998) ................................................................................. 3

*Marshall v. HHS*,
   587 F.3d 1310 (Fed. Cir. 2009) ............................................................................... 14

*Maryland v. U.S. Dep't of Agriculture*,
   No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ................................... 13, 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) .................................................................................................. 16

*Medkirk v. United States*,
   45 Ct. Cl. 395 (Ct. Cl. 1910) ........................................................................ 3

*Montana Envtl. Info. Ctr. v. Stone-Manning*,
   766 F.3d 1184 (9th Cir. 2014) .................................................................... 15

*Munaf v. Geren*,
   553 U.S. 674 (2008) ....................................................................................... 8

*Nat'l Treasury Employees Union v. Vought*,
   149 F.4th 762 (D.C. Cir. 2025) ................................................................... 13

*Nat'l Treasury Emps. Union v. Trump*,
   770 F. Supp. 3d 1 (D.D.C. 2025) ................................................................ 13

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................... 8

*Nuclear Regulatory Comm'n v. Texas*,
   605 U.S. 665 (2025) ................................................................................ 17, 18

*Nyunt v. Chairman, Broad. Bd. of Govs.*,
   589 F.3d 445 (D.C. Cir. 2009) .................................................................... 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ........................................................................................ 18

*Sampson v. Murray*,
   415 U.S. 61 (1974) ............................................................................. 9, 19, 20

*Smith v. Dep't of Army*,
   89 M.S.P.R. 82 (2001) .................................................................................... 9

*Smith v. Dep't of Army*,
   458 F.3d 1359 (Fed. Cir. 2006) ..................................................................... 9

*Stoner v. Ariz. Dep't of Economic Sec.*,
   No. CV-24-1034, 2024 WL 3818614 (D. Ariz. Aug. 14, 2024) ................... 16

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ................................................................. 8, 11

*Terveer v. Billington*,
   34 F. Supp. 3d 100 (D.D.C. 2014) ........................................................ 17, 18

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ..................................................................................... 13

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) .......................... 13

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ........................................................................................... 8

**Statutes**

5 U.S.C. § 701(a)(1) ........................................................................................ 16

5 U.S.C. § 704 ................................................................................................. 18

5 U.S.C. § 1204(a)(2) .......................................................................................................... 9

5 U.S.C. § 706(2) ............................................................................................................... 17

5 U.S.C. § 3502(a) ............................................................................................................... 3

5 U.S.C. § 7101 ................................................................................................................... 4

5 U.S.C. § 7103(a)(9) ........................................................................................................ 13

5 U.S.C. § 7105(a) ............................................................................................................... 4

5 U.S.C. § 7121 ................................................................................................................... 3

5 U.S.C. § 7123 ................................................................................................................. 14

5 U.S.C. § 7123(a) ............................................................................................................... 5

5 U.S.C. § 7511(a)(1) ........................................................................................................... 4

5 U.S.C. § 7512 ................................................................................................................... 4

5 U.S.C. § 7701(a) ............................................................................................................. 12

22 U.S.C. § 4010a(c) ......................................................................................................... 12

28 U.S.C. § 1295(a)(9) ................................................................................................... 4, 14

28 U.S.C. § 1331 ............................................................................................................... 12

31 U.S.C. 1349(a) ......................................................................................................... 5, 17

31 U.S.C. 1350 ................................................................................................................... 5

31 U.S.C. § 1351 ............................................................................................................... 17

31 U.S.C. § 1341 ............................................................................................................ 2, 5

31 U.S.C § 1342 ................................................................................................................. 5

Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 701, 92 Stat. 1111 ............... 4

**Rules**

Fed. R. Civ. P. 65(b)(2) ...................................................................................................... 9

Fed. R. Civ. P. 65(c) ......................................................................................................... 20

**Regulations**

5 C.F.R. part 351 ................................................................................................................. 5

5 C.F.R. § 351.201 ............................................................................................................... 3

5 C.F.R. § 351.901 ......................................................................................................... 4, 12

5 C.F.R. § 315.801 ............................................................................................................... 4

5 C.F.R. § 315.806 ............................................................................................................... 4

# INTRODUCTION

In preparation for a lapse in appropriations that has now spanned more than a week, the Office of Management and Budget ("OMB") and Office of Personnel Management ("OPM") issued guidance for federal agencies in the event of such a lapse. Included in this guidance were directives to consider possible reductions in force ("RIFs"). Before any lapse—much less any associated RIFs—occurred, Plaintiffs raced to court to challenge the guidance. Days later, Plaintiffs amended their complaint to add over 30 federal agencies as defendants, and they moved for a temporary restraining order ("TRO") that would "halt any implementation of RIFs during the shutdown" across the federal government. But in their rush to pre-litigate the validity of potential future RIFs, Plaintiffs have ignored fundamental limitations on courts' ability to hear claims arising out of the federal employment relationship and award emergency relief, as well as on Plaintiffs' ability to bring suit under the Antideficiency Act and Administrative Procedure Act ("APA").

To begin, Plaintiffs fail to establish irreparable harm. Their asserted harms—which stem from future loss of federal employment—would not take place until weeks or months from now, if at all. Indeed, Plaintiffs acknowledge that the action that will allegedly cause them irreparable harm—an agency-issued RIF notice—would "call for separation of employment within 30 or 60 days." TRO Mem. at 13. Because Plaintiffs' alleged harms hinge on future contingencies that would not materialize until *after* any TRO presumptively expires, entering the TRO requested by Plaintiffs would serve little purpose. On top of that, for employees of most (though not all) defendant agencies, any harms would occur only after a decisionmaking process by each individual agency that is not currently final and may or may not result in a decision to conduct RIFs. And even if any harms alleged by Plaintiffs might occur absent emergency relief, those harms would be reparable by reinstatement or backpay in a proper forum such as the Merit Systems Protection Board ("MSPB") or Federal Labor Relations Authority ("FLRA").

