Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Alice X. Wang (SBN 335224)
Robin S. Tholin (SBN 344845)
Talia Stender (SBN 341654)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al.,<br><br>Defendants. | Case No. 3:25-cv-08302-SI<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    I.    Additional Plaintiffs and Defendants ........................................................2

    II.    Actual and Threatened Shutdown RIFs ....................................................3

        A.    The Shutdown RIFs ......................................................................4

            1.    OMB Directives to Agencies to Layoff Employees During the Shutdown ....................................................4

            2.    OPM and OMB Require Agency Employees to Work Without Pay to Prepare and Issue RIF Notices ...................................6

            3.    OMB and OPM's Centralized Control ............................8

            4.    The Decision to Use Shutdown Layoffs for Partisan Political Ends ......................................................9

            5.    RIFs Begin October 10 ....................................................10

            6.    History of These Emergency Proceedings .........................11

        B.    The Impact of the October 10 and Additional RIFs on Plaintiffs ................14

ARGUMENT .......................................................................................................................18

    I.    This Court Should Enjoin Defendants' Shutdown RIFs ..........................18

        A.    Plaintiffs Are Likely to Succeed on the Merits ...........................18

        B.    Defendants Have and Will Continue to Cause Irreparable Harm ................19

        C.    The Balance of Equities and Public Interest Strongly Support this Injunction ....................................................20

    II.    Plaintiffs' Proposed Relief Is Necessary to Maintain the Status Quo and to Prevent Ongoing Irreparable Harm ....................................................20

        A.    Plaintiffs' Proposed Injunction ....................................................20

        B.    This Injunction Maintains the Status Quo ....................................22

        C.    The Proposed Injunction Is No Broader than Necessary to Remedy and Prevent Plaintiffs' Harms ....................................................22

CONCLUSION ....................................................................................................................25

1

2

**TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Federal Cases**

5

*AFGE v. OPM*,
  2025 WL 2633791 (N.D. Cal. Sept. 12, 2025) ................................................. 8, 19

6

7
*AFGE v. Trump*,
  139 F.4th 1020 (9th Cir. 2025), *stay granted on other grounds sub nom. Trump*

8
  *v. AFGE*, 145 S. Ct. 2635 (2025) .......................................................... 19

9
*AFGE v. Trump*,
  784 F.Supp.3d 1316 (N.D. Cal. 2025) ........................................................ 8, 9

10

11
*Allen v. Milligan*,
  599 U.S. 1 (2023) ........................................................................... 25

12

13
*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................... 22, 25

14
*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
  840 F.2d 701 (9th Cir. 1988) ............................................................... 20

15

16
*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ........................................................................ 25

17
*Department of Homeland Sec'y v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) .......................................................................... 25

18

19
*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
  92 F.3d 1486 (9th Cir. 1996) ............................................................... 25

20

21
*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................ 20

22
*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) (en banc) ...................................................... 22

23

24
*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ........................................................................ 23

25

26
*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................ 20

27
*National Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) .............................................................. 23

28

*National TPS Alliance v. Noem*,
   150 F.4th 1000 (9th Cir. 2025) ............................................................................25

*Nebraska v. Biden*,
   52 F.4th 1044 (8th Cir. 2022), *reversed and remanded on other grounds*, 600
   U.S. 477 (2023) ...................................................................................................25

*NTEU v. FLRA*,
   800 F.2d 1165 (D.C. Cir. 1986) ..........................................................................23

*Vazquez-Burgos v. Rodriguez-Perez*,
   111 F.Supp.3d 135 (D.P.R. 2015) .......................................................................20

*Warth v. Seldin*,
   422 U.S. 490 (1975) .............................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..........................................................................................18, 19

**Federal Statutes and Regulations**

5 U.S.C.
   § 705 .............................................................................................................20, 25
   § 706(2) ...............................................................................................................25
   § 3502 ..................................................................................................................24
   § 7114(A)(1) ........................................................................................................23

31 U.S.C.
   § 1350 ....................................................................................................................8

5 C.F.R. Pt. 351 ...........................................................................................................24

**Rules**

Fed. R. Civ. P. 65(a), (b)(3) ........................................................................................18

# INTRODUCTION

As this Court found in its October 15, 2025 Order granting Plaintiffs' Motion for a Temporary Restraining Order ("TRO") (ECF 56), "[o]n October 10, 2025, federal agencies began laying off thousands of employees in the midst of a government shutdown," taking action that is "unprecedented in our country's history." ECF 56 at 1-2. This Court rejected any attempt to characterize these politically driven reductions-in-force ("RIFs") imposed during a government shutdown as "ordinary," pointing out that "it is far from normal for an administration to fire line-level civilian employees during a government shutdown as a way to punish the opposing political party." *Id*. at 1. Nor is it lawful. As the Court recognized at the TRO hearing, the stated legal premise for the shutdown RIFs—that a temporary lapse in funding eliminates statutory authority and so warrants RIFs—is erroneous (ECF 57 at 4-5), and "[i]f what plaintiffs allege is true, then the agencies' actions in laying off thousands of public employees during a government shutdown—and in targeting for RIFs those programs that are perceived as favored by a particular political party—is the epitome of hasty, arbitrary and capricious decisionmaking." ECF 56 at 4.

Based on briefing and argument on Plaintiffs' TRO Motion, this Court concluded that Plaintiffs were likely to succeed on their Administrative Procedure Act ("APA") claims, that Plaintiffs and the federal employees they represent face imminent irreparable harm, that Defendants would suffer no harm from a "temporary preservation of the status quo," and that the public interest was served by halting further RIF notices and the implementation of any RIFs already initiated on or after October 10. ECF 56, 57. Plaintiffs now move for a preliminary injunction to restore the status quo for the duration of this litigation, by extending the temporary relief granted by the Court prohibiting further RIFs during the shutdown and by ordering the rescission of the unlawful RIFs issued during the shutdown. Nothing less is required to maintain the status quo that existed before Defendants took their patently unlawful, ongoing action.

Plaintiffs incorporate by reference their prior briefing and evidence submitted with their TRO Motion and related filings (including the Motion, ECF 17; Supplemental Motion for TRO and Evidence, ECF 39, 42; Reply, ECF 47; and Urgent Request for Status Conference and Further Relief, ECF 59). As this Court is aware, Defendants have thus far declined to defend the lawfulness of the

shutdown RIFs.  ECF 41, 57.  Thus, while the President, OMB Director Russell Vought, and other Administration officials have trumpeted their intent to shut down "Democrat" agencies and programs and doubled down on the legal fiction that a lapse in funding eliminates agency authority (*see infra* at 3-4, 9-10), Defendants have raised only threshold procedural and jurisdictional defenses.  ECF 41, 57.  Plaintiffs therefore do not repeat their arguments establishing that the RIFs are likely unlawful.

This brief supplements the existing record by addressing the following:

1.    Plaintiffs summarize and update the record regarding agency actions and statements by the Administration regarding the shutdown layoffs.

2.    Plaintiffs address the evidence of harm from actual and imminent RIFs including as pertains to new unions that are included as Plaintiffs in the proposed Second Amended Complaint.[1]

3.    Plaintiffs address the scope of relief requested by this Motion.  The scope and scale of the relief requested by Plaintiffs is driven by Defendants' willful disregard of their legal obligations, at great cost to, and without any regard for, the federal employees who are experiencing disruption of their lives and livelihoods as a result of Defendants' unlawful actions.  Defendants' representations to this Court have made clear that, absent adequate injunctive relief, they will continue to throw the lives of federal employees into chaos for perceived political gain and retribution.

Plaintiffs respectfully request the requested preliminary injunction be granted.

## BACKGROUND

### I.    Additional Plaintiffs and Defendants

Plaintiffs that originally moved for a TRO were the American Federation of Government Employees ("AFGE"), several of its affiliates, and the American Federation of State, County, and Municipal Employees ("AFSCME").  ECF 15, 17.  Plaintiffs previously moved to add as Plaintiffs (ECF 64, 65), and this Court previously added to the TRO (ECF 70), three other unions that represent federal employees who have been or imminently will be harmed by Defendants' shutdown layoffs: the National Federation of Federal Employees ("NFFE"); Service Employees International Union

---

[1] As set forth herein, Plaintiffs previously requested leave to amend their complaint to add three additional union plaintiffs and have filed a revised motion for leave to add as Plaintiffs six unions that represent federal employees.

