Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Alice X. Wang (SBN 335224)
Robin S. Tholin (SBN 344845)
Talia Stender (SBN 341654)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

*Attorneys for Plaintiffs*
[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO (AFGE); AFGE LOCAL 1236; AFGE LOCAL 3172; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO (AFSCME); NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM, AFL-CIO (NFFE); SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO (SEIU); NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC. (NAGE); NATIONAL TREASURY EMPLOYEES UNION (NTEU); INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS (IFPTE); and AMERICAN FEDERATION OF TEACHERS (AFT), <br><br> Plaintiffs, <br><br> v. | Case No. 3:25-cv-08302-SI <br><br> **REVISED SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> ADMINISTRATIVE PROCEDURE ACT CASE |

UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official capacity
as Director of U.S. Office of Management and
Budget; UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT;
SCOTT KUPOR, in his official capacity as
Director of the U.S. Office of Personnel
Management; UNITED STATES
DEPARTMENT OF AGRICULTURE;
BROOKE ROLLINS, in her official capacity
as Secretary of the U.S. Department of
Agriculture; UNITED STATES
DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official capacity
as Secretary of the U.S. Department of
Commerce; UNITED STATES
DEPARTMENT OF DEFENSE;  PETE
HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
EDUCATION; LINDA McMAHON, in her
official capacity as Secretary of the U.S.
Department of Education; UNITED STATES
DEPARTMENT OF ENERGY; CHRIS
WRIGHT, in his official capacity as Secretary
of the U.S. Department of Energy; UNITED
STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES;  ROBERT F.
KENNEDY JR., in his official capacity as
Secretary of the U.S. Department of Health
and Human Services; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of the U.S. Department
of Homeland Security; UNITED STATES
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT; SCOTT
TURNER, in his official capacity as Secretary
of the U.S. Department of Housing and Urban
Development; UNITED STATES
DEPARTMENT OF JUSTICE; PAM BONDI,
in her official capacity as Attorney General of
the U.S. Department of Justice; UNITED
STATES DEPARTMENT OF THE
INTERIOR; DOUG BURGUM, in his official
capacity as Secretary of the U.S. Department
of the Interior; UNITED STATES

DEPARTMENT OF LABOR; LORI
CHAVEZ-DEREMER, in her official capacity
as Secretary of the U.S. Department of Labor;
UNITED STATES DEPARTMENT OF
STATE; MARCO RUBIO, in his official
capacity as Secretary of the U.S. Department
of State; UNITED STATES DEPARTMENT
OF TREASURY; SCOTT BESSENT, in his
official capacity as Secretary of U.S.
Department of Treasury; UNITED STATES
DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as
Secretary for the U.S. Department of
Transportation; UNITED STATES
DEPARTMENT OF VETERANS AFFAIRS;
DOUG COLLINS, in his official capacity as
Secretary of Veterans Affairs; CONSUMER
PRODUCT SAFETY COMMISSION; PETER
FELDMAN, in his official capacity as Acting
Chairman of the U.S. Consumer Product
Safety Commission; UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official
capacity as Administrator of U.S.
Environmental Protection Agency; EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION; ANDREA LUCAS, in her
official capacity as Acting Chair of the Equal
Employment Opportunity Commission;
FEDERAL TRADE COMMISSION;
ANDREW N. FERGUSON, in his official
capacity as the Chairman of the Federal Trade
Commission; UNITED STATES GENERAL
SERVICES ADMINISTRATION; MICHAEL
RIGAS, in his official capacity as Acting
Administrator for U.S. General Services
Administration; INSTITUTE OF MUSEUM
AND LIBRARY SERVICES; KEITH E.
SONDERLING, in his official capacity as
Acting Director of the Institute of Museum and
Library Services; NATIONAL
AERONAUTICS AND SPACE
ADMINISTRATION; SEAN DUFFY, in his
official capacity as Acting Administrator for
the National Aeronautics and Space
Administration; NATIONAL ARCHIVES
AND RECORDS ADMINISTRATION;
MARCO RUBIO, in his official capacity as

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

Acting Archivist of the United States;
NATIONAL ENDOWMENT FOR THE
ARTS; MARY ANNE CARTER, in her
official capacity as Acting Chair of the
National Endowment for the Arts;
NATIONAL ENDOWMENT FOR THE
HUMANITIES; MICHAEL MCDONALD, in
his official capacity as Acting Chairman for
the National Endowment for the Humanities;
NATIONAL GALLERY OF ART; Kaywin
Feldman, in her official capacity as Director of
the National Gallery of Art; NATIONAL
SCIENCE FOUNDATION; BRIAN STONE,
in his official capacity as Acting Director of
the National Science Foundation; NATIONAL
TRANSPORTATION SAFETY BOARD;
JENNIFER L. HOMENDY, in her official
capacity as Chairwoman of the National
Transportation Safety Board; NUCLEAR
REGULATORY COMMISSION; David A.
Wright, in his official capacity as Chairman of
the Nuclear Regulatory Commission; UNITED
STATES SMALL BUSINESS
ADMINISTRATION; KELLY LOEFFLER, in
her official capacity as Administrator of the
U.S. Small Business Administration;
SMITHSONIAN INSTITUTION; LONNIE G.
BUNCH III, in his official capacity as
Secretary of the Smithsonian Institution;
UNITED STATES SOCIAL SECURITY
ADMINISTRATION; FRANK BISIGNANO,
in his official capacity as Commissioner of the
U.S. Social Security Administration; UNITED
STATES INTERNATIONAL
DEVELOPMENT FINANCE
CORPORATION; DEV JAGADESAN, in his
official capacity as Acting Chief Executive
Officer of the U.S. International Development
Finance Corporation; PEACE CORPS; PAUL
SHEA, in his official capacity as Chief
Executive Officer of the Peace Corps;
COMMODITY FUTURES TRADING
COMMISSION; CAROLINE D. PHAM, in
her official capacity as Acting Chairman of the
Commodity Futures Trading Commission;
FEDERAL COMMUNICATIONS
COMMISSION; BRENDAN CARR, in his
official capacity as Chairman of the Federal

Communications Commission; FEDERAL
ELECTION COMMISSION; SHANA M.
BROUSSARD, in her official capacity as
Chair of the Federal Election Commission;
U.S. SECURITIES AND EXCHANGE
COMMISSION; PAUL ATKINS, in his
official capacity as Chairman of the U.S.
Securities and Exchange Commission; U.S.
MERIT SYSTEMS PROTECTION BOARD;
HENRY J. KERNER, in his official capacity
as Acting Chairman of the U.S. Merit Systems
Protection Board,

            Defendants.

1

**INTRODUCTION**

2    1.    As the nation headed toward a federal government shutdown on October 1, 2025, in an

3    effort to pressure members of Congress to agree to the Donald J. Trump administration's legislative

4    demands, the administration threatened to inflict punishment on, and further traumatize, federal

5    employees throughout the nation.

6    2.    Existing law provides for a temporary federal government shutdown in the event that

7    Congress does not adopt appropriations legislation by the end of the Fiscal Year.

8    3.    When shutdowns have occurred in the past, and pursuant to federal law, federal

9    employees have been assigned into two categories: "excepted" employees, who continue working

10    during the shutdown but are not paid until appropriations resume; and "non-excepted" employees

11    who are furloughed during a shutdown and receive back pay after a shutdown ends.

12    4.    Despite this well-established practice, the Trump administration has made unlawful

13    threats to dismantle essential federal services and functions provided by federal personnel, deviating

14    from historic practice and violating applicable laws, if a shutdown occurred.

15    5.    Thus, on Wednesday, September 24, 2025, the Office of Management and Budget

16    ("OMB") issued a memorandum threatening that if "congressional Democrats" do not agree to the

17    administration's demands, and the federal government shuts down, there will be mass firings of

18    federal employees.

19    6.    The OMB memorandum takes the legally unsupportable position that a temporary

20    interruption of appropriations eliminates the statutory requirement for all unfunded government

21    programs and directs all federal agencies to "use this opportunity" to consider reductions in force

22    ("RIFs") for any programs for which the funding has lapsed and that are not priorities of the

23    President.

24    7.    Then, on Sunday, September 28, 2025, the Trump administration doubled down on its

25    illegal activity, as OMB and the Office of Personnel Management ("OPM") told agencies that federal

26    employees could work during the shutdown in order to effectuate these RIFs.  But this directive is

27

28

contrary to federal law, because carrying out RIFs is plainly not a permitted (or "excepted") function that can lawfully continue during a shutdown.

8.    The threat of massive layoffs was repeated and reinforced the day before the shutdown began by the White House press secretary who, when asked whether there will be mass layoffs of federal employees, answered, "There will be if Democrats don't keep the government open."

9.    The threats have now become a reality.  On October 1, 2025, the government shutdown began.  Since that time, OMB, OPM, and the federal agencies have moved forward to begin implementing this unlawful scheme to engage in mass layoffs federal employees during the shutdown. Since October 10, 2025, federal agencies have sent RIF notices to thousands of employees. This implementation has meant that, as directed by OMB and OPM, agency employees who are forbidden by federal law to work during the shutdown have performed work to prepare widespread RIF notices..

10.    These actions are contrary to law and arbitrary and capricious, and the cynical use of federal employees as a pawn in Congressional deliberations should be declared unlawful and enjoined by this Court.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. §1331.

12.    Venue is appropriate in this district under 28 U.S.C. §1391(e).  Plaintiffs AFGE, AFGE Local 1236, AFGE Local 3172, AFSCME, NFFE, SEIU, NAGE, NTEU, IFPTE, and AFT represent federal, state, and/or local government employees whose place of employment is within the Northern District of California.

13.    Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

## PARTIES

14.    Plaintiff AFGE is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents approximately 800,000 federal civilian employees through its affiliated councils and locals at 192

1    Departments, agencies and sub-agencies of the federal government (including certain Federal Agency

2    Defendants named herein), and in every state in the United States.  AFGE has more than 17,000

3    members in California and represents tens of thousands of other federal employees in the state.

