1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

AMERICAN FEDERATION OF STATE
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, et al.,

8

9

Plaintiffs,

10

v.

11

UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET, et al.,

12

Defendants.

13

14

Case No.  25-cv-08302-SI

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND ENJOINING SHUTDOWN-RELATED REDUCTIONS IN FORCE (RIFs)**

Re: Dkt. No. 79

15        On October 10, 2025, federal agencies began laying off thousands of employees in the midst

16   of a government shutdown.  This is unprecedented in our country's history.  The President has

17   publicly stated that the layoffs will be "a lot" and that they "will be Democrat-oriented, because we

18   figure, you know, they started this thing, so they should be Democrat-oriented."  Dkt. No. 42-2

19   ("Walls Decl.") ¶¶ 2-4 & Ex. A.  While the full scope of the layoffs remains unclear, as of about

20   two weeks ago, federal agencies were laying off roughly 4,000 workers during the shutdown.  *See*

21   Dkt. No. 56 at 1 n.1.  Publicly, Office of Management and Budget Director Russell Vought has said

22   that the roughly 4,000 layoffs reported to this Court in the current lawsuit was a "snapshot" and that

23   he "think[s] we'll probably end up being north of 10,000."  Dkt. No. 79-18 ("Shively Decl."), Ex.

24   B (citing Brett Samuels, *Vought Says Layoffs During Shutdown Likely to Exceed 10,000 People*,

25   The Hill (Oct. 15, 2025), https://thehill.com/homenews/administration/5556978-trump-

26   administration-federal-layoffs/ [https://perma.cc/K8H9-36RF]).

27        Typically, by law, a reduction-in-force ("RIF") notice allows for a 60-day period before the

28   employee is terminated.  5 U.S.C. § 3502(d), (e); 5 C.F.R. § 351.801.  This allows employees time

United States District Court
Northern District of California

to prepare, to get their personnel records in order so that they may apply to new jobs, to consult with human resources about the continuation of healthcare or calculation of their benefits, and to consider whether to retire if they are retirement-eligible. But these sorts of preparations are not taking place during the shutdown because the very staff who would normally assist employees facing a RIF are on furlough or are RIF'd themselves. *See, e.g.*, Dkt. No. 47-3 ("Jacobs Decl.") ¶¶ 2, 7 (human resources staff at the Centers for Disease Control and Prevention were brought back into the office over the weekend to work on issuing RIF notices, and then were told "to issue RIF notices to themselves"); Dkt. No. 79-12 ("Beyersdorf Decl.") ¶ 9 (retirement-eligible employee who got RIF notice cannot get information on retirement or severance calculation); Dkt. No. 79-13 ("Stevens Decl.") ¶¶ 4, 9 (employee on maternity leave who got RIF notice cannot get information about benefits and extending health insurance); Dkt. No. 79-17 ("Johnson Decl.") ¶¶ 2, 6, 16 (employee working in human resources got RIF notice, along with entire team, and now cannot get information about her own personnel file).

The record before the Court paints a chaotic picture, with employees wondering what is happening and no one at the agencies able to guide them. Some employees did not even realize the clock was ticking on their pre-termination notice period because their RIF notices were sent to government e-mail accounts, and they were either unable or told not to access work e-mail during the shutdown. Dkt. No. 47-4 ("Gittleman Decl.") ¶ 4 & Ex. A; Dkt. No. 47-5 ("Robinson Decl.") ¶ 8; Dkt. No. 79-11 ("Grassman Decl.") ¶¶ 7-8; Dkt. No. 79-15 ("Washington Decl.") ¶ 7. RIF notices are going out with errors in them, leading employees to wonder whether their service dates and benefits are being properly calculated or whether they are even supposed to be subject to a RIF at all. *See* Washington Decl. ¶ 12 (describing someone in HHS's Division of Primary Prevention (DPP)—which was not subject to RIFs—receiving RIF notice erroneously listing their division as the Division of Targeted Prevention (DTP)—which was subject to RIFs); *see also* Dkt. No. 79-6 ("Erwin Decl.") ¶ 12 (severance pay errors); Dkt. No. 79-9 ("Roper Decl.") ¶¶ 6-7 (performance rating errors, later amended); Johnson Decl. ¶ 17 (service computation date does not match personnel records). The U.S. Department of Health and Human Services erroneously issued 800

RIF notices on October 10 that it later had to rescind.[1]  Unions are hearing from members who have serious health conditions, who are late in their pregnancies or who just had babies, and who worry that their health insurance will be impacted by the RIFs, but there is no one in the office who can answer their questions during the shutdown.  Jacobs Decl. ¶¶ 9, 14; Gittleman Decl. ¶ 16; Robinson Decl. ¶¶ 6, 12; Stevens Decl. ¶¶ 4, 9.

Employees—both those who have gotten RIF notices and those who have not yet—are scared, confused, "terrified" and "traumatiz[ed]."  Roper Decl. ¶ 27; Dkt. No. 79-10 ("Ronneberg Decl.") ¶ 15; Dkt. No. 79-14 ("Medrano Decl.") ¶ 14.  One RIF'd employee at the Department of Housing and Urban Development, who previously served in the United States Air Force, said, "During all that time, including during my combat deployment, I have never gone through anything as traumatizing as what I am now experiencing."  Dkt. No. 79-16 ("Crocker Decl.") ¶ 13.  For some employees, this is the second time they have received RIF notices this year.  Roper Decl. ¶ 14; Medrano Decl. ¶ 6.  Employees were RIF'd earlier this year, terminated, reinstated, and are now being RIF'd again.  Medrano Decl. ¶¶ 4, 6-8.  Workers have filed declaration upon declaration chronicling the stress they have lived under this year, compounded by the government shutdown and now RIF notices on top of that.  *Id.* ¶ 7 ("The constant threat of being fired, which has persisted for months, has caused me tremendous physical and mental distress. . . .  In early April, while I was on administrative leave [in the lead-up to the first RIF], I experienced a severe stress-induced seizure and had to be hospitalized."); Grassman Decl. ¶ 14 (RIF'd worker had to go on higher dose of anxiety medication).

The administration has publicly announced that these RIFs are intended to punish the Democrats.  On the second day of the shutdown, President Trump took to social media to post: "I

---

[1] On October 10, 2025, defendants filed a declaration that 1100-1200 employees at Health and Human Services had received RIF notices.  Dkt. No. 40 ("Billy Decl.") ¶ 7.  On October 14, 2025, defendants filed another declaration explaining that "[a]s a result of data discrepancies and processing errors, RIF notices were issued on October 10, 2025, to approximately 1,760 employees instead of to the 982 employees who were intended to receive RIF notices."  Dkt. No. 49-1 ("Nagy Decl.") ¶ 3.  Defendants then followed up with a third declaration on October 20 that additional notices were rescinded, bringing the total number of RIF notices at HHS during the shutdown to 954.  Dkt. No. 71-3 ("Nagy Suppl. Decl.") ¶ 4 & n.1.

have a meeting today with Russ Vought, he of PROJECT 2025 Fame, to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut, and whether or not those cuts will be temporary or permanent. I can't believe the Radical Left Democrats gave me this unprecedented opportunity." Dkt. No. 92 ("SAC") ¶ 194; Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 2, 2025, at 4:59 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115304455138824245 (last visited Oct. 28, 2025). The memorandum from the Office of Management and Budget that appears to have initiated the shutdown RIFs says the same. *See* Dkt. No. 92-1, SAC, Ex. A ("OMB Lapse Mem.") (directing agencies to "use this opportunity" of the shutdown to consider RIF notices, including in those areas that are "not consistent with the President's priorities" and stating the hope that the RIF "steps outlined above will not be necessary" if "Democrats in Congress will not trigger a shutdown"). On October 21, 2025, President Trump delivered a speech to Republican Senators at a White House luncheon praising Vought as "Darth Vader" and stating, "He's cutting Democrat priorities, and they're never going to get them back. . . . They've caused this, and they've really allowed us to do it." Dkt. No. 88-1 ("Shively Suppl. Decl."), Ex. A (citing Andrew Feinberg, *'We have Darth Vader': Trump introduces Star Wars villain as Republican hero in rambling 'Rose Garden Club' lunch*, The Independent (Oct. 21, 2025), https://www.the-independent.com/news/world/americas/us-politics/trump-rose-garden-darth-vader-b2849596.html [https://perma.cc/AY9F-HSVP].

This order enjoins further shutdown-related layoffs by defendants and pauses the clock on those RIF notices that have issued during the shutdown until this lawsuit can be resolved. A preliminary injunction is appropriate because plaintiffs are likely to prevail on the merits of their claims under the Administrative Procedure Act. If what plaintiffs allege is true, the agencies' actions in laying off thousands of public employees—and in targeting those from a particular political party—during a government shutdown is the epitome of hasty, arbitrary and capricious decisionmaking. In addition, plaintiffs are likely to succeed on their claim that the direction from the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM") that agencies consider RIFs during a shutdown rests on illegal grounds. To preserve the status quo

and prevent irreparable harm in the interim, and because the Administrative Procedure Act requires this Court to "hold unlawful and set aside agency action" where a violation of the Act is found, a preliminary injunction shall issue.  *See* 5 U.S.C. § 706(2).

## BACKGROUND

### I.    Agency and RIF Framework

From the current record, the government shutdown RIFs appear to have been triggered by the Office of Management and Budget and the Office of Personnel Management.  OPM "serves as the chief human resources agency and personnel policy manager for the Federal Government."  U.S. Off. of Personnel Mgmt., *About Us,* https://www.opm.gov/about-us/ [https://perma.cc/45X7-M7JP].  Congress has given to OPM the authority to prescribe regulations for the "order of retention" agencies are to follow in implementing a RIF.  5 U.S.C. § 3502.  Congress has also vested the Director of OPM with a number of functions, though none include the termination of employees from other federal agencies outside of OPM.  *See* 5 U.S.C. § 1103(a).  In another recent case involving RIFs of probationary employees, "OPM concede[d] that it lacks the authority to direct firings outside of its own walls . . . ."  *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780-WHA, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025).

OMB is located within the Executive Office for the President.  *See* 31 U.S.C. §§ 501-507; Act of Sept. 13, 1982, Pub. L. No. 97-258, § 501, 96 Stat. 886.  Like OPM, OMB has its functions laid out in statute.  *See* 31 U.S.C. §§ 501-507.  None of the statutes authorize OMB to terminate employees outside of OMB or to order other agencies to downsize, nor do defendants point to any such authority in their brief.  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 126 (D.D.C. 2025) ("the structure and provisions of Section 503 strongly suggest that OMB occupies an oversight role" and 31 U.S.C. § 503(a)(5) "further indicates that OMB's role is mainly supervisory, rather than directly active").

The laws describing how RIFs are to be conducted are laid out in both statute and regulation. 5 U.S.C. § 3502 lays out the order of retention, accounting for factors such as tenure of employment, military service, efficiency or performance ratings, and whether the employee has a service-

1   connected disability.  5 U.S.C. § 3502(a)-(b).  The statute also requires that the employee may not

2   be released due to a RIF unless the employee and the union are given written notice "at least 60 days

3   before such employee is so released[.]"  *Id.* § 3502(d)(1).  The notice period may be shortened for

4   a particular RIF "if necessary because of circumstances not reasonably foreseeable" but cannot be

5   less than 30 days.  *Id.* § 3502(e).  The RIF regulations "are numerous, spanning an entire Part of the

6   Code of Federal Regulations. . . .  Therefore, properly preparing for and implementing a RIF can

7   often take well over a year."  *State of Md. v. U.S. Dep't of Agriculture*, 151 F.4th 197, 205 (4th Cir.

8   2025) (citing 5 C.F.R. §§ 351.201-351.902; J.A. 235).

9

10   **II.    Government Shutdown**

11      **A.    The Antideficiency Act and Its Exceptions**

12      The federal fiscal year begins on October 1 of each year.  2 U.S.C. § 631.  When the President

13   and Congress fail to reach an agreement on full-year or interim appropriations by this date, federal

14   agencies and programs reliant on discretionary funding experience a "funding gap" or lapse in

15   appropriations.  Clinton T. Brass et al., Cong. Rsch. Serv., RL34680, *Shutdown of the Federal*

16   *Government: Causes, Processes, and Effects* 2 (2025) (hereinafter, "CRS RL34680").  A gap likely

17   to continue for a full calendar day or longer triggers a government "shutdown."  *Id.* at 1.  If funding

18   does not resume in time to continue government operations, an agency must generally cease

19   operations pursuant to the Antideficiency Act.  *Id.* at 5.

