STANLEY E. WOODWARD, JR.
Associate Attorney General
BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON
Deputy Assistant Attorney General
MICHAEL K. VELCHIK
Senior Counsel to the Assistant Attorney General
ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division
CHRISTOPHER R. HALL
Assistant Branch Director
BRAD P. ROSENBERG
Special Counsel
STEVEN M. CHASIN (DC Bar No. 495853)
PIERCE J. ANON
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-0747
E-mail: steven.m.chasin2@usdoj.gov
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Case No. 3:25-cv-08302-SI <br><br> **DECLARATION OF JACQUELINE CLAY PURSUANT TO ORDER ISSUED AT NOVEMBER 14, 2025 STATUS CONFERENCE** |

I, Jacqueline Clay, declare as follows:

1. I am the Chief Human Capital Officer at the U.S. Department of Education, headquartered in Washington, D.C. I have served in this position since June 22, 2019.

2. In my role at the U.S. Department of Education ("agency" or "ED"), I am responsible for personnel management. I have the responsibility for tracking and recording personnel actions, including Reductions-in-Force (RIFs). I assist in ensuring that all personnel actions comply with court orders and federal law.

3. I make this declaration pursuant to the Court's order at the November 14, 2025 Status Conference in this case. As stated in the Minute Order dated November 17, 2025 summarizing that Status Conference, "The Court **ORDERED** that Defendants file a report updating the Court on what actions have been taken on the RIFs that were issued as of 10/1/2025." ECF No. 115. I further understand that at the Status Conference, the Court specified that this report should pertain to RIFs which are within the scope of the Court's temporary restraining order (TRO) (ECF No. 56) and/or the preliminary injunction order (PI Order) (ECF No. 94) entered in this case.

4. Plaintiffs in this lawsuit include eight national unions, American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"), National Federation of Federal Employees ("NFFE"), Service Employees International Union ("SEIU"), National Association of Government Employees, Inc. ("NAGE"), National Treasury Employees Union ("NTEU"), International Federation of Professional and Technical Engineers, AFL-CIO ("IFPTE"), and the American Federation of Teachers ("AFT"), and two local California-based chapters, AFGE Local 1236 and AFGE Local 3172.

5. I am aware of and have reviewed the Court's October 15, 2025 TRO (ECF No. 56), which granted Plaintiffs temporary injunctive relief and restrained certain Defendants from taking specified actions related to RIFs.

6. Specifically, the TRO provides that Defendants are restrained from:

   1) taking any action to issue any Reduction in Force ("RIF") notices to federal employees in any PPA (program, project, or activity) that includes any bargaining unit or member represented by any Plaintiff during or because of the federal government shutdown, including but not limited to by taking any action to implement or enforce the OMB Lapse Memorandum (dated September 24, 2025), the portions of the related OPM Guidance for Shutdown Furloughs (as revised September 28, 2025), the related OPM "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025" (dated September 28, 2025), or any other decision or directive that purports to authorize or require issuance of RIF notices during a shutdown;

   2) taking any further action to administer or implement any RIF notices already issued beginning on October 10, 2025 to federal employees in any PPA (program, project, or activity) that includes any bargaining unit or member represented by any Plaintiff, including but not limited to by requiring federal employees to perform work to further administer or implement RIF notices and by enforcing or counting any days towards any period of notice with respect to those notices (i.e., the effective date of the RIF shall be stayed and Defendants shall therefore toll the running of all RIF notice periods).

7. The TRO also required Defendants to report certain information by October 17, 2025:

   Defendants shall serve and file an accounting of all RIFs, actual or imminent, that are enjoined by this TRO, including but not limited to a description of the agency that imposed or is planning to impose the enjoined RIF, the number of employees included in the enjoined RIF, and description of the PPAs that Defendants included in the enjoined RIF.

8. I am aware that the TRO subsequently was clarified and modified. *See* ECF No. 70, 82.

9. I also am aware of and have reviewed the Court's October 28, 2025 PI Order (ECF No. 94), which granted Plaintiffs preliminary injunctive relief and enjoined Defendants from taking certain actions related to RIFs.