Although the total absence of irreparable harm is enough to defeat Plaintiffs' arguments for a TRO, the Court could also deny the motion without even considering the equitable requirements for preliminary relief. That is because the Civil Service Reform Act ("CSRA") and Federal Service Labor-Management Relations Statute ("FSLMRS"), comprehensively address disputes concerning federal employment and

labor relations and preclude district court jurisdiction here.  Numerous recent decisions in analogous cases confirm as much.  And even if the Court had jurisdiction, Plaintiffs fail to show a likelihood of success on the merits because they lack a viable APA or *ultra vires* cause of action to challenge either the OMB or OPM guidance documents or agency actions implementing them (many of which are hypothetical at this juncture).  Plaintiffs seek to enforce limitations on the expenditure of funds by Executive Branch officials imposed by the Antideficiency Act, but that Act provides a comprehensive scheme for addressing violations that precludes any private right of action under the APA.

As to the agency defendants that have not yet made a decision whether and to what extent to conduct RIFs, Plaintiffs' motion also fails because they challenge agency actions that are not final under the APA.  For largely the same reasons, this dispute is unripe as to those agencies: Plaintiffs challenge OMB/OPM guidance that expressly contemplates further implementing actions by federal agencies that have not yet occurred (and, in many cases, might never occur).  Given the potential variation in agency implementation of any future RIFs under OMB or OPM guidance, Plaintiffs have not shown a likelihood of success on the merits of their facial challenges to the implementation of RIFs at those agencies during the current shutdown. For all these reasons, and because the balance of equities favors the government, the Court should deny Plaintiffs' motion for a TRO.

## ISSUES TO BE DECIDED

1. Whether Plaintiffs carried their burden to establish that they are likely to suffer irreparable harm in the absence of emergency injunctive relief.

2. Whether Plaintiffs carried their burden of establishing the Court's jurisdiction over claims arising out of the federal employment relationship.

3. Whether Plaintiffs established that their challenges to hypothetical future agency actions are ripe.

4. Whether Plaintiffs have a cause of action to assert claims based on alleged violations of the Antideficiency Act, 31 U.S.C. §§ 1341-42.

5. Whether Plaintiffs challenge final agency action justiciable under the APA.

6. Whether the equities favor emergency relief.

**BACKGROUND**

**I.     Legal Framework**

**A.     Agency Authority To Engage In RIFs**

For approximately 150 years, Congress has recognized federal agencies' authority to engage in RIFs.  Over the decades, courts repeatedly recognized that such reductions were a matter of executive discretion.  *See, e.g.*, *Keim v. United States*, 177 U.S. 290, 295 (1900); *Cross v. Dep't of Transp.*, 127 F.3d 1443, 1447 (Fed. Cir. 1997); *Medkirk v. United States*, 45 Ct. Cl. 395, 401 (Ct. Cl. 1910). Currently applicable law maintains a large role for the exercise of that discretion. It provides that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to—(1) tenure of employment; (2) military preference, subject to section 3501(a)(3) of this title; (3) length of service; and (4) efficiency or performance ratings."  5 U.S.C. § 3502(a)(1)-(4).   Under current regulations, agencies may invoke RIF authority "when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties."  5 C.F.R. § 351.201.  A "reorganization" is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization."  *Id*. § 351.203.

The regulations acknowledge agencies' discretion when deciding that a RIF is necessary.  "Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated."  *Id*. § 351.201(a)(1).  "This includes determining when there is a surplus of employees at a particular location in a particular line of work."  *Id*. The regulations further emphasize that "[e]ach agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction [in] force is necessary."  *Id*. § 351.204.  Generally, federal employees may challenge RIFs at the MSPB.  *Id*. §§ 351.901, 1201.3(a)(6); *see also* 5 U.S.C. § 7121.  The MSPB's decision can be appealed to the Federal Circuit.  *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998).

**B.      Exclusive Statutory Scheme for Review of Employment and Labor Disputes Involving Federal Employees**

The CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted).  If an agency takes a final adverse action against an employee no longer in his or her probationary period—including removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less, 5 U.S.C. § 7512—the employee may appeal to the MSPB.  *Id*. § 7513(d).  The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Non-probationary employees may appeal final MSPB decisions to the Federal Circuit, which generally has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9).  This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.[1]

The FSLMRS, set forth in Title VII of the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (codified at 5 U.S.C. §§ 7101-35), governs labor relations between the Executive Branch and its employees.  The statute "establishes a scheme of administrative and judicial review."  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE*").   Under that scheme, the Federal Labor Relations Authority ("FLRA") reviews matters including negotiability and "unfair labor practice[]" disputes or claims.  *See* 5 U.S.C. § 7105(a).  When reviewing unfair labor practice complaints, it is "the FLRA [that] resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118)).  Direct review of the FLRA's

---

[1] Federal employees serving in their probationary periods (for the Competitive Service) or trial periods (for the Excepted Service) generally are not considered "employee[s]" for purposes of the CSRA's Chapter 75, 5 U.S.C. § 7511(a)(1), but remain properly considered as "applicants" for employment under an extended hiring and evaluation period.  *See* 5 U.S.C. § 7511(a)(1)(A)-(B) (one-year trial period), (C) (two-year trial period); 5 C.F.R. §§ 315.801, 301.806.  However, many of the protections of the CSRA's Chapter 23 extend to both "applicants and employees."  *See, e.g.*, 5 U.S.C. § 2302(a)(2)(A)(i)–(xii) (identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in an agency").  And probationers have appeal rights under 5 C.F.R. § 351.901, *see id*. § 351.501(b)(2).

1  decisions on unfair labor practice and negotiability issues is available in the courts of appeals. 5 U.S.C.
2  § 7123(a).