("SEIU"), and National Association of Government Employees ("NAGE"). Plaintiffs now file a revised motion for leave to amend and request that the TRO and preliminary injunctive relief be extended to three more union plaintiffs: the National Treasury Employees Union ("NTEU"), the International Federation of Professional and Technical Engineers ("IFPTE"), and American Federation of Teachers ("AFT"). *See* Revised Motion for Leave to Amend, filed herewith; Kaspar Decl. (NTEU); Biggs Decl. (IFPTE); Lieberman Decl. (AFT).[2]

Plaintiffs' revised proposed Second Amended Complaint also adds six federal agencies at which existing and new Plaintiffs represent federal employees threatened by Defendants' plans for shutdown layoffs: the Peace Corps, Commodity Futures Trading Commission, Federal Communications Commission, Federal Elections Commission, Securities and Exchange Commission, and Merits Systems Protection Board. *See* ECF 17-5; Kaspar Decl. ¶6; Biggs Decl. ¶3; *see also* Revised Motion for Leave to Amend, accompanied by revised Second Amended Complaint.

## II.    Actual and Threatened Shutdown RIFs

On October 10, 2025, Defendants began implementing the decision to lay off federal employees during the government shutdown that began October 1 by sending notices of RIFs to employees of at least eight federal agencies. ECF 41, 49-2, 62-4, 62-6, 62-9, 62-18, 66-1. As President Trump, OMB Director Vought, and other administration officials have repeatedly explained, these layoffs have been aimed at programs perceived to be supported by "Democrats," using federal employees' lives and livelihoods as pawns for partisan political gain. *E.g.,* ECF 42-2, Ex. A (President Trump on Oct. 10, 2025: the layoffs are "Democrat oriented, because … they started this thing, so they should be Democrat oriented"); ECF 48, Ex. A (President Trump on Oct. 14, 2025: "We're closing up Democrat programs that we disagree with. And they're never going to open

---

[2] As the Court is aware from the events of last week, Plaintiffs moved swiftly to ask the Court to modify the October 15 TRO on Friday, October 17 to protect employees represented by NFFE, SEIU and NTEU from RIFs that were threatened to begin at the Department of the Interior ("DOI") on Monday, October 20, 2025, notwithstanding this Court's TRO. ECF 59, 64. Defendant DOI's October 20 filing confirmed those RIF plans, which had not previously been revealed to Plaintiffs or the Court. ECF 62-11 (DOI Decl.); 67-1 (Supp. DOI Decl.). Plaintiffs' counsel informed the Court at the status conference on Friday, October 17 that they were likely to move to amend the complaint to add additional union plaintiffs and to extend the TRO to those additional plaintiffs, and have now done so.

again.").  Defendants' justification for these layoffs has rested on the baseless legal premise that the temporary lapse in funding eliminated statutory authority for agency functions.  ECF 17-3, Ex. A (OMB Lapse Memorandum); Shively Decl., Ex. B; ECF 47-1, Exs. A, S, T.  To execute this RIF plan, Defendants have required federal employees to illegally work during the shutdown (without pay) to prepare and issue RIF notices to their fellow employees, and in some instances, to themselves. *E.g.*, ECF 47-1, Exs. E-K; Ex. 47-3.  As the record evidence to date plainly establishes, Defendants are not finished with this scheme and would have already imposed further RIFs, and will impose more imminently, absent injunctive relief from this Court.  *E.g.*, ECF 40 ¶10 (Billy Decl.); ECF 49-2 ¶4 (Supp. Billy Decl.); ECF 47-1, Ex. T (EPA Notice of Intent to RIF: "The decision to conduct a RIF has been made…."); ECF 66-1 (Energy Decl.); ECF 67-1 (Supp. DOI Decl.); *see infra* at 14-18.

> **A.    The Shutdown RIFs**
>
> > **1.    OMB Directives to Agencies to Layoff Employees During the Shutdown**

As the federal government approached the start of a new fiscal year without enactment of either a continuing funding resolution or appropriations legislation, Defendants made the decision to engage in mass terminations of federal employees during the impending shutdown.  In furtherance of these plans, on September 24, 2025, OMB issued a memorandum to all agencies threatening that if "congressional Democrats" did not agree to the administration's demands, and the federal government shut down, there would be mass firings of federal employees (hereinafter, "OMB Lapse Memorandum" or "Memorandum").  ECF 17-3 ¶4, Ex. A at 1.  That Memorandum stated that "congressional Democrats are currently blocking th[e] clean CR" supported by the Trump administration "due to their partisan demands."  *Id*.  It thus expressly attributed any shutdown to the actions of "congressional Democrats," who it described as "intend[ing] to break this bipartisan trend and shut down the government in the coming days over a series of insane demands."  *Id.*

The Memorandum then directed: "With Respect to those Federal programs whose funding would lapse and which are otherwise unfunded, *such programs are no longer statutorily required to be carried out*."  *Id*. (emphasis added).  It cited no authority for this conclusion.  OMB continued: "agencies are directed to use this opportunity to consider Reduction in Force (RIF) notices for all employees in programs, projects, or activities (PPAs) that satisfy all three of the following

1    conditions: (1) discretionary funding lapses on October 1, 2025; (2) another source of funding, such

2    as H.R. 1 (Public Law 119-21) is not currently available; and (3) the PPA is not consistent with the

3    President's priorities." *Id.* OMB further expressly directed that these "RIF notices will be in addition

4    to any furlough notices provided due to the lapse in appropriation. *RIF notices should be issued to all*

5    *employees working on the relevant PPA, regardless of whether the employee is excepted or*

6    *furloughed* during the lapse in appropriations." *Id.* (emphasis added). Finally, OMB directed: "Any

7    proposed RIF plan must be submitted to OMB." *Id.*

8    　　　After issuance of the Memorandum, federal agencies began, as directed, submitting to OMB

9    for approval their proposed RIFs (ECF 40 ¶5), and OMB began reviewing and approving those RIFs,

10   including by controlling the timing of the issuance of RIF notices during the shutdown. ECF 17-3

11   ¶¶26-28. As Defendants' declarant OMB Senior Advisor Stephen Billy admitted, the OMB Lapse

12   Memorandum instructed that RIFs "must" be submitted to OMB, and agencies submitted plans

13   "identifying whether they found the criteria in the OMB Lapse Email were met as to any offices or

14   employees within their agencies." ECF 40 ¶5. Similarly, various public statements by the President,

15   OMB Director Vought, and other administration officials attributed decision-making power for the

16   shutdown layoffs to OMB and its Director. *See* ECF 17-3 ¶22 ("He wields the pen, the funds, and the

17   brain"), Exs. J, M, N, O. OMB overruled some agencies' objections to these RIFs, including that

18   they were unlawful. ECF 47-2, Ex. C ("The layoffs run counter to recent internal warnings from

19   senior government officials that such dismissals are legally questionable … officials privately

20   counseled agencies against conducting reductions in force while the government lacks funding

21   because it would probably violate the law"); *see also* ECF 17-3 ¶¶26-28. As OMB Director Vought

22   announced on October 15, "We're going to keep those [RIFs] rolling throughout the shutdown,

23   because we think it's important to stay on offense for the American taxpayer." Shively Decl. ¶4, Ex.

24   B at 2.[3]

---

[3] Defendants' declarations from Mr. Billy assert, contrary to the record evidence, that decisions
are being made at the agency level. This is the same argument that they tried and failed to support
with credible evidence in prior cases in this Court. *See infra* at 8-9. Here, too, the record shows Mr.
Billy's statements are not credible. Further, Mr. Billy's declarations repeatedly rest on his lack of
awareness or knowledge. *See, e.g.*, ECF 40 ¶¶9, 10. And the declarations are contradicted by
numerous public statements by OMB and other administration officials. *See supra* at 3-4, 9-10.