4        15.    Plaintiff AFSCME is a labor organization and unincorporated association

5    headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union

6    of public employees in the United States, with 1.4 million members organized into approximately

7    3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico.

8    AFSCME members include nurses, corrections officers, child care providers, emergency medical

9    technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with

10   one thing in common:  a dedication to making our communities stronger, healthier, and safer.

11   AFSCME represents federal civilian employees in numerous agencies and departments across the

12   federal government (including certain Federal Agency Defendants named herein), and state and local

13   government employees who rely on the services of the federal government every day.

14       16.    Plaintiff AFGE Local 1236 is a labor organization and unincorporated association

15   headquartered in San Francisco, California.  AFGE Local 1236 represents approximately 74 attorney-

16   advisors at Environmental Protection Agency Region 9 Headquarters in San Francisco, California,

17   and EPA's National Center for Radiation Field Operations in Las Vegas, Nevada.

18       17.    Plaintiff AFGE Local 3172 is a labor organization and unincorporated association

19   headquartered in Pacifica, California.  AFGE Local 3172 represents approximately 1,600 employees

20   at SSA field offices in California and Nevada.  Those employees work in positions including Claims

21   Services Representatives, Claims Specialists, Technical Experts, and other administrative and

22   facilities staff.

23       18.    Plaintiff National Federation of Federal Employees, IAM, AFL-CIO ("NFFE") is an

24   unincorporated association headquartered in Washington, D.C.  NFFE, the nation's first federal

25   union, is a national labor union representing approximately 110,000 professional and non-

26   professional federal government workers across the United States. NFFE is an affiliate of the

27   International Association of Machinists and Aerospace Workers (IAM).  NFFE and its affiliates

28

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

1    represent employees at numerous agencies and departments across the federal government, including

2    in San Francisco, Oakland, and the greater Bay Area.

3          19.    Plaintiff Service Employees International Union, AFL-CIO ("SEIU") is a labor

4    organization of approximately two million working people united by the belief in the dignity and

5    worth of workers and the services they provide.  SEIU's members work in healthcare, the public

6    sector, and property services.  SEIU has over 150 affiliates across the United States, Canada, and

7    Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036.

8    SEIU, together with its local affiliates, including National Association of Government Employees,

9    Inc. ("NAGE"), together represent approximately 80,000 federal sector employees in the United

10   States, numerous agencies and departments across the federal government (including certain Federal

11   Agency Defendants named herein), including nurses, doctors, other healthcare workers, police

12   officers, first responders, office workers, scientists, engineers, analysts, maintenance workers, and

13   more.  SEIU federal sector members provide a broad swath of services and bring a substantial amount

14   of expertise to numerous agencies across the federal government.

15         20.    Plaintiff National Association of Government Employees, Inc. ("NAGE"), also known

16   as the National Association of Government Employees, SEIU Local 5000, is a national labor

17   organization incorporated in the state of Delaware with its place of business at 159 Thomas Burgin

18   Parkway, Quincy, MA 02169.  Founded in 1961, NAGE is an organization of members united by the

19   belief in the dignity and worth of workers and the services they provide, dedicated to improving the

20   lives of workers and their families, and creating a more just and humane society.  NAGE and its local

21   units are the certified exclusive bargaining representative of nearly 75,000 federal employees in 43

22   states, including California, numerous agencies and departments across the federal government

23   (including certain Federal Agency Defendants named herein).

24         21.    Plaintiff National Treasury Employees Union ("NTEU") is a labor organization and

25   unincorporated association with its principal place of business at 800 K Street, N.W., Washington,

26   D.C. 20001, and with eight field offices across the country including in Oakland, California. NTEU

27   negotiates collective bargaining agreements with agency employers, pushes for legislation that

28
     REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

improves federal employees' working lives, and litigates disputes involving federal employees' rights. NTEU is the exclusive bargaining representative of employees in 38 federal departments and agencies (including certain Federal Agency Defendants named herein), proudly representing more than 160,000 federal employees, including more than 8,000 federal employees in California.  NTEU-represented employees include revenue officers, information technology specialists, scientists, food inspectors, program analysts, and park rangers.

22.     Plaintiff International Federation of Professional & Technical Engineers, AFL-CIO ("IFPTE"), is an international labor organization headquartered at 513 C St. NE, Washington, DC, 20002 that represents over 90,000 professional and technical workers in professions such as scientists, researchers, analysts, and engineers.  IFPTE is the exclusive collective bargaining representative of approximately 30,000 federal sector employees working across the nation at multiple agencies (including certain Federal Agency Defendants named herein), such as at the Environmental Protection Agency's Region 9 Headquarters in San Francisco, California; several of the National Aeronautics and Space Administration's centers, including Ames Research Center in Moffett Field, California; and several components of the Department of Defense, including civilian employees of the Department of the Navy in San Diego, California and of the U.S. Army Corps of Engineers in San Francisco, California.

23.     Plaintiff American Federation of Teachers, AFL-CIO ("AFT") represents more than 1.8 million members in more than 3,000 local affiliates across the country.  It is a labor organization and unincorporated association headquartered at 555 New Jersey Ave. N.W., Washington, DC 20001. AFT is a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare and public services for students, their families and communities.  It is committed to advancing these principles through community engagement, organizing, collective bargaining and political activism, and especially through the work done by AFT members.  AFT represents federal employees who work in three departments across the government (all of which are Federal Agency Defendants named herein), and most AFT members, in

both the private and public sectors, depend upon the services provided by federal employees in order to do their jobs and serve their communities.

24.    Defendant Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.  OMB is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §551(1).

25.    Defendant Russell Vought is the Director of OMB and is sued in his official capacity.

26.    Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the APA, 5 U.S.C. §551(1).

27.    Defendant Scott Kupor is the Director of OPM and is sued in his official capacity.

28.    The following federal departments and agencies, including their agency heads, may be referred to collectively herein as "Federal Agency Defendants."  For purposes of this Amended Complaint, the Federal Agency Defendants do not include Defendants OMB or OPM, which will be specifically identified.  The Federal Agency Defendants are sued for their own unlawful conduct and also pursuant to Rule 19 for purposes of effectuating complete relief as to Claims against OMB, OPM, and their agency heads.

29.    Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

30.    Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

31.    Defendant United States Department of Commerce ("Commerce") is a federal agency headquartered in Washington, D.C. Commerce is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

32.    Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

33.     Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C. Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

34.     Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity.

35.     Defendant United States Department of Education ("Education") is a federal agency headquartered in Washington, D.C.  The U.S. Department of Education is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

36.     Defendant Linda McMahon is the Secretary of Education and is sued in her official capacity.

37.     Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C.  Energy is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

38.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

39.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C.  HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

40.     Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.

41.     Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

42.     Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity.

43.     Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C.  HUD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

44.     Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity.

45.    Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.  DOJ is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

46.    Defendant Pam Bondi is the Attorney General and is sued in her official capacity.

47.    Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C.  Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

48.    Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

49.    Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C.  DOL is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

50.    Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

51.    Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

52.    Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.

53.    Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C. Treasury is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

54.    Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.

55.    Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C. DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

56.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.

57.     Defendant United States Department of Veterans Affairs ("the VA") is a federal agency headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

58.     Defendant Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity.

59.     Defendant Consumer Product Safety Commission ("CPSC") is a federal agency headquartered in Bethesda, Maryland.  CPSC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

60.     Defendant Peter Feldman is the Acting Chairperson of the CPSC and is sued in his official capacity.

61.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

62.     Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity.

63.     Defendant Equal Employment Opportunity Commission ("EEOC") is a federal agency headquartered in Washington, D.C.  EEOC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

64.     Defendant Andrea Lucas is the EEOC Acting Chair and is sued in her official capacity.

65.     Defendant Federal Trade Commission ("FTC") is a federal agency headquartered in Washington, D.C.  FTC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

66.     Defendant Andrew N. Ferguson is the FTC Chairman.

67.     Defendant United States General Services Administration ("GSA") is a federal agency headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

68.     Defendant Michael Rigas is the GSA Acting Administrator and is sued in his official capacity.

69.     Defendant Institute of Museum and Library Services ("IMLS") is a federal agency headquartered in Washington, D.C.  IMLS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

70.     Defendant Keith E. Sonderling is the Acting Director of IMLS and is sued in his official capacity.

71.     Defendant National Aeronautics and Space Administration ("NASA") is a federal agency headquartered in Washington, D.C.  NASA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

72.     Defendant Sean Duffy is the Acting Administrator for NASA and is sued in his official capacity.

73.     Defendant National Archives and Records Administration ("NARA") is a federal agency headquartered in College Park, Maryland.  NARA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

74.     Defendant Marco Rubio is the Acting Archivist of NARA and is sued in his official capacity.

75.     Defendant National Endowment for the Arts ("NEA") is a federal agency headquartered in Washington, D.C.  NEA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

76.     Defendant Mary Anne Carter is the Acting Chair of the National Endowment for the Arts and is sued in her official capacity.

77.     Defendant National Endowment for the Humanities ("NEH") is a federal agency headquartered in Washington, D.C.  NEH is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

78.     Defendant Michael McDonald is the Acting Chairman of NEH and is sued in his official capacity.

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

79.     Defendant National Gallery of Art ("NGA") is a federal agency headquartered in Washington, D.C.  NGA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

80.     Defendant Kaywin Feldman is the Director of NGA and is sued in her official capacity.

81.     Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia.  NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

82.     Defendant Brian Stone is the Acting Director of the NSF and is sued in his official capacity.

83.     Defendant National Transportation Safety Board ("NTSB") is a federal agency headquartered in Washington, D.C.  NTSB is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

84.     Defendant Jennifer L. Homendy is the Chair of the NTSB and is sued in her official capacity.

85.     Defendant Nuclear Regulatory Commission ("NRC") is a federal agency headquartered in Rockville, Maryland.  NRC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

86.     Defendant David A. Wright is the Chair of the NRC and is sued in his official capacity.

87.     Defendant United States Small Business Administration ("SBA") is a federal agency headquartered in Washington, D.C. SBA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

88.     Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official capacity.