20      Article I, Section 9, Clause 7 of the Constitution states, "No Money shall be drawn from the

21   Treasury, but in Consequence of Appropriations made by Law."  The Antideficiency Act prohibits

22   all officers and employees of the federal government from "mak[ing] or authoriz[ing] an expenditure

23   or obligation exceeding an amount available in an appropriation or fund for the expenditure or

24   obligation" and from "involv[ing the] government in a contract or obligation for the payment of

25   money before an appropriation is made unless authorized by law."  31 U.S.C. § 1341(a)(1)(A)-(B).

26   The Antideficiency Act also provides in relevant part that "[a]n officer or employee of the United

27   States Government . . . may not accept voluntary services . . . or employ personal services exceeding

28   that authorized by law except for emergencies involving the safety of human life or the protection

1    of property." *Id.* § 1342.  Federal employees who violate the Antideficiency Act are subject to

2    adverse personnel actions and to administrative and penal sanctions.  *Id.* §§ 1349, 1350.

3            The Department of Justice has recognized that an agency may still incur an obligation in the

4    absence of an appropriation for five "excepted" functions.  *Authority for the Continuance of*

5    *Government Functions During a Temporary Lapse in Appropriation*s, 5 Op. O.L.C. 1 (Jan. 16,

6    1981) ("1981 AG Op."); *Government Operations in the Event of a Lapse in Appropriations*, 1995

7    WL 17216091, at *3 (Aug. 16, 1995) ("1995 OLC Op.").  First, spending funds for government

8    functions that operate under multi-year or indefinite appropriations, including Social Security

9    payments, does not violate the Antideficiency Act, since the funding for these programs does not

10   lapse if Congress and the President fail to enact an annual appropriations act.  1995 OLC Op. at *3.

11   Second, the Antideficiency Act does not apply where Congress expressly provides authority for

12   agencies to enter into contracts or borrow funds to accomplish some of their functions without an

13   appropriation.  *Id.*  Third, known as the "necessary implication" exception, the Antideficiency Act

14   contemplates that a limited number of government functions funded through annual appropriations

15   must continue because they are necessary to other activities expressly required by Congress.  *Id.*

16   Fourth, the Department of Justice has recognized an exception to the Antideficiency Act for

17   "functions instrumental in the discharge of the President's powers."  *Id.* at *4.  Fifth, the Act contains

18   an express exception for services provided in "emergencies involving the safety of human life or

19   the protection of property," but that term expressly "does not include ongoing, regular functions of

20   government the suspension of which would not imminently threaten the safety of human life or the

21   protection of property."  *Id.*; 31 U.S.C. § 1342.  Congress intended this language to "limit the

22   coverage" of the term "emergency" and "prohibit[] overly expansive interpretations of the

23   'emergency' exception."  1995 OLC Op. at *6.  For the emergency exception to apply, first "there

24   must be some reasonable and articulable connection between the function to be performed and the

25   safety of human life or the protection of property," and second, "there must be some reasonable

26   likelihood that the safety of human life or the protection of property would be compromised, in some

27   degree, by delay in the performance of the function in question."  *Id.*

28           To comply with the Antideficiency Act, executive agencies must prepare "shutdown plans"

United States District Court
Northern District of California

7

1   or "lapse plans" that describe the process for shutting down affected programs at their agencies.  2

2   OMB Circular A-11, *Preparation, Submission, and Execution of the Budget* § 124 (July 2024),

3   https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf  [https://perma.cc/L5Y5-HF25].

4   Shutdown plans identify the employees excepted from furlough under the Antideficiency Act and

5   specify under which of the five categories of exceptions identified by DOJ each employee qualifies.

6   CRS RL34680 at 9.  Whereas "excepted" federal employees continue working during the shutdown,

7   "non-excepted" employees are furloughed – that is, they are "prohibited from coming to work" and

8   are placed in a temporary, nonduty, nonpay status.[2]  *Id.* at 10, 13-14.  After a shutdown during his

9   first term, President Trump signed into law the Government Employee Fair Treatment Act of 2019,

10  requiring that federal employees

> furloughed as a result of a covered lapse[3] in appropriations shall be
> paid for the period of the lapse in appropriations, and each excepted
> employee who is required to perform work during a covered lapse in
> appropriations shall be paid for such work, at the employee's standard
> rate of pay, at the earliest date possible after the lapse in
> appropriations ends . . . .

Government Employee Fair Treatment Act of 2019, Pub. L. No. 116-1, § 2, 133 Stat. 3 (1996)

(codified at 31 U.S.C. §1341(c)(2)).


### B.    OMB's Lapse Memorandum

On September 24, 2025, news agencies published a memorandum issued by OMB to federal

agencies to prepare for a possible government shutdown.  SAC ¶ 160 &  Ex. A.  OMB's "Lapse

Memorandum" attributes a possible government shutdown to "congressional Democrats" who

intend to "shut down the government in the coming days over a series of insane demands[.]"  OMB

Lapse Mem. at 2.[4]  OMB's Lapse Memorandum states, "With respect to those Federal programs

---

[2] "Excepted" employees are sometimes referred to colloquially as "essential."  CRS RL34680 at 10.

[3] Under 31 U.S.C. §1341(c)(1)(A), a "covered lapse" in appropriations is defined as "any lapse in appropriations that begins on or after December 22, 2018."

[4] As the Lapse Memorandum lacks page numbers, the Court references the page numbers stamped at the top right-hand corner of the page by the Court's electronic case filing system.

1    whose funding would lapse and which are otherwise unfunded, such programs are no longer

2    statutorily required to be carried out." *Id.* OMB's Lapse Memorandum further states:

3            . . . agencies are directed to use this opportunity to consider Reduction
             in Force (RIF) notices for all employees in programs, projects, or
4            activities (PPAs) that satisfy all three of the following conditions: (1)
             discretionary funding lapses on October 1, 2025; (2) another source
5            of funding, such as H.R. 1 (Public Law 119-21) is not currently
             available; and (3) the PPA is not consistent with the President's
6            priorities.

7    *Id.*[5]  The Lapse Memorandum states that these "RIF notices will be in addition to any furlough

8    notices provided due to the lapse in appropriation.  RIF notices should be issued to all employees

9    working on the relevant PPA, regardless of whether the employee is excepted or furloughed during

10   the lapse in appropriations." *Id.*  The Lapse Memorandum also directs that: "Once fiscal year 2026

11   appropriations are enacted, agencies should revise their RIFs as needed to retain the minimal number

12   of employees necessary to carry out statutory functions. Any proposed RIF plan must be submitted

13   to OMB." *Id.*

14

15           **C.      OPM's Updated Guidance and Special Instructions**

16           On September 28, 2025, OPM added a new section on Reductions in Force to its "Guidance

17   for Shutdown Furloughs."[6]  SAC ¶ 176; *see also* Dkt. No. 17-3, Huddleston Decl., Ex. C at 50-51

18   ("OPM Guidance").  Accompanying this addition were "Special Instructions for Agencies Affected

19   by a Possible Lapse in Appropriations Starting on October 1, 2025."  Dkt. No. 92-2, SAC, Ex. B

20   ("OPM Special Instructions").  Both the updated guidance and special instructions state that "OMB

21   has determined that agencies are authorized to direct employees to perform work necessary to

22   administer the RIF process during the lapse in appropriations as excepted activities."  SAC ¶ 177;

23   _____

24           [5] On July 4, 2025, President Trump signed into law H.R. 1, known formally as the "One Big
     Beautiful Bill Act."

25           [6] *Compare* OPM Guidance for Shutdown Furloughs, Internet Archive,
26   https://web.archive.org/web/20250925203852/https://www.opm.gov/policy-data-oversight/pay-
     leave/furlough-guidance/guidance-for-shutdown-furloughs.pdf    [https://perma.cc/8Q9E-UQAD]
27   (last  visited  Sept.  25,  2025)  *with*  OPM  Guidance  for  Shutdown  Furloughs,
     https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-
28   shutdown-furloughs-sep-28-2025/ [https://perma.cc/3AHN-KHSH].

United States District Court
Northern District of California

OPM Guidance at 50; OPM Special Instructions at 10.  The special instructions encourage agencies to prepare a decisional memorandum that supports RIF-related decisionmaking.  OPM Special Instructions at 10.  OPM acknowledges that "[a] RIF process is conducted separately from the process for administering a shutdown due to a lapse in appropriations, as separate notices must be issued and each process is subject to applicable rules and procedures." *Id.*  The special instructions further state that any RIF notice issued shortly before or after the lapse in appropriations that commences on October 1, 2025, "will generally provide for a full 60-day notice period during which employees will retain employment status." *Id.*

### D.    October 1, 2025 Shutdown and Subsequent RIFs

On October 1, 2025, Congress remained deadlocked over appropriations for discretionary spending and the federal government shut down.  SAC ¶ 188.  Also on October 1, 2025, news sources reported that OMB Director Vought told Congressional Republicans on a phone call that day that the administration would start mass RIFs of federal workers "in a day or two." *Id.* ¶ 189.  White House spokesperson Karoline Leavitt confirmed that RIFs would happen in "[t]wo days, imminent, very soon." *Id.* ¶ 191.  Vice President JD Vance confirmed the same and "suggested they would hit every agency." *Id.* ¶ 192.

On Friday, October 10, 2025, OMB Director Vought posted on social media: "The RIFs have begun." Dkt. No. 38-1 ("Huddleston Suppl. Decl."), Ex. A.  The President confirmed the same at a press conference, where the media reported that he said, "It will be Democrat oriented, because we figure, you know, they started this thing, so they should be Democrat-oriented.  It'll be a lot, and we'll announce the numbers over the next couple of days, but it'll be a lot of people, all because of the Democrats[.]" Walls Decl., Ex. A.  Also on October 10, 2025, defendants confirmed the RIFs in a filing in this case.  Stephen Billy, a Senior Advisor with OMB, filed a declaration in this case stating that on October 10 more than 4,000 RIF notices had gone out across eight defendant agencies and that other defendant agencies "may actively be considering whether to conduct additional RIFs" or "are making predecisional assessments regarding offices and subdivisions that may be considered for potential RIFs[.]" Billy Decl. ¶¶ 7, 9.

1

2    **E.    Scope of the RIFs**

3         The full scope of the RIFs that have been planned or administered remains unclear based on

4    the declarations defendants have filed.  *See* Dkt. No. 49-2 ("Billy Suppl. Decl.") ¶ 4 (OMB Senior

5    Advisor declaring that "the situation involving the lapse in appropriations, and RIFs related to that

6    lapse, is fluid and rapidly evolving").  On October 15, 2025, the Court entered a Temporary

7    Restraining Order ("TRO") and ordered defendants to file "an accounting of all RIFs, actual or

8    imminent, that are enjoined by this TRO."  Dkt. No. 56 at 6.  In response, on October 17, 2025,

9    defendants filed agency declarations describing RIFs enjoined by the TRO.[7]  Dkt. No. 62.  While

10   defendants' declarations describe RIFs that impact members of the unions who are plaintiffs in this

11   case, the declarations generally do not describe *other* RIFs planned or administered by the defendant

12   agencies and they do not account for the "north of 10,000" people OMB Director Vought stated on

13   October 15, 2025, that he expected would be RIF'd during the shutdown.  *See* Shively Decl., Ex. B

14   at 2.  Therefore, the figures provided below are likely underinclusive of the total number of RIFs

15   that have been planned or administered in response to the shutdown.  As described in sworn

16   declarations submitted by defendants, the Court understands the scope of the RIFs impacting

17   plaintiffs' members during the government shutdown to be at least the following.