10. The Court's PI Order provides that Defendants are enjoined from:

1) taking any action to issue any RIF notices during and because of the federal government shutdown to federal employees in any PPA (program, project, or activity) or competitive area that includes any bargaining unit or member represented by any Plaintiff, including but not limited to by taking any action to implement or enforce the OMB Lapse Memorandum (dated September 24, 2025), the portions of the related OPM Guidance for Shutdown Furloughs (as revised September 28, 2025), the related OPM "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025" (dated September 28, 2025), or any other decision or directive that purports to authorize or require issuance of RIF notices during a shutdown;

2) taking any action to administer or implement any RIF notices issued during and because of the federal government shutdown to federal employees in any PPA (program, project, or activity) or competitive area that includes any bargaining unit or member represented by any Plaintiff, including but not limited to by taking any action to implement or enforce the OMB Lapse Memorandum (dated September 24, 2025), the portions of the related OPM Guidance for Shutdown Furloughs (as revised September 28, 2025), the related OPM "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025" (dated September 28, 2025), or any other decision or directive that purports to authorize or require issuance of RIF notices during a shutdown.

11. The PI Order specifies, with respect to the above, that:

1) The phrase "federal employees in any PPA (program, project, or activity) or competitive area that includes any bargaining unit or member represented by any Plaintiff" includes (a) "federal employees in any PPA or competitive area" in which Plaintiffs have any members, regardless of whether those members are employed in a bargaining unit that is represented by a Plaintiff; and (b) "federal employees in any PPA or competitive area" in which any Plaintiff is or was a recognized collective bargaining representative of a bargaining unit prior to or after the issuance of Executive Orders 14251 and 14343, the effect of which is the subject of legal dispute.

2) The reference to issuance of RIF notices "during and because of the federal government shutdown" or "during a shutdown" applies to any RIF notices issued on or after October 1, 2025, and before the end of the federal government shutdown, unless the Court determines following an evidentiary hearing that the RIF was planned to occur independent of and before the shutdown.

12. The PI Order also required Defendants to report certain information by November 4, 2025:

> Each Defendant shall file an accounting of any RIFs that have been issued on or after October 1, or that were in preparation at the time of this Court's temporary restraining order (TRO) (ECF 56), clarified and modified TROs (ECF 70, 82), and/or preliminary injunction, including at a minimum information identifying: a) the impacted PPAs or competitive areas, including information or parameters (such as a description of the office or program within the agency) used by the Defendant to define the PPAs or competitive areas; b) whether each impacted PPA or competitive area includes any employees subject to this Court's injunction; c) how many employees are within each such PPA or competitive area; and d) the number of employees within each such PPA or competitive area whom Defendant has identified as protected by the Court's injunction.

13. The PI Order also required, by November 12, 2025, that each Defendant file a declaration "detailing the steps it has taken to comply with this Court's injunction."

14. Pursuant to these requirements in the TRO and PI Order, the agency previously submitted declarations which explained, in relevant part, that the agency had issued the following RIF notices, within the scope of the TRO and/or PI. As stated in my declaration of November 12, 2025 (ECF No. 112-6 at Par. 9): On October 10, 2025, ED issued RIF notices to 465 of the approximately 2,536 agency employees. Identified below is the specific number of RIF notices the agency sent out, as well as the total number of employees, in the relevant program, project, or activity (PPA), affected by the October 10 RIF:

    a. Office of the Secretary (4 RIF notices, out of 58 employees)

    b. Office for Civil Rights (137 RIF notices, out of 446 employees)

    c. Office of Special Education and Rehabilitative Services (121 RIF notices, out of 135 employees)

    d. Office of Communications (7 RIF notices, out of 26 employees)

    e. Office of Postsecondary Education (64 RIF notices, out of 125 employees)

    f. Office of Elementary and Secondary Education (132 RIF notices, out of 185 employees)

As also stated in my declaration of November 12, 2025 (ECF No. 112-6 at Par. 10), in constructing the above inventory of RIF actions, ED did not distinguish between PPAs ("offices" above) employing persons represented by a Plaintiff union (pertinent to ED, that is Plaintiff AFGE) and PPAs that might not employ any AFGE members. Thus, as I stated in that declaration, all October 10 RIF notices are accounted for above, regardless of Plaintiff representation of employees who received those notices.