3          C.      The Antideficiency Act

4          The Antideficiency Act limits the circumstances in which the United States may incur obligations
5  in the absence of, or in excess of, available appropriations.  In its current form, the Act (in pertinent part)
6  prohibits expenditures or obligations in excess of the amount of appropriations available, *see* 31 U.S.C §
7  1341(a)(1)(A), as well as any "contract or obligation for the payment of money before an appropriation is
8  made unless authorized by law." *Id.* § 1341(a)(1)(B).  When a lapse in appropriated funding occurs,
9  consistent with the Antideficiency Act, agencies must generally cease their activities unless those
10  activities fall within one of the Act's exceptions, including an exception for "emergencies involving the
11  safety of human life or the protection of property." *Id.* § 1342. Congress provided that violations of the
12  Antideficiency Act are addressed through remedies such as fines or removal from office of the official
13  responsible for the unauthorized expenditure. *See, e.g.*, Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1257-
14  1258 (fines and removal from office); 31 U.S.C. 1349(a) (administrative sanctions up to removal); 31
15  U.S.C. 1350 (criminal penalties for willful violations).

16  **II.     Factual And Procedural Background**

17          Anticipating a potential lapse in appropriations, OMB issued a memorandum to agencies on
18  September 24, 2025. The memorandum encouraged agencies to, "consistent with applicable law,
19  including the requirements of 5 C.F.R. part 351 . . . use this opportunity to consider Reduction in Force
20  (RIF) notices for all employees in programs, projects, or activities (PPAs) that satisfy all three of the
21  following conditions: (1) discretionary funding lapses on October 1, 2025; (2) another source of funding,
22  such as H.R. 1 (Public Law 119-21) is not currently available; and (3) the PPA is not consistent with the
23  President's priorities." ECF No. 15-1 at 1 ("OMB Lapse Email").  Soon thereafter, on September 28,
24  2025, OPM issued instructions clarifying OMB's determination under the Antideficiency Act "that
25  agencies are authorized to direct employees to perform work necessary to administer the RIF process
26  during the lapse in appropriations as excepted activities."  ECF No. 15-2 ("OPM Special Instructions") at
27  10.

28

Plaintiffs filed this suit on September 30, naming only OMB and OPM (and their Directors) as defendants and asserting two APA claims against the OMB Lapse Email and OPM Special Instructions. ECF No. 1. At the end of the day on September 30, 2025, the funding for many Executive Branch agencies expired. As a result, those agencies lacked appropriated funding. They began an "orderly shutdown" of certain activities, consistent with the Antideficiency Act and guidance from the Office of Legal Counsel and OMB.

On October 4, Plaintiffs amended their complaint to add as defendants more than 30 federal agencies and their heads (together with the original defendants, "the government"), as well as new claims under the Appropriations Clause and for "*ultra vires* unlawful government action." ECF No. 15. The same day, they moved for a temporary restraining order, ECF No. 17, seeking to "halt any implementation of RIFs during the shutdown." Pls.' Mem. of P&A in Supp. of Mot. for TRO at 2, ECF No. 17-1 ("TRO Mem."). On October 7, the Court ordered the government to file its response to the TRO motion by October 10 at 3 p.m. ECF No. 27. That Order further requires the government to provide certain information and evidence about agency plans for issuing RIF notices. *Id*. The information the Court requested is addressed in the attached declaration of Stephen Billy, Senior Advisor at OMB ("Billy Decl."), and can be summarized as follows:

The following Defendant agencies began issuing RIF notices related to the lapse in appropriations today, October 10, 2025, to approximately the following number of employees:

- Department of Commerce:[2] approximately 315 employees

- Department of Education: approximately 466 employees

- Department of Energy: approximately 187 employees

- Department of Health and Human Services: between approximately 1100 and 1200 employees

- Department of Housing and Urban Development: approximately 442 employees

- Department of Homeland Security: approximately 176 employees

- Department of Treasury: approximately 1446 employees

---

[2] The United States Patent and Trademark Office, which is a component agency of the Department of Commerce, separately issued lapse-related RIF notices to 126 employees on October 1, 2025.

Excepted employees at each of these listed Defendant agencies are working on RIF notices and implementation, with the exception of employees at the Department of Energy, which is not currently experiencing a lapse in appropriations and accordingly has not excepted employees to work on issuance of RIF notices. Billy Decl. ¶ 7.

The Environmental Protection Agency also issued a general "intent to RIF" notice to approximately 20-30 employees on October 10, 2025, notifying them that they may be affected by a RIF in the future.  EPA has not made a final decision as to whether or when to issue RIF notices to some or all of those employees at some point going forward and is currently deliberating regarding those potential plans. EPA has not excepted employees to work on RIF-related activities. *Id*. ¶ 8.

Other Defendant agencies (in addition to some of those agencies identified above) are actively considering whether to conduct additional RIFs related to the ongoing lapse in appropriations. Other Defendant agencies have made predecisional assessments regarding offices and subdivisions that may be considered for potential RIFs based on the criteria outlined in the OPM Lapse Email.  But those assessments remain under deliberation and are not final.  Nor is the declarant aware of any Defendant agencies other than those identified above that have made a final decision to issue RIF notices because of the ongoing lapse in appropriations.  Consequently, to date, while some agency employees have been excepted to conduct these predecisional assessments and RIF planning, as well as the activity described above, the declarant is not aware of employees of the remaining Defendant agencies having issued RIF notices as an excepted activity during or because of the ongoing lapse in appropriations. *Id*. ¶ 10.