These actions are consistent with OMB Director Vought's frequently stated goals to "embark[] on deconstructing this administrative state," and to "make sure that the bureaucracy can't reconstitute itself later in future administrations." ECF 17-3 ¶11, Ex. H at 5, 6. As he has long made clear: "We want the bureaucrats" (referring to federal employees) "to be traumatically affected." ECF 17-3 ¶8, Ex. E at 3. "When they wake up in the morning," he stated, "we want them to not want to go to work because they are increasingly viewed as the villains…. We want to put them in trauma." *Id*. Thus, while implementing these decisions to end the livelihoods of dedicated public servants, Mr. Vought bragged, "We're having fun." ECF 47-2, Ex. H at 7.

OMB Director Vought and others in the Administration have also repeated the (baseless) justification that the lapse in federal funding repeals statutory authorization for federal programs and agencies. On October 15 (as this Court was issuing the TRO), Defendant Vought confirmed: "[O]ne of the things we want to do is, if there are policy opportunities to downsize the scope of the federal government, we want to use those opportunities." Shively Decl., Ex C at 3. He explained further:

> "Congress is saying we're not going to fund these programs by not passing the Republican continuing resolution. So if there's no funding for these programs, *what would you have us do? Is it not to make an assumption that you don't intend to fund these in the future?* And so, we're then doing the normal, legal authorities that were given to us—and our focus, time and attention—to be able to go after and prioritize the RIFs, as opposed to the deregulatory agenda or any of the other things that we're normally tasked with at OMB."

*Id.* (emphasis added). When asked how many additional RIFs were intended, Vought responded: "I think we'll probably end up being north of 10,000." *Id*. at 2; *see also id*. Ex. B at 2.

### 2. OPM and OMB Require Agency Employees to Work Without Pay to Prepare and Issue RIF Notices

Four days after the OMB Lapse Memorandum, on September 28, 2025, OPM issued instructions to all federal agencies stating, "OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities." ECF 17-3 ¶¶6-7, Exs. C at 53, D at 10.[4] This direction appeared in both OPM's "Guidance for Shutdown Furloughs," hereinafter "OPM Guidance," and its

---

[4] The employees who have performed this work to prepare and issue RIF notices are being categorized as "excepted," without any lawful justification. *See* ECF 17-1 at 3-4, 9.

"Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025." *Id.* Exs. C, D.  Neither document explained the legal basis for this determination. As Defendants' declarant admitted, these OPM documents also directed that agencies "must" submit their RIFs to OMB.  ECF 40 ¶5.

These OPM documents were not even internally consistent.  The Guidance expressly states, "Reductions in force (RIF) furlough regulations … *are not applicable to emergency shutdown furloughs* because the ultimate duration of an emergency shutdown furlough is unknown at the outset and is dependent entirely on Congressional action, rather than agency action."  ECF 17-3 ¶6, Ex. C at 47 (emphasis added).  The Special Instructions also instruct, "[a] RIF process is conducted separately from the process for administering a shutdown due to a lapse in appropriations," *id.* ¶7, Ex. D at 10.

The work required to prepare and issue RIF notices—which OMB and OPM have directed be done during the shutdown—is substantial.[5]  As OPM has explained, "There are six phases to implementing a RIF," which should occur over many months and require a "team" to implement.[6] As OPM's 117-page operations manual for conducting RIFs explains, "Most RIF actions require some employees to work full-time on personnel actions related to the RIF."[7]  OPM recommends that this "RIF Team" be comprised of human resources staff that includes at least one manager/leader and support staff including "staffing assistants," "clerical support staff," "benefits specialists," and "computer specialists."  *Id.* at 15.  While issuing the RIF Notices is only one of the six phases of the RIF process, it involves substantial work: "determining each released employee's eligibility for benefits, preparing specific written RIF notices and mandatory attachments, sending notices to other organizations if 50 or more employees receive separation notices, notifying bargaining unit representatives, determining how to deliver RIF notices, preparing packages for separating

---

[5] *See* OPM, *Reductions in Force (RIF)*, available at:  https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/.

[6] OPM, *Overview of Reduction in Force (RIF)*, available at:  https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-overview.pdf; OPM, *Workforce Reshaping Operations Handbook*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

[7] *Workforce Reshaping Operations Handbook*, *supra*, at 13 ("Establishing the RIF Team").

employees, delivering RIF notices, and re-running RIF to reflect changes to the personnel roster in the competitive area." *Id.* at 20; *see also* Appendix L, *Issuing RIF Notices*.[8]

### 3. OMB and OPM's Centralized Control

Agencies understand themselves to be bound by OPM and OMB's instructions. The EPA Shutdown Plan, for example, explains, "In the event of a 'shutdown', when EPA is required to implement this general guidance, supplemental governmentwide guidance issued by the Office of Management and Budget, the Office of Personnel Management, and the General Services Administration also apply." ECF 17-3 ¶23, Ex. S at 5.[9]

OMB and OPM's orders to federal agencies, and the agencies' understanding that they are bound by those orders, are consistent with the manner in which the federal government has been run since January 2025. President Trump has assigned both OMB and OPM key roles in effectuating the "policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state." Exec. Order No. 14219 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); *see also, e.g.*, Exec. Order No. 14210 (Feb. 11, 2025).

While centralizing their control (without any statutory authority to do so), OMB and OPM have frequently cloaked their directives in language providing "guidance." For example, although OPM claimed that it was providing only "guidance," this Court found that OPM had "directed agencies across the federal government to terminate their probationary employees *en masse*." *AFGE v. OPM*, 2025 WL 2633791, at *1 (N.D. Cal. Sept. 12, 2025). Similarly, in relation to the OMB/OPM memorandum implementing Executive Order 14210, this Court also rejected Defendants' argument that they "were merely providing guidance"; rather, the Court found, "[l]ike other directives from the current administration, … the memo 'amounted to a command, not a suggestion.'" *AFGE v. Trump*, 784 F.Supp.3d 1316, 1352 (N.D. Cal. 2025) (quoting *New York v.*

---

[8] Available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping_appx.pdf.

[9] No agency-level employee would have ordered employees to work on RIFs during the shutdown without the OMB and OPM directives to do so because of the serious consequences of violating the Antideficiency Act ("ADA"). *See* 31 U.S.C. §1350.

*Trump*, 769 F.Supp.3d 119, 136 (D.R.I.)); *see also AFGE v. Trump*, 784 F.Supp.3d at 1327 ("Defendants maintain that the federal agencies are acting of their own accord and not at the President's direction, asking this Court to review the relevant executive actions using tunnel vision and ignore whatever may be happening on the ground. Numerous courts have rejected similar arguments in recent months.").

### 4.    The Decision to Use Shutdown Layoffs for Partisan Political Ends

As the shutdown approached and after it began, the President, OMB Director Vought, and other Administration officials have publicly and repeatedly acknowledged their plans to use shutdown layoffs as political pressure on their Democratic opponents.

● September 30, 2025, President Trump:  "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them.  Like cutting vast numbers of people out, *cutting things that they like, cutting programs that they like*."  ECF 17-3 ¶13, Ex. J at 2 (emphasis added).   Further, he stated, "*We can get rid of a lot of things that we didn't want, and they'd be Democrat things*."  ECF 17-1 at 10 (emphasis added).  "When you shut it down, you have to do layoffs.…  So we'd be laying off a lot of people that are going to be very affected… *And they're gonna be Democrats*."  *Id.* (emphasis added).

● October 1, 2025, White House spokesperson Karoline Leavitt:  "Unfortunately, because the Democrats shut down the government, the president has directed his cabinet, and the Office of Management and Budget is working with agencies across the board, to identify where cuts can [b]e made…  And we believe that layoffs are imminent.  They are unfortunately a consequence of this government shutdown."  ECF 17-3 ¶16, Ex. M at 3.

● October 2, 2025, President Trump: "I have a meeting today with Russ Vought, he of PROJECT 2025 Fame, to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut, and whether or not those cuts will be temporary or permanent.  I can't believe the Radical Left Democrats gave me this unprecedented opportunity."  ECF 17-3 ¶18, Ex. O.