89.     Defendant Smithsonian Institution ("Smithsonian") is a federal agency headquartered in Washington, D.C.  Smithsonian is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

90.     Defendant Lonnie G. Bunch III is the Secretary of the Smithsonian and is sued in his official capacity.

91.     Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

92.     Defendant Frank Bisignano is the Commissioner of the SSA and is sued in his official capacity.

93.     Defendant United States International Development Finance Corporation ("DFC") is a federal agency headquartered in Washington, D.C.  DFC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

94.     Defendant Dev Jagadesan is the DFC Acting Chief Executive Officer and is sued in his official capacity.

95.     Defendant Peace Corps is a federal agency headquartered in Washington, D.C.  The Peace Corps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

96.     Defendant Paul Shea is the Chief Executive Officer of the Peace Corps, currently responsible for leading the agency.  He is sued in his official capacity.

97.     Defendant Commodity Futures Trading Commission (CFTC) is a federal agency headquartered in Washington, D.C.  The CFTC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

98.     Defendant Caroline D. Pham is the Acting Chairman of the CFTC.  She is sued in her official capacity.

99.     Defendant Federal Communications Commission ("FCC") is a federal agency headquartered in Washington, D.C.  The FCC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

100.    Defendant Brendan Carr is the Chairman of the FCC.  He is sued in his official capacity.

101.    Defendant Federal Election Commission ("FEC") is a federal agency headquartered in Washington, D.C.  The FEC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

102.     Defendant Shana M. Broussard is the Chair of the FEC.  She is sued in her official capacity.

103.     Defendant U.S. Securities and Exchange Commission ("SEC") is a federal agency headquartered in Washington, DC.  The SEC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

104.     Defendant Paul S. Atkins is the Chairman of the SEC.  He is sued in his official capacity.

105.     Defendant U.S. Merit Systems Protection Board ("MSPB") is a federal agency headquartered in Washington, D.C.  The MSPB is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

106.     Defendant Henry J. Kerner is the Acting Chairman of the MSPB.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     The Executive's Prior Actions to Order Large-Scale RIFs

107.     Since taking office, President Donald J. Trump has enlisted the OMB as well as other agencies and officials of the federal government in a wide-ranging plan to dramatically reduce the size of the federal workforce, including through unlawful means.

108.     Defendant Vought has made clear that the arbitrary, cruel, and punitive manner in which this plan has been implemented is part of the objective.  As he stated in speeches before officially joining the Trump administration: "We want the bureaucrats" (referring to federal employees) "to be traumatically affected."  "When they wake up in the morning," he stated, "we want them to not want to go to work because they are increasingly viewed as the villains…  We want to put them in trauma."[1]

---

[1] Molly Redden, Andy Kroll, Nick Surgey, *'Put them in trauma': Inside a key MAGA leader's plans for a new Trump agenda*, Government Executive (Oct. 28, 2024), https://www.govexec.com/management/2024/10/inside-key-maga-leaders-plans-new-trump-agenda/400607/.

109.    On January 20, 2025, the President created "United States DOGE Service" ("DOGE Service" or "USDS") to engage in his project of radically transforming the size and scope of the federal government.  Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) (Establishing and Implementing the President's "Department of Government Efficiency').  That Order reorganized and renamed the U.S. Digital Service as DOGE.  *Id.*  The President's January 20 Order "further established within USDS … a temporary organization known as the 'U.S. DOGE Service Temporary Organization' … headed by the [DOGE] Administrator and … dedicated to advancing the President's 18-month DOGE agenda" and "DOGE Teams" embedded at each agency and jointly appointed by DOGE and the agency head.  *Id.*  The Administration has never made public the "18-month DOGE agenda" for the federal government.  *Id.*

110.    On January 20, 2025, the President also issued a Presidential Memorandum imposing a government-wide hiring freeze on all federal agencies, with limited exceptions.  The White House: *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[2]  The President generally ordered: "this freeze applies to all executive departments and agencies regardless of their sources of operational and programmatic funding."  *Id.*  The President then ordered DOGE, OMB, and OPM to create a plan to reduce the size of the federal government.  *Id.* ("Within 90 days of the date of this memorandum, the Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition.").

111.    The President issued numerous other directives aimed at furthering the goals of transformation of the government and federal employment according to his vision, at each step enlisting the aid of OPM, OMB and/or USDS to implement his directives.  *See* Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing) (OMB and OPM); Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 20, 2025) (Reforming the Federal Hiring Process and Restoring Merit to Government Service) (OMB, OPM, USDS, working with "the Assistant to the President for Domestic Policy"); Exec. Order No. 14171,

---

[2] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

90 Fed. Reg. 8625 (Jan. 20, 2025) (Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce) (OPM); Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) (OMB); Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative) (OMB, OPM, and USDS).

112.    In the President's own words: "It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state." Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative) (enlisting USDS and OMB); *see also* Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) (Implementing the President's Department of Government Efficiency Cost Efficiency Initiative: enlisting USDS in "a transformation in Federal spending").

113.    The President also eliminated certain agencies with the following proclamation:

> It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people. This order commences a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary. Reducing the size of the Federal Government will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation.

Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy) (enlisting OMB and OPM to eliminate the Presidio Trust; the Inter-American Foundation; the United States African Development Foundation; and the United States Institute of Peace).

114.    The President further enlisted OMB to "reduce the performance" of the following agencies to "the minimum presence and function required by law": the Federal Mediation and Conciliation Service; the United States Agency for Global Media; the Woodrow Wilson International Center for Scholars in the Smithsonian Institution; the Institute of Museum and Library Services; the United States Interagency Council on Homelessness; the Community Development Financial Institutions Fund; and the Minority Business Development Agency. Exec. Order No. 14238, 90 Fed.

Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy).  The President

explained:  "This order continues the reduction in the elements of the Federal bureaucracy that the

President has determined are unnecessary."  *Id.*

115.    The President also ordered the "closure" of the United States Department of Education

and transfer of certain functions to other agencies.  Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar.

20, 2025) (Improving Education Outcomes by Empowering Parents, States, and Communities).  The

President likewise closed the United States Agency for International Development, firing nearly all of

its staff, and subsumed what remained into the State Department,[3] as well as shuttered the Consumer

Financial Protection Bureau, attempting to fire nearly all of its staff as well.[4]

116.    The Trump administration has taken a series of other actions aimed at deconstructing

and drastically reducing the size of the federal government, including numerous "voluntary"

resignation programs beginning in January 2025 with the federal government-wide "Fork in the

Road" deferred resignation program and continuing to the present day in various agencies and under

various names; the unlawful termination of probationary employees nationwide in February 2025; the

placement of employees throughout the federal government on administrative leave for a variety of

reasons; and wide-scale RIFs in tens of federal agencies including tens of thousands of employees at

the U.S. Departments of Health and Human Services ("HHS"), Housing and Urban Development

("HUD"), Labor, and State, as well as the Environmental Protection Agency and Small Business

Administration.

117.    In many cases, the federal government has recognized the need to reinstate or rehire

federal employees who were previously RIFed or whose resignations were previously accepted.  For

example, the Internal Revenue Service reduced its workforce by tens of thousands of employees

---

[3] Stewart Patrick, *Trump's Move to Gut USAID Reveals the Crux of His Foreign Policy*, Carnegie Endowment for Int'l Peace (Feb. 4, 2025), https://carnegieendowment.org/emissary/2025/02/usaid-trump-foreign-aid-policy-why/.

[4] Hugh Son and Daniel Arkin, *Trump administration and Musk's DOGE plan to fire nearly all CFPB staff and wind down agency, employees say*, NBC News (Feb. 28, 2025), https://www.nbcnews.com/business/business-news/trump-administration-musks-doge-plan-fire-cfpb-staff-close-agency-rcna194217.

during the first half of 2025 but after realizing the consequences of the depletion of essential

personnel has now begun rescinding deferred resignation offers.[5]  After terminating 10,000

employees, HHS similarly reinstated essential employees at the Centers for Disease Control and

National Institutes of Health, acknowledging "we were not able to perform our job" without them.[6]

118.    Many of these RIFs have been implemented pursuant to Executive Order 14210,

which ordered all federal agencies to "commence[]" a "critical transformation of the Federal

bureaucracy" for the purported purpose of "eliminating waste, bloat, and insularity."  Exec. Order No.

14210.  The Executive Order applied to all executive departments and agencies,[7] which include

fifteen executive cabinet-level departments, 5 U.S.C. §101, and hundreds of federal agencies and

commissions.[8]

119.    Executive Order 14210 directed these federal agencies to reduce the number of federal

employees via hiring freezes, hiring/departure ratios, and OMB and DOGE control of agency hiring.

Exec. Order No. 14210, Sec. 3.  It directed all federal agencies to "promptly undertake preparations

to initiate large-scale reductions in force (RIFs)" and to submit "reorganization plan[s]" to OMB that

"discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated."

*Id.*

120.    In making these cuts, the President ordered that "[a]ll offices that perform functions

not mandated by statute or other law *shall be prioritized* in the RIFs, including," with limited

exceptions, the following: "all agency diversity, equity, and inclusion initiatives"; "all agency

initiatives, components, or operations that my Administration suspends or closes"; and "all

---

[5] Natalia Alms & Eric Katz, *IRS is canceling its layoff plans, will ask some it fired or pushed out to return*, Gov't Exec. (August 22, 2025), https://www.govexec.com/workforce/2025/08/irs-canceling-its-layoff-plans-will-ask-some-it-fired-or-pushed-out-return/407620/.

[6] Ahmed Aboulenein, *US heath secretary Kennedy says he brought back 722 CDC employees, 220 at NIH*, Reuters (June 24, 2025), https://www.reuters.com/business/healthcare-pharmaceuticals/us-health-secretary-kennedy-says-he-brought-back-722-cdc-employees-220-nih-2025-06-24/ (quoting HHS Secretary Robert F. Kennedy Jr.).

[7] Exec. Order No. 14210, Sec. 2(a) (citing 44 U.S.C. §3502).