18        The Department of Commerce reports that it issued 60-day RIF notices to 281 people, while

19   159 people received general "intent to RIF" notices, telling employees that "there was a possibility

20   of separation as a result of the RIF, and they would be provided specific notice in the future if it was

21   determined that they would be part of the RIF."  Dkt. No. 71-1 ("Taylor Suppl. Decl.") ¶ 8.  Within

22   Commerce, it appears that the U.S. Census Bureau, the Minority Business Development Agency,

23   and the United States Patent and Trademark Office ("USPTO") have issued RIF notices during the

24   _____

25        [7]  The Court clarified its TRO on October 17, 2025 and required defendants to provide the "accounting of all RIFs actual or imminent, that are enjoined by this TRO" including "any RIFs that

26   have been or are being planned or prepared to be issued during the federal government shutdown" by October 20, 2025.  Dkt. No. 70.  Interior, Commerce, and Health and Human Services filed

27   supplemental declarations on October 20, 2025.  Dkt. No. 71.  Defendants' opposition filed October 24, 2025, also included additional supplemental declarations from Health and Human Services,

28   Commerce, Education, and National Science Foundation.  Dkt. No. 85.  The information regarding RIFs described in this section is drawn from these various declarations.

shutdown. The U.S. Census Bureau, which has employees represented by plaintiff American Federation of Government Employees, AFL-CIO ("AFGE"), issued 108 RIF notices, but the actual number of impacted employees is 102, as the U.S. Census Bureau erroneously sent notices to six individuals who had recently separated from the agency. *Id.* ¶ 10. The Minority Business Development Agency, which has employees represented by plaintiff National Federation of Federal Employees, IAM, AFL-CIO ("NFFE"), issued 23 RIF notices. *Id.* ¶ 11. The U.S. Patent and Trademark Office reports that it issued an unspecified number of RIFs on October 1, 2025, but that those RIFs had been planned since early March and followed a seven-month preparation period.[8] Dkt. No. 85-2 ("Mendez Decl.") ¶¶ 4, 6-7.

The U.S. Department of the Interior includes employees represented by plaintiffs NFFE, Service Employees International Union, AFL-CIO ("SEIU"), and the National Association of Government Employees, Inc. ("NAGE"). Interior has filed three different declarations. *See* Dkt. Nos. 62-11, 67-1, 71-2. The most recent declaration states that, when including members of NFFE, SEIU, and NAGE, Interior had intended to issue RIFs for 89 competitive areas that include members and bargaining unit employees of the plaintiffs. Dkt. No. 71-2 ("Borra 2d Suppl. Decl.") ¶ 10. The RIFs would abolish 2,050 positions. *Id.* Interior further states that these RIFs predated the shutdown and "were in no way motivated by or pursuant to" the OMB Lapse Memo or the OPM Guidance. *Id.* ¶ 12. Interior reports that it has been working on potential RIF plans since early 2025. Dkt. No. 62-11 ("Borra Decl.") ¶ 8.

U.S. Department of Health and Human Services, which has plaintiff AFGE members as employees,[9] issued approximately 1,760 RIF notices on October 10, 2025, but rescinded many of

---

[8] USPTO has remained fully funded and operational during the lapse in appropriations that has affected other agencies. Dkt. No. 85-5 ("Mildrew Decl.") ¶ 5.

[9] The status of these AFGE members is disputed. On March 27, 2025, President Trump issued Executive Order 14251, "Exclusions from Federal-Labor Management Relations Programs." HHS previously had AFGE bargaining units, but defendants argue that pursuant to Executive Order 14251 HHS no longer has any bargaining unit employees represented by plaintiffs. AFGE challenged Executive Order 14251, and the district court entered a preliminary injunction in that case. *See AFGE v. Trump*, No. 25-cv-03070-JD (N.D. Cal. Apr. 3, 2025). The preliminary injunction was stayed by the Ninth Circuit. *See AFGE v. Trump*, 148 F.4th 648 (9th Cir. 2025). Plaintiffs have filed a petition for rehearing en banc, which remains pending as of the date of this Order.

them as issued in error, bringing the total to 954 RIF notices.  Nagy Decl. ¶ 3; Nagy Suppl. Decl. ¶ 4 & n.1.

U.S. Department of Housing and Urban Development, which has employees represented by plaintiffs AFGE and NFFE, issued 442 RIF notices on October 10, 2025, including 333 RIF notices to AFGE members and 20 RIF notices to NFFE members.  Dkt. No. 62-9 ("Michalski Decl.") ¶ 7.

The Department of Education sent RIF notices to 465 employees across six PPAs involving plaintiff AFGE representation on October 10, 2025.  Dkt. No. 62-6 ("Clay Decl.") ¶ 8; Dkt. No. 85-3 ("Clay Suppl. Decl.") ¶ 4.

National Science Foundation states in its October 17, 2025 declaration that it conducted a RIF in May 2025 and issued 45-day RIF notices to approximately 41 career Senior Executive Service ("SES") employees who are "not union members."  Dkt. No. 62-28 ("Keiser Decl.") ¶ 9.  In its supplemental declaration, NSF states that it conducted a RIF of two tiers of SES impacting 84 positions, prior to and separate from the OMB Lapse Memorandum and the OPM Guidance.  Dkt. No. 85-4 ("Keiser Suppl. Decl.") ¶¶ 3, 5-6.  NSF indicates that it began planning the SES RIF in January 2025 and that RIF notices "were issued long before the October 1, 2025 lapse in appropriations," but that the RIFs themselves "were not effectuated until October 4, 2025" due to various judicial proceedings.  *Id.* ¶¶ 6-10.

U.S. Department of Homeland Security indicates that it issued an unspecified number of RIF notices, but that "none of the RIF notices that were previously issued by the Department during the current lapse in appropriations were issued to federal employees in any PPA (program, project, or activity) that includes any bargaining unit or member represented by any Plaintiff."  Dkt. No. 62-8 ("Edwards Decl.") ¶¶ 8-9.

U.S. Department of Education reports that while it has not issued any RIF notices during the shutdown, it issued "general RIF notices, which did not include an effective date for the RIF action."  Dkt. No. 66-1 ("Trznadel Decl.") ¶ 8.

U.S. Environmental Protection Agency similarly states that it issued "preliminary Notices of Intent to Conduct a RIF" that notified employees that formal RIF notices, if any, would be issued at least 60 days prior to the separation date.  Dkt. No. 62-18 ("Wells Decl.") ¶ 10.  EPA states that

27 employees who received these preliminary notices are in PPAs in which plaintiffs may represent employees.[10]  *Id.*  ¶ 10.

U.S. Small Business Administration issued a 30-day RIF on September 29, 2025, impacting 73 employees set to be terminated on October 29, 2025.  Dkt. No. 62-31 ("Serpa Decl.") ¶ 9.  SBA states that RIF notices for the majority of those 73 employees were originally issued in April 2025 but were later rescinded.  *Id.*  SBA states these RIFs predated the shutdown and were not "initiated or enforced based on, or in reliance on" the OMB Lapse Memo or the OPM Guidance.[11]  *Id.*

U.S. Department of Treasury states that none of the RIF notices issued during the lapse in appropriations were issued to federal employees in any PPA that includes any bargaining unit or member represented by any plaintiff.  Dkt. No. 62-14 ("Norris Decl.") ¶ 9.

U.S. Department of Defense declares that RIF notices were previously sent to employees represented by an AFGE local affiliate and the 60-day notice period is scheduled to conclude on October 24, 2025.  Dkt. No. 62-5 ("Cogar Decl.") ¶ 9.  Defense states that the preexisting RIF is "unrelated to the current lapse in appropriations and was not issued in anticipation of any potential lapse in appropriations."  *Id.*

The remaining original defendants to this lawsuit all state that they have not issued any RIF notices implicated by the Court's TRO.[12]

---

[10] EPA states that it no longer recognizes AFGE as the sole legal representative of former bargaining unit employees due to Executive Order 14251, but that individual EPA employees may still be members of AFGE.  Wells Decl. ¶¶ 4-5, 10, n.1.

[11] The Court has received numerous phone calls and letters in recent days from concerned employees at the SBA who received RIF notices in late September, with a separation date of October 29, 2025.  For reasons explained at the end of this Order, today's Order does not extend to employees whose RIF notices went out before the government shut down on October 1, 2025.

[12] Newly added defendants Commodity Futures Trading Commission, Federal Communications Commission, Federal Election Commission, U.S. Securities and Exchange Commission, Merit Systems Protection Board, and Peace Corps have not yet submitted declarations because they were not part of the case when the original TRO issued.

United States District Court
Northern District of California

## II.    Procedural Background

On September 30, 2025, plaintiffs filed this suit in federal court.[13]  Dkt. No. 1.  The original plaintiffs were two labor organizations and their local affiliates: AFGE; AFGE Local 1236; AFGE Local 3172; and American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME").  They sued OMB, OMB Director Vought, OPM, and OPM Director Scott Kupor.

On October 4, 2025, plaintiffs filed an amended complaint, adding numerous federal agencies and their agency heads as defendants.  Dkt. No. 15.  Also on October 4, 2025, plaintiffs moved for a temporary restraining order.  Dkt. No. 17.  The matter received full briefing from both sides.  *See* Dkt. Nos. 38, 39, 41, 47, 49.

On October 15, 2025, the Court held a hearing on the matter and granted a TRO, finding that plaintiffs' APA claims were likely to succeed on the merits and that other factors favored injunctive relief.  Dkt. No. 56.  The TRO enjoined and stayed defendants from issuing any RIF notices during or because of the shutdown, and from taking further actions to implement RIF notices issued on or after October 10 "to federal employees in any PPA (program, project, or activity) that includes any bargaining unit or member represented by any Plaintiff."  *Id.* at 5.

On October 16, 2025, plaintiffs requested an urgent status conference after learning that the Department of Interior was planning to issue RIF notices on October 20, despite the TRO.  Dkt. No. 59.  The Court advanced the deadline for defendants' disclosure of "planned RIFs and the manner in which defendants intend to comply with the TRO" and scheduled a status conference for the following day.  Dkt. No. 60.  On October 17, 2025, plaintiffs filed a motion for leave to file a second amended complaint[14] and an ex parte application to modify the TRO, in order to add three additional

---

[13] Plaintiffs also filed an administrative motion to relate the case to an earlier action filed by some of the same plaintiffs challenging the Trump administration's authority to engage in large-scale RIFs and reorganizations at numerous federal agencies.  *See* Admin. Mot. to Consider Whether Cases Should Be Related (Civil L.R. 3-12), *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-cv-3698-SI (N.D. Cal. Sept. 30, 2025), Dkt. No. 272.  The government did not respond to the related case motion and on October 7, 2025, the Court granted the motion.  Dkt. No. 23.  This case was then reassigned to the undersigned Judge.

[14] Plaintiffs also filed an administrative motion to shorten time to hear plaintiffs' motion for leave to amend the complaint.  Dkt. No. 63.  The Court granted that motion and set a briefing schedule.  Dkt. No. 75.  Plaintiffs later amended their motion and the Court again set a briefing schedule.  Dkt. Nos. 76, 77, 83.

1    unions as plaintiffs: NFFE, SEIU, and NAGE.  Dkt. Nos. 64, 65.  Following the October 17, 2025

2    status conference, the Court clarified the language in its prior TRO, modified the TRO to extend

3    relief to these three additional unions, and required defendants to provide an "accounting of all RIFs

4    actual or imminent" that were enjoined by the TRO.  Dkt. No. 70 at 4.

5        On October 21, 2025, plaintiffs filed another urgent request to modify the TRO to include

6    three more unions they propose adding to the complaint—the National Treasury Employees Union

7    ("NTEU"), the International Federation of Professional & Technical Engineers ("IFPTE"), and the

8    American Federation of Teachers ("AFT")—and six new agency defendants.[15]  Dkt. No. 76.  On

9    October 22, 2025, the Court modified the TRO for a second time.  *See* Dkt. No. 82.

10       The second amended complaint alleges four claims for relief against all defendants: that

11   "OMB's Lapse Memorandum, OPM's associated directives, the decision to implement RIFs during

12   a government shutdown, and the decision to assign staff to prepare RIFs are all contrary to the law

13   and exceed statutory authority . . .[,]" SAC ¶ 212, in violation of the Administrative Procedure Act

14   ("APA"), 5 U.S.C. § 706(2)(A) and (C) ("Claim I"); that OMB, OPM, and federal agency

15   defendants' actions are *ultra vires* ("Claim II"); that OMB, OPM, and federal agency defendants'

16   actions are arbitrary and capricious in violation of the APA, 5 U.S.C § 706(2)(A) ("Claim III"); and

17   that OMB, OPM, and federal agency defendants' actions "spending funds to administer RIFs during

18

19       [15] In total, the "federal agency defendants" are the departments of Agriculture ("USDA"),
     Commerce, Defense ("DoD"), Education, Energy, Health and Human Services ("HHS"), Homeland
20   Security ("DHS"), Housing and Urban Development ("HUD"), Justice ("DOJ"), the Interior, Labor
     ("DOL"), State, Treasury, Transportation ("DOT"), Veterans Affairs ("the VA"), as well as the
21   Consumer Product Safety Commission ("CPSC"), U.S. Environmental Protection Agency ("EPA"),
     Equal Employment Opportunity Commission ("EEOC"), Federal Trade Commission ("FTC"),
22   General Services Administration ("GSA"), Institute of Museum and Library Services ("IMLS"),
     National Aeronautics and Space Administration ("NASA"), National Archives and Records
23   Administration ("NARA"), National Endowment for the Arts ("NEA"), National Endowment for
     the Humanities ("NEH"), National Gallery of Art ("NGA"), National Science Foundation ("NSF"),
24   National Transportation Safety Board ("NTSB"), Nuclear Regulatory Commission ("NRC"), U.S.
     Small Business Administration ("SBA"), Smithsonian Institute ("Smithsonian"), U.S. Social
25   Security Administration ("SSA"), U.S. International Development Finance Corporation ("DFC"),
     Peace Corps, Commodity Futures Trading Commission, Federal Communications Commission,
26   Federal Election Commission, U.S. Securities and Exchange Commission, and U.S. Merit Systems
     Protection Board.
27       For ease of reference, this order refers to these defendants collectively as the "federal agency
     defendants."  That term does not include defendants OMB or OPM.
28

United States District Court
Northern District of California

the government shutdown violate the Appropriations Clause of the Constitution[,]" U.S. Const. Art. I § 9, cl. 7, SAC ¶ 246 ("Claim IV").