15. I understand that on November 12, 2025, the President signed into law H.R. 5371, the "Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026" (referred to as the Continuing Resolution or the "C.R."). As relevant here, section 120(e) of the C.R. provides:

> (e) Notwithstanding section 106(1), any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect.
>
>     (1) Any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025, without interruption. Such employees shall receive all pay to which they otherwise would have been entitled in the absence of receiving such notice, including backpay in accordance with section 116 of this Act.
>
>     (2) Within 5 days of date of enactment of this Act, each Federal agency shall send notice to all affected employees and the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives of the withdrawal of the reduction in force notice and the affected employee's reinstatement, if applicable.
>
>     (3) Notices must include reinstatement date and the amount of back pay determined in paragraph (1), if applicable.

16. Pursuant to C.R. section 120(e), the agency, on November 12, 2025, rescinded the RIF notices to all of the 465 employees inventoried in Par. 14 above, and sent notice to all of those affected employees including information regarding backpay, and on November 17, 2025, sent notice of the rescissions to Congress.

17. As also stated in my November 12, 2025, declaration in this case (ECF No. 112-6 at Par. 11-12), in April 2025, ED issued RIF notices to 299 Office for Civil Rights (OCR) employees, providing 60 days notice of June 2025 separation-from-employment dates. None of those 299 OCR employees are among the 137 OCR employees—as identified in the inventory in Par. 14 above—to whom a RIF notice was (later) issued on October 10 and as to whom RIF notices were rescinded as described in Par. 16 above.

18. As also stated in my November 12, 2025, declaration in this case (ECF No. 112-6 at Par. 11-12), the March 2025 RIF of OCR employees was subsequently enjoined by a district court in two separate actions. Stays of those district court injunctions were obtained in one action in July 2025, and in the other on September 29, 2025. On October 14, 2025, ED emailed the OCR employees who had received RIF notices in April stating that their separation dates had been adjusted from June to November.  *See* Exhibit A. Thus, there are two separate RIFs at ED involving two entirely separate groups of OCR employees:

- the March 2025 RIF, now encompassing 247 OCR employees (out of 299 OCR employees that received RIF notices in April 2025, 52 of which departed from OCR or ED entirely in the interim); and

- the October 10, 2025 RIF, encompassing 137 OCR employees.

Put differently, included in the 446 total number of OCR employees (as referenced in the inventory above in Par. 14(b)), are 384 employees who received RIF notices: (i) the 137 OCR employees who were subject to the lapse-related October RIF, and (ii) the 247 OCR

employees (currently on paid administrative leave) who were subject to the March RIF and who have not since departed from OCR or ED. Although the March 2025 RIF group of OCR employees is an entirely separate group from the 137 OCR employees to whom October 10 RIF notices were issued, and finalizing the March 2025 RIF does not involve issuing or implementing a RIF during and because of the shutdown, ED has paused separating the March RIF OCR employees pursuant to this Court's preliminary injunction pending clarification from the Court that the current preliminary injunction does not encompass ED's March 2025 RIF.

19. ED has not rescinded the RIF notices to OCR employees for the March 2025 RIF. The notice period for that RIF is tolled and the separation dates for those employees are stayed, pending clarification from this Court that the current preliminary injunction does not encompass that pre-shutdown RIF.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 21, 2025

/s_____
Jacqueline Clay

# Exhibit A

**Jackson, Candice**

| | |
|---|---|
| **From:** | CHCO-Info |
| **Sent:** | Tuesday, October 14, 2025 1:55 PM |
| **Subject:** | Update on Reduction in Force for OCR |
| **Attachments:** | VRLC Stay.pdf |

Dear Colleague,

Pursuant to, and consistent with, the September 29, 2025, U.S. Court of Appeals For the First Circuit decision to stay a lower court's injunction regarding the implementation of the Reduction in Force (RIF) as to the Office of Civil Rights, the Department of Education is continuing with the RIF.