Further, given that (to the knowledge of the declarant) no agency head at a Defendant agency other than those identified above has made a final decision to issue RIF notices during or because of the ongoing lapse in appropriations, and such agencies are instead actively deliberating about and continually revising potential RIF plans in which they have identified offices or subdivisions that meet the criteria in the OMB Lapse Email, the declarant is unaware of any agency other than those identified above having a concrete estimate of how many employees will receive RIF notices.  As part of this preliminary work, some agencies have offered preliminary estimates of how many employees might receive RIF notices, but those estimates are subject to change as agencies that are considering potential RIFs actively consider the scope

1   of such potential RIFs. Likewise, to the knowledge of the declarant, no agency other than those identified

2   above has reached a final decision regarding the earliest date that it might issue RIF notices, if any. *Id*. ¶

3   11. The situation involving the lapse in appropriations is fluid and rapidly evolving.  The statements

4   reflected in the Billy Declaration reflect the current information available. *Id*. ¶ 12.

5          There are preexisting RIFs which are currently in progress at federal agencies; those RIFs were

6   undertaken prior to the October 1 lapse in appropriations; are unrelated to the OMB Lapse Email; and are

7   not addressed herein. As to these agencies, OPM has advised that continuing to plan for RIFs, or

8   implementing previously-announced RIFs, may, as agencies deem appropriate, be treated as excepted

9   activity. *Id*. ¶ 9.

10                                    **LEGAL STANDARD**

11         A temporary restraining order is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S.

12  674, 689-90 (2008) (citation omitted).  A district court should enter preliminary relief only "upon a clear

13  showing that the [movant] is entitled to such relief."  *Winter v. NRDC, Inc*., 555 U.S. 7, 22 (2008).  The

14  moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely

15  to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its

16  favor; and (4) that the proposed injunction is in the public interest.  *Id*. at 20.  Finally, when "the

17  Government is the opposing party," the assessment of "harm to the opposing party" and "the public

18  interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

19                                        **ARGUMENT**

20  **I.    Plaintiffs Will Not Suffer Irreparable Harm Absent A TRO.**

21         The Court should not issue a TRO because Plaintiffs have not shown that they face a risk of

22  irreparable harm without one. The irreparable harm standard requires Plaintiffs to "demonstrate that

23  irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  A "possibility" of

24  irreparable harm is not enough. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting

25  *Winter*, 555 U.S. at 375-76).

26         Plaintiffs fail to carry that burden here.  Most obviously, they seek a TRO that would take effect

27  immediately and last "for a period of fourteen days," ECF No. 17 at 2; *see also* Fed. R. Civ. P. 65(b)(2),

28

Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order
3:25-cv-08302-VC

1    but acknowledge that the action that will allegedly cause them irreparable harm—an agency-issued RIF

2    notice—will "call for separation of employment within 30 or 60 days."  TRO Mem. at 13; *see also* ECF

3    No. 15-2 (OPM guidance that "[a]ny RIF notice issued shortly before or after the lapse in appropriations

4    that commences on October 1, 2025, will generally provide for a full 60-day notice period during which

5    employees will retain employment status").  Because Plaintiffs do not allege any harm that would take

6    place during the period of time their requested TRO would cover, the Court can deny their motion on this

7    basis alone.

8         Even setting aside the timing, the employment-related harms Plaintiffs assert—up to and including

9    loss of federal employment—are generally not irreparable.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61,

10   88-91 (1974) (rejecting notion "that either loss of earnings or damage to reputation might afford a basis

11   for a finding of irreparable injury and provide a basis for temporary injunctive relief"); *Hartikka v. United*

12   *States*, 754 F.2d 1516, 1518 (9th Cir. 1985) (treating "loss of income, loss of retirement and relocation

13   pay, and damage to . . . reputation" as "insufficient under the *Sampson* standard to justify injunctive

14   relief"); *Garcia v. United States*, 680 F.2d 29, 31-32 (5th Cir. 1982) ("It is practically universal

15   jurisprudence in labor relations in this country that there is an adequate remedy for individual wrongful

16   discharge after the fact of discharge.").  That is because the MSPB may make employees with meritorious

17   claims (if any) whole through reinstatement, backpay, and attorney's fees. 5 U.S.C. §§ 1204(a)(2),

18   7701(g); *see also Smith v. Dep't of Army*, 458 F.3d 1359, 1366 (Fed. Cir. 2006) ("Reinstatement, back

19   pay, and benefits are routinely awarded by the Board[.]").  And although Plaintiffs cite employees'

20   possible loss of "wages and health benefits for themselves and their families, including by having to

21   relocate" if they are separated from government service, TRO Mem. at 23, the Supreme Court has

22   explained that these sorts of burdens common to most losses of government employment are insufficient.

23   *See Sampson,* 415 U.S. at 92 n.68 ("insufficiency of savings or difficulties in immediately obtaining other

24   employment—external factors common to most discharged employees and not attributable to any unusual

25   actions relating to the discharge itself—will not support a finding of irreparable injury"); *see also Smith*

26   *v. Dep't of Army*, 89 M.S.P.R. 82, 83 (2001) (noting remedial actions for life and health insurance for

27   federal employee reinstated after RIF).  Given the availability of these remedies, Plaintiffs' injuries are

28

Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order
3:25-cv-08302-VC

remediable. It is irrelevant that "[d]amages are not available in APA cases," TRO Mem. at 23; Plaintiffs cannot make otherwise reparable injuries irreparable by choosing to proceed under the APA.

Plaintiffs also posit different RIF-related alleged harms to other members, including (1) a possibility of "radically altered workplaces" and increased workload for those employees who "are not included in the RIF or receive a RIF that is revoked," and (2) an alleged "intangible harm of political discrimination," which Plaintiffs speculate would be suffered by "employees who receive RIF notices" based on "their perceived political affiliation." *See* TRO Mem. at 23-24. But such speculative and downstream harms cannot justify emergency injunctive relief. As noted, the RIFs themselves—which Plaintiffs allege would cause the altered workplaces or increased workload—could be remedied at final judgment in a proper forum, absent the extraordinary preliminary relief Plaintiffs seek. More fundamentally, a TRO should not issue on the basis of alleged harm to employees who ultimately will not be subject to a RIF: if the employees who face RIFs are not entitled to injunctive relief as an equitable matter (and they are not), it would turn equity on its head to grant injunctive relief based on more remote, attenuated harms to other employees based on speculation that they might be indirectly affected by the separation of some employees. Indeed, beyond irreparable harm, Plaintiffs have offered no theory that would support *standing* for members who are not themselves subject to RIFs to bring this challenge. Likewise, if a TRO were ordered on the basis of RIFs of non-member employees, it would raise the additional problem that Plaintiffs likely lack standing to pursue relief on behalf of non-members. *See FDA v. All.for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (noting that "when (as here) a plaintiff challenges the government's unlawful regulation . . . of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish" (citation and quotation marks omitted)); *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (injunctions prohibiting government action as to non-plaintiffs are generally not an available remedy). It is Plaintiffs' burden to establish standing, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006), and they must establish that their members are subject to any given RIF notice.