● October 10, 2025, President Trump:  "the layoffs are "Democrat oriented, because … they started this thing, so they should be Democrat oriented."  ECF 42-2, Ex. A.  "These are people that

the Democrats wanted, that, in many cases, were not appropriate … Many of them will be fired."
ECF 47-2, Ex. E.  "It'll be a lot."  ECF 42-2 Ex. A.

●  October 12, 2025, Vice President Vance:  "[T]he president of the United States wanted to
reopen the government.  He was trying to work with Democrats in order to make that happen. But the
longer this goes on, the deeper the cuts are going to be."  ECF 47-2, Ex. C.

●  October 14, 2025, OMB:  "OMB is making every preparation to batten down the hatches
and ride out the Democrats' intransigence.  Pay the troops, pay law enforcement, continue the RIFs,
and wait."  ECF 47-2, Ex. B.

●  October 14, 2025:  President Trump:  "The Democrats are getting killed in the shutdown,
because we're closing up programs that are Democrat programs that we're opposed to."  ECF 48, Ex.
A.  He stated:  "And they're never going to come back, in many cases….  We're not closing up
*Republican* programs because we think they work …. We're closing up Democrat programs that we
disagree with.  And they're never going to open again."  Shively Decl. ¶8, Ex. F.; *see also id*
(characterizing the targeted programs as "the most egregious, socialist, semi communist, probably not
full communist").

### 5.    RIFs Begin October 10

After weeks of public statements that these RIFs were coming, on October 10, 2025,
Defendants began issuing thousands of RIF notices.  ECF 38, 40, 41, 42, 49-2; *see also* ECF 47-3
¶¶6-7; ECF 47-4. ¶2; ECF 47-5 ¶5.[10]  According to their declarations, Defendants sent individual RIF
notices to employees of the Departments of Commerce, Education, Health and Human Services,
Housing and Urban Affairs, Homeland Security, and Treasury, and sent general notices of future
intent to send RIF notices to employees of the Environmental Protection Agency and Department of
Energy.  ECF 40, 49-2.  The offices that received RIF notices perform work ranging from providing
support to disabled children in public schools, ECF 47-4 ¶9, to managing public health threats, ECF
47-3 ¶¶3, 6.  *See also* Beyersdorf Decl. ¶3 (Census field agent); Crocker Decl. ¶2 (housing
discrimination complaints); Grassman Decl. ¶¶2-3 (employment opportunities for the blind); Johnson

---

[10] After Plaintiffs filed their TRO motion, Defendants revealed that one agency (National Science
Foundation) had also issued RIF Notices earlier in the shutdown, on October 4, 2025.  ECF 62-28.

Decl. ¶2 (National Center for Injury Prevention); Roper Decl. ¶3 (compliance with laws governing sensitive health information).

The RIF notices and the RIF process itself have been riddled with errors.  *See* ECF 47-1, 47-3; *compare* ECF 40 with 49-2.  As information became public, the following became clear:

- HHS issued RIF notices to over 1300 employees, primarily aimed at the Center for Disease Control and Prevention ("CDC"), and then rescinded more than 700 of those notices the next day.  ECF 40, 62-7, 71-3.  As of October 20, HHS now reports a total of 954 RIF notices sent and not rescinded.  ECF 71-3; *see also* ECF 47-1, Ex. E-K; Shively Decl. ¶9, Ex. G.

- Mr. Billy's second declaration had to revise the numbers of his first declaration's "estimates," notwithstanding Defendants' knowledge of the exact number of RIF notices they sent. *Compare* ECF 40 with ECF 49-2.

- Agencies sent RIF notices to federal employees' work emails, even though the Department of Education and other agencies had instructed employees *not to review work email during the shutdown.*  ECF 47-4; *see also* Kaspar Decl. ¶20; Supp. Erwin Decl. ¶12; Grassman Decl. ¶7-8; Roper Decl. ¶6; Johnson Decl. ¶5.

- HHS required its human resources employees to work without pay to issue RIFs to their fellow employees, and then issue RIFs to themselves, leaving no one remaining at the agency to address human resources questions and issues.  ECF 47-3.

- HHS continued to issue revised RIF notices through October 15, contrary to the most recent agency declaration which stated notices were sent on October 10.  *Compare* ECF 71-3 ¶4 (Nagy Decl.) *with* Roper Decl. ¶¶6-7, Exs. A, B.  The notices dated October 15 (signed by Mr. Nagy) contained different separation dates from those issued electronically to the same people on October 10.  *Id.*

### 6.    History of These Emergency Proceedings

Plaintiffs filed their complaint on September 30, 2025 (ECF 1), and after Defendants announced imminent RIF plans, an amended complaint and TRO Motion on October 4 (ECF 16, 17).  This Court issued a briefing and hearing schedule in which it directed Defendants to address, and to support with evidence, the following:

(1) the status of any currently planned or in-progress RIF notices to be issued during/because of the government shutdown, including the earliest date that those RIF notices will go out;

(2) which of the defendant agencies anticipate issuing RIF notices during/because of the government shutdown and the estimated number of employees at the defendant agency who will receive such RIF notices; and

(3) whether any employees at the defendant agencies have been ordered back to work during the government shutdown in order to effectuate the issuance of RIF notices.

ECF 27 at 1 (requiring Defendants to respond by October 10, 2025).

When Plaintiffs learned RIF notices were to issue that day, Plaintiffs filed a supplemental TRO motion on October 10. ECF 38. In response to the Court's order, Defendants then filed the first Billy declaration, after Defendants issued their RIF notices. ECF 40. That declaration revealed the agencies that had issued RIF notices beginning October 10 and "estimated" the number of RIF'd employees. *Id.* ¶7. But it declined to identify any agencies with "planned" or "anticipate[d] RIFs," ECF 27 at 1, stating only that "other Defendant agencies … may actively be considering whether to conduct additional RIFs" or "making predecisional assessments," ECF 40 ¶9.

This Court then advanced the TRO hearing to October 15 and directed Defendants to "file a supplemental declaration by October 14" that would, among other things, "updat[e] as needed the information provided in the Billy Declaration …, in response to the questions the Court previously issued." ECF 43 at 1-2. Defendants filed a second Billy Declaration on October 14, "provid[ing] an updated accounting of the agencies that have begun issuing RIFs" but again failing to reveal which agencies were actively planning additional imminent RIFs. ECF 49-2 ¶4.

This Court granted a TRO on October 15, 2025. ECF 56. The Court found that it had jurisdiction, Plaintiffs had standing, and Plaintiffs had ripe and cognizable claims. *Id.* at 3-4. The Court determined that Plaintiffs' APA claims were likely to succeed and that other factors favored injunctive relief, which would "preserve the status quo and prevent irreparable harm." *Id.* at 4-5. The TRO therefore enjoined and stayed Defendants from issuing any RIF notices during the shutdown, and from taking further actions to implement RIF notices issued on or after October 10, "to federal employees in any PPA (program, project, or activity) that includes any bargaining unit or member represented by any Plaintiff." *Id.* at 5. And it ordered Defendants to provide an "accounting of all RIFs, actual *or imminent*, that are enjoined by this TRO, including but not limited to a description of the agency that imposed *or is planning to impose* the enjoined RIF, the number of employees included in the enjoined RIF, and description of the PPAs that Defendants included in the enjoined RIF." *Id.* (emphases added).

On October 16, 2025, the day after this Court issued the TRO, Plaintiffs learned that the

Department of Interior (DOI) was planning a large-scale RIF commencing October 20, 2025. ECF 59-1. The preparations for this RIF had not been revealed in either Billy declaration. ECF 40, 49-2. Plaintiffs sought confirmation or denial of these plans from Defendants, who declined to provide any information, *id.*, although it was later revealed that Plaintiffs' information was accurate and that DOI had intended to imminently issue RIF notices to thousands of employees. ECF 62-11, 67-1.