[8] USA Government, *A-Z index of U.S. Government Departments and Agencies*, https://www.usa.gov/agency-index.

components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website" ("Funding Lapse Plan Staffing Levels"). *Id.* (emphasis added).

121.    On February 26, 2025, OMB and OPM issued a Memorandum to Heads of Executive Departments and Agencies to implement Executive Order 14210.[9]  The Memorandum echoed the President's purposes in transforming the federal bureaucracy, explaining:

> The federal government is costly, inefficient, and deeply in debt.  At the same time, it is not producing results for the American public.  Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.
>
> The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

*Id* at 1.

122.    In the February 26 memorandum, OMB and OPM directed federal agencies to comply with the President's Executive Order by submitting the "Agency RIF and Reorganization Plans" ("ARRPs") required by the Workforce Executive Order to OMB and OPM for "review and approval"; instructed that those ARRPs "should" include "[a] significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required" and that, "[p]ursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions."  *Id.*  OMB and OPM further directed that agencies "should also," among other things, "seek to consolidate areas of the agency organization chart that are duplicative";

---

[9] Russell T. Vought, Charles Ezell, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025), https://www.opm.gov/chcoc/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

"consolidate management layers where unnecessary layers exist"; and "seek reductions in components and positions that are non-critical." *Id.*

123. OMB and OPM, in their February 26 memorandum, also directed agencies to work with USDS in planning required RIFs for non-essential positions, and to use 2019 Funding Lapse Plan Staffing Levels as the "starting point" for identifying those positions that are "essential." *Id*. And agencies were required to identify, among other things, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated" as well as these Funding Lapse Plan Staffing Levels:

> All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

*Id*. Agencies were also instructed to propose a new organization chart and, among other things, competitive areas for large-scale RIFs, relocations of agency bureaus and offices, and components absorbing functions. *Id.*

124. Although the RIF statute and regulations provide that OPM may approve waivers of the 60-day notice period only "[w]hen a reduction in force is caused by circumstances not reasonably foreseeable," 5 C.F.R. §351.801; *see also* 5 U.S.C. §3502, the February 26 OMB/OPM memorandum also specifically invited agencies to "accelerate" their RIF "timelines" by seeking such waivers.

## II.     OMB and OPM's Authority

125. Federal agencies are "creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). Since the founding of the nation, federal courts have recognized that the federal agencies are not created by the President: "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010).

126. Congress has largely delegated authority, particularly for employment decisions, to the heads of each federal agencies (including Federal Agency Defendants), not to the President or to

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

OMB.  5 U.S.C. §3101 ("General authority to employ": "Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); *see also, e.g.*, 26 U.S.C. §§7803, 7804 (IRS: "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.").

127.    OMB and OPM, like other Federal Agency Defendants, are governed by authorizing statutes.  Congress has not granted OMB or OPM the authority to order federal agencies to downsize or reorganize themselves, to assume final decision-making power by requiring agencies to submit such plans for approval, or to RIF employees.  31 U.S.C. §§501-507.

128.    Federal Agency Defendants must exercise their delegated authority for employment decisions within the confines of other congressional statutes, including those setting forth the required statutory functions of each agency, and those governing federal employment broadly.

## III.    The Antideficiency Act and Government Shutdowns

129.    The federal fiscal year runs from October 1 to September 30.

130.    Agencies and programs in the federal government are funded by Congress in several different ways.  Congress authorizes and controls discretionary funding for many agencies and programs through annual appropriations acts.  Other agencies and programs receive mandatory funding, including through multi-year appropriations and budget authority provided in and controlled by other statutes.

131.    For agencies and programs that rely on discretionary funding, Congress and the President must enact interim or full-year appropriations by October 1 (or by the expiration of any continuing resolution ("CR") providing interim funding), or else the government experiences a "funding gap" or lapse in appropriations.[10]

---

[10] Clinton T. Brass et al., Cong. Rsch. Serv., RL34680, *Shutdown of the Federal Government: Causes, Processes, and Effects* (2025), https://www.congress.gov/crs-product/RL34680.

132.    A funding gap that is likely to continue for a full calendar day generally triggers a government "shutdown," in which the affected agencies cease most operations pursuant to the Antideficiency Act, 31 U.S.C. §1341.[11]

133.    The Antideficiency Act prohibits the government from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing] either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."  31 U.S.C. §1341(a)(1)(A)-(B).

134.    The government is also prohibited from accepting voluntary services for the United States, or employing personal services not authorized by law, except in cases of emergency involving the safety of human life or the protection of property.  31 U.S.C. §1342.

135.    Longstanding opinions from the Department of Justice have analyzed "the various exceptions in the Antideficiency Act that permit some continuing government functions" during a shutdown.  *Gov't Operations In the Event of a Lapse in Appropriations*, 1995 WL 17216091, at *3 (Aug. 16, 1995) ("*1995 OLC Op.*") (citing *Auth. for the Continuance of Gov't Functions During a Temp. Lapse in Appropriations*, 43 Op. Att'y Gen. 293 (Jan. 16, 1981) ("*1981 AG Op.*")).  As these opinions explain, Congress has created five narrow categories of exceptions to the Act.

136.    First, government functions that operate under multi-year or indefinite appropriations, including Social Security payments, are not affected, as the funding for these programs does not lapse if Congress and the President fail to enact an annual appropriations act., and thus spending those funds does not violate the Antideficiency Act.  *1995 OLC Op.* at *3.[12]

137.    Second, Congress has expressly authorized certain "agencies to enter into contracts or to borrow funds to accomplish some of their functions," such as the Department of Defense authority

---

[11] *See id.*

[12] Activities that have funds available are often referred to as "exempted" from a lapse in appropriations rather than "excepted."  *See* US Environmental Protection Agency Contingency Plan For Shutdown at 4 (March 10, 2025), https://www.epa.gov/system/files/documents/2025-03/epa_contingency_plan_2025_march.pdf ("EPA Shutdown Plan").

to contract for necessary clothing, food, and supplies without an appropriation. *Id.* The Antideficiency Act does not apply to specific activities authorized by law where there is evidence in the statute that Congress intends the funding to continue despite a lapse in appropriations. *Id.*

138. Third, "the Antideficiency Act contemplates that a limited number of government functions funded through annual appropriations must otherwise continue" during a shutdown because they are necessary to other activities expressly required by Congress. *Id.* This exception, known as the "necessary implication" exception, includes, for instance, check-writing functions for Social Security payments (because such payments are not subject to annual appropriations and continue during a lapse), as well as "those minimal obligations necessary to closing [the] agency." *Id.* (quotation omitted).

139. Fourth, as a matter of constitutional avoidance, DOJ has recognized an exception to the Antideficiency Act for "functions instrumental in the discharge of the President's constitutional powers." *Id.* at *4.

140. Finally, the express terms of 31 U.S.C. §1342 allow an exception for services provided in "emergencies involving the safety of human life or the protection of property," but that exception "does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." As explained in the 1995 OLC Opinion analyzing the text and history of this provision, Congress intended this language to "prohibit[] overly expansive interpretations of the 'emergency' exception." *1995 OLC Op.* at *6. The exception requires both "some reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property" and "some reasonable likelihood that the safety of human life or the protection of property would be compromised" in some significant degree, by delay in performance of the function. *Id.* (quoting *1981 AG Op.*) (revising the 1981 Opinion slightly in light of new amendments).

141. Federal employees who violate the Antideficiency Act are subject to adverse personnel actions and to administrative and penal sanctions. 31 U.S.C. §§1349, 1350.

142. To comply with the Antideficiency Act in the event of a lapse in appropriations, agencies prepare "shutdown plans" or "lapse plans" that describe the process for shutting down affected programs.[13] These plans identify the employees excepted from furlough under the Antideficiency Act, and specify under which of the categories of exceptions identified by DOJ each employee qualifies.[14]

143. The length of a shutdown depends on how quickly Congress and the President are able to enact an interim or full-year appropriations act. Although some shutdowns are very brief, others have lasted for several weeks, with the longest beginning on December 21, 2018 and lasting 35 days.[15]

144. Following that shutdown, in 2019, President Trump signed into law the Government Employee Fair Treatment Act, requiring that federal employees "furloughed as a result of a covered lapse in appropriations shall be paid for the period of the lapse in appropriations, and each excepted employee who is required to perform work during a covered lapse in appropriations shall be paid for such work, at the employee's standard rate of pay, at the earliest date possible after the lapse in appropriations." 31 U.S.C. §1341(c)(2).

**IV.    There is No Statutory Authority for Reductions in Force During a Shutdown**

145. When federal agencies undertake a RIF, in which federal employees are laid off due to organizational changes rather than individual performance or conduct, federal statutes and regulations set forth required procedures for agencies to follow.

---

[13] OMB Circular A-11, Preparation, Submission, and Execution of the Budget §124 (July 2024), https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf; *see, e.g.*, EPA Shutdown Plan at 4-5, 10-15; U.S. Merit Systems Protection Board, Shutdown Plan: Contingency Plan for Periods of Lapsed Appropriations at 2, 3, 9 (updated March 11, 2025), https://www.mspb.gov/MSPB_Shutdown_Plan_3.11.2025.pdf ("MSPB Shutdown Plan").

[14] *See, e.g.*, MSPB Shutdown Plan at 3 (providing for two employees to be retained as "Necessary to perform activities expressly authorized by law"); EPA Shutdown Plan at 1 (providing for, among other excepted employees, 597 to be retained as "Necessary to protect life and property").

[15] Justin Murray & Carol Wilson, Cong. Rsch. Serv., R41759, *Past Government Shutdowns: Key Resources* (2025), https://www.congress.gov/crs-product/R41759.

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

146.     The statutes governing RIFs and the accompanying regulations do not provide independent legal authority for agencies to conduct RIFs.  *See* 5 U.S.C. §§3501-3504.  Instead, these statutes and regulations set forth procedures, particularly retention preference procedures, that apply to RIFs that agencies implement.  In particular, the RIF regulations state that these procedures apply when an agency chooses to "release[] a competing employee from his or her competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement, when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization."  5 C.F.R. §351.201(a)(2).  The RIF regulations derive from the Veterans' Preference Act of 1944, among other statutes, which sought to protect veterans in the event of a RIF by providing mechanisms for veterans to move into different remaining positions.