The preliminary injunction motion has been fully briefed.  Dkt. Nos. 79 ("Mot."), 85 ("Opp'n"), 88 ("Reply").  Defendants have also filed an opposition to plaintiffs' motion for leave to file the revised Second Amended Complaint and plaintiffs filed a reply.  Dkt. Nos. 86, 87.  The Court held a hearing on both motions on October 28, 2025.[16]

## LEGAL STANDARDS

### I.    Injunctive Relief

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  In order to obtain a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20 (citations omitted).

Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks and citation omitted).  This formulation recognizes a sliding scale approach, where "a stronger showing of one element may offset a weaker showing of another."  *Id.* at 1131, 1134-35.

### II.    Administrative Procedure Act

The APA provides, in relevant part, that

> The reviewing court shall—
>
> . . . **(2)** hold unlawful and set aside agency action, findings, and

---

[16] In a separately issued order, the Court has granted plaintiffs' motion for leave to file the second amended complaint.

conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
. . .
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . .

5 U.S.C. § 706(2); *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) (citing *All. for the Wild Rockies*, 632 F.3d at 1131-34).

# DISCUSSION

## I.    Jurisdiction

Before proceeding further, the Court must ensure it has jurisdiction to hear this suit. Defendants argue that this Court lacks jurisdiction because Congress "channeled" employment decisions "to agency adjudicators under the Civil Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSLMRS)."  Opp'n at 1.  In examining whether particular claims should be channeled to agency review, courts consider three factors from *Thunder Basin Coal Company v. Reich*, 510 U.S. 200, 207, 212 (1994): "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim?  Next, is the claim wholly collateral to the statute's review provisions?  And last, is the claim outside the agency's expertise?"  *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (internal quotation marks, brackets, and citations omitted).  Affirmative answers to these questions suggest that Congress did not intend to limit jurisdiction, "[b]ut the same conclusion might follow if the factors point in different directions."  *Id.*  Together, these factors recognize that agency action should rarely evade effective judicial review, but channeling from a district court to an agency adjudication may be appropriate "in the matters [an agency] customarily handles, and can apply distinctive knowledge to."  *Id.*

This Court recently considered the channeling question in a case brought by some of the same plaintiffs against many of the same defendants regarding the Executive's authority to conduct widespread RIFs and reorganizations across federal agencies without partnering with Congress.  *See Am. Fed'n of Gov't Emps. v. Trump*, 784 F. Supp. 3d 1316 (N.D. Cal. 2025), *stayed pending appeal*, 145 S. Ct. 2635, *vacated and remanded on other grounds*, No. 25-3293, No. 25-4476, --- F.4th ---,

2025 WL 2716266 (9th Cir. Sept. 19, 2025).  The Court adopts the discussion and reasoning on subject matter jurisdiction from that decision here.  *See id.* at 1337-42.  Although that case involved express claims regarding the separation of powers and whether Executive Order 14210 had overstepped the President's authority and usurped that of Congress, the same reasons the Court found plaintiffs' claims should not be channeled to administrative agencies in that case are at play here.  Indeed, plaintiffs here allege that OMB and OPM have determined by fiat that federal agencies' statutory mandates no longer apply during a government shutdown.  *See* OMB Lapse Mem. at 2.

In denying the government's application for a stay of the preliminary injunction in *American Federation of Government Employees v. Trump*, 139 F.4th 1020 (9th Cir. 2025), the Ninth Circuit agreed with this Court.  The appeals court found that all three *Thunder Basin* factors favored the plaintiffs in that case.  *Id.* at 1030.  In sum, the Ninth Circuit found that "Plaintiffs' *ultra vires* and APA claims plainly fall outside the scope of the CSRA's review provisions[,]" that a constitutional challenge of the type the plaintiffs were raising would be "collateral" to the subject of an individual employment dispute before the administrative body, and that the relevant administrative bodies "lack the relevant expertise, as well as the jurisdiction," to decide the structural constitutional or statutory APA challenges.  *Id.* at 1030-32.  Finally, the Ninth Circuit found that "channeling Plaintiffs' claims would preclude meaningful judicial review."  *Id.* at 1032.  Subsequently, the Supreme Court stayed the preliminary injunction in that case but did not address the channeling argument that the government raised in its stay application.  *See Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ---, 145 S. Ct. 2635 (2025).

Last month, the First Circuit denied the government's emergency motion to stay a preliminary injunction that enjoined HHS from further implementing its RIF and restructuring plans at four of its sub-agencies.  *New York v. Kennedy*, --- F.4th ---, No. 25-1780, 2025 WL 2658233 (1st Cir. Sept. 17, 2025).  In rejecting the government's argument that the district court lacked jurisdiction due to channeling of claims to the Merit Systems Protection Board under the CSRA, the First Circuit noted that no "Supreme Court interim order or decision [has] accepted the government's CSRA argument in a like case."  *Id.* at *4.  Indeed, specifically examining the

Supreme Court's stay in the above-discussed RIF/reorganization case, the First Circuit found the

Supreme Court's stay order "doubly unhelpful to the government":

> [E]ven though the government raised the same CSRA argument in
> <u>AFGE</u> that it asserts here, the Court's determination that the
> government was likely to succeed in establishing that the Executive
> Order was lawful, a necessarily merits-based ruling, indicates that the
> Supreme Court concluded that the district court likely had jurisdiction
> to make that decision. Thus, in issuing its interim order in <u>AFGE</u>, the
> Supreme Court likely decided that the CSRA did not funnel the
> dispute at issue . . . to the MSPB.

*Id.* The Court is not persuaded that the facts of this case warrant a different outcome here.


## II.    Standing

As noted above, plaintiffs are labor organizations representing federal civilian employees.

AFGE, for instance, represents approximately 800,000 federal civilian employees at 192

Departments, agencies and sub-agencies of the federal government who are located in every state in

the United States.  SAC ¶ 14.

Federal courts may only hear a case if plaintiffs can show they have standing to sue.  *Spokeo,*

*Inc. v. Robins*, 578 U.S. 330, 338 (2016, *revised* May 24, 2016).  To establish standing to sue,

plaintiffs must show an injury, trace that injury to the defendants' conduct, and prove that courts

can provide adequate redress for the injury.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

The injury "must be concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted).  To be imminent, a

threatened injury must be "certainly impending"— "allegations of possible future injury are not

sufficient."  *Id.* (internal quotation marks, brackets, and citations omitted).  Plaintiffs cannot base

standing on a theory of harm that "relies on a highly attenuated chain of possibilities."  *Id.* at 410.

The standing inquiry must be "rigorous" where the court faces claims that Congress or the executive

branch has acted unconstitutionally.  *Id.* at 408.

Organizational plaintiffs such as trade unions or membership-based non-profit organizations

have two paths to establish standing.  "[A]n association has standing to bring suit on behalf of its

members when: (a) its members would otherwise have standing to sue in their own right; (b) the

United States District Court
Northern District of California

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Organizations without formal members may achieve associational standing if they are "the functional equivalent of a membership organization." *Fund Democracy, LLC v. SEC.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Hunt*, 432 U.S. at 342-45).

### A.     Injury

Injury may come in many forms.  The threat of a pending job loss constitutes a concrete economic injury.  *Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1014 (N.D. Cal. 2007).  The possible loss of federal funding is also sufficient to establish injury.  *Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 688 (N.D. Cal. 2020).  A failure to provide relevant information can constitute injury where one might be entitled to such information.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20 (1998).  While the Ninth Circuit has held that an organization can meet the injury requirement by showing it had to divert resources to fight a problem affecting the organization, *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010), the Supreme Court recently rejected organizations seeking standing "simply by expending money to gather information and advocate against the defendant's action," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

In this case, plaintiffs are now ten labor organizations or their local affiliates.  Each plaintiff represents federal employees who work for the federal agency defendants that were directed by OMB and OPM to consider executing RIFs during the shutdown.  In their motion for a preliminary injunction and supporting declarations, plaintiffs assert several types of harm.

First, while acknowledging that RIF notices will likely provide for separation after 30 or 60 days (as required by law), plaintiffs assert that their federal employee members who may be subject to RIFs are injured by the immediate prospect of losing their jobs, causing them and their families to spend significant time and energy making contingency plans.  Blake Decl. ¶ 9; Kelley Decl. ¶¶ 11-15; Niemeier-Walsh Decl. ¶¶ 11-14.  Second, plaintiffs assert injury on behalf of federal employee

members who are likely to lose their jobs, healthcare, and other incidents of employment once RIF notices are issued. Blake Decl. ¶ 9; Kelley Decl. ¶¶ 14-15; Niemeier-Walsh Decl. ¶¶ 13-14. Third, they contend that federal employees who are not subject to RIFs will be injured by significantly increased workloads. Blake Decl. ¶ 11; Kelley Decl. ¶ 17; Niemeier-Walsh Decl. ¶¶ 16-21. Plaintiffs also assert injury on behalf of federal employees who work in positions determined necessary to implement RIFs, who may therefore be subject to possible criminal penalties under the Antideficiency Act, 31 U.S.C. § 1350. Dkt. No. 17 ("TRO Mot.") at 14. Finally, plaintiffs assert injury to the unions themselves, in the form of the substantial time and resources that would have been devoted to representational work and that have been diverted instead to challenging OMB's and OPM's actions. Blake Decl. ¶10; Kelley Decl. ¶¶18-19; Niemeier-Walsh Decl. ¶13.

The Court finds the types of harms plaintiffs claim are both concrete and imminent, and therefore sufficient to establish injury. Plaintiffs have standing both on behalf of their dues-paying members and in their own right for injury the unions themselves suffer by defendants' challenged actions. In particular, there is certainly sufficient injury alleged with respect to plaintiffs' members who have already received RIF notices, as the clock is currently ticking on their separation dates. And as plaintiffs' declarations explain, those workers are currently being injured by the shutdown's impact on their ability to prepare for their upcoming separations. These workers cannot access their personnel records, obtain information on continuing their health insurance, or receive answers to questions regarding severance pay, retirement, or errors in their RIF notices. *See, e.g.*, Erwin Decl. ¶ 12; Roper Decl. ¶¶6-7, 17-18; Johnson Decl. ¶ 11; Washington Decl. ¶¶ 11-12.

As an illustration, one of the employees at the Department of Education who received a RIF notice during the shutdown is one of three employees who administers the statutorily-created Randolph-Shepard Program, which provides blind people with employment opportunities. Grassman Decl. ¶¶ 2-3. She is a member of AFGE Local 252. *Id.* ¶ 4. Her RIF notice states that her last date of employment will be December 9, 2025. *Id.* ¶ 8. She reports, "As a 56-year-old woman who is blind, there are not many employment opportunities available to me." *Id.* ¶ 12. "The idea of losing my job is both terrifying and devastating." *Id.* ¶ 11. She is the sole breadwinner for her family, since her husband, who is also blind, closed his business during the Covid-19 pandemic.