A RIF notice was previously issued to you on April 30, 2025, with an original separation date of June 30, 2025, under the required 60-day notice period. **Following the Court of Appeals decision, your separation date has been adjusted to November 3, 2025.** You will receive a final statement of your leave accruals and any additional payments you are entitled to under law.

The Department appreciates your service and recognizes the difficulty of the moment. This RIF action is not a reflection upon your performance or conduct and is solely due to agency restructuring, as described in previous correspondence.

With regard,

Jacqueline Clay
Chief Human Capital Officer

Attachment:
24A1203 McMahon v. New York, 7-14-25

# United States Court of Appeals
## For the First Circuit

No. 25-1787

VICTIM RIGHTS LAW CENTER; T.R., by and through his parent, Tara Blunt; TARA BLUNT; A.J., by and through his parent, Karen Josefosky; KAREN JOSEFOSKY

Plaintiffs, Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; CRAIG TRAINOR, in his official capacity as Acting Assistant Secretary for Civil Rights

Defendants, Appellants.

Before

Montecalvo, Rikelman, and Aframe,
Circuit Judges.

**ORDER OF COURT**

Entered: September 29, 2025

The government seeks a stay pending appeal of an injunction issued by the district court on June 18, 2025, ("Injunction") and an administrative stay. The Injunction preliminarily prevented the United States Department of Education ("Department") from implementing a sweeping reduction-in-force ("RIF") announced in March that reduced by half the staff of the Department's Office of Civil Rights ("OCR"). In July, after the district court had issued the Injunction, the Supreme Court stayed pending appeal a similar injunction in a case challenging the same RIF as it applied to the entire Department, not just OCR. See McMahon v. New York, 145 S. Ct. 2643 (2025).[1] In light of the Supreme Court's stay in McMahon, the government moved the

---

[1] The parallel case challenging the RIF as applied to the entire Department has been variously captioned "New York v. McMahon" (before the District of Massachusetts), "Somerville Public Schools v. McMahon" (before this court), and "McMahon v. New York" (before the Supreme Court). For clarity, we refer to that case herein as "McMahon."

district court to vacate the Injunction in this case or, in the alternative, for a stay pending appeal. The district court concluded that, although the two cases addressed the same underlying RIF, they were distinguishable, and the Supreme Court's McMahon order did not require it to vacate the Injunction or issue a stay pending appeal. For the reasons that follow, at this preliminary stage, we cannot agree and grant the government's motion for a stay.

In March 2025, the Department announced a RIF that would cut the Department's staff by about half. Many suits have challenged this RIF in whole or in part, including this case and McMahon. In McMahon, the plaintiffs challenged the RIF's effect on the entire Department, whereas in this suit, the challenge is limited to the effect the RIF had on OCR. The two cases were assigned to the same district court judge and have proceeded along parallel tracks.

The Plaintiffs here are two former public school students and their parents as well as an advocacy group, the Victim Rights Law Center ("VRLC"). The students, A.J. and T.R., allege that they were bullied at the public schools they attended on the basis of disability and race, respectively. They contend that, when this bullying and harassment went unaddressed, they were forced to withdraw from school. They then filed complaints with OCR; A.J. for disability-based harassment and failure to implement a Section 504 plan, T.R. for racial harassment under Title VI of the Civil Rights Act of 1964. But, they say, neither complaint has been investigated or addressed because of RIF-imposed staffing cuts at OCR.[2] VRLC is a nonprofit "dedicated to serving the legal needs of victims of sex-based harassment," including by representing students in OCR investigations. VRLC alleges that it has been forced to "divert its limited resources to exploring alternative [non-OCR] remedies for its clients" and anyone else who might seek its advice.