Plaintiffs' assertion that their members will suffer intangible harms of political discrimination similarly fails. They offer nothing but speculation and scattered quotations to support their assertion that

1    any political discrimination will occur.  The guidance documents Plaintiffs challenge do *not* contemplate

2    targeting individuals based on political affiliation.  Without evidence that the "intangible" harm they

3    describe is imminently likely to occur, Plaintiffs cannot establish irreparable harm.  Plaintiffs do not even

4    explain the kind of political-discrimination claim that their alleged harm, if actually suffered, would

5    support.  And in any event, such harm would not be irreparable because, as discussed above, the MSPB

6    may make wrongly removed employees whole through reinstatement, backpay, and attorney's fees.

7        As to all agency defendants *except* the Department of Energy, Department of Housing and Urban

8    Development, Department of Treasury, Department of Commerce, Department of Education, Department

9    of Homeland Security, and Department of Health and Human Services—where RIFs have been or soon

10   will be noticed—Plaintiffs' irreparable-harm theories fail for an additional reason.  Specifically, for

11   employees of the 26 remaining agencies at which RIFs have not yet been noticed, any harms would occur

12   only after a decisionmaking process by each individual agency that is not currently final and may or may

13   not result in a decision to conduct RIFs of indeterminate scope.  The non-final nature of these agencies'

14   decisionmaking process is discussed further below, in Section III.B.  In addition to defeating Plaintiffs'

15   motion on APA final-action grounds as to employees at the 26 remaining agencies, the lack of finality

16   also gives the Court an independent basis to reject Plaintiffs' irreparable-harm theory as to those

17   employees. *See Selecky*, 586 F.3d at 1138.

18   **II.    This Court Lacks Jurisdiction.**

19       **A.    Plaintiffs' Claims Are Precluded By The CSRA And FSLMRS.**

20       A mounting body of decisions establishes that claims like Plaintiffs' involve the type of federal

21   employment disputes over which District Courts lack jurisdiction.  Plaintiffs seek to enjoin the defendant

22   agencies from "taking any action to issue or administer any [RIF] notices to federal employees" or "taking

23   any action to implement or enforce the OMB Lapse Memorandum [Email]" and related OPM guidance

24   "that purport to authorize administration of RIFs during a shutdown." Proposed Order at 2-3, ECF No.

25   17-2.  No matter how Plaintiffs style their claims, these disputes concern the federal employer-employee

26   relationship and must be channeled through the avenues created by Congress under the CSRA and the

27   FSLMRS.

28

Congress has "established a comprehensive system" as the "exclusive means" for reviewing the federal agency employment decisions challenged by Plaintiffs here. *Elgin*, 567 U.S. at 5, 8 (citation omitted). The CSRA, together with the FSLMRS, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) ("*Air Force*") (cleaned up). Congress allowed certain employees to challenge agency personnel decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, limited to the claims and remedies provided by Congress. *See AFGE*, 929 F.3d at 757. Such an exclusive alternative scheme displaces district-court jurisdiction under 28 U.S.C. § 1331 if "the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489 (2010) (cleaned up).

Plaintiffs' claims are of the type Congress intended to be reviewed in the first instance by agency adjudicators—not federal district courts. *See AFGE*, 929 F.3d at 755. Plaintiffs preemptively challenge agencies' future potential RIF decisions. Proposed Order at 2-3. But federal employees (such as Plaintiffs' members) who believe a RIF has violated a statute or regulation may seek redress only through the MSPB, *see* 5 U.S.C. § 7701(a); 5 C.F.R. § 351.901, or another specialized scheme for administrative review. *See, e.g.*, 22 U.S.C. § 4010a(c); *see also Alder v. Tennessee Valley Auth.*, 43 F. App'x 952, 956 (6th Cir. 2002) ("[A] challenge to [a] reduction-in-force decision" is "a fundamental employment claim subject to MSPB review.").

Plaintiffs may not evade this scheme by bringing claims as unions asserting harms to their members or asserting a loss of membership dues. Otherwise, any unionized employee "could circumvent the CSRA's strictures." *See Air Force*, 716 F.3d at 639. Moreover, the FSLMRS "establishes a comprehensive scheme to deal with labor relations in federal employment," which channels adjudication to the FLRA followed by direct review in the courts of appeals. *Id.* at 636 (citation omitted). Under the FSLMRS, unions may file a grievance under preexisting collective bargaining agreements "concerning any matter relating to the employment of any employee," "the effect or interpretation, or a claim of breach,

of a collective bargaining agreement," or "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. §§ 7103(a)(9), 7121(a)(1).