Plaintiffs immediately moved for an urgent hearing, and the Court "advanced" the deadline "for disclosure *of planned RIFs*" and how "defendants intend to comply with the TRO." ECF 59 (emphasis added). Plaintiffs moved the next morning to modify the TRO to extend relief to three other union Plaintiffs. ECF 64. Defendants filed declarations from each enjoined agency but again, other than DOI, did not reveal planned or anticipated RIFs at any other agencies that were enjoined by the TRO. ECF 62-1 to 62-32, 66-1, 67-1. These declarations also made clear that Defendants had adopted, and premised their compliance declarations on, an overly narrow and incorrect construction of the TRO. ECF 68. Following a hearing, the Court clarified its prior TRO to dispel Defendants' asserted confusion, modified the TRO to extend relief to three new unions, and required, again, that Defendants provide the "accounting of all RIFs actual *or imminent*, that are enjoined by this TRO" including "any RIFs that have been or are being planned or prepared to be issued during the federal government shutdown" by October 20, 2025. ECF 70 (emphasis added).

On October 20, Defendants filed new declarations from three agencies (DOI, HHS, and Commerce) that described prior RIFs (at HHS and Commerce) and the intended RIF at DOI. ECF 71-1, 71-2, 71-3. They still identified no additional "planned" RIFs enjoined by the TRO (despite OMB Director Vought's October 15 statement that he expected to RIF 10,000 people, *supra*, 6).

Notwithstanding Defendants' consistent refusal to reveal imminent RIFs as required by this Court, the record evidence conclusively establishes that, absent injunctive relief, Defendants intend to impose additional RIFs during the shutdown. *See* ECF 62-11, 67-1; *see also* Shively Decl., Exs. B, C (Vought Oct. 15, 2025 statements); ECF 48, Ex. A (Oct. 14 President statements); ECF 47-2, Ex. D (Oct. 11 senior Administration official: "*More RIFs will be coming*, and the court filing is just a snapshot in time, a senior administration official said, speaking on the condition of anonymity to

discuss personnel matters.") (emphasis added); ECF 47-1, Ex. T (EPA Oct. 10 Notice of Intent to RIF: "*The decision to conduct a RIF has been made*….") (emphasis added).

### B. The Impact of the October 10 and Additional RIFs on Plaintiffs

Defendants began issuing RIF notices to federal employees represented by Plaintiffs across federal agencies on and shortly after October 10, and this Court's TRO prevented (at least) more than 2,000 additional RIF notices from going out to DOI employees represented by Plaintiffs.  ECF 71-2. The employees who have received such RIF notices include individuals who have spent many decades in federal employment and devoted their entire careers to public service.  *See*, *e.g.*, Beyersdorf Decl. ¶2; Stevens Decl. ¶3; Crocker Decl. ¶13; Washington Decl. ¶¶8-9; Roper Decl. ¶3.

The receipt of RIF notices, presenting the imminent threat of layoff and attendant loss of health benefits, has "thrown" employees' lives "into significant turmoil."  ECF 17-6 ¶11; *see also* ECF 17-4 ¶¶11-15 (fired employees lose income and health benefits for families); ECF 17-5 ¶9 (fired employees face inability to obtain comparable employment); ECF 17-6 ¶¶11-14 (similar).

RIF'd employees represented by Plaintiffs are suffering from significant emotional stress, including because of concern that they will be unable to pay essential bills and forced to uproot their lives.  *See*, *e.g.*, Beyersdorf Decl. ¶6 ("I am not sure how we will pay our utility bills, make our monthly car payment, or afford groceries."); Grassman Decl. ¶13 ("Losing my job means that my husband and I may have to move to an area with a lower cost of living in order to afford housing."; also describing difficulty of entering new community as blind family); Roper Decl. ¶14 ("My job allows me to support my family, which consists of myself and my child who is away at college…[and] depends on me for financial support"); Crocker Decl. ¶9 ("The RIF has also left me with no way to pay my rent and other bills."); Stevens Decl. ¶8 ("Potentially losing my job in a couple of months has also put a significant strain on my family's financial situation... [U]nless I can find other comparable work, we might have to move."); Medrano Decl. ¶11 ("I am worried about whether I will have to break my lease again [as I did after receiving a RIF notice in April] and move back in with my sister"); Johnson Decl. ¶8; Kaspar Decl. ¶18; Washington Decl. ¶¶8-9; Supp. Erwin Decl. ¶¶8-9; ECF 47-3 ¶9; ECF 46-4 ¶15; ECF 47-5 ¶6; Supp. Neuman Decl. ¶18; Biggs Decl. ¶15.

This stress is exacerbated because RIF'd employees face serious barriers to finding substitute

employment with comparable compensation and benefits (or, in some cases, any job at all), especially given the number of former federal employees who are similarly seeking work.  Grassman Decl. ¶12 ("As a fifty-six-year-old woman who is blind, there are not many employment opportunities available to me."); Beyersdorf Decl. ¶8 ("I am 60 years old, and it has been 20 years since I last was on the job market.  I am concerned that, given my age, many prospective employers will not seriously consider me."); Crocker Decl. ¶12; Supp. Erwin. Decl. ¶10; Supp. Neuman Decl. ¶¶16, 23; Medrano Decl. ¶16; Roper Decl. ¶15; Biggs Decl. ¶ 5; ECF 47-3 ¶15; Ronneberg Decl. ¶18.

        As a result, many terminated employees represented by Plaintiffs are suffering from serious anxiety causing physical effects including inability to sleep.  *See, e.g.*, Grassman Decl. ¶14 ("I've experienced a worsening in my post-traumatic stress disorder and anxiety symptoms …, have had to go on a higher dose of my anxiety medication," and have "also had difficulty sleeping and have been experiencing more frequent flashbacks, nightmares, and stomach issues."); Beyersdorf Decl. ¶¶7-8 ("Both my wife and I have had difficulty sleeping due to the stress, often waking up in the middle of the night and finding ourselves unable to fall back asleep."); Johnson Decl. ¶11 ("I cannot sleep at night" and "[t]he stress has made being a new mom very challenging"); Crocker Decl. ¶13 ("I have worked in government for a long time….  During all that time, including during my combat deployment, I have never gone through anything as traumatizing as what I am now experiencing."); Roper Decl. ¶26 ("I experienced a panic attack due to all of the stress and financial uncertainty."). Many federal employees have built their professional identity around their work and are committed to public service, exacerbating the emotional injury caused by the loss of their employment.  Roper Decl. ¶16; Crocker Decl. ¶8; Biggs Decl. ¶16; Medrano Decl. ¶15.  Even those federal employees who have not yet received RIF notices are experiencing harm from concern that they will, and those harms would be exacerbated by the issuance of RIF notices.  Kaspar Decl. ¶19; Lieberman Decl. ¶¶10-13; ECF 17-6 ¶¶13-14; ECF 47-4 ¶13; Ronneberg Decl. ¶¶14-17.

        The emotional distress is particularly acute for those employees who (or whose family members) are facing serious health issues, are pregnant, or have young children who need regular preventive care.  ECF 47-3 ¶9; ECF 47-5 ¶6; ECF 47-4 ¶¶15-16; ECF 17-4 ¶15; ECF 17-6 ¶14; Stevens Decl. ¶7; Crocker Decl. ¶10; Johnson Decl. ¶9; Medrano Decl. ¶¶9, 12 ("I am extremely

concerned about the impact of this financial stress and anxiety on my physical health given that I have a history of stress-induced seizures.").  Such terminated employees are concerned they will soon be unable to pay their medical bills, which may cause them to postpone or forego necessary care for serious health conditions.  Roper Decl. ¶25 ("I am now having to decide whether I can afford those procedures or whether I should delay them or even forgo them altogether").