147.     For example, under the processes set out in the RIF regulations, an agency is required to determine the organizational units, geographical areas, and specific positions subject to the RIF, 5 C.F.R. §§351.402-403, and then develop a list of affected employees based on type of employment, veteran preference, length of service, and performance that determines the order in which they are released.  5 C.F.R. §351.501.  Employees who are subject to RIFs ordinarily must receive 60-days' notice, although OPM may approve a shorter 30-day notice in certain circumstances, 5 C.F.R. §351.801(a), and employees who meet certain criteria have the right to be reassigned and displace lower-tenure employees in positions not subject to the RIF, 5 C.F.R. §351.803(b).

148.     These RIF procedures do not apply to furloughs that arise under the Antideficiency Act in the event of a shutdown.  Nothing in the Antideficiency Act or any other statute authorizes RIFs of employees who work in agencies or programs with a lapse in funding.  Instead, the Act expressly provides that all employees who are not paid during a shutdown—whether furloughed or excepted—must receive back pay for that time period once funding is reinstated.

149.     There are two different types of furloughs:  Administrative ("Money-Saving") Furloughs and Shutdown ("Emergency") Furloughs.[16]  "An administrative furlough is a planned

---

[16] *See* Taylor N. Riccard, Cong. Rsch. Serv., IF11703, *Federal Employee Furloughs: Types and Implications* (2020), https://www.congress.gov/crs-product/IF11703.

event by an agency which is designed to absorb reductions necessitated by downsizing, reduced funding, lack of work, or any budget situation other than a lapse in appropriations."[17]  A shutdown furlough "occurs when there is a lapse in appropriations."

150.    The RIF regulations do not apply to shutdown furloughs.  As the Trump administration recently reaffirmed, in OPM's just-updated Guidance document, "Reductions in force (RIF) furlough regulations *... are not applicable to emergency shutdown furloughs* because the ultimate duration of an emergency shutdown furlough is unknown at the outset and is dependent entirely on Congressional action, rather than agency action."[18]

151.    OPM further instructs that, if a shutdown furlough lasts more than 30 days, "agencies should treat it as a second shutdown furlough and issue another adverse action or furlough notice."[19]

152.    The OPM Guidance, in distinguishing between administrative and shutdown furloughs, is consistent with the purpose and the process for implementing RIFs.  A shutdown furlough is based on a temporary lapse in funds, whereas the RIF procedures contemplate permanent or long-term changes to the structure of an agency.

153.    Moreover, the RIF procedures require extensive agency action to plan and implement, which generally cannot legally occur during a shutdown while most employees, including those who would be responsible for planning and implementing such actions, are furloughed and prohibited from carrying out non-excepted duties under the Antideficiency Act.  As explained further below, planning and implementing of a RIF does not qualify under any category of "excepted" work that may be conducted during a shutdown.[20]

---

[17] U.S. Office of Personnel Management, *Furlough Guidance*, https://www.opm.gov/policy-data-oversight/pay-leave/furlough-guidance/.

[18] OPM, *Guidance for Shutdown Furloughs* at 44-45 (September 2025), https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-shutdown-furloughs-sep-28-2025/ ("OPM Guidance") (emphasis added) (specifying that agencies should follow OPM regulations under 5 CFR part 752, for adverse actions rather than applying the RIF procedures).

[19] *Id.* at 44.

[20] *See 1995 OLC Op.* at *3-4; *1981 AG Op.*; OMB Circular A-11, §124.1(a).

154.    On information and belief, during the only prior shutdown lasting for more than 30 days, no federal employees were subject to RIF procedures or received RIF notices.

## V.    As a Shutdown Approached, OMB and OPM Issued Instructions to Agencies to Terminate Federal Employees

155.    Federal government agencies and programs rely on annual funding appropriations through budget legislation adopted by Congress and signed by the President, typically consisting of twelve appropriations bills, one for each Appropriations subcommittee.

156.    Congress has not yet enacted any of the twelve bills for Fiscal Year 2026—which begins on October 1, 2025—that make up the discretionary spending budget.

157.    In the absence of the enactment of full appropriations legislation, Congress may adopt a CR that will temporarily fund the government and keep it open.  CRs may apply only to certain appropriations, or may fund all discretionary functions for as long as the entire year.

158.    CRs differ from regular appropriations legislation in that they often "continue" funding allocations from previous bills at the prior year's level, or through a formula based on the prior year's level.  CRs may be "clean," which is an informal term for a CR that does not contain policy riders or substantive changes to funding levels, or may include provisions that increase or decrease specific items or "policy riders," where certain funding restrictions are specified to dictate policy.

159.    In the absence of appropriations legislation or a CR, the federal government must shut down.  In a "shutdown," federal agencies must discontinue all non-excepted discretionary functions until new funding legislation is passed and signed into law.  Excepted services continue to function, as do mandatory spending programs.

### A.    OMB's Lapse Memorandum

160.    On September 24, 2025, multiple news sources reported on, and some published, a memorandum issued by OMB to federal agencies in preparation for an impending shutdown.[21]

---

[21] *E.g.*, Sophia Cai, *White House to agencies: Prepare mass firing plans for a potential shutdown*, Politico (Sep. 24, 2025), https://www.politico.com/news/2025/09/24/white-house-firings-

161.    This memorandum, known hereinafter as "OMB's Lapse Memorandum," invokes the possibility of a government shutdown as a new basis for downsizing federal agencies through RIFs that the President and OMB have been ordering agencies to implement since the President's February 11, 2025 Executive Order 14210.

162.    OMB's Lapse Memorandum states that "congressional Democrats are currently blocking th[e] clean CR" supported by the Trump administration "due to their partisan demands." *Id.*

163.    OMB's Lapse Memorandum further states that, "[w]ith Respect to those Federal programs whose funding would lapse and which are otherwise unfunded, *such programs are no longer statutorily required to be carried out*." *Id.* (emphasis added).

164.    OMB's Lapse Memorandum cites no authority for this conclusion.

165.    Nor could it; a lapse in funding does not repeal, vacate, or otherwise have any effect on statutory provisions requiring or authorizing agencies to perform specified functions.[22] *See*, *e.g.*, 29 U.S.C. §671 (establishing and giving duties to National Institute for Occupational Safety and Health); 29 U.S.C. §151 et seq. (similar, National Labor Relations Board); 42 U.S.C. §280b

_____

shutdown-00579909.  A copy of the OMB Lapse Memorandum may be found at https://www.politico.com/f/?id=00000199-7e8f-ddde-a199-fedf6c5d0000 and is attached hereto as Exhibit A.

[22] The process for enacting spending bills involves two steps.  First, Congress must pass "authorizing legislation," i.e. "[s]ubstantive legislation ... that establishes and continues the operation of a federal program or agency ... or that sanctions a particular type of obligation or expenditure within a program."  U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 15 (2005); *see also* James V. Saturno, Cong. Rsch. Serv., R46497, *Authorizations and the Appropriations Process* (2023), https://www.congress.gov/crs-product/R46497 ("An *authorization* ... defines the authority of the government to act... By itself, however, an authorization does not provide funding for government activities.").  Second, Congress must pass an "appropriation act," which "generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes."  GAO Glossary of Terms at 13.

"If an authorization of appropriations expires, or if Congress fails to appropriate sufficient funds without explicitly denying their use for a particular purpose, those statutory obligations still exist even though the agency may lack sufficient funds to satisfy them.  The mere failure to appropriate sufficient funds is not enough to consider an agency's statutory duties or obligations to be repealed by implication."  James V. Saturno, Cong. Rsch. Serv., R46497, *Authorizations and the Appropriations Process* (2023), https://www.congress.gov/crs-product/R46497.

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

1   (imposing certain duties upon Director of Centers for Disease Control); 42 U.S.C. §901 et seq.

2   (establishing and giving duties to Social Security Administration); 42 U.S.C. §12651 et seq. (similar,

3   for Corporation for National and Community Service); 42 U.S.C. §4336d (mandating certain

4   environmental studies and reports).

5           166.    Based on its erroneous interpretation of federal law, OMB's Lapse Memorandum

6   continues: "agencies are directed to use this opportunity to consider Reduction in Force (RIF) notices

7   for all employees in programs, projects, or activities (PPAs) that satisfy all three of the following

8   conditions:  (1) discretionary funding lapses on October 1, 2025; (2) another source of funding, such

9   as H.R. 1 (Public Law 119-21) is not currently available; and (3) the PPA is not consistent with the

10  President's priorities." *Id.*

11          167.    OMB's Lapse Memorandum further directs that these "RIF notices will be in addition

12  to any furlough notices provided due to the lapse in appropriation.  RIF notices *should be issued to all*

13  *employees working on the relevant PPA, regardless of whether the employee is excepted or*

14  *furloughed* during the lapse in appropriations." *Id.* (emphasis added).

15          168.    OMB's Lapse Memorandum thus directs agencies to issue RIF notices even to

16  employees that the agency has already determined are excepted on the basis that they are performing

17  work necessary to protect life or property during the shutdown.[23]  In the event that a shutdown lasts

18  for longer than the RIF notice period, then unless those RIF notices are rescinded, those employees

19  would be separated and government services so essential that Congress provided for them to continue

20  without appropriations would be forced to end entirely.

21          169.    OMB's Lapse Memorandum also provides that:  "Once fiscal year 2026 appropriations

22  are enacted, agencies should revise their RIFs as needed to retain the minimal number of employees

23  necessary to carry out statutory functions.  Any proposed RIF plan must be submitted to OMB." *Id.*

24

25  _____

26          [23] Under the EPA Shutdown Plan, for example, 597 employees are excepted as "[n]ecessary
    to protect life and property" for activities including, but not limited to: "emergency and disaster
    assistance," "Superfund response work, where a failure to maintain operations would pose an
27  imminent threat to human life," and maintenance of lab instrumentation, controlled environments,
    and lab animals.