*Id.* She and her husband now have to consider whether to move to a lower-cost community, leaving behind the community they have worked hard to build and her mother who has Alzheimer's disease. *Id.* ¶ 13. Another declarant, an IT specialist with the Centers for Disease Control and Prevention, has worked for the federal government for 40 years. Roper Decl. ¶¶ 2-3. She is a member of AFGE Local 2923. *Id.* ¶ 3. She received a RIF notice to her government e-mail account on October 10, 2025, but she did not know until her supervisor texted her personal cellphone the next day to tell her to check her work e-mail. *Id.* ¶ 6. Her RIF notice incorrectly identified her performance ratings as lower than they should be. *Id.* She received an "amended" notice on October 20, changing her performance ratings and changing her separation date to December 9 (from December 8). *Id.* ¶¶ 6-7. She states, "Because of the shutdown, I am not able to contact anyone in human resources to determine why the changes were made or confirm that the 'Amended' RIF notice is correct." *Id.* Many of her colleagues had their recent RIF notices rescinded, but her network access has been cut off, so she can no longer check her government e-mail, and her understanding is that "most, if not all, of the human resources (HR) staff have received RIF notices as well." *Id.* ¶¶ 17-18. She also suffers from long-term health issues and depends on prescription medications, and she is trying to fit in as many critical medical appointments as she can before her separation date. *Id.* ¶ 24. Individuals such as these clearly are suffering injury now, and the plaintiff public-sector labor unions stand in the shoes of their members for Article III standing purposes. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Office of Personnel Mgmt.*, --- F. Supp. 3d ---, No. 25-cv-1780-WHA, 2025 WL 2633791, at *9 (N.D. Cal. Sept. 12, 2025).

The unions themselves have also sufficiently shown that they too are experiencing injury. The RIFs that have issued and the threat of impending RIFs at all defendant agencies, acting at the direction of OMB and OPM, are sowing panic and chaos, causing unions to devote significant resources to addressing the challenged actions. Blake Decl. ¶ 10; Kelley Decl. ¶¶18-19; Niemeier-Walsh Decl. ¶ 13; Ronneberg Decl. ¶ 8; Washington Decl. ¶¶ 7-8. The unions are also being stymied in their core mission of representing workers because many of the unions and local reps cannot do their jobs and make inquiries because they have received their own RIFs and/or because human resource staff is furloughed during the shutdown. Jacobs Decl. ¶ 20; Roper Decl. ¶ 27; Ronneberg

23

1    Decl. ¶¶ 12, 24.  Unions also suffer injury from membership losses and loss of dues when their

2    members are RIF'd, and they lose strength and bargaining power when their numbers are

3    diminished.  Dkt. No. 79-4 ("Biggs Decl.") ¶¶ 18-19; Dkt. No. 79-7 ("Kaspar Decl.") ¶¶ 22-23;

4    Ronneberg Decl. ¶ 24.

5            To the extent defendants argue there is no injury to plaintiffs at defendant agencies where

6    shutdown RIFs have not yet issued, the Court rejects that argument at this time.  The RIFs are not

7    merely hypothetical.  As defendants' own declarations state, those defendant agencies that have not

8    yet issued RIF notices "may actively be considering whether to conduct additional RIFs, including

9    RIFs related to the ongoing lapse in appropriations."  Billy Decl. ¶ 9.  Moreover, "[a]n organization

10   establishes representational standing where it shows that some subset of its members have been, or

11   imminently stand to be, injured."  *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Office of Personnel

12   Mgmt.*, 781 F. Supp. 3d 920, 937-38 (N.D. Cal. 2025) (citing *Friends of the Earth, Inc. v. Laidlaw

13   Env't Servs. (TOC), Inc.*, 528 U.S. 167, 182-83 (2000)).  As Judge Alsup of this district has observed,

14   "[t]he Sierra Club was not asked to show that every last member sat in solitude and wonderment at

15   Mineral King."  *Id.* at 937 (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)).

16

17           **B.      Causation and Redressability**

18           Plaintiffs challenge the OMB Memorandum, the OPM Guidance and Special Instructions,

19   and RIFs issued by agency defendants in accordance with those directives.  The harms experienced

20   by plaintiffs or imminently threatening them stem from the OMB and OPM directives, and from

21   RIFs carried out by defendant agencies pursuant to those directives.  These harms are fairly traceable

22   to defendants' actions and there are no intervening actors causing these harms.  *See Lujan*, 504 U.S.

23   at 560.  The Court can redress the harms by vacating and setting aside the agency action, as the APA

24   requires.

25

26           **C.      Conclusion as to Standing**

27           At this stage, the Court finds that at least some of the plaintiffs have sufficient standing to

28   bring their claims.  The union plaintiffs have standing in their own right and may assert standing on

United States District Court
Northern District of California

behalf of their dues-paying members who have already been subject to RIFs during the shutdown or whose agencies are actively considering shutdown RIFs. "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (proceeding to the merits where one of the two plaintiffs "unquestionably" had standing and defendant challenged standing only as to the other plaintiff).

### III.    Preliminary Injunction

The Court now proceeds to the *Winter* factors, examining whether plaintiffs have established they are likely to succeed on the merits, whether they are likely to suffer irreparable harm in the absence of preliminary relief, if the balance of equities tips in their favor, and whether an injunction is in the public interest. *See Winter*, 555 U.S. at 22.

### A.    Likelihood of Success on the Merits

Plaintiffs bring two claims under the APA, that the challenged actions are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A); and are not in accordance with the law and exceed statutory authority, in violation of 5 U.S.C. § 706(2)(A) and (C).

### 1.    Threshold Issues (APA)

Defendants' arguments—both at the TRO stage and now—focus more on procedure and less on the merits. Defendants' main argument in opposition to plaintiffs' APA claims is that plaintiffs lack a cause of action to challenge violations of the Antideficiency Act. Opp'n at 13 (incorporating argument at Dkt. No. 41 at 16-19). As the Court previously explained, this misconstrues plaintiffs' case, which is not brought under the Antideficiency Act. Rather, plaintiffs sue to enjoin what they argue are unlawful agency actions, in violation of the APA. "The APA instructs a reviewing court to 'hold unlawful and set aside' agency actions that are contrary to any law, 'not merely those laws that the agency itself is charged with administering.'" *New York v. Kennedy*, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *15 (D.R.I. July 1, 2025) (quoting 5 U.S.C. § 706(2)(A); *FCC v.*

United States District Court
Northern District of California

1    *NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003)).  This is distinct from an individual

2    plaintiff bringing a direct claim under the Antideficiency Act.  The Court finds plaintiffs have

3    properly framed their claims under the APA and that the APA clearly provides a cause of action to

4    challenge agency conduct such as what is alleged here.

5         The Court next examines whether there has been final agency action.  The APA provides

6    that "[a]gency action made reviewable by statute and final agency action for which there is no other

7    adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  Because plaintiffs do

8    not allege that any action here was made reviewable by statute, the threshold question is whether

9    the challenged actions constitute "final agency action."  If not, this Court is without subject matter

10   jurisdiction to decide the APA claim.  *See San Francisco Herring Ass'n v. U.S. Dep't of Interior*,

11   683 F. App'x 579, 580 (9th Cir. 2017).

12        The Supreme Court has explained that "two conditions must be satisfied for agency action

13   to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process

14   . . . —it must not be of a merely tentative or interlocutory nature.  And second, the action must be

15   one by which 'rights or obligations have been determined,' or from which 'legal consequences will

16   flow[.]'"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).  The Supreme Court

17   has "long taken" a "pragmatic approach" to the question of what constitutes final agency action.

18   *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting

19   *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)); *see also Or. Nat. Desert*

20   *Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) ("We focus on the practical and legal

21   effects of the agency action: [T]he finality element must be interpreted in a pragmatic and flexible

22   manner.") (internal quotation marks and citations omitted).

23         Plaintiffs bring Claims I and III under the APA.  They argue that "OMB's issuance of the

24   Lapse Memorandum, OPM's associated issuance of Guidance and Special Instructions for the

25   pending shutdown, the decision to implement RIFs during the government shutdown, and the

26   decision to assign staff to prepare RIFs are all final agency actions for the purposes of APA review."

27   SAC ¶ 210.

28        The Court concludes that at a minimum the OMB Lapse Memorandum, OPM's Guidance

United States District Court
Northern District of California

and Special Instructions, and the RIF notices from certain federal agency defendants that have already gone out during the shutdown are final agency actions under the APA. The Lapse Memorandum, Guidance, and Special Instructions represent the culmination of OMB's and OPM's respective decisionmaking processes. When OMB issued the Lapse Memorandum, it made several conclusive, final determinations, the most significant of which are: (1) OMB's legal conclusion that a federal program's lapse in funding during the shutdown means that "such programs are no longer statutorily required to be carried out[;]" (2) OMB's directive to agencies "to use this opportunity to consider Reduction in Force (RIF) notices for all employees in programs, projects, or activities (PPAs)" that meet the criteria OMB laid out; and (3) OMB's instruction that "RIF notices should be issued to all employees working on the relevant PPA, regardless of whether the employee is excepted or furloughed during the lapse in appropriations." *See* OMB Lapse Mem. at 2. The Lapse Memorandum is neither "tentative" nor "interlocutory." *See Bennett*, 520 U.S. at 178. Rather, it purports to provide the legal authority for agencies to RIF employees during a shutdown, directs that the agencies shall consider issuing RIF notices, and disposes of any legal distinction between excepted versus furloughed employees. It is from this memorandum that the very real legal consequences followed, which ultimately resulted in thousands of federal employees receiving RIF notices during the shutdown.

The OPM Guidance (as of September 28, 2025) and Special Instructions reiterate all of the above points from the OMB Lapse Memorandum, while providing agencies with additional details. *See* OPM Guidance at 50-51; Special Instructions at 9-10. The new OPM Guidance clearly tells agencies, for instance, that "Yes," they can "run a RIF during a shutdown furlough[.]" OPM Guidance at 50. The Special Instructions also state OMB's conclusion (endorsed by OPM) that "OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities." OPM Special Instructions at 10. The OPM Guidance and Special Instructions are therefore final in the same way as the OMB Lapse Memorandum.

The OMB and OPM documents are not made less final because they depended on subsequent action from the federal agencies in order for the RIFs to be executed: "a federal agency's assessment,

plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, *a decision by another administrative agency*, or conduct by a regulated party." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025) (emphasis added).

Finally, the RIF notices that have actually issued from certain federal agency defendants are also final agency actions, as defendants do not appear to dispute. To issue those notices, the agencies must have reached decisions regarding which PPAs to RIF and then decided to issue RIF notices, giving employees a certain notice period before their terminations become final. Again, the RIF notices represent the culmination of each agency's decisionmaking process regarding whether and whom to RIF, and nothing about the notices indicates that they are tentative or interlocutory. Rather, impacted employees have been told that at a date certain in the future, their termination will become final. *See, e.g.*, Grassman Decl., Ex. A; Medrano Decl., Ex. A; Johnson Decl., Ex. A.

For these reasons, the Court finds that plaintiffs have properly challenged "final agency action" for purposes of the APA.[17]

## 2.    Arbitrary and Capricious (APA)

Plaintiffs argue that the OMB Lapse Memorandum, OPM's associated guidance, and RIFs pursuant to those directives are arbitrary and capricious under the APA, incorporating by reference their merits arguments at the TRO stage. Defendants did not address Claim III on the merits at all at the TRO stage and now dedicate only three pages of their preliminary injunction opposition brief to refuting plaintiffs' arbitrary and capricious claim.

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

---

[17] Defendants make a cursory argument in a footnote in their brief, implying that some of the federal agency defendants are not "agencies" subject to the APA. *See* Opp'n at 13 n.1. Defendants do not specifically argue which agencies this might include, save a citation to a case from the D.C. Circuit finding the Smithsonian Institute is not an "agency" under the Privacy Act, 5 U.S.C. § 552a(a)(1). *See id.* (citing *Dong v. Smithsonian Inst.*, 125 F.3d 877, 878-79 (D.C. Cir. 1997)). The Court need not reach this determination at this stage because the argument has not been properly briefed, and even if defendant Smithsonian Institute is not an "agency" within the meaning of the APA, the Court finds below that plaintiffs are also likely to succeed on the merits of their *ultra vires* claim.