The district court determined that the Plaintiffs were likely to succeed on the merits of several of their claims. It found that the RIF had eliminated about half of OCR's 550-person staff and shuttered seven of OCR's twelve regional offices. This reduction, the district court determined, "leaves OCR with the capacity to address only a small fraction of the complaints that it receives, making it impossible for OCR to comply with its statutory and regulatory obligations." It concluded that the Department's implementation of the RIF likely violated the Administrative Procedure Act as it was likely arbitrary and capricious and contrary to law, including Title VI's and Title IX's mandates that OCR enforce the Civil Rights Act's antidiscrimination provisions. See 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. It also found that the Plaintiffs were likely to prevail on their claim that the RIF exceeded the Department's lawful authority.

Finding that the balance of equities also favored the Plaintiffs, the district court preliminarily enjoined the implementation of the RIF as to OCR. In relevant part, the Injunction ordered the government to "stay the termination or elimination, and take all steps necessary to facilitate the return to duty, of all OCR employees whose employment was set to be terminated or otherwise eliminated as part of the reduction-in-force announced on March 11, 2025 to restore the OCR to the status quo such that it is able to carry out its statutory functions."

The McMahon plaintiffs, by contrast, are a group of twenty-one states, two public school districts, and five labor unions. Somerville Pub. Sch. v. McMahon, 139 F.4th 63, 67 (1st Cir.

---

[2] Plaintiff A.J. later settled his claims in private mediation.

2025).  Unlike the Plaintiffs here, who challenge the RIF with respect to OCR only, the McMahon plaintiffs challenged the RIF order as it applied Department-wide.

In McMahon, as here, the district court concluded that the RIF's implementation likely violated the APA, again because it was likely arbitrary and capricious and contrary to law. Accordingly, on May 22, 2025, the district court in McMahon enjoined implementation of the RIF as a whole ("McMahon Injunction"), ordering the government to "reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the reduction-in-force announced on March 11, 2025 to restore the Department to the status quo such that it is able to carry out its statutory functions."  New York v. McMahon, 784 F. Supp. 3d 311, 374 (D. Mass. 2025).

The McMahon Injunction issued on May 22, 2025.  The government moved for a stay pending appeal, which we denied on June 4.  See generally Somerville Pub. Sch., 139 F.4th 63. Two weeks after our opinion in McMahon, the Injunction in this case issued.  About a month after that, on July 14, the Supreme Court stayed the McMahon Injunction pending appeal, permitting the Department-wide RIF to go into effect.  McMahon, 145 S. Ct. 2643.

In light of the Supreme Court's order in McMahon, the government then asked the district court here to vacate the Injunction or, in the alternative, for a stay pending appeal.  The district court declined to vacate the Injunction or to issue a stay.  This appeal followed.

As the party seeking a stay, Defendant-Appellants bear the burden of showing they are entitled to such "extraordinary" relief.  Rhode Island v. Trump, No. 25-1477, 2025 WL 2621593, at *3 (1st Cir. Sept. 11, 2025) (citation omitted).  The now-familiar Nken factors guide our analysis:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Nken v. Holder, 556 U.S. 418, 434 (2009) (citation omitted).  The first two Nken factors "are the most critical."  Id.

The government characterizes this case as a "lesser-included version" of McMahon and focuses much of its briefing on that point.  Because, it maintains, the Supreme Court's McMahon order controls, we should reach the same result here that the Supreme Court did there.

We have now considered McMahon's impact in the context of several stay applications. See, e.g., New York v. Kennedy, No. 25-1780, 2025 WL 2658233, at *2 (1st Cir. Sept. 17, 2025); Rhode Island, 2025 WL 2621593, at *3-4.  As we noted in those orders, the Supreme Court in McMahon provided no explanation for the stay it ordered.  So, as before, we have carefully reviewed the McMahon order in light of the arguments raised in the parties' briefs to the Supreme Court in McMahon, mindful of the Supreme Court's guidance that, although "not conclusive as to

- 3 -

the merits," interim orders like the one in McMahon "inform how a court should exercise its equitable discretion in like cases." Trump v. Boyle, 145 S. Ct. 2653, 2654 (2025).