These comprehensive provisions foreclose Plaintiffs' attempt to raise their labor dispute in district court. Indeed, numerous courts in recent months and years have applied the same preclusion principle to similar federal-employment suits brought by both employees and unions (including Plaintiff AFGE). *See, e.g.*, *AFGE*, 929 F.3d at 753, 761 (challenge to three executive orders governing collective bargaining and grievance processes); *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) (termination of probationary employees); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352, 2025 WL 573762, at *8-*11 (D.D.C. Feb. 21, 2025) (challenge to employees' placement on administrative leave); *Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 7-11 (D.D.C. 2025) (challenge to terminations of probationary employees, anticipated RIFs, and deferred-resignation program); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459, at *1-*3 (D. Mass. Feb. 12, 2025) (challenge to deferred-resignation program); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025) (noting that "'[w]e have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions.'" (quoting *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009))); *Nat'l Treasury Employees Union v. Vought*, 149 F.4th 762, 775 (D.C. Cir. 2025) ("*NTEU*") (holding that "the claims seek redress for allegedly unlawful terminations—the heartland of CSRA coverage" and "the CSRA precludes district-court jurisdiction over the claims of the" unions). Although this Court disagreed when issuing an injunction in a different employment-related case (an injunction that was subsequently stayed, then vacated) *see Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1482511, at *27 (N.D. Cal. May 22, 2025), *stay granted*, 606 U.S. ___, 2025 WL 1873449 (July 8, 2025) (Mem.), *and injunction vacated*, --- F.4th ---, 2025 WL 2716266 (9th Cir. Sept. 19, 2025), more recent appellate decisions like *NTEU* make ever clearer that channeling precludes district-court jurisdiction.

As these decisions show, it is well settled that claims like Plaintiffs' are channeled to agency adjudication. To the extent the Court specifically considers the *Thunder Basin Coal Co. v. Reich* factors anew, they reinforce that Plaintiffs are required to channel the claims asserted here. *See* 510 U.S. 200

(1994). The first step under *Thunder Basin*—Congress's intent to preclude—is satisfied: Congress established a detailed scheme for adjudicating federal labor disputes. The FSLMRS provides for "administrative and judicial review" regarding disputes between employees and their federal employers and disputes between unions representing those employees and the government. *AFGE*, 929 F.3d at 752. The factors considered under the second step—(i) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (ii) "is the claim wholly collateral to the statute's review provisions"; and (iii) "is the claim outside the agency's expertise," *Axon Enterprise, Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (cleaned up)—also support channeling.

Here, as in the 2019 *AFGE* case, parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." 929 F.3d at 757. Similarly, if any Plaintiff thinks particular RIFs conflict with any federal rule, guidance, or statute, they may assert such a claim within one of the review schemes. *See, e.g., Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. Dep't of Veteran's Affs.*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether regulation was violated); *Fed. L. Enf't Offs. Ass'n v. Ahuja*, 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system). If dissatisfied with a ruling of the MSPB or FLRA, Plaintiffs or their members may obtain judicial review in the courts of appeals. 28 U.S.C. § 1295(a)(9); 5 U.S.C. § 7123.

Nor are Plaintiffs' claims "wholly collateral" to the CSRA and FLRA scheme. What matters for this inquiry is whether the subject of Plaintiffs' challenge is a matter covered by the CSRA and FSLMRS, not how Plaintiffs describe their claims. *See Elgin*, 567 U.S. at 22. Here, the subject of Plaintiffs' claims is RIFs and related federal employment and labor matters; their contention that the OMB Lapse Email and OPM Special Instructions are unlawful is simply the "vehicle" by which they seek to stop RIFs from taking place. *See id*. Plaintiffs ask "for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders." *AFGE*, 929 F.3d at 760. Thus, "[t]heir challenge is not wholly collateral to the statutory scheme." *Id.*

Finally, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. The application of the RIF regulations and the statutes governing agency operations are matters on which administrative agencies have expertise. *See id.* (reasoning that "[m]any of [plaintiffs] claims allege that the executive orders direct agencies to violate the Statute by refusing to bargain over mandatory subjects or by taking actions that are inconsistent with the duty to bargain in good faith" and that "[t]hese matters lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations'").

**B.    As To The Agencies That Have Not Yet Made RIF Decisions, Plaintiffs' Request For Emergency Relief Is Not Ripe.**

Plaintiffs' request for a TRO is not ripe as to the employees at the 26 agencies that have not yet announced RIFs, because their theories "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (citation omitted). Specifically, they seek to forestall hypothetical agency actions—"mass RIFs," TRO Mem. at 2—that they acknowledge have not occurred and are not certain to occur. *See id.* (speculating about when such RIFs "are likely to begin"). That strategy cannot succeed because if "the supposed injury has not materialized and may never materialize," the "dispute is more of an abstraction than an actual case" and cannot "survive the standing/ripeness inquiry." *Montana Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014) (cleaned up).

Plaintiffs try to get around this deficiency by asserting that the OMB Lapse Email and OPM Special Instructions are binding on agencies. *See* TRO Mem. at 7; *see also, e.g.*, *id.* at 18 (characterizing OMB and OPM as "direct[ing] other agencies"). But these documents are not binding because individual agencies—not OMB or OPM—are the entities that would conduct any RIFs. They are also the entities that would make any final decision whether to do so. *See* OMB Lapse Email at 1 (directing agencies to "use this opportunity to *consider* Reduction in Force (RIF) notices"). Specifically, each agency will conduct its own individualized analysis of whether a RIF is necessary or appropriate. And all agencies' planning remains subject to change. In other words, individual agencies are taking the guidance at its word and considering whether the relevant factors in the guidance support RIFs at particular agencies.

*See id.* at 2 (listing relevant factors in determining whether to issue RIF notices).  While that process of consideration continues, Plaintiffs' claims with respect to these agencies are not ripe.