That these RIF notices have been (or will be) issued during the federal government shutdown is both worsening the existing harm and causing unique harms.  Ordinarily, employees and the Plaintiff unions that represent them work with human resources staff during a RIF notice period to prepare for the employees' separations, which is a complex endeavor.  ECF 47-3 ¶¶10-15; ECF 47-5 ¶¶11-12; ECF 47-4 ¶¶19-20; Kaspar Decl. ¶¶20-21.  During the notice period, agencies are supposed to "[c]onduct employee briefings, town halls, and one-on-one meetings"; "[o]ffer reemployment priority and career transition assistance to eligible employees";[11] and assist employees with severance pay, payment for unused leave, unemployment compensation, health insurance, and other benefits available to employees upon separation.[12]  Employees depend on those services to find other employment options and select the most financially viable options for them and their families during their unemployment, including to ensure that they and their families have health insurance coverage upon their separation.  ECF 47-3 ¶¶10-15; ECF 47-5 ¶12; ECF 47-4 ¶¶19-20; Kaspar Decl. ¶¶20-21; Beyersdorf Decl. ¶9; Stevens Decl. ¶¶7, 9; Crocker Decl. ¶¶10-11.

None of this work can be done during the shutdown while these employees and other agency staff are furloughed, without violating the ADA.  ECF 47-3 ¶¶11-15; ECF 47-5 ¶¶11-12; ECF 47-4 ¶¶19-20; Kaspar Decl. ¶¶20-21; Washington Decl. ¶11.  Indeed, at least one agency, after issuing RIF notices to other employees, RIF'd *the human resources staff*, leaving it with no

---

[11] OPM, *Overview of Reduction in Force (RIF)*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-overview.pdf; *see also* OPM, *Workforce Reshaping Operations Handbook*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

[12] OPM, *Employee Guide to Pay, Leave, and Other Benefits During a Reduction in Force*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/#url=Pay-Leave-Other-Benefits.

one left to inform employees about health insurance continuation, severance, retirement options, unemployment, or other civil service options, and unable to access relevant information itself. ECF 47-3 ¶7; Johnson Decl. ¶18 ("I am unable to help my colleagues who have received RIF notices who would typically be turning to me for support in my role as an Administrative Officer."). Plaintiffs and the employees they represent will therefore suffer irreparable harm from being deprived of the assistance and information they would ordinarily receive during this time period. ECF 47-3 ¶21; ECF 47-5 ¶15; ECF 47-4 ¶¶19-20; Kaspar Decl. ¶¶20-21; Washington Decl. ¶11; Roper Decl. ¶¶19-21, 28 ("Because of the recent RIFs, our members cannot contact the CDC Ethics Office, so there is no way to gain clearance to apply for a particular job."); Johnson Decl. ¶16.

Indeed, because many employees have been instructed not to check their work e-mail during the shutdown, ECF 47-4 ¶3, Ex. A at 3; Kaspar Decl. ¶20; Crocker Decl. ¶7, "the shutdown is preventing some furloughed employees from even knowing that they are being RIF'd." ECF 56 at 5 (citing ECF 47-4, 47-5). Those employees who are eligible for and may want to retire in lieu of being subject to RIFs cannot navigate that process because human resources staff are furloughed. Beyersdorf Decl. ¶9; Roper Decl. ¶19. Employees are unable to obtain information about severance pay, health insurance, or other unemployment benefits for the same reason. Beyersdorf Decl. ¶9; Roper Decl. ¶27; Kaspar Decl. ¶21; Stevens Decl. ¶9; Crocker Decl. ¶11; ECF 47-3 ¶¶14-15; ECF 47-4 ¶¶19-20.

Finally, ordinarily during the RIF notice period, Plaintiffs and federal employees work with agency staff to review and correct errors in the notices or retention registers, which determine the order in which employees subject to a RIF are separated from civil service or reassigned to other positions, and correct other errors in how the RIF was conducted. ECF 47-3 ¶¶16-20; ECF 47-5 ¶¶13-14; Washington Decl. ¶12.[13] The current round of RIFs have been riddled with errors, as publicly disclosed by HHS and reported by Plaintiffs' members. *Supra* at 11; *see also* ECF 47-3 ¶¶6,

---

[13] During previous rounds of RIFs earlier this year, Plaintiffs found numerous errors in the RIF process, which can lead to the termination of the wrong employees. ECF 47-3 ¶16. Plaintiffs have also found errors in RIF notices issued during the shutdown. Washington Decl. ¶12.

17-20; ECF 47-5 ¶14; Washington Decl. ¶12; Supp. Erwin Decl. ¶12; Roper Decl. ¶¶6-7; Johnson Decl. ¶17.  But the shutdown will prevent Plaintiffs and the employees they represent from working together to correct such errors.  ECF 47-3 ¶¶16-20; ECF 47-5 ¶¶13-14; Roper Decl. ¶7; Beyersdorf Decl. ¶9; *see also* ECF 56 at 5 ("errors in RIF notices cannot be corrected because human resources staff are not working") (citing ECF 47-3).

## ARGUMENT

## I.    This Court Should Enjoin Defendants' Shutdown RIFs

Plaintiffs show that preliminary injunctive relief is warranted because they establish (1) likely success on the merits; (2) likely irreparable harm in the absence of the requested preliminary relief; and that (3) the balance of equities and (4) public interest support an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* Fed. R. Civ. P. 65(a), (b)(3).

### A.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on the merits of their claims for the reasons set forth in the Plaintiffs' Motion for a TRO (ECF 17-1) and Reply (ECF 47), incorporated herein by reference.  To date, Defendants have made no argument that their actions are lawful.

First, Plaintiffs previously explained the many ways Defendants' actions violate the APA's prohibition on arbitrary and capricious agency action.  *See* ECF 17-1 at 18-21; ECF 47 at 3-4.  As this Court's held, "the agencies' actions in laying off thousands of public employees during a government shutdown—and in targeting for RIFs those programs that are perceived as favored by a particular political party—is the epitome of hasty, arbitrary and capricious decisionmaking."  ECF 56 at 4.

Plaintiffs also established that Defendants' actions exceed and are contrary to agency authority, so violate the APA and are *ultra vires*.  *See* ECF 17-1 at 14-21; ECF 47 at 3-7.  As this Court also held, "OPM and OMB's direction that agencies consider RIFs during a shutdown rests on illegal grounds."  ECF 56 at 4.  The OMB Lapse Memorandum's statement that "'Federal programs whose funding would lapse and which are otherwise unfunded … are no longer statutorily required to be carried out' … essentially seeks to overturn mandates that Congress has put in place."  *Id.* at 4 (quoting OMB Lapse Mem. at 1).  Additionally, Plaintiffs previously established that Defendants' actions violate the ADA and that those violations are contrary to law and thus may be the subject of

APA claims.  ECF 47 at 4-7 (explaining that no ADA provision precludes judicial review and the remedies the ADA provides do not conflict with those in the APA); ECF 56 at 3-4 (rejecting argument that Plaintiffs cannot use the ADA as a basis for an APA contrary to law claim).

Responding to Defendants' procedural and jurisdictional roadblocks, Plaintiffs also previously established that this Court has jurisdiction and should reach the merits of Plaintiffs' claims.  ECF 47 at 7-8.  This Court agreed:  "[T]his Court has jurisdiction because the types of challenges plaintiffs bring here are not appropriately 'channeled' to administrative bodies that hear challenges to individual employment actions."  ECF 56 at 3 (citing *AFGE v. Trump*, 139 F.4th 1020, 1030-32 (9th Cir. 2025), *stay granted on other grounds sub nom. Trump v. AFGE*, 145 S. Ct. 2635 (2025)).  Plaintiffs also demonstrated that they challenge final agency actions, including OMB and OPM directives and decisions to implement RIFs during the shutdown.  ECF 17-1 at 10-22; ECF 47 at 8-11.  This Court again agreed:  "Plaintiffs' claims are ripe for review: the challenged memorandum and guidance that triggered the RIFs have been issued and are final, even if not all defendant agencies have issued actual RIF notices as of this date."  ECF 56 at 4.  Finally, Plaintiffs established that Defendants' argument that this Court cannot consider Plaintiffs' *ultra vires* claims is contrary to governing law.  ECF 17-1 at 14-18; ECF 47 at 11.

## B.     Defendants Have and Will Continue to Cause Irreparable Harm

Plaintiffs will suffer "likely" irreparable harm in the absence of preliminary relief.  *Winter*, 555 U.S. at 20, 22.  The Ninth Circuit has explained that "it is obvious that 'back pay' is far from an adequate remedy….  It cannot account for harms resulting from loss of income in the interim or for gaps in health-and childcare that accompany job loss."  *AFGE*, 139 F.4th at 1040.  As this Court held, Plaintiffs' members "face loss of income, loss of healthcare, and possible relocation from their homes, all constituting irreparable harm if they do not receive immediate injunctive relief.  *See [AFGE]*, 139 F.4th at 1040."  ECF 56 at 4-5; *supra* at 14.