28  REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

170.    OMB's Lapse Memorandum expressly attributes any possible shutdown—as well as the RIFs falsely claimed to be "necessary" because of any shutdown—to the actions of "congressional Democrats," who OMB described as "intend[ing] to break this bipartisan trend and shut down the government in the coming days over a series of insane demands."  It describes a shutdown as pending "if the Democrats choose to pursue one," and concludes in part by stating that "[w]e remain hopeful that Democrats in Congress will not trigger a shutdown."  *Id.*

171.    On information and belief, OMB's Lapse Memorandum is a partisan attempt to pressure members of Congress to accede to the Trump administration's demands in negotiations over a CR, and to punish federal employees and the labor unions that represent them if those members of Congress do not surrender to the President's demands.

172.    This partisan aim of OMB's Lapse Memorandum is highlighted by its language blaming "congressional Democrats" for any shutdown and by Defendant Vought's own statements. Additionally, Defendant Vought recently called the shutdown "a very critical juncture" and said that Republicans have Democrats "in a very good position."[24]

173.    On September 30, 2025, moreover, the Trump administration posted the following statement on HUD's opening page, advancing heightened partisan rhetoric about the shutdown to any person who accesses this official federal government website and its resources: "The Radical Left are going to shut down the government and inflict massive pain on the American people unless they get their $1.5 trillion wish list of demands."[25]

174.    OMB's Lapse Memorandum also seeks to take advantage of the circumstances of a shutdown, and the statutory furloughs of federal employees, to justify further and extensive reductions in force contrary to statutory authority and requirements. Russell Vought has stated in

---

[24] Jennifer Scholtes, Megan Messerly, *'Pain on the bureaucracy': Russ Vought's crusade upends the shutdown fight,* Politico (Sep. 26, 2025), https://www.politico.com/news/2025/09/26/russ-vought-shutdown-layoffs-00581412.

[25] https://www.hud.gov/#openModal.

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

public speeches that "We have ... embarked on deconstructing this administrative state,"[26] and that "We want to make sure that the bureaucracy can't reconstitute itself later in future administrations."[27]

175.     The day before the shutdown began, President Trump himself weighed in as well, threatening that "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them, like cutting vast numbers of people out, cutting things that they like, cutting programs that they like."  He continued, making explicit that this threat would be carried out by Defendants OMB and Vought: "You all know Russell Vought, he's become very popular recently, because he can trim the budget to a level that you couldn't do any other way.  So they're taking a risk by having a shutdown."[28]  These comments built on his threat earlier the same day, when, referring to layoffs during a shutdown, he warned, "Well, we may do a lot, and that's only because of the Democrats."[29]

**B.      OPM's Updated Guidance and Special Instructions**

176.     On September 28, 2025, OPM updated its "Guidance for Shutdown Furloughs" to include a new section on Reductions in Force.[30]  This update was accompanied by a separate

---

[26] Coral Davenport, *The Man Behind Trump's Push for an All-Powerful Presidency*, N.Y. Times (Sept. 29, 2025), https://www.nytimes.com/2025/09/29/us/politics/russell-vought-trump-budget.html.

[27] *Id.*

[28] Alex Gangitano, *Trump floats cutting benefits during shutdown, warns Democrats are taking a risk*, The Hill (Sep. 30, 2025), https://thehill.com/homenews/administration/5529071-trump-floats-cutting-benefits-during-shutdown-warns-democrats-are-taking-a-risk/.

[29] Alex Gangitano, *Trump says there may be 'a lot' of federal workers laid off in government shutdown*, The Hill (Sep. 30, 2025), https://thehill.com/homenews/administration/5528527-federal-government-shutdown-threat/

[30] *Compare* Guidance for Shutdown Furloughs, Internet Archive (archived version from September 25, 2025) https://web.archive.org/web/20250925203852/https://www.opm.gov/policy-data-oversight/pay-leave/furlough-guidance/guidance-for-shutdown-furloughs.pdf *with* OPM Guidance, https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-shutdown-furloughs-sep-28-2025/? (dated September 28, 2025 in the URL, including section titled "R. Reductions in Force").

document entitled "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025," which specifically cites OMB's Lapse Memorandum.[31]

177.    OPM's updated guidance and instruction documents both state that "OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities."[32]  Neither document explains the basis for this determination, nor could they, as this determination is wholly contrary to governing law.

178.    The "work necessary to administer the RIF process" is substantial.  OPM maintains a detailed website and guidance documents for federal agencies that explain the work that must be performed to prepare for and administer any RIF, which can be found at https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/.  As OPM has explained:  "There are six phases to implementing a RIF," which occur over many *months,* and require a "team" to implement.[33]  As OPM's 115-page operations manual for conducting RIFs explains:  "Most RIF actions require some employees to work full-time on personnel actions related to the RIF."[34]  OPM recommends that the RIF Team include human resources staff, including at least manager or leader, and support staff including "staff assistants," clerical support staff," "benefits specialists," and "computer specialists."  *Id.*

179.    Sending RIF Notices is only one of the six phases of the RIF process, but in itself requires substantial work.  According to OPM, this involves "determining each released employee's

---

[31]OPM, Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025 at 9, https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/special-instructions-for-agencies-affected-by-a-possible-lapse-in-appropriations-starting-on-10-1-2025/ ("OPM Special Instructions"). A copy of this document is attached hereto as Exhibit B.

[32] OPM Guidance at 50; OPM Special Instructions at 10.

[33] *See* OPM, *Overview of Reduction in Force (RIF),* available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-overview.pdf; OPM, *Workforce Reshaping Operations Handbook*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

[34] OPM, *Workforce Reshaping Operations Handbook*, *supra* n. 32, at page 13 ("Establishing the RIF Team").

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

31

eligibility for benefits, preparing specific written RIF notices and mandatory attachments, sending notices to other organizations if 50 or more employees receive separation notices, notifying bargaining unit representatives, determining how to deliver RIF notices, preparing packages for separating employees, delivering RIF notices, and re-running RIFs to reflect changes to the personnel roster in the competitive area." *Id*. at 20; *see also* Appendix L, *Issuing RIF Notices*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping_appx.pdf.

180.    "Work necessary to administer the RIF process" does not fall under any of the narrow exceptions to the Antideficiency Act.  *See 1995 OLC Op.* at *3-4; *1981 AG Op.*  Such work is not otherwise "authorized by law" to continue during a lapse in appropriations, 31 U.S.C. §1341, either through a multi-year appropriation or through another statute expressly authorizing agencies to spend nonappropriated funds to implement and administer RIFs.

181.    The administration of a RIF process cannot be part of the allowable "minimal obligations necessary" for "the orderly termination of those functions that may not continue during a period of lapsed appropriations," *1995 OLC Op.* at *3, as OPM itself acknowledges that "[a] RIF process is conducted separately from the process for administering a shutdown due to a lapse in appropriations," OPM Special Instructions at 10.

182.    Administration of RIFs is also not excepted from the Antideficiency Act as "instrumental in the discharge of the President's constitutional powers."  *1995 OLC Op.* at *4.

183.    Administration of a RIF is in no way necessary to protect life or property from imminent harm.  31 U.S.C. §1342; *see 1995 OLC Op.* at *7.

184.    Thus, without any basis for an exception under the law, ordering any employee to work during a shutdown to administer a RIF process would directly violate the Antideficiency Act.

***

185.    Agencies understand themselves to be bound by applicable guidance provided by OMB and OPM in the event of a shutdown.  The EPA Shutdown Plan, for example, explains that:  "In the event of a 'shutdown', when EPA is required to implement this general guidance, supplemental

governmentwide guidance issued by the Office of Management and Budget, the Office of Personnel Management, and the General Services Administration also apply."[35]

186.    On information and belief, and based on the past practice of this administration including in relation to other actions directed at federal employees since January 2025, when OMB and OPM have used language like urging agencies to "consider" taking certain actions or providing "guidance" with respect to federal employees, OMB and OPM have intended and have conveyed to agencies that the language represents mandatory directives and removes agency discretion over whether to comply, and agencies, in turn, have understood such purportedly advisory language to direct them to take the action they have been told to "consider" or the "guidance" they have been told to follow.

187.    The partisan nature of OMB's Lapse Memorandum and OPM's updated guidance and special instructions, and the imminency of the threat of RIFs, were both underscored on September 30, the day before the shutdown began, when White House press secretary Karoline Leavitt, asked whether there will be mass layoffs of federal employees, threatened, "There will be if Democrats don't keep the government open."[36]

C.        **The October Shutdown and Administration's Imminent Plans for RIFs**

188.    On October 1, 2025, the new fiscal year for the federal government began with Congress deadlocked over appropriations for discretionary spending, and the federal government entered a period of temporary shutdown pending Congressional enactment of appropriations legislation.

---

[35] EPA Shutdown Plan at 4.

[36] Alex Gangitano, *White House: Government layoffs coming if Democrats don't prevent shutdown*, The Hill (Sep. 29, 2025), https://thehill.com/homenews/administration/5526761-white-house-warns-democrats-layoffs.

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

189.    That day, OMB Director Vought conducted a telephone call for Congressional Republicans, in which he confirmed that mass firings of federal employees would begin "in a day or two."[37]

190.    In order to send RIF notices to federal employees, agencies must engage in the substantial work as previously described, including by teams of human resources employees to prepare RIF notices.  *E.g.*, OPM, Workforce Reshaping Operations Handbook, Appendix L:  *Issuing RIF Notices*, available at https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping_appx.pdf.  To be ready to issue RIF notices in "a day or two," agency employees necessarily would be engaging in substantial work.

191.    The same day, White House spokesperson Karoline Leavitt confirmed that mass federal layoffs would happen in "[t]wo days, imminent, very soon."[38]  Leavitt further confirmed:  "Unfortunately, because the Democrats shut down the government, *the president has directed his cabinet, and the Office of Management and Budget is working with agencies across the board, to identify where cuts can me made…And we believe that layoffs are imminent*. They are unfortunately a consequence of this government shutdown."[39]  (Emphasis added.).