United States District Court
Northern District of California

1    decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061,

2    1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.*

3    *Ins. Co.*, 463 U.S. 29, 53 (1983)).  "Normally, an agency rule would be arbitrary and capricious if

4    the agency has relied on factors which Congress has not intended it to consider, entirely failed to

5    consider an important aspect of the problem, offered an explanation for its decision that runs counter

6    to the evidence before the agency, or is so implausible that it could not be ascribed to a difference

7    in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  Agency action is also

8    arbitrary and capricious if, "[w]hen an agency changes course," it fails to take into account "that

9    longstanding policies may have engendered serious reliance interests[.]"  *Dep't of Homeland Sec.*

10    *v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citations

11    omitted).  Although an agency is not required to "consider all policy alternatives in reaching [its]

12    decision[,]" where the agency is "not writing on a blank slate, . . . it [is] required to assess whether

13    there were reliance interests, determine whether they were significant, and weigh any such interests

14    against competing policy concerns." *Id.* at 33 (internal quotation marks and citations omitted).  "The

15    scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute

16    its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and

17    articulate a satisfactory explanation for its action including a rational connection between the facts

18    found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citations

19    omitted).

20         The Court finds that plaintiffs are likely to succeed on the merits of Claim III.  When

21    evaluating agency decisionmaking, a court must look to "the grounds that the agency invoked when

22    it took the action." *Michigan v. E.P.A.* 576 U.S. 743, 758 (2015).  Review of the OMB

23    Memorandum, the OPM Guidance and Special Instructions, and the declarations provided by

24    defendants do not reveal reasoned decisionmaking.  The RIFs at issue here, planned and

25    administered during a government shutdown, are likely arbitrary and capricious: they are explicitly

26    intended for the purpose of political retribution and have been rolled out haphazardly, with no

27    evidence of reasoned decisionmaking or consideration of the federal employees' reliance interests.

28    Defendants' arguments to the contrary are unavailing.

United States District Court
Northern District of California

*First*, defendants argue that a temporary lapse in appropriations provides a legitimate basis for RIFs, citing to 5 C.F.R. § 351.201(a)(2) and a case from the Federal Circuit. Opp'n at 11. It does not. As the Court explains further in § III.A.3 below, contrary to defendants' assertion, the regulation's reference to a "release [that] is required because of . . . [a] shortage in funds" does not mean that a government shutdown provides a legitimate basis for administering RIFs. *See* 5 C.F.R. § 351.201(a)(2). Defendants suggest that even though a lapse in appropriations is expected to be temporary, it is a valid basis for conducting RIFs because future funding may not be guaranteed after the lapse ends. However, the Federal Circuit case defendants point to does not stand for this proposition. In *Cross v. Department of Transportation*, the Interstate Commerce Commission (ICC) was abolished by an act of Congress, and released ICC employees challenged RIF notices they received on the agency's "final day in existence" or thereafter, when some of the agency's core functions had been transferred to other entities. 127 F.3d 1443, 1445-46 (Fed. Cir. 1997). There, the ICC's anticipated shortage of funds was not expected to be temporary, nor did it occur due to a lapse in appropriations. Rather, the Federal Circuit found that agency officials reasonably anticipated a permanent budget shortfall "due to the imminent demise of the agency." *Id.* at 1447 ("Where agency officials reasonably and genuinely believe the agency's abolition is inevitable and its funding is to be terminated, initiation of a RIF is proper."). In short, this case has no bearing on agencies conducting politically motivated RIFs during a temporary lapse in appropriations.

*Second*, defendants suggest that the agencies' decisionmaking was adequately explained and reasoned because agencies "considered various factors while planning RIFs." Opp'n at 11. They state that President Trump determined that government efficiency is a priority and agencies are therefore appropriately taking steps to accomplish the President's goal by optimizing workforces in light of the lapse in appropriations. *Id.* at 10; *see* OMB Lapse Mem. at 1 ("[u]se this opportunity to consider [RIF] notices for all employees in [PPAs] . . . [where, among other stated conditions,] the PPA is not consistent with the President's priorities."). They point to explanations for RIFs provided in two defendant agencies' declarations. Dkt. No. 85-3 ("Clay Decl.") ¶ 6 (stating Education examined factors "including shortage of funds, operational realities, supervisory lines, and current administrative structures at the branch level."); Dkt. No. 85-2 ("Mendez Decl.") ¶ 6 (stating USPTO

"focused on identifying those positions that were attenuated from the agency's core mission of examining patents and registering trademarks, and strategically reducing those attenuated functions."). These vague and limited articulations do not justify agency defendants' drastic, out of the ordinary actions during a government shutdown. To be sure, these justifications are a far cry from "satisfactory explanation[s] for its action[s] including a rational connection between the facts found and the choice[s] made." *See State Farm*, 463 U.S. at 43.

*Third*, defendants contest plaintiffs' allegations of improper political retaliation. Opp'n at 11-12. Defendants focus their opposition briefing on whether there is sufficient evidence of particular *individuals* being targeted for RIFs due to their political affiliation. In doing so, defendants miss the mark. The core issue is that the President and OMB are explicitly directing agencies to use RIFs to punish Democrats by targeting *programs* perceived as having a certain political affiliation. In describing this blatant political discrimination as merely "alleged 'targeting' of certain federal programs, pursuant to policy priorities" defendants brush over the problem. *See* Opp'n at 11. "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that 'would work a violation of the arbitrary-and-capricious' standard.'" *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quoting *Hagelin v. FEC*, 411 F.3d 237, 243 (D.C. Cir. 2005)) (citation, internal quotation marks, and alteration omitted). Some of the RIF notices sent since October 1, 2025, state that the RIF determinations were made by identifying programs not in alignment with the President's priorities. *See* Dkt. No. 47-1 ("Schwarz Decl."), Ex. L ("HUD RIF Notice") ("RIF determinations were made by identifying those programs not in alignment with the President's Management Agenda or the Administration's priorities."), Ex. T ("EPA RIF Notice") ("The decision to conduct a RIF has been made pursuant to the President's priority programs, projects and activities, and anticipated availability of funding."). The President and OMB Director Vought have been more than clear that what is meant by programs that are not in alignment with the President's priorities are programs that are "Democrat-oriented." *See* Walls Decl. ¶¶ 2-4; Dkt. No. 42-2, Ex. A. And, the OMB Lapse Memorandum itself opens with a statement regarding Congressional Democrats' intention to shut down the government "over a series of insane demands," before instructing agencies to consider carrying out RIFs. *See* OMB Lapse Mem.

1    On September 30, 2025, President Trump stated: "We can do things during the shutdown

2  that are irreversible, that are bad for them and irreversible by them.  Like cutting vast numbers of

3  people out, cutting things that they like, cutting programs that they like."  Dkt. No. 17-3 ¶ 13, Ex. J

4  at 2.  Further, he stated, "We can get rid of a lot of things that we didn't want, and they'd be

5  Democrat things."  Dkt. No. 17-1 at 10.  "When you shut it down, you have to do layoffs.… So

6  we'd be laying off a lot of people that are going to be very affected….  And they're gonna be

7  Democrats." *Id*.  The OMB memorandum that directed the shutdown RIFs says the same.  *See* OMB

8  Lapse Mem. (directing agencies to "use this opportunity" of the shutdown to consider RIF notices,

9  including in those areas that are "not consistent with the President's priorities" and stating the hope

10  that the RIF "steps outlined above will not be necessary" if "Democrats in Congress will not trigger

11  a shutdown").  More recently, on October 14, 2025, President Trump stated, "The Democrats are

12  getting killed in the shutdown, because we're closing up programs that are Democrat programs that

13  we're opposed to."  Dkt. No. 48, Ex. A.  He continued: "And they're never going to come back, in

14  many cases….  We're not closing up Republican programs because we think they work….  We're

15  closing up Democrat programs that we disagree with.  And they're never going to open again."

16  Shively Decl. ¶ 8, Ex. F.  This kind of partisan motivation exemplifies arbitrary and capricious

17  agency action.

18    *Finally*, defendants state that the factual record refutes plaintiffs' contention that RIFs were

19  unduly hasty.  Opp'n at 12-13.  The Court does not agree.  Numerous procedural guardrails exist to

20  protect the rights and interests of federal employees.  *See* 5 C.F.R. §§ 351.201-351.902.  The RIF

21  regulations provide a comprehensive framework for the manner in which agencies are to conduct

22  RIFs.  Therefore, "[j]ust to *prepare* for a RIF, an agency spends approximately 12 to 18 months to

23  comply with all of these employee-centric provisions."  *State of Md.*, 151 F.4th at 214 (citation and

24  internal quotation marks omitted).  Instead, here agencies are rapidly laying off thousands of public

25  employees during a temporary lapse in funding.  Defendants argue that they took sufficient time

26  considering whether to administer RIFs, citing three agency declarations that state they have been

27  working on potential RIF plans for months.  *See* Borra Decl. ¶ 8; Mendez Decl. ¶¶ 3-10; Keiser

28  Suppl. Decl. ¶¶ 3-10.  The factual record reveals otherwise.  RIF notices are going out with errors

in them; they are being sent to employees' work e-mail addresses, which furloughed employees have been told they may not check; they are being issued in error and rescinded shortly after; they are being issued by Human Resources staff called back to work on RIFs and then ordered to RIF themselves. Gittleman Decl. ¶ 4 & Ex. A; Robinson Decl. ¶ 8; Grassman Decl. ¶¶ 7-8; Washington Decl. ¶¶ 7, 12; Erwin Decl. ¶ 12; Johnson Decl. ¶ 17; Jacobs Decl. ¶¶ 2, 7. The Director of Field Operations at NTEU reports that the union did not receive legally required notice from any federal agencies when its members received RIF notices on October 1 and October 10, 2025. Kaspar Decl. ¶ 11. In sum, it has been a tumultuous process pervaded by errors and uncertainty.

In their reply brief and during oral argument, plaintiffs state that defendants offer no defense for their failure to account for reliance interests of federal employees subject to RIFs. Reply at 1. The Court agrees with plaintiffs that defendants fail to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Failing to assess reliance interests is arbitrary and capricious.

The Court further agrees with plaintiffs that OMB's directive to implement RIFs during the lapse in appropriations departs from longstanding policies without providing a reasoned explanation for doing so. It is longstanding practice for Presidents to act in concert with Congress when undertaking large-scale RIFs. "Even the most cursory examination of history readily reveals that, over the past century, Presidents have worked *with* Congress – rather than around it – when seeking to significantly reorganize the agencies that comprise the Executive Branch." *Trump*, 145 S. Ct. at 2636 (Jackson, J., dissenting). However, here, the agencies sharply depart from historical practice, unilaterally acting out President Trump's and OMB Director Vought's retaliatory and partisan "policy goal" of punishing Democrat-oriented agencies amid a government shutdown. Unable to discern any reasoned basis for the agency defendants' actions, the Court concludes that plaintiffs are likely to succeed on their arbitrary and capricious claim under the APA.

### 3.    Not In Accordance With Law Under the APA

Plaintiffs argue that federal agencies may not conduct RIFs during a government shutdown

and that OMB and OPM's directive is contrary to law.  Defendants' opposition briefs, at the TRO stage and now, noticeably do not address this claim (Claim I) on the merits at all.  At the hearing on the TRO, counsel for defendants repeatedly refused to answer the Court's question of whether or not defendants' actions are legal, instead saying that defendants were "not prepared" to address the merits that day.  At the preliminary injunction hearing, defense counsel raised numerous arguments for the first time that defendants omitted from their briefs.

The Court finds that plaintiffs are likely to succeed on the merits of Claim I, that the OMB Lapse Memorandum and subsequent OPM Guidance and Special Instructions are unlawful.  On its face, the OMB Lapse Memorandum plainly oversteps the Executive's boundaries, pushing aside Congressional mandates without explanation.  The Lapse Memorandum announces: "With respect to those Federal programs whose funding would lapse and which are otherwise unfunded, such programs are no longer statutorily required to be carried out."  OMB Lapse Mem. at 2.  The memorandum thus essentially seeks to overturn the agency mandates Congress has put in place, offering no authority for this extreme legal position.  At the hearing, defense counsel asserted that OMB's position was "obviously correct," pointing to various sources of authority seemingly inapposite to the shutdown RIF case at hand, such as legislative bills containing an "appropriations rider" and the President's "removal authority."  None of this was in the papers, nor is it persuasive. At the hearing, counsel for defendants also argued that laying off government workers during a shutdown was "morally the right thing" to do.

Defendants' opposition brief makes no real attempt to justify the position OMB takes in the Lapse Memorandum.  The closest defendants' papers come to justifying the legality of their actions is a reference in their arbitrary and capricious section that "[a]n agency's 'shortage of funds' is one of the explicit regulatory predicates for a RIF."  *See* Opp'n at 11 (quoting 5 C.F.R. § 351.201(a)(2)).  Defendants take this quote wholly out of context.  The regulation they cite governs "Use of Regulations" for RIFs, and it reads in full:

> Each agency shall follow this part when it releases a competing employee from his or her competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement, when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the

> exercise of reemployment rights or restoration rights; or reclassification of an employee's position die to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days.