We are persuaded that, given the particular facts and the arguments made by the parties in the stay briefing to us, this case appears to be—unlike other cases in which we have considered the Supreme Court's McMahon order—effectively a subset of McMahon and is sufficiently "like" McMahon such that the McMahon order must control the outcome at this early stage of the litigation. First, and most critically, the essential facts here were before the Supreme Court in McMahon, and the Plaintiff-Appellees have not presented any argument to us that those facts have changed in any material way, if at all, since the McMahon order in mid-July. Further, the district court discussed the very same plaintiffs here in the McMahon Injunction at some length. McMahon, 784 F. Supp. 3d at 329-31 (discussing effect of RIF on OCR and specifically A.J., T.R., and VRLC); id. at 369-72 (same). As the district court explained there, OCR is how the Department "safeguard[s] equal access to public education," one of five areas the district court described in McMahon as some of the Department's "critical programs and functions." Id. at 328-29. And in its discussion in McMahon of the RIF's effect on OCR, the district court recounted in detail the facts of the harassment that T.R. and A.J. suffered, and OCR's failure to take action on their complaints. Id. at 331.

Elsewhere in its order, the district court identified as one of the four irreparable harms supporting an injunction the "loss of essential services provided by the . . . [OCR]." Id. at 360. The opinion then discussed the staff cuts and office closures at OCR and specifically identified OCR's failure to address the harms suffered by A.J.:

> Cuts to OCR have already resulted in stalled or dropped investigations, further burdening Plaintiff States and [their] students . . . . A Michigan student who withdrew from public school due to harassment was informed on February 5, 2025 that OCR had paused its investigation into his complaint . . . [The family] has no reason to believe the school will take steps to keep A.J. safe in public school without OCR's intervention.

Id. at 370 (final alteration in original and citation omitted).

Besides the significant discussion of the facts of this case in the McMahon Injunction, the McMahon plaintiffs directly invoked the RIF's effect on OCR in their briefing before the Supreme Court, arguing that if the RIF were allowed to go into effect, "[s]tates will be forced to dedicate greater resources to civil rights enforcement because the Department cut half of the staff at OCR, including seven of the twelve regional OCR offices." Br. of State Pls., McMahon v. New York, 2025 WL 1697525, at *11. The government, too, discussed the effect of the RIF on OCR in its briefing before the Supreme Court. See Reply Br., McMahon v. New York, 2025 WL 1697526, at *7-8. In short, the facts and circumstances that underpin this case -- discussed in the briefing and underlying order in McMahon -- are a subset of the facts and circumstances in McMahon and were before the Supreme Court when it issued its order in that case.

- 4 -

Second, not only were the same facts before the Supreme Court when it decided McMahon, including about the very plaintiffs here, but also many of the legal issues in the two cases overlap. For example, when the district court addressed the government's argument that the Civil Service Reform Act divested federal courts of jurisdiction to hear claims related to employment disputes between federal employees and the government, it recognized that the government had "advance[d] largely the same arguments . . . as they did in the Lead Case," and added that our order denying a stay in McMahon had "addressed, and squarely dismissed, Defendants' [jurisdictional] concerns." Similarly, in the context of its "discrete and final agency action" analysis, the district court explained that it was reaching the same conclusions it did in McMahon for the same reasons: "Defendants' contentions that their actions are not final . . . [are] unconvincing for the same reasons I held in the Lead Case." So too in its analysis of the Department's discretionary authority: "In the Lead Case, I addressed and dismissed Defendants' arguments that RIFs are generally subject to agency discretion." And in its discussion of whether the RIF was arbitrary and capricious: "I have already addressed why the March 11 Directive announcing the RIF was arbitrary and capricious in the Lead Case." The district court also borrowed from its prior analysis when addressing the equitable stay factors: "For a detailed analysis of the balance of the equities and the public interest factors, see [the district court's order in McMahon]. I further decline to impose bond for the same reasons explained in the Lead Case." Overall, in its thorough 43-page order granting the Injunction, the district court identified this suit as "related to" McMahon, referred to McMahon as the "Lead Case," and relied repeatedly on both its own decision to grant the McMahon Injunction and our decision to deny a stay of that injunction on appeal, noting the overlapping issues presented in both cases.