**III.    Plaintiffs' Claims Are Not Likely To Succeed On The Merits.**

    **A.    Plaintiffs Lack A Cause Of Action To Challenge Violations Of The Antideficiency Act.**

    Even if Plaintiffs' motion did not fail for lack of jurisdiction or the other reasons addressed above, it would fail because Plaintiffs lack a cause of action to bring this sprawling challenge to all potential and hypothetical agency RIFs during the current lapse in appropriations.  The crux of their lawsuit is that internal OMB and OPM guidance documents contain directives that "are directly contrary to the Antideficiency Act."  TRO Mem. at 15.  But they do not attempt to sue directly under the Act – and with good reason.  That statute does not contain an express cause of action and provides no basis for implying one.  *See Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*, 5 F.4th 952, 958 (9th Cir. 2021) ("'[C]lear and unambiguous terms' are 'required for Congress to create new rights enforceable under an implied private right of action.'" (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002))).  The Antideficiency Act operates as a restriction on the actions of Executive Branch officers; it does not regulate the rights of—much less create rights for—individuals. Thus, courts have had no trouble determining that "'[n]o private right of action for declaratory, mandatory or injunctive relief exists under' the Anti-Deficiency Act."  *Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) (Jackson, J.) (citation omitted); *see also, e.g.*, *Stoner v. Ariz. Dep't of Economic Sec.*, 2024 WL 3818614, at *3 (D. Ariz. Aug. 14, 2024) ("[N]one of these statutes provide Plaintiff with a private right of action.").

    Likely recognizing this limitation, Plaintiffs assert their claims under the APA or as a challenge to "*ultra vires* unlawful governmental action."  But neither theory allows for judicial review of Plaintiffs' claims.  Under the APA, a cause of action is not available if any other "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).  Here, Plaintiffs cannot rely on the APA cause of action to assert alleged violations of the Antideficiency Act because the comprehensive and particularized structure of the latter precludes resort to the generalized former.  *Cf. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) ("When Congress has dealt in particularity with a claim and has

intended a specified remedy . . . to be exclusive, that is the end of the matter; the APA does not undo the judgment." (cleaned up)).

An alternative statutory scheme can preclude APA review either through "express language" or through "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). The Antideficiency Act establishes a comprehensive remedial scheme, and the types of remedies it affords differ in kind from the type of broad judicial relief against agency action available under a statute like the APA. *See* 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action" based on certain findings). In particular, where an Executive Branch employee has allegedly violated the Antideficiency Act, that employee's agency head must report the violation to the President, Congress, and the Comptroller General. *See* 31 U.S.C. § 1351. Sanctions for violations include administrative discipline, removal from office of the individual responsible for the unauthorized expenditure, and criminal penalties. *See id*. §§ 1349, 1350. Such remedies avoid the disruption of retroactive invalidation or vacatur of agency action sometimes awarded by courts under the APA. By addressing violations through after-the-fact reporting and enforcement, including through the involvement of Congress' Comptroller General, Congress intended to foreclose private enforcement of the Antideficiency Act through individual suits for injunctive or set-aside relief against agency actions allegedly taken in violation of the Act. *See, e.g.*, *Global Health Council v. Trump*, --- F. 4th ---, 2025 WL 2480618, at *10-11 (D.C. Cir. Aug. 28, 2025) (similarly reticulated statutory enforcement scheme precluded APA review; "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits to enforce the [statute] at any time and without notice to the Congress of the alleged violation").

Nor can Plaintiffs avoid these strictures by relying on an extra-statutory, or *ultra vires*, cause of action. Such "last resort" claims, *Terveer v. Billington*, 34 F. Supp. 3d 100, 123 (D.D.C. 2014), are not cognizable where "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review," *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bd. of Govs. of the*

*Fed. Res. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991)).  As discussed above, that is the case here, where Congress, through the FSLMRS and CSRA, established exclusive procedures for review of (and appropriate remedies for) the type of claims at issue here *and* foreclosed private enforcement of the Antideficiency Act through the APA cause of action.

In any event, even where potentially cognizable, *ultra vires* claims are intended to be of "extremely limited scope."  *Terveer*, 34 F. Supp. 3d at 123.  The "very stringent standard," *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.), is only met in situations where an Executive Branch officer "acts without any authority whatever."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (cleaned up).  That standard is not met here, where (as Plaintiffs seem to recognize) OMB and OPM have authority to offer guidance on agency responses to lapses in appropriations, and individual federal agencies plainly have general authority to conduct RIFs.  *See supra* Background Section I.; *see also Nuclear Regulatory Comm'n*, 605 U.S. at 681-82 (stating an *ultra vires* claim is "essentially a Hail Mary pass" that "in court as in football, . . . rarely succeeds").  Plaintiffs simply argue that the government has, in various ways, exceeded that authority; as the Supreme Court has made clear, courts should reject such attempts to "dress up a typical statutory-authority argument as an ultra vires claim."  *Id*. at 682.

### B.    Potential Future RIF Decisions At Most Of The Defendant Agencies Are Not Final Agency Actions.

To the extent their challenge is to agencies' hypothetical future decisions to conduct RIFs, *see, e.g.*, TRO Mem. at 21, Plaintiffs' motion fails because those decisions are not final.  "[F]inal agency action" is a requirement for APA review.  5 U.S.C. § 704.  To meet this definition, an action must "mark the consummation of the agency's decisionmaking process"—rather than being "of a merely tentative or interlocutory nature"—and it "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).  By their own terms, the OMB and OPM documents provide guidance and suggestions for agencies to consider as they respond to a lapse in appropriations and, more importantly, expressly contemplate that further agency action will be necessary to implement any RIF.  *See* ECF No. 15-1 (OMB memo directing

1   agencies to "*consider* [RIF] notices for" certain employees, to "revise their RIFs as needed to retain the

2   minimal number of employees necessary to carry out statutory functions," and to submit any proposed

3   RIF plan to OMB (emphasis added)); ECF No. 15-2 at 10 (OPM "special instructions" to agencies for

4   "administering an agency shutdown of operations due to a lapse in appropriations," recognizing the "RIF

5   process" that each agency must undertake and encouraging any agency issuing RIF notices to "prepare a

6   decisional memorandum that documents and supports RIF-related decision-making").  Most of the

7   defendant agencies have not generated a final action as a result of those documents. And as the documents

8   recognize, it is up to the agencies to decide whether and how to implement any RIF in response to the

9   lapse in appropriations.