As this Court previously recognized, issuing RIF notices to employees during a government shutdown is uniquely harmful.  ECF 56 at 5.  Errors may not be corrected, causing employees to face erroneous job loss.  *See supra* at 17-18.  Fired employees will be unable to access information they need in order to obtain unemployment benefits, decide whether to retire, and to maintain necessary

1    health coverage, among other things.  *See supra* at 16-17.

2         This imminent threat of layoff and loss of health benefits, combined with lack of information,

3    a difficult job market, and limited reemployment prospects, is causing significant emotional stress for

4    federal employees who have received RIF notices.  *See supra* at 14.  Emotional harm cannot be

5    compensated by monetary damages.  *See Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701,

6    709-10 (9th Cir. 1988).

7         Finally, employees who receive RIF notices because of political targeting suffer irreparable

8    harm from political discrimination and its accompanying chilling effect, which cannot be remedied

9    by money damages.  *Cf., e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Vazquez-Burgos v.*

10   *Rodriguez-Perez*, 111 F.Supp.3d 135, 139 (D.P.R. 2015).

11        **C.      The Balance of Equities and Public Interest Strongly Support this Injunction**

12        This Court's previous analysis of the balance of the equities applies equally to this

13   preliminary injunction.  ECF 56 at 5.  "The harms suffered by federal employees affected by RIFs are

14   having drastic and imminent public consequences, and 'the government does not "suffer by a

15   temporary preservation of the status quo."'"  *Id.* (quoting *AFGE*, 139 F.4th at 1030 (in turn quoting

16   *AFGE. v. Trump*, 782 F.Supp.3d 793, 827 (N.D. Cal. 2025)).  And the preliminary injunction serves

17   "the public interest" because "[t]here is generally no public interest in the perpetuation of unlawful

18   agency action."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)

19   (citations omitted), *quoted in* ECF 56 at 5.  For all the same reasons previously explained (ECF 17-1

20   at 14-25), these factors weigh heavily in favor of Plaintiffs.

21   **II.    Plaintiffs' Proposed Relief Is Necessary to Maintain the Status Quo and to Prevent
22           Ongoing Irreparable Harm**

23        A preliminary injunction is necessary and appropriate to preserve the status quo and this

24   Court's authority to enter and enforce relief vacating and setting aside Defendants' unlawful actions.

25        **A.      Plaintiffs' Proposed Injunction**

26        As set forth in Plaintiffs' motion and proposed order, Plaintiffs seek a preliminary injunction

27   that enjoins and/or stays, pursuant to 5 U.S.C. §705, Defendants' unlawful actions by 1) prohibiting

28   Defendants from taking any action to issue any RIF notices issued during or because of the federal

government shutdown to federal employees in any PPA[14] that includes any bargaining unit or member represented by any Plaintiff; and 2) prohibiting Defendants from taking any action to administer or implement any RIF notices issued during or because of the federal government shutdown to federal employees in any PPA that includes any bargaining unit or member represented by any Plaintiff, including by requiring Defendants to rescind any RIF notices issued during the shutdown to employees in PPAs that include members or bargaining units represented by any Plaintiff by individually notifying those employees.

Additionally, because it has been difficult for Plaintiffs and the Court to obtain clear and unambiguous information regarding Defendants' actions in compliance with the TRO, Plaintiffs request that each Defendant be ordered to take the following compliance measures:

1)      Within two (2) business days, file an accounting of any RIFs that have been issued on or after October 1, or that were in preparation at the time of this Court's TRO (ECF 56), clarified and modified TRO (ECF 70), and/or preliminary injunction, including at a minimum information identifying: a) the impacted PPAs, including information or parameters (such as a description of the office or program within the agency) used by the Defendant to define the PPAs; b) whether each impacted PPA includes any employees subject to this Court's injunction; c) how many employees are within each such PPA; and d) the number of employees within each such PPA whom Defendant has identified as protected by the Court's injunction.

2)      Within four (4) business days, file for this Court's review and approval a proposed form of a letter to be sent to each employee whose RIF notice must be rescinded under this Court's injunction, which expressly rescinds the prior RIF notice(s).  Defendants' counsel shall provide the proposed letter to Plaintiffs' counsel at least two (2) business days before filing the letter with the Court, to allow the parties to meet and confer as to content and form.  If the parties disagree as to content and form, they will so notify the Court.

---

[14] Plaintiffs use the term PPAs (programs, projects, or activities) because that is the term used by the OMB Lapse Memorandum, which directs agencies to RIF employees in PPAs and to eliminate PPAs that are inconsistent with the "President's priorities" and where funding has lapsed.  *See* ECF 17-3, Ex. A at 1.

3)      Within three (3) business days of the Court's approval of the letter described in the paragraph 2, file declarations from each Defendant required by this injunction to notify employees to whom RIF notices subject to this Court's injunction were issued, confirming that all employees have been sent the Court-approved letter by U.S. mail to the employees' current known mailing addresses, and to any work and personal email addresses known to the Defendant.

4)      Within ten (10) business days of this Court's injunction, file declarations from each Defendant detailing the steps it has taken to comply with this Court's injunction.

**B.      This Injunction Maintains the Status Quo**

The status quo is "the legally relevant relationship between the parties before the controversy arose." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc) (citation omitted).  In determining whether an injunction seeks to alter or maintain the status quo, courts should consider the time immediately prior to the challenged government action.  *Id*. at 684-85.  Thus, in *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), the Ninth Circuit squarely rejected the government's argument that implementation of the disputed government action constituted the relevant status quo for purpose of a preliminary injunction, explaining that "[i]n the government's re-imagining of the status quo in this context, this factor would always tip in the government's favor, effectively rendering the Court powerless to exercise its discretion[.]" *Id.* at 1068-69.  Instead, the Ninth Circuit held that it was the government's action "that altered the status quo for the Plaintiffs." *Id*. at 1068.

Here, the last uncontested status before the "controversy arose," *Fellowship of Christian Athletes*, 82 F.4th at 684, was prior to OMB's unlawful Lapse Memorandum, prior to OPM's instructions that purport to authorize administration of RIFs during a shutdown, and prior to the decision to move forward with RIFs during the government shutdown.  Plaintiffs' requested preliminary injunction restores the status quo for the impacted employees represented by Plaintiffs.

**C.      The Proposed Injunction Is No Broader than Necessary to Remedy and Prevent Plaintiffs' Harms**

An injunction may be as broad as "necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  This requires relief that protects all of Plaintiffs'

members from Defendants' unlawful acts. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (organization with associational standing may "invoke the court's remedial powers on behalf of its members" to obtain injunction that "will inure to the benefit of those members of the association actually injured"); *see also Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342-33 (1977) (even association that was "not a traditional voluntary membership organization" has standing to bring action on behalf of constituents).[15]  But labor organizations do not only represent their members, and Plaintiffs' associational interests as bargaining agents run to all employees in bargaining units that they represent, regardless of whether employees elect membership. *See* 5 U.S.C. §7114(A)(1) (unions must fairly represent all employees in bargaining unit "without regard to labor organization membership"); *NTEU v. FLRA*, 800 F.2d 1165, 1168-69 (D.C. Cir. 1986).