192.    Similarly, that same day, Vice President JD Vance confirmed that layoffs were imminent and "suggested they would hit every agency."[40]

193.    For layoffs to "hit every agency" within the timeframes predicted by OPM and the White House, every agency would necessarily have staff engaged in substantial work preparing for

---

[37] Meredith Lee Hill, *Vought: Mass firings will begin 'in a day or* two,' Politico (Oct. 1, 2025), https://www.politico.com/live-updates/2025/10/01/congress/russ-vought-mass-layoffs-firings-timeline-shutdown-00589875 ("OMB chief Russ Vought told House Republicans on a private call Wednesday that the administration will start mass reduction in force moves, or firings, of federal workers "in a day or two," according to four people granted anonymity to describe the call."); Coral Davenport, *The Man Behind Trump's Push for an All-Powerful Presidency*, N.Y. Times (Sept. 29, 2025), https://www.nytimes.com/2025/09/29/us/politics/russell-vought-trump-budget.html.

[38] Eric Katz, *White House: Shutdown layoffs are just days away*, Gov. Exec. (Oct. 1, 2025), https://www.govexec.com/workforce/2025/10/white-house-shutdown-layoffs-are-just-days-away/408534/.

[39] Hill, *supra*, note 36.

[40] Katz, *supra* note 37.

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

34

these RIFs.  Agency leadership would have made final decisions regarding which staff would be required to work during the shutdown to implement the RIFs.

194.    On October 2, 2025, the President posted on social media: "I have a meeting today with Russ Vought, he of PROJECT 2025 Fame, to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut, and whether or not those cuts will be temporary or permanent.  I can't believe the Radical Left Democrats gave me this unprecedented opportunity."

195.    On information and belief, OMB, including OMB Director Vought, has directed federal agencies to impose RIFs during the government shutdown.  As the shutdown approached, OMB instructed agencies to plan these RIFs.

196.    On information and belief, OMB is requiring federal agencies to submit plans for RIFs for OMB approval, and has been collecting RIF plans from agencies and providing approvals.

197.    On information and belief, OMB Director Vought is overseeing agency RIFs, including controlling the timing of sending RIF notices during the shutdown.

198.    RIF notices were sent to thousands of employees at multiple agencies starting on Friday, October 10, 2025. Some of those RIF notices were "rescinded" shortly thereafter.

199.    To comply with OMB's directives to all agencies to prepare RIFs, and to send notices, as confirmed by OMB and the White House, all agencies would necessarily have assigned staff be engaged in substantial work preparing for these RIFs prior to issuance of RIF notices and in issuing the RIF notices, and yet neither OMB, the White House, nor Federal Agency Defendants has made these plans public.

V.    **Harm to Plaintiffs**

200.    Plaintiffs AFGE, AFGE Local 1236, AFGE Local 3172, AFSCME, NFFE,SEIU, NAGE, NTEU, IFPTE, and AFT each represent, and have as members, federal employees who work at Federal Agency Defendants that shut down as a result of the pending lapse in appropriations and were directed by OMB that their programs will no longer be statutorily required and that they should implement large-scale RIFs.  Those federal employees will lose their income, their health benefits,

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

and other incidents of employment if subject to a RIF, causing severe irreparable harm to them, their families, and their communities.

201.    Plaintiffs AFGE, AFGE Local 1236, AFGE Local 3172, AFSCME, NFFE, SEIU, NAGE, NTEU, IFPTE, and AFT each represent and have as members federal employees who, if subject to a RIF during the shutdown and then reinstated thereafter, may face claimed ineligibility for the back pay to which they are statutorily entitled.

202.    Plaintiffs AFGE, AFGE Local 1236, AFGE Local 3172, AFSCME, NFFE, SEIU, NAGE, NTEU, IFPTE, and AFT each represent and have as members federal employees who, if they keep their job, will be subject to a reorganization resulting from the large-scale RIFs that makes doing their job more difficult as result of the OMB Lapse Memorandum.  Each federal employee who remains will be required to do more to meet the agency's statutory mission and obligations, without the support of colleagues who, until the implementation of the President's orders, the agency believed were needed to perform the work of the agency.

203.    Each union Plaintiff has the core function of representing employees, including those in federal bargaining units, in collective bargaining and providing counseling, advice, and representation to employees in the event of adverse employment actions.  Each union Plaintiff has and will be imminently prevented, by the RIFs directed by OMB during the federal government shutdown, from exercising those core functions as employee representatives.

204.    Each union Plaintiff has expended substantial time and resources as a result of the OMB Lapse Memorandum and RIF notices, addressing member concerns and attempting to provide employees with effective representation.  Each Plaintiff has been forced to divert resources that would be devoted to representing employees who have, will, or may experience adverse employment actions and/or other representational work.

205.    Each union Plaintiff has been harmed in multiple other ways by the actual and imminent termination of its members, including by the loss of dues income and bargaining power. For example, Plaintiffs AFSCME, and SEIU have been harmed because the well-being, job security, and working conditions of its members who work for state, local government, and private employers

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

36

will be significantly and adversely impacted by the imminent reduction in federal government services occasioned by the OMB Lapse Memorandum and the resulting RIFs.

## CLAIMS FOR RELIEF

### Claim I:
### Administrative Procedure Act, 5 U.S.C §706(2)(A) and (C)
### Against All Defendants
### (Action Not in Accordance With Law and Exceeding Statutory Authority)

206.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

207.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§706(2)(A), (C).

208.    If an "action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law." *Sec. & Exch. Comm'n v. Chenery Corp*., 318 U.S. 80, 94 (1943).

209.    OMB, OPM, and Federal Agency Defendants are agencies subject to the APA.  5 U.S.C. §701.

210.    OMB's issuance of the Lapse Memorandum, OPM's associated issuance of Guidance and Special Instructions for the pending shutdown, the decision to implement RIFs during the government shutdown and the decision to assign staff to prepare RIFs are all final agency actions for the purposes of APA review.

211.    Each of these actions are final, do not reference any further contemplation or future change in course, "mark[ing] the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 156 (1997); 5 U.S.C. §704.  In particular, the Lapse Memorandum directs agencies to consider specific factors outside the applicable statutes and regulations as a basis for RIFs, thus altering the established legal regime and determining the rights from which legal consequences will flow to federal employees.  *Bennett*, 520 U.S. at 156; 5 U.S.C. §704; *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (courts are to take a "pragmatic" approach to applying the *Bennett* finality test).  The OPM Guidance and Special Instructions tell agencies to "except" employees for the purposes of carrying out RIFs during the shutdown.  This

determination is final and legal consequences will flow to those federal employees who should be furloughed but will now be excepted.

212.    OMB's Lapse Memorandum, OPM's associated directives, the decision to implement RIFs during the government shutdown and the decision to assign staff to prepare RIFs are all contrary to the law and exceed statutory authority in at least three independent respects.

213.    First, OMB's Lapse Memorandum directs agencies to take action based on a misinterpretation of federal law, by instructing that "Federal programs whose funding would lapse and which are otherwise unfunded, such programs are no longer statutorily required to be carried out," allowing the agencies to issue RIF notices for the entire program or agency affected.  Exhibit A. The Antideficiency Act prevents the government from authorizing expenditures for these programs *during the lapse in funding*, but nothing in the Act repeals the agency's statutory mission and obligations under the law. In this manner, the OMB Lapse Memorandum unlawfully directs federal agencies to disregard their own authorizing statutes and other statutory requirements that programs be maintained and functions performed.

214.    Second, OMB's Lapse Memorandum is contrary to law and exceeds statutory authority by directing other agencies to issue RIF notices that would be contrary to the requirements of the Antideficiency Act governing the treatment of employees during a shutdown and the laws and regulations governing RIFs.

215.    In particular, the OMB Lapse Memorandum's misinterpretation of the law may deny statutorily required backpay to any employees subject to the RIFs, in the event that a shutdown lasts for longer than the RIF notice period.

216.    Third, OMB's Lapse Memorandum and OPM's associated Guidance and Instructions purport to authorize agencies to administer RIFs as "excepted activities" during a shutdown, in direct violation of the Antideficiency Act, which provides no such exception.  See *1995 OLC Op.*

217.    Agency decisions to require staff to prepare RIFs, and the work performed by staff preparing RIFs and RIF notices, violate the Antideficiency Act.

218.    OMB and OPM have no authority to direct other agencies to apply a misinterpretation of federal law.  Federal Agency Defendants likewise have no authority to violate the Antideficiency Act.

219.    The actions of OMB, OPM, and Federal Agency Defendants therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. §706(2)(A) and exceed statutory authority in violation of 5 U.S.C. §706(2)(C).

### Claim II:
### *Ultra Vires* Unlawful Governmental Action
### Against All Defendants

220.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

221.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

222.    OMB's Lapse Memorandum, OPM's associated directives, the decision to implement RIFs during the government shutdown and the decision to assign staff to prepare RIFs are all contrary to the law and exceed statutory authority in at least three independent respects.

223.    First, OMB's Lapse Memorandum directs agencies to take action based on a misinterpretation of federal law.  The Memorandum instructs that "Federal programs whose funding would lapse and which are otherwise unfunded, such programs are no longer statutorily required to be carried out," allowing the agencies to issue RIF notices for the entire program or agency affected. Exhibit A.  The Antideficiency Act prevents the government from authorizing expenditures for these programs *during the lapse in funding*, but nothing in the Act repeals the agency's statutory mission and obligations under the law. In this manner, the OMB Lapse Memorandum unlawfully directs federal agencies to disregard their own authorizing statutes and other statutory requirements that programs be maintained and functions performed.

224.    Second, OMB's Lapse Memorandum is contrary to law and exceeds statutory authority by directing other agencies to issue RIF notices that would be contrary to the requirements of the Antideficiency Act governing the treatment of employees during a shutdown and the laws and regulations governing RIFs.