5 C.F.R. § 351.201(a)(2). This regulation does not authorize agencies to disregard their statutory mandates during a lapse in appropriations. Indeed, it could not, because "the regulations of an agency of the United States must be issued within the powers conferred by Congress." *Fed. Maritime Comm'n v. Anglo-Canadian Shipping Co.*, 335 F.2d 255, 258 (9th Cir. 1964) (citation omitted). Here, the authorizing statutes do not confer the power that defendants now claim. *See* 5 U.S.C. §§ 1302, 3502, 3503. Defendants seem to acknowledge this by never quite expressly saying *what* legal grounds support their determination that a shutdown does away with agencies' statutory mandates.

OMB and OPM thus assume for themselves power that they simply do not have to override Congress's express mandates. "Administrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). "[A]n agency is not free simply to disregard statutory responsibilities[.]" *New York v. Kennedy*, --- F. Supp. 3d ---, No. 25-cv-196-MRD-PAS, 2025 WL 1803260, at *18 (D.R.I. July 1, 2025) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)), *stay pending appeal denied*, --- F.4th ---, 2025 WL 2658233 (1st Cir. Sept. 17, 2025). "'An agency may not confer power upon itself,' but instead must operate within the bounds 'authoritatively prescribed by Congress.'" *Id.* at *15 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)); *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). "At most, [OPM] can 'recommend[] policies relating to the . . . separation of employees' government-wide according to 'the merit system principles.'" *AFGE*, 2025 WL 2633791, at *15 (quoting 5 U.S.C. § 1103(a)(7)). As the Ninth Circuit recently observed, "OMB and OPM have only supervisory authority over the other federal agencies," and the government in that case conceded as much. *AFGE*, 139 F.4th at 1037 (citing 31 U.S.C. §§ 501-07; 5 U.S.C. §§ 1101-05).

In other words, a government shutdown does not relieve agencies of their statutory obligations. And OPM and OMB have no authority to override the requirements Congress has laid down in statute. The declarations filed in this case illustrate how mandates are being disregarded.

35

For instance, a Department of Education employee who administers a statutorily-created program providing employment opportunities to blind people was RIF'd along with her colleagues. Grassman Decl. ¶¶ 2-3, 8. She declares, "Because federal oversight of the Randolph-Sheppard Program is statutorily required, I had thought that my position was safe from staffing cuts. If the RIFs take effect, there will no longer be anyone at the Department of Education to oversee the Program." *Id.* ¶ 9. Every employee at the San Francisco Regional Office of HUD's Office of Fair Housing and Equal Opportunity received a RIF notice during the shutdown. Dkt. No. 79-16 ("Crocker Decl.") ¶¶ 2, 7. "This means that there is no one left to process and investigate complaints of Fair Housing Act violations arising out of Arizona, American Samoa, California, Guam, Hawaii, or Nevada." *Id.* ¶ 7.

Additionally, plaintiffs argue that defendants are acting contrary to law because having employees work on implementing RIFs during a government shutdown violates the Antideficiency Act. SAC ¶¶ 214-217. They point to OMB and OPM's direction that "OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities." OPM Special Instructions at 10. As discussed above, *see* § II.A, *supra*, the Antideficiency Act allows for workers to continue to perform "excepted activities" only in limited circumstances. Otherwise, the government is unlawfully accepting "voluntary services;" officers or employees who violate the Antideficiency Act "shall" be subject to adverse personnel actions and, if the violation was knowing and willful, "shall" be subject to fine and/or imprisonment. 31 U.S.C. §§ 1342, 1349, 1350. Defendants do not address this argument in their brief or make any justification for what "exception" allows for RIF implementation during a government shutdown.

To summarize, OMB and OPM purported to provide federal agencies with legal authority to implement RIFs and disregard their statutory mandates during a shutdown, and at least some of the federal agency defendants have followed suit.

### 4. Ultra Vires

"When an executive acts *ultra vires*, courts are normally available to reestablish the limits

on his authority." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated and remanded on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). The ability to enjoin unconstitutional action by government officials dates back to the courts of equity, "reflect[ing] a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)).

Here, the *ultra vires* claim overlaps with the APA Claim I, alleging that OMB's and OPM's actions in issuing the Lapse Memorandum and subsequent Guidance and Special Instructions are contrary to law and exceed statutory authority. For the same reasons stated above with regard to APA Claim I, the Court finds plaintiffs are likely to succeed on the merits of their *ultra vires* claim (Claim II). *Cf. AFGE*, 139 F.4th at 1039 (where appellate court found likelihood of success on *ultra vires* claim and government did not contest the merits of plaintiffs' APA claims, "it straightforwardly follows that the actions violate the APA").

Because the Court finds plaintiffs likely to succeed on the merits of their claims under the APA (Claims I and III) and their *ultra vires* claim (Claim II), the Court does not at this time separately analyze plaintiffs' claim that defendants have violated the Appropriations Clause (Claim IV).

### B.    Irreparable Harm

The Court already determined that plaintiffs have a concrete injury to establish standing but must next consider whether plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20, 22. Plaintiffs assert they face unique harms by receiving RIF notices, or being threatened with RIFs, during a government shutdown. Mot. at 19-20. They argue that, in addition to emotional harm and potential loss of income, receiving a RIF notice during a shutdown means that errors in the notices cannot be corrected, employees cannot access information about job benefits and health insurance, and that the RIF notices that have gone out because of "political targeting" cannot be remedied by money damages. *Id.* at 20.

Defendants counter that "the employment-related harms Plaintiffs assert—up to and including loss of federal employment—are generally not irreparable." Opp'n at 7. In *Sampson*, the Supreme Court considered whether to enjoin the dismissal of an individual employee and determined that the plaintiff had not made a sufficient showing of irreparable harm "in this type of case," even though the plaintiff would suffer at least a temporary loss of income. *Sampson v. Murray*, 415 U.S. 61, 63, 89-90, 92 (1974). The Court also recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68.

The Court agrees with plaintiffs that the evidence they have put forth in their declarations shows irreparable harm and repeats its observation from the TRO: RIFs during a government shutdown are not "ordinary" RIFs in any sense of the word. Conducting mass firings of federal government employees during a government shutdown is certainly a departure from the type of "normal situation" considered in *Sampson*. As noted above, it has never happened before. And unlike in *Sampson*, the Court here is not considering the potential loss of income of one individual employee, but the widespread termination of salaries and benefits for individuals, families, and communities with severe, far-reaching repercussions.

Twice now defendants have failed to confront the Ninth Circuit's recent ruling in a case challenging large-scale RIFs and reorganizations of federal agencies. *See AFGE*, 139 F.4th at 1040. In denying the government's application to stay the preliminary injunction,[18] the Ninth Circuit agreed with this Court that federal agency employees facing job loss due to widespread RIFs would suffer an irreparable injury in the absence of an injunction. *Id.* The appeals court stressed the "very substantial downstream impact" mass RIFs would have, "reaching far beyond the walls of the executive agencies." *Id.* The appeals court found it "obvious that 'back pay' is far from an adequate

_____

[18] The facts and procedural history of *American Federation of Government Employees v. Trump* are discussed above in Section I, Jurisdiction. After the Ninth Circuit denied the government's application for stay, the Supreme Court stayed the preliminary injunction but did not address the issue of irreparable harm. *See Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ---, 145 S. Ct. 2635 (2025).

38

remedy," noting that "[b]ack pay does not reinstate entire agency offices and functions," and cannot "account for harms resulting from loss of income in the interim or for gaps in health- and childcare that accompany job loss." *Id.* As the Ninth Circuit has noted, "[l]ack of timely access to health care poses serious health risks," especially for individuals with chronic health conditions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008). Plaintiffs cannot recover damages via an APA claim, making their monetary loss irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Moreover, from the declarations, it is apparent that the potential loss of healthcare looms as large as, or even more so, than the loss of income for employees facing potential RIFs. While no individual should be forced to sell their home or break a lease and relocate due to an illegally-issued RIF, a lapse in healthcare coverage cannot be remedied by backpay. For some of the impacted workers, the potential loss of health insurance truly feels like a matter of life or death. A 14-year Air Force veteran who now works in civil service states that he received a kidney transplant just days before the government shut down. Ronneberg Decl. ¶¶ 3, 5. His medications would cost over $9,000 per month without health insurance. *Id.* ¶ 5. He declares, "Any gap in healthcare coverage, especially one caused by a RIF during the shutdown when I am also not being paid, is enough to put my life in serious jeopardy. . . . If I am terminated, my life will be at risk and, at the very least, my family will face financial ruin." *Id.*

The Court also rejects defendants' assertions that radically altered workplaces and increased workload of employees who are not subject to RIFs are too speculative and downstream to warrant extending relief to non-parties. Opp'n at 17. The workloads of plaintiffs' members will be significantly impacted by RIFs during a shutdown. As of October 10, 2025, more than 4,000 RIF notices had already gone out across eight defendant agencies and other defendant agencies "may actively be considering whether to conduct additional RIFs" or "are making predecisional assessments regarding offices and subdivisions that may be considered for potential RIFs[.]" Billy Decl. ¶¶ 7, 9. OMB Director Vought has publicly stated that the RIFs should top 10,000. Shively Decl., Ex. B. Plaintiffs' declarations show that some of their members are already drowning in work due to RIFs and other separations over the course of this year. Ronneberg Decl. ¶¶ 19-20 (significant

turnover at Federal Aviation Administration in last ten months "is creating chaos in an agency responsible for aviation safety in the United States. . . . And if RIF notices go out for the FAA during the shutdown, out headcount will further plummet, without a doubt, leading any who remain to shoulder this increasingly impossible burden of keeping our aviation system operating safely"); Crocker Decl. ¶¶ 4-5, 7-8 (intake staff at her HUD office was cut in half this year, "which made it been [sic] impossible to keep up with intake and has caused us to accrue a backlog of hundreds of cases" and they were "already severely understaffed prior to the shutdown"). If the shutdown RIFs issue, radically altered work environments for plaintiffs' members, even those who remain employed, are neither speculative nor downstream.

In sum, the Court finds plaintiffs have established irreparable harm.

### C.    Balance of Interests

The last two factors—assessing the harm to the opposing party and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief … pay[ing] particular regard for the public consequences. *Winter*, 555 U.S. at 24. In this context, these factors require the Court to consider whether vacating the OMB Memorandum and associated OPM Guidance and pausing agency RIFs harms the government more than it benefits the plaintiffs.

Defendants argue, primarily, that the requested preliminary injunction would irreparably harm the government by preventing agencies from taking steps to implement the President's policy priority that agencies should use the government shutdown as an opportunity to reduce their workforces. Opp'n at 14 (incorporating argument at Dkt. No. 41 at 19-20). Moreover, the government argues that a preliminary injunction would require agencies to retain employees that might otherwise have been laid off, allegedly costing the government millions of dollars each week it would not be able to recover even if the court's order was vacated. Defendants also contend that the district court's exercise of jurisdiction will have a disruptive effect on the administrative processes established by the government to handle federal employment disputes.

The Court is not persuaded by defendants' arguments because "the government does not 'suffer by a temporary preservation of the status quo.'" *AFGE*, 139 F.4th at 1030 (quoting *Am. Fed'n of Gov't Emps. v. Trump*, 782 F. Supp. 3d 793, 827 (N.D. Cal. 2025)). The harms suffered by federal employees affected by RIFs, on the other hand, are having drastic and imminent public consequences. Moreover, the Court finds that relief as ordered below would serve the public interest because "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations omitted). Therefore, this Court has no trouble finding that both factors weigh in favor of maintaining the status quo and issuing a preliminary injunction.

### D.    Scope of Remedy and Order

Plaintiffs request that the Court enjoin defendants from any further action to issue RIF notices "during or because of" the federal government shutdown in any PPA that includes any bargaining unit or member represented by any plaintiff. Mot. at 20. Plaintiffs further request that the Court order agencies to rescind RIF notices that have already gone out during the shutdown. *Id.* Finally, they ask that defendants file a further accounting of their actions within two business days of issuance of this preliminary injunction. *Id.* Defendants raise several objections in their opposition brief to the scope of relief requested by plaintiffs, which the Court addresses below. At the hearing, defendants asked that the Court's preliminary injunction clarify that only those RIFs related to the OMB Lapse Memorandum and the associated OPM guidance are to be enjoined. Defendants also objected to the two-day timeline for further accounting as unreasonable. Today's Order grants some, but not all, of the relief that plaintiffs request.