Third, the Injunction here and the injunction at issue in McMahon provided similar relief concerning the same agency action. Although the Plaintiff-Appellees here seek to enjoin only the portion of the RIF that affects OCR, while the McMahon plaintiffs sought to enjoin the RIF with respect to the entire Department, both suits challenge the same underlying agency action, and seek largely the same relief. Compare Victim Rts. L. Ctr. v. U.S. Dep't of Educ., Civ. No. 25-11042, 2025 WL 1704311, at *1 (D. Mass. June 18, 2025) ("This case arises from the impacts of the far-reaching March 11, 2025 reduction in force . . . which severely impacted OCR, resulting in the . . . dismissal of half its employees.") with McMahon, 784 F. Supp. 3d at 323 ("On March 11, 2025, Defendants announced a massive reduction in force . . . cutting the Department's staff by half."). At a minimum, the relief ordered here is substantially encompassed within the relief granted in McMahon. In the Injunction here, the district court ordered as follows:

> The Defendants are enjoined from carrying out the reduction-in-force announced on March 11, 2025 as to the employees of the Department of Education's Office for Civil Rights . . . . The Defendants shall stay the termination or elimination, and take all steps necessary to facilitate the return to duty, of all OCR employees whose employment was set to be terminated or otherwise eliminated as part of the reduction-in-force announced on March 11, 2025 to restore the OCR to the status quo such that it is able to carry out its statutory functions.

The relief ordered in McMahon is essentially the same, although not cabined to OCR:

- 5 -

> The Agency Defendants are enjoined from carrying out the reduction-in-force announced on March 11, 2025; from implementing President Trump's March 20, 2025 Executive Order . . . .  The Agency Defendants shall reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the reduction-in-force announced on March 11, 2025 to restore the Department to the status quo such that it is able to carry out its statutory functions.

McMahon, 784 F. Supp. 3d at 374.  That the two cases involve an identical challenged agency action and similar relief supports our determination that the McMahon stay order must inform our exercise of equitable discretion here even though, based on the text of the McMahon order, we do not know the grounds for the Supreme Court's decision to grant a stay in that case.

To be sure, the Plaintiff-Appellees have identified potential legal distinctions between their situation and those of the McMahon plaintiffs.  As they have pointed out, some of their arguments in support of their Article III standing in this case are legally and factually different from the arguments put forward by the plaintiffs in McMahon.  But given the significantly overlapping nature of the parties' injuries and the identical cause of those injuries, as well as the federal government's similar arguments against Article III standing in both cases, these distinctions are insufficiently material for us to conclude—at this early stage—that the standing analysis justifies a different stay outcome here than in the Supreme Court's grant of a stay in McMahon.[3]  And that leaves the scope of the injunctions as the main difference between the two cases, which appears to us, based on the arguments before us, insufficient to make this case not "like" McMahon at this preliminary stage.

We note the district court's careful analysis concluding that the Department's decision to reduce by half the staff of OCR, a statutorily-created office, imperils Congress's mandate that OCR "enforce federal civil rights laws that ban discrimination based on race, sex, and disability in the public education system."  Victim Rts. L. Ctr., 2025 WL 1704311, at *1.  Indeed, by Congress's design, OCR is to serve a key role in furthering equal access to public education in the United States by ensuring the implementation of federal legislation like the Civil Rights Act, see id., as well as the promise of Brown v. Board of Education, 347 U.S. 483 (1954). "Congress created the Department in the wake of the Supreme Court's decision in Brown v. Board of Education, a time when Congress recognized, from past experience, that the enforcement of the civil rights laws could face an inhospitable climate depending on the executive in power and the politics of the era." McMahon, 784 F. Supp. 3d at 373 (quoting Br. for Members of Congress as Amici Curiae Supporting Pls., McMahon, 784 F. Supp. 3d 311) (internal quotation marks omitted).  In this stay posture and at this preliminary stage of the litigation, however, we cannot conclude that this case