10      Indeed, Plaintiffs themselves describe potential agency decisions in hypothetical terms.  *See id*. at

11  22 (suggesting, without identifying one, that an agency action effectuating a RIF "*would be* final agency

12  action" (emphasis added)).  As to the 26 agencies that have not yet made final lapse-related RIF decisions,[3]

13  the Court should reject Plaintiffs' attempt to circumvent—with reference only to abstract legal

14  interpretations and hypothetical actions—the APA's requirement that judicial review focus on discrete,

15  identifiable agency action.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[R]espondent

16  cannot seek wholesale improvement of this program by court decree, rather than in the offices of the

17  Department or the halls of Congress, where programmatic improvements are normally made.").

18  **IV.    The Balance Of The Equities Weighs In The Government's Favor.**

19      The balance of harms and public interest strongly cut against entering a TRO.  First, the requested

20  TRO would irreparably harm the government.  The President, through OMB, has determined that agencies

21  should operate more efficiently and has directed them to consider steps to optimize their workforces in

22  light of the ongoing lapse in appropriations.   A TRO would prevent agencies from taking steps to

23  implement this policy priority and determining how best to organize their workforces, even though the

24  government has "traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'"

---

[3] As noted above, EPA has issued intent-to-RIF notices to certain employees, but has not made a final decision as to the scope or timing of any potential RIF.

1   *Sampson*, 415 U.S. at 83.  And it would halt agencies from engaging in the kind of RIF proceedings

2   suggested by OMB, with implications across the Executive Branch.

3           Moreover, as to the agencies that have noticed RIFs and those that may ultimately plan to conduct

4   a RIF through appropriate processes in response to the lapse in appropriations, a TRO would require those

5   agencies to retain employees they might otherwise have discharged (or reassigned) via RIF.   The

6   government will not be able to recover the cost of those salaries and benefits, even if the court's order is

7   vacated.  *See Maryland*, 2025 WL 1073657, at *1.  Such an order could cost the government millions of

8   dollars each week.  Finally, a district court's exercise of jurisdiction over a federal employment dispute—

9   in the face of a comprehensive remedial scheme for resolving such issues—has a "disruptive effect on the

10  administrative processes established by the government to handle cases such as these."  *Garcia*, 680 F.2d

11  at 32.

12          On the other side of the ledger, Plaintiffs have not established irreparable injury.  As discussed

13  above, in the ordinary course, employment disputes rarely justify preliminary relief because there are

14  procedures by which a terminated employee may obtain backpay following final judgment.  *See, e.g.*,

15  *Sampson*, 415 U.S. at 92 & n.68.  And Plaintiffs' irreparable-harm arguments fail for the additional reasons

16  discussed above.  Moreover, Plaintiffs would need to—and have not—established standing to seek the

17  full scope of relief that they seek.  *See supra* Section I.  At a bare minimum, any relief should be limited

18  to particular agency subcomponents in which Plaintiffs establish they have members who will be subject

19  to lapse-related RIFs.

20          In sum, the equities support denying Plaintiffs' motion.

21  **V.    Any Injunctive Relief Should Be Stayed Pending Appeal And Be Accompanied By A Bond,**

22  **And No Declaration Should Be Required.**

23          If the Court issues any injunctive relief, the government respectfully requests that such relief be

24  stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum,

25  administratively stayed for a period of seven days to allow the government to consider whether to seek an

26  emergency, expedited stay from the court of appeals if an appeal is authorized.

27

28

1    The government also respectfully requests that any injunctive relief be accompanied by a bond

2  under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a

3  temporary restraining order only if the movant gives security in an amount that the court considers proper

4  to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

5  restrained." Here, an appropriate bond would be commensurate to the salaries and benefits the

6  government must pay for any employees it would prefer to separate from service, but would be prevented

7  from doing so for the duration of any preliminary relief. The government is prepared to submit evidence

8  concerning the appropriate amount of a bond.

9    Finally, Plaintiffs ask that the government be required to "serve and file an accounting of all RIFs

10  enjoined by this TRO within two business days, including but not limited to a description of the agency

11  planning to impose the enjoined RIF, the number of employees intended to be included in the enjoined

12  RIF, and description of the PPAs that Defendants included in the enjoined RIF." ECF No. 17 at 2. They

13  also ask that the Court order the government to "file a declaration(s) verifying" compliance with any TRO

14  "within two (2) business days." The Court should not order such extraordinary filings. Each goes well

15  beyond maintaining the status quo and is certainly not "necessary to provide relief" to injured parties.

16  *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Not to mention that, as to most of the defendant agencies, the

17  requested information for the "accounting" would likely be preliminary, subject to change, non-final, and

18  of minimal (if any) use to any party or the Court. Filing such a broad "accounting"—which Plaintiffs

19  effectively admit is a fishing expedition to require the government to "reveal [its] actions now," TRO

20  Mem. at 25—just two days after entry of emergency relief would also divert valuable resources away from

21  agency compliance efforts. Instead, if the Court orders relief, the presumption of regularity should apply,

22  and the Court should presume the government will comply with any such order. *See Am. Cargo Transp.,*

23  *Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[W]e presume the government is acting in

24  good faith.").

25                                    **CONCLUSION**

26    The Court should deny Plaintiffs' motion.

27

28

Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order
3:25-cv-08302-VC

Dated: October 10, 2025

Respectfully Submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

EMILY M. HALL
TIBERIUS DAVIS
Counsel to the Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Branch Director
BRAD P. ROSENBERG
Special Counsel
R. CHARLIE MERRITT
Senior Counsel
Civil Division, Federal Programs Branch

*/s/ Elizabeth Hedges*
ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 616-0929
E-mail: elizabeth.t.hedges@usdoj.gov

*Attorneys for Defendants*