As discussed at the October 17, 2025 status conference, Defendants previously failed to acknowledge the express language and scope of the TRO, and limited Plaintiffs' representational interests to only those bargaining units Defendants currently choose to acknowledge. *See* ECF 68; ECF 62-7 (HHS Decl.).  But Defendants do not dictate the parameters of Plaintiffs' associational interests by (unlawfully) eliminating bargaining rights, and Plaintiffs continue to dispute Defendants' refusal to recognize these units of employees.  Plaintiffs' proposed preliminary injunction therefore seeks relief with respect to all the employees Plaintiffs represent, and applies to RIF notices issued in any PPA (a) in which Plaintiffs have members, (b) in which Plaintiffs represent bargaining units recognized by Defendants, *or* (c) in which Plaintiffs—until recent Executive Orders purporting to remove employees' right to collectively bargain, which are the subject of pending litigation— represented bargaining units that Defendants now refuse to recognize.  *See* ECF 68; *see also*, *e.g.*, ECF 62-7 (HHS Decl.); Kaspar Decl. ¶¶6, 8; Lieberman Decl. ¶4; Supp. Erwin Decl. ¶5; Supp. Neuman Decl. ¶10; Supp. Sutton Decl. ¶3; Biggs Decl. ¶5; Cann Decl. ¶3.  As a practical matter, every union Plaintiff has at least one member (and often many more) within the "former" bargaining

---

[15] Plaintiffs have identified affected members. *See*, *e.g.*, Beyersdorf Decl.; Crocker Decl.; Washington Decl.  In doing so, Plaintiffs have gone beyond what is required for injunctive relief: "Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, … we see no purpose to be served by requiring an organization to identify by name the member or members injured."  *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

units, and thus the PPAs that include bargaining units that Defendants no longer recognize are also

PPAs that include Plaintiffs' members, and are properly subject to the proposed injunction for both

reasons.  Kaspar Decl. ¶8; Supp. Erwin Decl. ¶5; Liberman Decl. ¶4; Supp. Neuman Decl. ¶11;

Sutton Decl. ¶3; Biggs Decl. ¶5; Cann Decl. ¶¶5-7.

Next, Plaintiffs have asked that relief extend, as it did in the TRO, to enjoining the entire RIF

for any PPA containing any of the employees the Plaintiffs represent.  That granting full relief to

Plaintiffs will necessarily, on this record, cause incidental benefit to others (i.e., other employees

within the PPAs) results directly from the choices Defendants have made in structuring these RIFs.

Defendants have chosen to construct their RIFs using the unit of "PPA" (which some agencies have

defined to mean the "competitive area" defined for purposes of a RIF).  *See* ECF 17-3, Ex. A ("RIF

notices should be issued to all employees working on the relevant PPA, regardless of whether the

employee is excepted or furloughed during the lapse in appropriations."); *see also* ECF 62-9 ¶7.

RIFs are conducted with respect to a closed universe of an identified group of employees, according

to and applying detailed, required retention preference rules.  *See* 5 U.S.C. §3502; 5 C.F.R. Pt. 351.[16]

If the Court were to issue an injunction that applied only to certain employees within a PPA, thereby

essentially excising them from the PPA (or competitive area) that is subject to a RIF, the entire RIF

retention preference analysis and rankings would need to be redone, to comply with the law.  *See*

ECF 47-1, Ex. A (sample RIF notices identifying assigned competitive level used to determine

retention ranking).  Thus, there is no practical way to remedy or prevent harm only to Plaintiffs and

the employees they represent in a manner that does not also benefit others, because the Court cannot

---

[16] *See, e.g.*, OPM, *Reductions in Force (RIF) — "Summary" Tab,* available at:
https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/.  As
OPM explains, the agency first defines a competitive area; then it applies criteria to assign
"competitive levels" within that area.  *Id.*  It then applies four specific retention factors to create a
"retention register" that ranks employees within the competitive area:  "The agency lists the name of
each employee on the retention register in the order of the employee's relative retention standing."
*Id.*  Then, the agency uses those rankings to determine which employees to release:  "The agency
releases employees from the retention register in the inverse order of their retention standing."  *Id.*
Further:  "An employee who the agency releases from a competitive level may have bump or retreat
rights to a continuing position on a different competitive level held by another employee with lower
retention standing."  *Id.*  All of this would be disrupted by removing some federal employees, but not
others, from the unit to which the ranking requirements have been applied.

invalidate only part of a RIF consistent with how RIFs must be conducted.

This Court has authority under both the APA and its long-standing equitable power to fashion such relief.  First, the APA gives this Court authority to stay agency action and preserve rights pending its review, even if that affects persons beyond the parties.  *See* 5 U.S.C. §§705, 706(2); *Department of Homeland Sec'y v. Regents of the Univ. of Cal.*, 591 U.S. 1, 9 (2020); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830-31 (2024) (Kavanaugh, J., concurring) ("[T]his Court has affirmed countless decisions that vacated agency actions . . . rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs.") (collecting cases).

Next, the Supreme Court has also long recognized courts' authority to fashion injunctive relief that may properly benefit nonparties when "necessary to redress the [harm to the] complaining parties."  *Califano*, 442 U.S. at 702; *National TPS Alliance v. Noem*, 150 F.4th 1000, 1028-29 (9th Cir. 2025) ("limiting the relief to individual plaintiffs and [association] members is not a workable solution" because it "would effectively mean rewriting [agency's action] in a way that does not comply with the [relevant] statute"); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (relief to all motorcyclists statewide was appropriate when defendants would as a practical matter be unable to apply injunction only to named plaintiffs); *see also Allen v. Milligan*, 599 U.S. 1, 17 (2023) (affirming injunction of redistricting plan); *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022), *reversed and remanded on other grounds*, 600 U.S. 477 (2023) (declining to limit preliminary injunction of student loan forgiveness program to plaintiff states).

In short, collateral benefits to others protected from unlawful government action are no reason to deny an injunction necessary to completely remedy a plaintiff's harm, particularly when the harm arises within a system that implicates the rights of others.  Plaintiffs' proposed preliminary injunctive relief is properly tailored to remedy the irreparable harm Defendants' unlawful conduct is causing for the federal employees Plaintiffs represent.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion and order the preliminary injunctive relief set forth in the accompanying proposed order.

Dated: October 21, 2025                    Respectfully submitted,

                                           Stacey M. Leyton
                                           Barbara J. Chisholm
                                           Danielle E. Leonard
                                           Alice X. Wang
                                           Robin S. Tholin
                                           Talia Stender
                                           ALTSHULER BERZON LLP
                                           177 Post St., Suite 300
                                           San Francisco, CA 94108
                                           Tel.: (415) 421-7151
                                           Fax: (415) 362-8064
                                           sleyton@altber.com
                                           bchisholm@altber.com
                                           dleonard@altber.com
                                           awang@altber.com
                                           rtholin@altber.com
                                           tstender@altber.com

                                    By: */s/ Danielle Leonard*

                                           *Attorneys for All Plaintiffs*

                                           Elena Goldstein (pro hac vice)
                                           Jennie Kneedler (pro hac vice)
                                           DEMOCRACY FORWARD FOUNDATION
                                           P.O. Box 34553
                                           Washington, DC 20043
                                           Tel: (202) 322-1959
                                           egoldstein@democracyforward.org

                                           *Attorneys for All Plaintiffs*

                                           Norman L. Eisen (pro hac vice)
                                           Craig Becker (pro hac vice)
                                           DEMOCRACY DEFENDERS FUND
                                           600 Pennsylvania Avenue SE #15180
                                           Washington, D.C. 20003
                                           Tel: (202) 594-9958
                                           Norman@democracydefenders.org
                                           Craig@democracydefenders.org

                                           *Attorneys for All Plaintiffs*
                                           Rushab Sanghvi (SBN 302809)
                                           AMERICAN FEDERATION OF GOVERNMENT
                                           EMPLOYEES, AFL-CIO
                                           80 F Street, NW

Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

*Yvette M. Piacsek\**
NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM, AFL-CIO
1225 New York Ave. N.W., Suite 450
Washington, D.C. 20005
Tel: (202)216-4428
ypiacsek@nffe.org

*Attorneys for proposed Plaintiff National Federation of Federal Employees, IAM, AFL-CIO*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

*Attorneys for proposed Plaintiff Service Employees International Union, AFL-CIO (SEIU)*

Sarah E. Suszczyk\*
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.
159 Thomas Burgin Parkway

Quincy, MA 02169
Tel: (617) 376-7239
ssuszczyk@nage.org

*Attorneys For proposed Plaintiff National Association of Government Employees, Inc.  (NAGE)*

*\*Pro hac vice application forthcoming*