225.    In particular, the OMB Lapse Memorandum's misinterpretation of the law may deny statutorily required backpay to any employees subject to the RIFs, in the event that a shutdown lasts for longer than the RIF notice period.

226.    Third, OMB's Lapse Memorandum and OPM's associated Guidance and Instructions purport to authorize agencies to administer RIFs as "excepted activities" during a shutdown, in direct violation of the Antideficiency Act, which provides no such exception.  See *1995 OLC Op.*

227.    Agency decisions to require staff to prepare RIFs, and the work performed by staff preparing RIFs and RIF notices violate the Antideficiency Act.

228.    OMB and OPM have no authority to direct other agencies to apply a misinterpretation of federal law.  Federal Agency Defendants likewise have no authority to violate the Antideficiency Act.

229.    The actions of OMB, OPM, and Federal Agency Defendants therefore exceed OMB, OPM, and the Federal Agency Defendants' authority and are contrary to statute and are therefore *ultra vires*.

**Claim III:**
**Administrative Procedure Act, 5 U.S.C §706(2)(A)**
**Against All Defendants**
**(Arbitrary and Capricious Agency Action)**

230.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

231.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

232.    The APA requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

233.    For the same reasons that OMB, OPM and the Federal Agency Defendants' actions are contrary to law—in particular that they considered, and directed other agencies to consider, irrelevant factors in making the determination of whether to issue RIF notices to entire programs and agencies, while ignoring important aspects of the problem—as well as numerous other independent reasons set forth below, they are also arbitrary and capricious.

234.    First, as previously discussed, OMB's Lapse Memorandum rests on a fundamental misunderstanding of the governing law during a lapse in appropriations, specifically that such a lapse removes statutory obligations of the agency.

235.    Second, OMB's Lapse Memorandum directed that in the event of a RIF, notices "should be issued to all employees working on the relevant PPA, regardless of whether the employee is excepted or furloughed during the lapse in appropriations." Exhibit A. This directive ignores the vital work done by excepted employees, including work to preserve life and protect property, as well as work carried out pursuant to mandatory appropriations. Issuing RIFs to these employees, suggesting that such RIFs are permissible, or directing agencies to conduct such RIFs is inherently arbitrary and capricious.

236.    Third, in providing that RIF notices should be issued to entire programs and agencies, the OMB Lapse Memorandum further ignores any other statutory obligations of the agency that are required to be carried out and for which funding would resume at the end of a shutdown. Instead, the Memorandum provides that "[o]nce fiscal year 2026 appropriations are enacted, agencies should revise their RIFs as needed to retain the minimal number of employees necessary to carry out statutory functions." *Id.* But issuing and revising RIF notices—which require extensive planning and process—based on a temporary funding lapse rather than the agency's determination of its own statutory obligations and capacity ignores the primary factors an agency should consider. At a minimum, reasoned decision-making would not subject employees who are "necessary to carry out statutory functions" to a RIF that would need to later be reversed or "revised."

237.    Fourth, the OMB Lapse Memorandum and OPM's associated Guidance and Instructions direct agencies to treat work, and Federal Agency Defendants are treating work,

necessary to administer the RIF process as excepted from the Antideficiency Act without providing any basis justifying that exception. Ignoring binding federal law is arbitrary and capricious.

238.    Fifth, the OMB Lapse Memorandum and the actions to implement that Memorandum, including RIFs by Federal Agency Defendants, are expressly aimed at influencing the votes of congressional Democrats—and punishing them (and the people they represent) if they do not agree to the Trump administration's appropriations demands—by threatening to implement and implementing unlawful RIFs in the event of any pending shutdown. OMB has no authority to issue directives to agencies, and agencies have no authority to implement those directives, on the pretextual basis of a clearly erroneous interpretation of the law, nor for partisan objectives.

239.    Sixth, the OMB Lapse Memorandum does not consider, or direct agencies to consider, and Federal Agency Defendants are not considering, the important interests, including reliance interests, of constituencies directly impacted by these actions: the federal employees who will be subject to RIFs predicated on temporary shutdown, or subject to a RIF and then potentially a revised (or rescinded) RIF based on the restoration of funding; and the members of the public who will be impacted by the harm caused by the RIFs. Ignoring the interests of the federal employees and members of the public directly impacted by these actions is arbitrary and capricious.

240.    Seventh, the OMB Lapse Memorandum and OPM's associated Guidance and Instructions are inherently contradictory. They direct agencies to carry out RIFs due to the shutdown, but this instruction is in direct conflict with other aspects of OPM's Guidance and Instructions, which explains that "Reductions in force (RIF) furlough regulations … are not applicable to emergency shutdown furloughs because the ultimate duration of an emergency shutdown furlough is unknown at the outset and is dependent entirely on Congressional action, rather than agency action." This confusing, conflicting directive is arbitrary and capricious.

241.    Eighth, the OMB Lapse Memorandum and OPM's associated Guidance and Instructions, and Federal Agency Defendants' actions to implement those directives, depart from these agencies' previous positions—including by directing that employees should be subject to a RIF rather than a furlough during a federal government shutdown, that even excepted employees may be

subject to a RIF, and that administration of RIFs may take place during a shutdown—but fail to acknowledge those changes in position or to provide a reasoned explanation for their departure from those positions.

242.    Ninth, OMB, OPM, and Federal Agency Defendants' actions are arbitrary and capricious because, on information and belief, they are implementing the directive to issue RIFs by singling out and targeting agencies, programs, and employees believed to be "Democrats" and "Democrat agencies."

243.    The actions of OMB, OPM, Federal Agency Defendants and their Directors thus violate the APA because they are arbitrary and capricious under 5 U.S.C. §706(2)(A).

### Claim IV:
### Appropriations Clause
### Against All Defendants

244.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

245.    The Appropriations Clause of the Constitution provides in part that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. Art. I, §9, cl. 7.  The clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).  Congress has not appropriated funds to administer RIFs during the government shutdown.

246.    The actions of OMB, OPM, and Federal Agency Defendants spending funds to administer RIFs during the government shutdown violate the Appropriations Clause of the Constitution.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

1.    Declare that OMB, OPM, and Federal Agency Defendants have exceeded statutory
     authority, acted contrary to law, and acted in an arbitrary and capricious manner in issuing

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

1          the OMB Lapse Memorandum, the associated OPM Guidance and Instructions, the

2          decision to implement RIFs during the government shutdown, and the RIFs themselves;

3     2.   Vacate, hold unlawful, set aside, and stay the OMB Lapse Memorandum and the portions

4          of the updated OPM Guidance and Instructions that purport to authorize administration of

5          RIFs during a shutdown, as well as any and all actions taken pursuant to it including the

6          decision to implement RIFs during the government shutdown, and the RIFs themselves,

7          under 5 U.S.C. §§705 and 706;

8     3.   Enter preliminary and permanent injunctive relief;

9     4.   Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as

10         appropriate; and

11    5.   Grant such other relief as this Court may deem proper.

Dated: October 28, 2025                    Stacey M. Leyton
                                           Barbara J. Chisholm
                                           Danielle E. Leonard
                                           Alice X. Wang
                                           Robin S. Tholin
                                           Talia Stender
                                           ALTSHULER BERZON LLP
                                           177 Post St., Suite 300
                                           San Francisco, CA 94108
                                           Tel.: (415) 421-7151
                                           Fax: (415) 362-8064
                                           sleyton@altshulerberzon.com
                                           bchisholm@altshulerberzon.com
                                           dleonard@altshulerberzon.com
                                           awang@altshulerberzon.com
                                           rtholin@altshulerberzon.com
                                           tstender@altshulerberzon.com

                               By: */s/ Stacey M. Leyton*

                                   *Attorneys for All Plaintiffs*


                                           Elena Goldstein (pro hac vice)
                                           Jennie L. Kneedler (pro hac vice)
                                           DEMOCRACY FORWARD FOUNDATION
                                           P.O. Box 34553

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

44

1

Washington, DC 20043
Tel: (202) 322-1959

2

egoldstein@democracyforward.org
jkneedler@democracyforward.org

3

4

*Attorneys for All Plaintiffs*

5

6

Norman L. Eisen (pro hac vice)
Craig Becker (pro hac vice)

7

STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180

8

Washington, D.C. 20003
Tel: (202) 594-9958

9

Norman@democracydefenders.org
Craig@democracydefenders.org

10

11

*Attorneys for All Plaintiffs*

12

13

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT

14

EMPLOYEES, AFL-CIO
80 F Street, NW

15

Washington, D.C. 20001
Tel: (202) 639-6426

16

Sanghr@afge.org

17

*Attorneys for Plaintiffs American Federation of*

18

*Government Employees, AFL-CIO (AFGE) and AFGE*
*locals*

19

20

Teague Paterson (SBN 226659)
AMERICAN FEDERATION OF STATE, COUNTY,

21

AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.

22

Washington, D.C. 20036
Tel: (202) 775-5900

23

TPaterson@afscme.org

24

25

*Attorneys for Plaintiff American Federation of State*
*County and Municipal Employees, AFL-CIO (AFSCME)*

26

27

28

REVISED SECOND AMENDED COMPLAINT, No. 3:25-cv-08302-SI

Yvette M. Piacsek*
NATIONAL FEDERATION OF FEDERAL
EMPLOYEES, IAM, AFL-CIO
1225 New York Ave. N.W., Suite 450
Washington, D.C. 20005
Tel: (202)216-4428
ypiacsek@nffe.org

*Attorneys for Plaintiff National Federation of Federal
Employees, IAM, AFL-CIO*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

*Attorneys for Plaintiff Service Employees International
Union, AFL-CIO (SEIU)*

Sarah E. Suszczyk*
NATIONAL ASSOCIATION OF GOVERNMENT
EMPLOYEES, INC.
159 Thomas Burgin Parkway
Quincy, MA 02169
Tel: (617) 376-7239
ssuszczyk@nage.org

*Attorneys For Plaintiff National Association of
Government Employees, Inc.  (NAGE)*

*Pro hac vice application forthcoming*