The Court is not persuaded by defendants' argument that the claims against the federal defendant agencies that have not yet issued RIF notices are unripe. Here, the Court has found that plaintiffs have standing on behalf of their members and in their own right as unions, that both the unions and their members (those who have and have not yet received RIF notices) have shown

likelihood of irreparable harm, and the Court is satisfied that the claims pertaining to all of the federal defendant agencies are ripe for review. OMB and OPM have already "directed" all federal agencies to use the "opportunity" of the shutdown "to consider Reduction in Force (RIF) notices for all employees" in PPAs that satisfy the criteria OMB has outlined. OMB Lapse Mem. at 2. The government's declarant indicates that other defendant agencies in addition to those that have already issued RIF notices "may actively be considering" shutdown-related RIFs or "are making predecisional assessments regarding offices and subdivisions that may be considered for potential RIFs[.]" Billy Decl. ¶ 9. The Court has found that OMB's and OPM's underlying directives for agencies to consider RIFs during the shutdown are likely unlawful. It therefore follows that the agencies' actions in carrying out those directives should be enjoined under the APA, regardless of whether the agency is still in the RIF planning process, whether they have paused RIF notices that otherwise would have issued absent a TRO, or whether their RIF notices have already gone out.

The Court likewise rejects defendants' argument that relief should not extend to "individuals who are not members of recognized bargaining units" in light of the recent Executive Orders impacting collective bargaining rights of the unions vis-à-vis the federal government. *See* Opp'n at 16 (citing Executive Orders 14251 and 14343). Plaintiffs have filed declarations that, notwithstanding the Executive Orders, they continue to provide representation to federal employees in bargaining units that are no longer recognized by the Executive Orders and their members continue to pay dues. Dkt. No. 79-2 ("Cann Decl.") ¶¶ 6-7; Biggs Decl. ¶ 5; Dkt. No. 79-5 ("Sutton Decl.") ¶ 5; Erwin Decl. ¶ 5; Kaspar Decl. ¶ 8; Dkt. No. 79-8 ("Neuman Decl.") ¶ 11. Moreover, as plaintiffs note, the Executive Orders are currently the subject of "many lawsuits" and whether the Executive Orders will ultimately be upheld as lawful remains unclear. *See* Reply at 13 n.11 (collecting cases).

The Court finds it appropriate to continue to enjoin any implementation of shutdown-related RIFs in the entire PPA where an individual who is a member of a plaintiff union works, even if this provides relief to those who are not union members. Defendants argue that doing so would be contrary to the Supreme Court's recent decision in *Trump v. CASA*, 606 U.S. 831 (2025). Opp'n at 15. But in *CASA*, the Supreme Court declined to extend its holding to the APA context. 606 U.S.

at 847 n.10, 869 ("To be sure, in the wake of the Court's decision, . . . in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule.") (Kavanaugh, J., concurring).  Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary and capricious or contrary to law.  5 U.S.C. § 706(2).

In order to provide complete relief to plaintiffs, the Court finds that any RIFs administered *because of and during* the shutdown must be enjoined in the entire PPA or competitive area containing any of the employees the plaintiffs represent.[19]  While defendants argue that this would impermissibly extend relief to non-parties under *CASA*, the Court is not persuaded.  "The equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*.  While party-specific injunctions sometimes advantage nonparties, they do so only incidentally." *CASA*, 606 U.S. at 851 (internal quotation marks and citations omitted).  The Supreme Court explained that in the "archetypal case" where one neighbor sues another for blasting loud music at all hours of the night, a court must enjoin the neighbor playing the music to provide complete relief, even though that will incidentally benefit other neighbors.  *Id.* at 851-52.  Here, too, "there is no way to peel off just the portion of the nuisance that harmed the plaintiff."  *See id.* (internal quotations and citations omitted).  First, plaintiffs explain that a piecemeal injunction that only applies to certain employees within a PPA would be unworkable, given detailed procedural safeguards and retention preferences that apply to how RIFs are conducted under 5 U.S.C. § 3502.  *See* Mot. at 24 & n.16; Reply at 12.  The entire ranking process and retention preference analysis would need to be redone.  Defendants have not responded to this argument.  Second, layoffs within any given PPA or competitive area will cause plaintiffs' members to have increased workloads in drastically altered working environments to compensate for reduced workforces.  Ronneberg Decl.

---

[19] Where there are factual disputes about whether a pending RIF is occurring "because of and during" the shutdown or whether the RIF was already in process and is unrelated to the shutdown, the Court will hold an evidentiary hearing as to that agency.  At the preliminary injunction hearing, the parties flagged that there are disputes as to Interior, Education, and USPTO (within Commerce).  At this time, the Court will apply the preliminary injunction to these defendants for the reasons stated in this Order.  The Court may exempt these defendants from the injunction following the evidentiary hearing.

¶¶ 19-20; Crocker Decl. ¶¶ 4-5, 7-8.  Plaintiff unions' purpose is to protect their members' interests in the workplace, and plaintiffs have provided declarations explaining the increase in work and stress their members have experienced due to RIFs.  Dkt. No. 79-8 ("Medina Decl.") ¶ 17; Grassman Decl. ¶ 6.  In sum, non-plaintiff members may be incidentally benefitted by the complete relief required for plaintiffs.

The Court agrees with defendants, however, that rescinding the RIF notices that have already gone out is equivalent to final relief and therefore premature at the preliminary injunction phase. The Court finds that it is sufficient that the clock on those RIF notices is now paused and that those employees cannot be separated from their jobs while the injunction is in place.

The Court also agrees that the accounting plaintiffs request is unduly burdensome for defendant agencies to complete within two days and extends the timeline to one week from issuance of the preliminary injunction.

For clarity, this injunction does not apply to RIF notices that issued before the government shut down on October 1, 2025.  Those RIF notices are outside the scope of this lawsuit, which challenges RIFs during and because of the government shutdown.  *See* Reply at 15.  This means that the RIF notices that went to SBA employees on September 29 or 30 are not covered by this Order.

Defendants also request that any injunctive relief be accompanied by a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The district court retains discretion "as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted).  The government has requested that the Court require plaintiffs give security in an amount "commensurate to the salaries and benefits the government must pay—to the extent injunctive relief might extend beyond the lapse—to any employees it would prefer to separate from service, but would be prevented from doing so for the duration of any preliminary relief."  Opp'n at 24.  The reality is that neither furloughed nor excepted employees are being paid right now due to the government shutdown, so there is currently no loss to the government.  The Court also notes that

United States District Court
Northern District of California

United States District Court
Northern District of California

defendants seek security only for injunctive relief that "might" extend beyond the lapse in appropriations. At this point there is no telling how long the lapse in appropriations will extend and defendants have not provided support for security in any fixed amount. The Court will require that plaintiffs post a nominal bond of $10 total (not per plaintiff) **by no later than November 4, 2025.**

Finally, the Court denies defendants' request for a stay of execution of the preliminary injunction, as doing so would render the relief pointless. It would deprive plaintiffs of their ability to prevail in this case in any practical sense of the term, and they have already shown a likelihood of success on the merits.

### PRELIMINARY INJUNCTION

Accordingly, pursuant to this Court's authority including but not limited to authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights," 5 U.S.C. §705, IT IS HEREBY ORDERED as follows:

Defendants OMB, OPM, and Defendant Federal Agencies;[20] their officers, agents, servants, employees, and attorneys; and all persons acting by, through, under, or in concert with these Defendants are hereby enjoined and/or stayed pursuant to 5 U.S.C. § 705 as follows from:

1. Taking any action to issue any Reduction in Force ("RIF") notices during and because of the federal government shutdown to federal employees in any PPA (program, project, or activity) or competitive area that includes any bargaining unit or member represented by any Plaintiff,[21] including but not limited to by taking

---

[20] Defendant Federal Agencies are the departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Justice, Interior, Labor, State, Treasury, Transportation, and Veterans Affairs, as well as the Consumer Product Safety Commission, Environmental Protection Agency, Equal Employment Opportunity Commission, Federal Trade Commission, General Services Administration, Institute of Museum and Library Services, National Aeronautics and Space Administration, National Archives and Records Administration, National Endowment for the Arts, National Endowment for the Humanities, National Gallery of Art, National Science Foundation, National Transportation Safety Board, Nuclear Regulatory Commission, Small Business Administration, Smithsonian Institute, Social Security Administration, the International Development Finance Corporation, the Peace Corps, Commodity Futures Trading Commission, Federal Communications Commission, Federal Elections Commission, Securities and Exchange Commission, and Merit Systems Protection Board.

[21] Plaintiffs include the American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State County and Municipal Employees, AFL-CIO

any action to implement or enforce the OMB Lapse Memorandum (dated September 24, 2025), the portions of the related OPM Guidance for Shutdown Furloughs (as revised September 28, 2025), the related OPM "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025" (dated September 28, 2025), or any other decision or directive that purports to authorize or require issuance of RIF notices during a shutdown; and

2. Taking any action to administer or implement any Reduction in Force ("RIF") notices issued during and because of the federal government shutdown to federal employees in any PPA (program, project, or activity) or competitive area that includes any bargaining unit or member represented by any Plaintiff, including but not limited to by taking any action to implement or enforce the OMB Lapse Memorandum (dated September 24, 2025), the portions of the related OPM Guidance for Shutdown Furloughs (as revised September 28, 2025), the related OPM "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025" (dated September 28, 2025), or any other decision or directive that purports to authorize or require issuance of RIF notices during a shutdown.

The phrase "federal employees in any PPA (program, project, or activity) or competitive area that includes any bargaining unit or member represented by any Plaintiff" includes (a) "federal employees in any PPA or competitive area" in which Plaintiffs have any members, regardless of whether those members are employed in a bargaining unit that is represented by a Plaintiff; and (b) "federal employees in any PPA or competitive area" in which any Plaintiff is or was a recognized collective bargaining representative of a bargaining unit prior to or after the issuance of Executive Orders 14251 and 14343, the effect of which is the subject of legal dispute.

The reference to issuance of RIF notices "during and because of the federal government shutdown" or "during a shutdown" applies to any RIF notices issued on or after October 1, 2025, and before the end of the federal government shutdown, unless the Court determines following an evidentiary hearing that the RIF was planned to occur independent of and before the shutdown.

IT IS FURTHER ORDERED that each Defendant shall:

3. By November 4, 2025, file an accounting of any RIFs that have been issued on or after October 1, or that were in preparation at the time of this Court's TRO (ECF 56), clarified and modified TROs (ECF 70, 82), and/or preliminary injunction, including at a minimum information identifying: a) the impacted PPAs or competitive areas, including information or parameters (such as a description of the office or program within the agency) used by the Defendant to define

---

("AFSCME"), AFGE Local 1236, and AFGE Local 3172, National Federation of Federal Employees ("NFFE"), Service Employees International Union ("SEIU"), National Association of Government Employees, Inc. ("NAGE"), National Treasury Employees Union ("NTEU"), International Federation of Professional and Technical Engineers, AFL-CIO ("IFPTE"), and the American Federation of Teachers ("AFT").

United States District Court
Northern District of California

the PPAs or competitive areas; b) whether each impacted PPA or competitive area includes any employees subject to this Court's injunction; c) how many employees are within each such PPA or competitive area; and d) the number of employees within each such PPA or competitive area whom Defendant has identified as protected by the Court's injunction.

   4. Within ten (10) business days of this Court's injunction, file declarations from each Defendant detailing the steps it has taken to comply with this Court's injunction.

## CONCLUSION

  For the reasons stated above, the Court GRANTS plaintiffs' motion for a preliminary injunction, except that this Order does not provide all of the relief plaintiffs have requested. A preliminary injunction is in effect, as stated above. Plaintiffs shall post a bond of $10 total (not per plaintiff) by no later than November 4, 2025. Defendants' request for a stay of the injunction is denied. Defendants shall file their accounting of RIFs by November 4, 2025.

  The parties shall meet and confer regarding the timing of an evidentiary hearing as to the shutdown RIFs at the Department of Interior, the Department of Education's Office of Civil Rights, and the U.S. Patent and Trademark Office (within Commerce). For now, the above injunction applies to these agencies, but the Court may modify the injunction following an evidentiary hearing.

  **IT IS SO ORDERED**.

Dated: October 28, 2025

_____

SUSAN ILLSTON
United States District Judge