---

[3] The federal government does not appear to challenge T.R.'s Article III standing.  It does argue, however, that even if T.R. could succeed on the merits of his claims, the only relief to which he would be entitled would be narrow and could not support the particular injunction here.  The Plaintiff-Appellees have not presented a developed argument to us, at this stage, for why T.R.'s claims could support the injunction issued by the district court.

- 6 -

differs enough from McMahon to reach a contrary result to the Supreme Court's order staying the injunction in McMahon.

Our analysis of the Nken factors follows our conclusion that this case is of a piece with McMahon. Because this case is in effect a subset of another in which the Supreme Court has already issued a stay pending appeal, thus permitting the RIF challenged there to proceed, the government has made a strong showing that it is entitled to the same interim relief here. In light of the unique factual and legal overlap between these two cases, and the arguments presented by the parties in their briefing to us, we are persuaded at this preliminary stage that this is the sort of "like case" referred to by the Supreme Court in Boyle. 145 S. Ct. at 2654.

For all these reasons, the motion for a stay pending appeal is GRANTED. The accompanying motion for an administrative stay is DENIED AS MOOT.

**AFRAME**, **Circuit Judge**, **concurring**. I join my colleagues' conclusion that a stay is warranted here because this is a "like" case to McMahon under Boyle. New York v. McMahon, 606 U.S. ___, 145 S. Ct. 2643 (2025); Trump v. Boyle, 606 U.S. ___, 145 S. Ct. 2653 (2025). I write separately to emphasize that while the unreasoned order in McMahon was essential to resolving the government's stay appeal, that order's import will be limited as this case moves ahead.

Justice Kavanaugh has explained why the Supreme Court frequently does not issue reasoned orders when granting a stay of interim relief:

> [A]n opinion for [the Supreme Court] addressing likelihood of success on the merits for an emergency application can sometimes come at a cost. A written opinion by [the] Court assessing likelihood of success on the merits at a preliminary stage can create a lock-in effect because of the opinion's potential vertical precedential effect (de jure or de facto), which can thereby predetermine the case's outcome in the proceedings in the lower courts and hamper percolation across other lower courts on the underlying merits question.

Labrador v. Poe, 601 U.S. ___, 144 S. Ct. 921, 933-34 (Kavanaugh, J., concurring). In other words, unreasoned orders from the Supreme Court allow space for judges "to think and decide differently when [they] know[] more." Trump v. CASA, 606 U.S. 831, 877 (2025) (Kavanaugh, J., concurring).

We have decided the interim relief question here based on Boyle's command for treating like cases alike and the limited information before us about the reasons grounding the McMahon stay. Presumably, this case will carry on and the record will grow. If we confront this case again, it may well be after the district court has issued a final decision on the merits. At that point, the legal question will not be governed by Boyle. Instead, the legal question will be whether the plaintiffs have met their burden to show that the RIF is unlawfully impeding the operation of the Office of Civil Rights such that the administration is failing to execute a key feature of Congress's

- 8 -

plan for providing universal equal access to public education. The Supreme Court's unreasoned stay order in <u>McMahon</u> will have little to do with deciding that ultimate question.

By the Court:

Anastasia Dubrovsky, Clerk

cc: Hon. Myong J. Joun, Robert Farrell, Clerk, United States District Court for the District of Massachusetts, Donald Campbell Lockhart, Abraham R. George, Melissa N. Patterson, Steven A. Myers, Lindsey Reid Skibell, Sean R. Ouellette, Jonathan Hale Friedman