Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Alice X. Wang (SBN 335224)
Robin S. Tholin (SBN 344845)
Talia Stender (SBN 341654)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al.; <br><br> Defendants. | Case No. 3:25-cv-08302-SI <br><br> **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION OF PLAINTIFFS AFGE AND AFSA FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.      The 2025 Government Shutdown and the Continuing Resolution.............................2

    II.    The Administration's Misinterpretation of Section 120 of the CR ............................3

    III.   State Department's Imminent Separation of Employees............................................6

    IV.   Imminent Harm to Plaintiffs.......................................................................................7

ARGUMENT .........................................................................................................................9

    I.      This Court Should Enjoin Defendants' Imminent Unlawful RIFs Pending
             Consideration of a Preliminary Injunction ...............................................................9

          A.    Plaintiffs Are Likely to Succeed on the Merits ...............................................9

               1.    OPM and OMB's November directives to agencies to continue
                      implementing previously noticed RIFs are contrary to law and
                      are therefore ultra vires and violate the APA ......................................9

                    a.    Section 120 prohibits implementation of any RIFs
                          regardless of whether they were initiated before the
                          shutdown period ..........................................................................9

                    b.    Implementation of OMB and OPM's directives would
                          violate the Appropriations Clause ..........................................144

               2.    The imminent separations at the State Department are contrary
                        to Sections 120(a) and 120(e), and thus violate the APA and the
                        Appropriations Clause ......................................................................14

                 3.    The OPM and OMB memoranda and the decision to separate
                        the State Department employees are final agency actions subject
                        to the APA ........................................................................................16

          B.    Plaintiffs Face Imminent and Irreparable Harm ...........................................17

          C.    The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor ......18

CONCLUSION ...................................................................................................................18

1

# INTRODUCTION

2    Plaintiff American Federation of Government Employees ("AFGE") and proposed Plaintiff

3    American Foreign Service Association ("AFSA")[1] move this Court for an immediate temporary

4    restraining order ("TRO") staying and enjoining the imminent and unlawful execution of reductions

5    in force ("RIFs") by the Defendant United States Department of State ("State Department"),

6    scheduled for Friday, December 5, 2025.  Those RIFs would violate the federal legislation that ended

7    the federal government shutdown, which prohibits implementation of any RIFs through January 30,

8    2026, and mandates the rescission of previously noticed RIFs implemented during the shutdown.

9    Pub. L. No 119-37, §120, 139 Stat 495 (2025) (the "Continuing Resolution" or "CR").

10    On December 1, 2025, relying on the direction of Defendants Office of Personnel

11    Management ("OPM") and Office of Management and Budget ("OMB"), Defendant State

12    Department informed employees that they will be permanently separated from federal employment

13    on December 5, 2025.  This notice, and the direction under which it issued, were premised on

14    Defendants' position that the Continuing Resolution signed into law on November 12, 2025 applies

15    only to RIFs that were noticed on or after October 1, 2025, and so does not prohibit those actions.

16    Defendants are wrong.  The plain language of the Continuing Resolution prohibits any actions

17    implementing any RIFs of any employees at any agency between November 12, 2025 and January

18    30, 2026, *and* requires rescission of any previously issued RIF notices (regardless of when they were

19    issued) if the RIFs were implemented during the shutdown.  Plaintiffs are therefore likely to prevail

20    on their claims, which enforce the plain language of this statute.  Unless a TRO issues, Defendants'

21    imminent actions will cause Plaintiffs and the employees they represent significant irreparable harm,

22    and the balance of equities and public interest support halting these unlawful acts.  Plaintiffs therefore

23

24

25

26    _____
[1] Plaintiffs have filed herewith an Unopposed Motion for Leave to File Supplemental Complaint that
27    adds AFSA as a plaintiff to this action in light of Defendants' decision to proceed with unlawful RIFs
at the State Department.  This motion for a temporary restraining order is filed on behalf of Plaintiff
28    AFGE and proposed Plaintiff AFSA, which represent employees of the State Department who are
and will be impacted by the imminent RIF separation dates.

respectfully request this Court grant this Motion for a TRO and provide relief by 9 a.m. Eastern time on Friday, December 5, 2025—in advance of the State Department's scheduled separations.[2]

# BACKGROUND

## I.     The 2025 Government Shutdown and the Continuing Resolution

On November 10, 2025, the United States Senate passed H.R. 5371 (the "Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026") to end the shutdown of the federal government that began on October 1, 2025. That legislation included language protecting federal employees from taking any further actions to implement RIFs. On November 12, 2025, the United States House of Representatives passed the Senate's version of H.R. 5371. The same day, President Trump signed the Continuing Resolution into law. Pub. L. No 119-37, 139 Stat 495 (2025).

The CR provides partial government funding through January 31, 2026, allowing the shutdown of the government to end. The CR also contains Section 120, which prohibits federal agencies from issuing or implementing RIFs through January 30, 2026, and requires agencies to rescind previous RIFs. The operative language provides:

> SEC. 120. (a) PROHIBITION.—Notwithstanding section 106(1), during the period between the date of enactment of this Act and the date specified in section 106(3) of this Act, no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government.

> (b) APPLICABILITY.—The prohibition under subsection (a) shall apply to all civilian positions, whether permanent, temporary, fulltime, part-time, or intermittent, and without regard to the source of funding for such positions.

> (c) EXCEPTION.—The prohibition under subsection (a) shall not apply to—

> (1) voluntary separations or retirements;

> (2) actions necessary to comply with a court order; or

> (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to implement or maintain an orderly shutdown of government operations.

---

[2] Plaintiffs inquired on December 2 as to whether Defendants would agree to toll the separations at issue to avoid the need for this Motion. Leonard Decl. in Supp. of TRO, ¶¶2-3. Defendants confirmed on December 3, 2025 that they oppose this motion, and provided no confirmation that they would postpone these separations. *Id.*

(d) DEFINITIONS.—For purposes of this section, the term "reduction in force" means actions taken by an agency pursuant to section 3501 through 3504 of title 5, United States Code or section 3595 of such title, or any similar reduction of positions at any department, agency, or office of the Federal Government, unless such reduction has been provided for in this Act.

(e) Notwithstanding section 106(1), any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect.

(1) Any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025, without interruption. Such employees shall receive all pay to which they otherwise would have been entitled in the absence of receiving such notice, including backpay in accordance with section 116 of this Act.

(2) Within 5 days of date of enactment of this Act, each Federal agency shall send notice to all affected employees and the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives of the withdrawal of the reduction in force notice and the affected employee's reinstatement, if applicable.

(3) Notices must include reinstatement date and the amount of back pay determined in paragraph (1), if applicable.

## II.    The Administration's Misinterpretation of Section 120 of the CR

On November 12, 2025, OPM issued a memorandum to all federal agencies regarding the CR and the reopening of the government, which addressed Section 120 and RIFs.  That memorandum (entitled "Employee Pay, Leave, Benefits, and Other Human Resources Programs Affected by the Lapse in Appropriations," and attached to Plaintiffs' Supplemental Complaint as Exhibit A) instructed agencies that Section 120 applies only to RIF notices issued *after* October 1, 2025:

> Additionally, Section 120(e) of the Continuing Appropriations Act of 2026 requires any agencies that issued Reduction in Force (RIF) notices between October 1, 2025 and November 12, 2025 to issue notices to rescind the RIF notices within 5 days. Agencies should issue those notices and confirm to OPM the rescissions have been issued at employ@opm.gov. OPM will provide additional guidance separately. (Supp. Compl., Ex. A at *1).

The November 12 OPM memorandum is significantly under-inclusive, because it instructs federal agencies to rescind only those RIFs issued since October 1, 2025 rather than "any reduction in force proposed, noticed, initiated, *executed*, *implemented*, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment," as required by the statute.  Pub. L. No 119-37,

§120(e) (emphasis added).

On November 13, 2025, OPM issued a further memorandum to all federal agencies addressing Section 120 and RIFs ("Reduction in Force Actions Affected by Continuing Appropriations Act, 2026," attached to the Supplemental Complaint as Exhibit B). That memorandum repeats the under-inclusive instruction to federal agencies:

> Agencies must review all RIF notices issued between October 1, 2025, and November 12, 2025; rescind those notices; and restore each affected employee affected by a RIF notice issued between October 1, 2025 and November 12, 2025 to their September 30, 2025 employment status…. (Supp. Compl., Ex. B at *2).

The November 13 OPM Memorandum further instructs:

> Agencies must submit to OPM at employ@opm.gov confirmation that the agency has issued a notice to rescind any RIFs that were noticed between October 1, 2025 and November 12, 2025, no later than November 19, 2025.

*Id*. at *3. OPM's spokesperson issued a statement to the New York Times confirming this under-inclusive interpretation: "Congress was specific in the bill it wrote that it was concerned with RIF notices issued during the shutdown, not RIFs that were noticed before Oct. 1, 2025…. RIFs that were noticed before the shutdown but happened to have a separation date that fell later were not 'implemented or executed' during the shutdown, but rather before."[3]

At the time OPM issued these memos, it was aware that federal agencies had continued to implement (during the shutdown) RIF notices that had been issued to employees prior to October 1, 2025.[4] Specifically, OPM itself instructed agencies that employees could be forced to work during the shutdown to implement previously issued RIFs (as previously challenged in this case as unlawful under the APA and contrary to the Antideficiency Act). ECF 17-3, Ex. D at 9-10. And, in general, OPM's RIF instruction manual sets forth the many phases of RIF implementation that must occur between the time an initial RIF notice is sent to an employee and the time that the employee is later

---

[3] *See* https://www.nytimes.com/2025/11/25/us/politics/gsa-fired-employees-shutdown.html (Nov. 25, 2025).

[4] Some of these actions were enjoined by this Court. ECF 56, 92, 109. The further implementation of previously issued RIF notices was not enjoined by this Court's October 28 preliminary injunction unless the agency had reissued the notice during the shutdown, or if the RIFs did not impact agency components with employees represented by Plaintiffs. ECF 92, 109.

separated, all of which involve substantial work by an assigned team of agency human resources

employees taking care of issues regarding the impact on health benefits, retirement, and other

matters.  ECF 17-1 at 11-12.

The State Department was one of several federal agencies that had issued RIF notices to

employees prior to the shutdown, with implementation and execution dates falling within the

shutdown time period.  Dinkelman Decl. ¶¶11-21, Ex. B-I.  On December 1, 2025, the State

Department revealed for the first time that OMB, along with the Department of Justice's Office of

Legal Counsel ("OLC"), had provided the State Department with "formal written guidance"

regarding RIFs that had been issued prior to the October 1, 2025 shutdown but further implemented

during or after the shutdown.  *Id.*, Ex. K.  In that "formal written guidance," according to the State

Department, OMB instructed that Section 120 does not prohibit agencies from completing RIFs that

were noticed prior to the October 1, 2025 shutdown, including by effectuating the separation of

employees.  *Id.*  The State Department, on December 2, 2025, posted the following Frequently Asked

Questions on its website:[5]

**Will separations that occurred during the lapse in appropriations be reversed?**

- No, the Department – following formal guidance from both the Office of Management and Budget and the Department of Justice Office of Legal Counsel – has determined that H.R. 5371 does not prohibit completing RIFs that were noticed prior to the lapse in appropriations.

**Will the Department move forward with Foreign Service or other pending separations issued prior to the lapse in appropriations?**

- The Department has determined that H.R. 5371 does not prohibit completing RIFs that were noticed prior to the lapse in appropriations.

As of the time of this filing, neither OMB nor OLC have made public this "formal guidance"

provided to the State Department.[6]

These OPM and OMB instructions to federal agencies, like the prior OMB Lapse

---

[5] *See* Department of State, FAQs for Employees Separated via a RIF Action (Dec. 2, 2025), https://www.state.gov/faqs-for-employees-separated-via-a-rif-action/ (last accessed Dec. 3, 2025).
[6] *See* OMB website, https://www.whitehouse.gov/omb/information-resources/guidance/memoranda/ (last accessed December 3, 2025); OLC website, https://www.justice.gov/olc/opinions (last accessed December 3, 2025)

Memorandum and OPM guidance telling agencies that RIFs could be implemented during the

shutdown and other OPM and OMB directives to federal agencies regarding federal employment (see

ECF 79-1 at 8-9), are directives regarding how agencies must interpret Section 120 of the CR and

apply that law to their employees, and are not permissive or suggestions, notwithstanding the use of

the term "guidance." *See, e.g.*, *AFGE v. Trump*, 784 F. Supp. 3d 1316, 1352 (N.D. Cal. 2025)

(rejecting Defendants' argument that they "were merely providing guidance" and finding "[l]ike

other directives from the current administration, … the memo 'amounted to a command, not a

suggestion.'") (quoting *New York v. Trump*, No. 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025);

*AFGE v. OPM*, 2025 WL 2633791, at *15-19 (N.D. Cal. Sept. 12, 2025) (finding that evidence

demonstrated that OPM directed terminations of probationary employees despite argument that the

agency only provided "guidance").

**III.    State Department's Imminent Separation of Employees**

On July 11, 2025, the State Department issued RIF Notices to approximately 1,300

employees, with separation dates in September 2025 for the civil service and of November 10, 2025

for the foreign service (after a mandatory 120-day notice period).  Willson Decl. ¶3; Dinkelman Decl.

¶10.  The State Department granted extensions of separation dates to a small number of civil service

employees, in response to requests from affected employees who had recently given birth and/or

faced medical issues.  Willson Decl. ¶¶4-5.

During the shutdown, the State Department continued to implement the stages of these RIFs

in preparation for final separation of the employees, including by processing personnel paperwork in

advance of the planned separations.  Willson Decl. ¶6, Exs. A-B; Dinkelman Decl. ¶10.  For

example, the State Department took steps that included processing the mandatory SF-50 paperwork

for these to-be-separated employees.  Willson Decl., Ex. B.  Likewise, for the foreign service, the

State Department took many steps to implement and prepare for the employees' November 10

separation, including issuing assessments of retirement eligibility and other personnel-related

documents and communications.  Dinkelman Decl. ¶¶11-21, Exs. B-I.  However, the November 10

date came and went without the State Department executing the RIF.  Dinkelman Decl. ¶22.  Instead,

on or around November 10, affected employees received a message stating only that their

administrative leave would continue. *Id.* ¶23, Ex. J. The RIF notices were not re-issued, and employees received nothing further from the State Department regarding the now-expired RIF notices until December 1, 2025. *Id*. ¶¶24-25.

On December 1 and 2, 2025, the State Department notified employees for the first time that they were not covered by the CR and would be separated from federal employment imminently, on December 5, 2025. *Id.* ¶¶25, 27; Willson Decl. ¶¶7-8. The foreign service employees received an email notice that stated, in its entirety:

> Following formal written guidance from both the Office of Management and Budget and Department of Justice Office of Legal Counsel, the Department of State's Office of the Legal Adviser has determined that completing the reductions in force (RIFs) noticed prior to the lapse in appropriations does not violate the Antideficiency Act (ADA) or any other restriction within HR 5371. Given this determination, the Department will finalize your separation or involuntary retirement on Friday, December 5.

Dinkelman Decl., Ex. K. The civil service employees received a similar message, largely without a new separation date (although some employees were also informed they would be separated on December 5). Willson Decl., Exs. C, E. On December 2, 2025, three days prior to the date on which it intended to permanently separate the affected employees, the State Department posted the FAQ referenced above to its website for the first time. *Supra* at n.5.

## IV.     Imminent Harm to Plaintiffs

Plaintiffs AFGE and AFSA and the employees at the State Department they represent who are subject to these imminent actions will suffer irreparable harm if these separations are permitted to take place starting December 5. As a result of these imminent separations from federal employment, employees will lose their income, their health benefits, and other incidents of employment, causing severe irreparable harm to them and their families. Dinkelman Decl. ¶¶29, 30; Willson Decl. ¶¶10-11, 19. For many of these employees, they will lose their careers built over years or even decades as dedicated public servants in federal employment. Dinkelman Decl. ¶3; Willson Decl. ¶¶11, 16; Gliha Decl. ¶14.

For example, one AFSA member facing separation on December 5, 2025, has completed more than twenty years of service in the Department, repeatedly serving in high-threat positions and building a career as a distinguished diplomat. Gliha Decl. ¶14. He survived a terrorist bombing

while stationed overseas in Jeddah. *Id.* ¶3. He is worried that his December 5 termination will essentially end his career because the specialized nature of his work does not translate easily to the private sector. *Id.* ¶¶15, 16. As he puts it, "I have lost the ability to continue serving American interests in critical regions where I built decades of expertise and relationships." *Id.* ¶15. On top of the loss of his career, his family stands to lose 50% of its income because of his separation. *Id.* ¶19. He continues to suffer from bombing-related PTSD, and since receiving notification on December 2 that he would be separated days later, the symptoms of his PTSD have been exacerbated, and he has had trouble sleeping and been short of temper. *Id.* ¶17.

For many of these employees, the imminent loss of employment means a sustained loss of income and benefits in a job market already flooded with unemployed former State Department and USAID employees. Willson Decl. ¶11. For example, one AFGE member who gave birth only a few months ago is concerned that she will be unable to find another job in the human rights advocacy space because the federal government has also eliminated grants in that space and stigmatized such work as "DEI." Willson Decl. ¶¶13-14. For others, who are stationed overseas and must remain there in light of their families or spouses, loss of this job will mean unemployment. For example, one Foreign Service officer is married to another Foreign Service Officer who is currently posted abroad, and has very limited job opportunities abroad because of host-country laws, language requirements, and embassy restrictions. Brunsdale Decl. ¶11. Moreover, she had to give up one of the few job opportunities available to her: although she had applied for and conditionally accepted a position intended specifically for spouses of foreign service officers who are not employed with the Department, she later turned down the job under the belief that she was ineligible for the position because she would not be separated from the Department until the end of January, consistent with the Continuing Resolution. Brunsdale Decl. ¶¶12-13. Instead, she suddenly received notice that she will be separated on December 5. Brunsdale Decl. ¶14.

The loss of health benefits will irreparably harm employees who are already suffering or have family members suffering significant medical issues. In particular, the AFGE-represented employees at the State Department who have yet to be separated are in that category because they were in the

midst of health care and other circumstances that led to extensions of their prior separation dates. Willson Decl. ¶10.

## ARGUMENT

**I.    This Court Should Enjoin Defendants' Imminent Unlawful RIFs Pending Consideration of a Preliminary Injunction**

A TRO is warranted when (1) the moving party is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.  Fed. R. Civ. P. 65 (b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  All factors strongly favor a TRO.

**A.    Plaintiffs Are Likely to Succeed on the Merits**

**1.    OPM and OMB's November directives to agencies to continue implementing previously noticed RIFs are contrary to law and are therefore ultra vires and violate the APA**

OPM and OMB's directives that agencies can continue to implement RIFs where the initial RIF notice was issued prior to October 1, 2025 are contrary to Section 120 of the Continuing Resolution and direct agencies to act in violation of the Appropriations Clause.  The plain language of Section 120(a) prohibits any further spending to implement *any* RIFs between November 12, 2025 and January 30, 2026, and is in no way limited to implementing "new" RIF notices.  Further, Section 120(e) requires recission of any RIFs that were implemented during the shutdown period and does not limit that mandate to RIF notices issued only after October 1, 2025.  The directive to the State Department to further implement these RIFs because the initial notice was issued prior to October 1 violates the Administrative Procedure Act ("APA"), 5 U.S.C. §706 (2)(A), (B) and (C), and the Constitution, and is *ultra vires*.

**a.    Section 120 prohibits implementation of any RIFs regardless of whether they were initiated before the shutdown period**

The gravamen of OPM and OMB's interpretation of Section 120 is that Congress intended Section 120 to cover only RIFs that were noticed on or after the shutdown began on October 1, 2025.  But Section 120(a) plainly prohibits further implementation of any RIFs regardless of when the initial RIF notice was sent, and Section 120(e) likewise is not limited to RIFs issued after October 1.  Thus, nothing in the plain language of Section 120 supports Defendants' interpretation.  In interpreting

Section 120 of the CR, "we start where we always do: with the text of the statute." *Van Buren v. United States*, 593 U.S. 374, 381 (2021). "It is a well-recognized rule of statutory construction that '[t]he plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results.'" *Eisinger v. Fed. Lab. Rels. Auth.*, 218 F.3d 1097, 1102 (9th Cir. 2000) (quoting *United States v. Daas,* 198 F.3d 1167, 1174 (9th Cir. 1999)).

First, with respect to Section 120(a), that provision prohibits the use of *any* federal funds from November 12, 2025 through January 30, 2026 "to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government," without qualification. Pub. L. No 119-37, §120(a). This language is not limited, for example, by when a RIF was first issued; nor did Congress limit the prohibition only to "new" RIFs. Instead, Congress used the terms "implement" and "carry out," both of which encompass any steps taken to complete an action or process. *See, e.g.*, *Implement*, Garner's Modern English Usage (4th ed. 2016) ("to carry out or put into effect; to take practical steps toward the fulfillment of"); *Carry Out*, Merriam-Webster, https://www.merriam-webster.com/dictionary/carryout ("to bring to a successful issue").[7]

Any interpretation limiting Section 120(a) to newly issued RIF notices would render the words "carry out" and "implement" meaningless. But courts "must 'give effect, if possible, to every clause and word of [the] statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). If Congress meant to prohibit only the expenditure of federal funds for new RIF notices, all the listed terms in Section 120(a) would be entirely duplicative: there is no difference between initiating notice, carrying out notice, implementing notice, or otherwise noticing a reduction in force.[8] The better reading of the statute,

---

[7] If Congress meant this provision to apply only to newly issued RIFs, it could have stopped after "initiate," and there would have been no need to include the broader words "carry out" or "implement," since the issuance of new RIF notices would have already been prohibited.

[8] The word "otherwise" does not alter the broad meaning of the terms in this list. The Supreme Court has explained that "a general phrase can be given a more focused meaning by the terms linked to it," *Fischer v. United States*, 603 U.S. 480, 488 (2024), but that analysis does not require reading the final term in a list to be entirely duplicative of the other express terms. *See id.* at 489 ("[D]epending on the context, 'the word otherwise can'—though not 'must'—'refer to a crime that is similar to the listed

1    and the only one that gives these terms any independent meaning, is that it covers any action taken to

2    further any RIF, from the initiation and notice through all the steps of implementation, including

3    carrying out a final separation—exactly what the statute says.  Although some overlap in the agency

4    actions listed may remain (as between "carry out" and "implement," or "initiate" and "otherwise

5    notice"), "'surplusage is nonetheless disfavored,' and our 'construction that creates substantially less

6    of it is better than a construction that creates substantially more.'"  *Fischer*, 603 U.S. at 496 (citation

7    omitted).

8         Moreover, the terms "carry out" and "implement" apply to "reduction in force," which

9    includes actions far beyond just the sending of the initial notice.  Section 120 defines "reduction in

10   force" as "*actions* taken by an agency pursuant to section 3501 through 3504 of title 5, United States

11   Code or section 3595 of such title, or any similar reduction of positions at any department, agency, or

12   office of the Federal Government, unless such reduction has been provided for in this Act."  Pub. L.

13   No 119-37, §120(d) (emphasis added).  By defining "reduction in force" to include all of the actions

14   taken by an agency to effectuate the removal of positions, Section 120 thus broadly prohibits any of

15   the many steps that must occur to implement a RIF, from sending an initial RIF notice through

16   separation of employees.  *Supra* at 4.  The referenced statutes relate broadly to the "release of

17   competing employees in a reduction in force," not just to the initial notice process for such

18   reductions, *see, e.g.*, 5 U.S.C. §3502(a).  Similarly, OPM's regulations implementing these statutes

19   pertain to actions beyond the issuance of a RIF notice, making clear that the notice is just one of the

20   many steps required to implement a RIF.  *See generally* 5 C.F.R. part 351.  Actions taken to release

21   federal employees—including those taken to finally separate those who have already received

22   notice—are plainly encompassed by Section 120's statutory definition of "reduction in force," and

23   _____

24   examples in some respects but different in others.'") (citations omitted).  Moreover, *Fischer*'s
     interpretation of "otherwise" relied on the canon of *noscitur a sociis* to interpret ambiguous text, a

25   canon that would be inappropriate here.  "Rules of statutory construction are to be invoked as aids to
     the ascertainment of the meaning or application of words otherwise obscure or doubtful.  They have

26   no place ... except in the domain of ambiguity."  *Russell Motor Car Co. v. United States*, 261 U.S.
     514, 519 (1923); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) ("In any event, we do not

27   woodenly apply limiting principles every time Congress includes a specific example along with a
     general phrase.").  Where, as here, the text is unambiguous, there is no need to apply canons of

28   construction to aid that analysis.

1    the implementation of that separation is thus covered by Section 120(a).  Further, nowhere does the

2    definition in Section 120(d) include a qualifier: it applies broadly to "any" RIF or reduction in

3    positions at any agency, which in this case means *all* RIFs, and does not exclude RIFs where the

4    agency issued the RIF notice prior to October 1, 2025.

5        Second, the text and structure of the remainder of Section 120 confirm that 120(a) prohibits

6    any actions to implement RIFs during this time period—regardless of when any RIFs were noticed.

7    Initially, the text of Section 120(c) shows that when Congress intended to limit the scope of Section

8    120(a), it did so expressly.  Section 120(c) provides for three enumerated exceptions to Section

9    120(a): "(1) voluntary separations or retirements; (2) actions necessary to comply with a court order;

10   or (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to

11   implement or maintain an orderly shutdown of government operations."  Pub. L. No 119-37, §120(c).

12   While adopting these exceptions, Congress did not exempt any of the many existing (and highly

13   publicized) RIFs that had been noticed prior to the October 1, 2025 shutdown.  "[W]here Congress

14   explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be

15   implied, in the absence of evidence of a contrary legislative intent."  *Hillman v. Maretta*, 569 U.S.

16   483, 496 (2013) (quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–617 (1980)).

17       Further, Section 120(a) operates in concert with Section 120(e).  Under Section 120(e), "any

18   reduction in force proposed, noticed, initiated, *executed*, *implemented*, or otherwise taken by an

19   Executive Agency between October 1, 2025, and the date of enactment, shall have no force or

20   effect."  Pub. L. No 119-37, §120(e) (emphasis added).  This language expressly refers not only to

21   RIFs proposed, initiated, or noticed during the shutdown, but also to any RIF "executed" or

22   "implemented" after October 1.  OPM and OMB's interpretation of this language to cover only "RIF

23   notices issued between October 1, 2025, and November 12, 2025," *supra* at 3-4, is directly contrary

24   to the statutory language.  Again, courts must give effect to all of these terms.  *Williams*, 529 U.S. at

25   404.  Nor should courts add limiting language or qualifications where Congress provided none.

26   Nothing in Section 120(a)'s language states that the RIF in question must be noticed after October 1,

27   2025 for the protections of the provision to apply.  And at the time this law was enacted, many highly

28   publicized RIFs had been announced and noticed (including by the State Department), and were

being implemented (even if not yet completed) during the shutdown.[9]  Despite this, Congress did not include the limitation that OPM and OMB would have the Court read into the statute.[10]

The best reading of the statute as a whole requires the unwinding of *any* RIF-related actions taken during the shutdown and the prohibition of any further action to implement any RIFs by federal agencies.  Taken together, these provisions ensure that all covered federal employees return to and remain in the employed status they held as of September 30, 2025, just before the prior congressional appropriations lapsed.  Further, that OMB and OLC issued this narrow statutory interpretation in something called a "formal written guidance" matters not at all; as the Supreme Court has explained, agencies receive no deference in the realm of statutory interpretation, which is a function of the Article III courts.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024).

Finally, any attempt by Defendants to rely on legislative history to inform the meaning of Section 120's plain text should be disregarded.  "It is a fundamental principle of appropriations law that we may only consider the text of an appropriations rider, not expressions of intent in legislative history."  *United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir. 2016).  "An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history."  *Id.* (quoting *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012)).  Thus, any cherry-picked statements by legislators that focus on RIFs issued during the shutdown (which plainly was one of Congress's concerns, but not the only concern) will not further OPM and OMB's argument, and in any event there are just as many statements evidencing legislative intent to broadly protect employees from any further RIF actions going forward (*e.g.*, Supp. Compl. ¶258).

---

[9] *E.g.*, Associated Press, *State Department Lays Off Over 1,300 Employees Under Trump Administration Plan* (July 11, 2025), available at https://apnews.com/article/layoffs-diplomats-state-department-trump-rubio-bfdb86767b7bd5b6570819d404a7782e.

[10] That Congress drafted this section to broadly apply to any RIF implemented during the shutdown regardless of whether the RIF notice was issued prior to the shutdown is further supported by the reference to "reinstatement," and returning employees to status "without interruption."  Pub. L. No 119-37, §120(e)(1).  The RIF regulations (and some agency-specific statutes and bargaining agreements) require at least 60 days' notice (which OPM is allowed to reduce in limited circumstances, *see* 5 C.F.R. §351.801).  If Section 120(e) were intended to cover *only* those RIFs issued during the shutdown, there would be little practical need for this reinstatement remedy.

1

2

**b.      Implementation of OMB and OPM's directives would violate the Appropriations Clause**

3        OPM and OMB's directives authorizing implementation of RIFs that were initially noticed

4   prior to October 1 also directs agencies to violate the Constitution.  Under the Appropriations Clause,

5   "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by

6   Law."  U.S. Const. art. I, §9, cl. 7.  "The Clause has a 'fundamental and comprehensive purpose ... to

7   assure that public funds will be spent according to the letter of the difficult judgments reached by

8   Congress as to the common good and not according to the individual favor of Government agents.'"

9   *McIntosh*, 833 F.3d at 1178 (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28

10  (1990)).  The Appropriations Clause allows Congress to restrict the use of funds for certain purposes,

11  regardless of whether those purposes are otherwise lawful.  *Office of Pers. Mgmt.*, 496 U.S. at 425

12  ("Any exercise of a power granted by the Constitution to one of the other branches of Government is

13  limited by a valid reservation of congressional control over funds in the Treasury.").  As Defendants

14  explained in the preliminary injunction hearing in this very case, "if [Congress] includes an

15  appropriation rider that specifically says, 'No funds may be used by this agency to carry out X, Y, Z,'

16  I think we would all agree that that is a program that the Government cannot statutorily carry out."

17  ECF 97 at 8.  That is precisely what Congress has done here, in enacting Section 120(a).  *See supra* at

18  10.  But OPM and OMB have now instructed agencies that they may nevertheless carry out the very

19  action Congress has prohibited.

20                                                      * * *

21        OMB and OPM have no authority to direct other agencies to apply a misinterpretation of, and

22  to violate, federal law or the Appropriations Clause.  For all of these reasons, actions of OMB and

23  OPM therefore violate the Administrative Procedure Act because they are inconsistent with law in

24  violation of 5 U.S.C. §706(2)(A), are contrary to the Constitution in violation of 5 U.S.C. §706(2)(B),

25  exceed statutory authority in violation of 5 U.S.C. §706(2)(C), and are ultra vires.

26        **2.      The imminent separations at the State Department are contrary to Sections 120(a) and 120(e), and thus violate the APA and the Appropriations Clause**

27

28        The State Department's imminent action to implement RIFs through final separations

beginning on December 5, 2025, in reliance on OMB's "formal written guidance," is contrary to Section 120 and therefore violates the Appropriations Clause for largely the same reasons that OPM and OMB's directives are contrary to statute and the Constitution.

On December 1, 2025, employees represented by both AFSA and AFGE received notice from the State Department that it was "completing the reductions in force" it had previously noticed, and "the Department will finalize your separation or involuntary retirement on Friday, December 5." Willson Decl., Ex. E; Dinkelman Decl., Ex. K. These planned actions violate both Sections 120(a) *and* (e).

First, the State Department's actions to separate these employees "implement" and "carry out" RIFs after November 12, 2025, which Section 120(a) prohibits. There is no possible mechanism by which these employees can be separated from federal employment that does not involve the expenditure of time and resources by agency staff, and therefore, the federal funds prohibited by Section 120(a). For all the same reasons explained above, Section 120(a)'s prohibition is not limited to issuing or implementing new RIFs, and the State Department can no more escape the broad scope of Section 120(a) than can OPM and OMB.

Second, the RIFs at issue are also covered by Section 120(e), which requires the rescission of any prior RIF notices "implemented" after October 1. Pub. L. No 119-37, §120(e). All of the employees subject to State's attempt to separate them from employment were employed in their positions when the shutdown began on October 1. Dinkelman Decl. ¶10; Willson Decl. ¶5. And the evidence is overwhelming that the State Department continued to take action to implement the RIFs during the shutdown, in anticipation of and preparation for separating these employees from service once their notice period ran. The foreign service employees were given a separation date of November 10, 2025, and as that date approached during the shutdown, the State Department took numerous steps to further implement the RIF, including sending employees materials related to their impending separations, such as SF-50 personnel forms. Dinkelman Decl. ¶¶11-21. Likewise, the State Department processed the separations of the AFGE-represented employees. Willson Decl. ¶6.

After the shutdown ended, the State Department did not comply with Section 120(e) by rescinding the prior RIF notices for RIFs that it had continued to implement during the shutdown;

instead, it is trying to move forward to effectuate these RIFs. But Section 120(e) requires the State Department to rescind any RIF that it implemented after October 1. And, if Plaintiffs are correct that Section 120(e) renders these RIFs null and void and requires rescission, then any attempt to impose a new separation date also necessarily would require issuing a *new* RIF notice (which, even under Defendants' interpretation, would be prohibited by Section 120(a)). Section 120 does not permit the State Department to avoid the application of either provision by holding RIFs in abeyance and then implementing them several weeks later than planned, with four days' notice to employees of their final separation date.

Finally, the State Department's actions to implement these RIFs violate the Appropriations Clause, for all the same reasons explained above. The Constitution's "straightforward and explicit command ... means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt.*, 496 U.S. at 424. Where an agency spends money for a purpose prohibited by an appropriations rider, it is "drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *McIntosh*, 833 F.3d at 1175; *see id.* at 1172-73 (allowing defendants to seek to enjoin expenditure of funds on their criminal prosecutions where expenditure barred by an appropriations rider). The State Department's prior and future actions to plan for and determine final separation dates, prepare the correct paperwork, address any individual mistakes or questions that arise, reassign work to other employees, and more all require drawing on federal funds for the staff and work being conducted. Those actions violate the Appropriations Clause.

### 3. The OPM and OMB memoranda and the decision to separate the State Department employees are final agency actions subject to the APA

The OPM and OMB memoranda and the decision announced by the State Department to imminently separate employees are "final agency action" and thus reviewable under the APA. 5 U.S.C. §704. To be final, an "action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 991 (9th Cir. 2025). Both factors are established here.

As both the Ninth Circuit and this Court have recently held in several cases, OMB and OPM's instructions to other agencies satisfy this "pragmatic and flexible" finality standard, *Oregon Nat. Desert Ass'n*, 465 F.3d at 982, where the agencies make conclusive, final decisions of law or review and approve other agency plans. *See, e.g.*, ECF 94 at 26-27; *AFGE v. Trump*, 139 F.4th 1020, 1039 (9th Cir. 2025). OPM's November 12 and 13 memoranda to all federal agencies and the OMB's "formal written guidance" to the State Department "mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178; 5 U.S.C. §704. Those directives set out the agencies' interpretations and instructions to agencies regarding the meaning of statutory authority and specifically direct agencies that the CR only applies to RIFs noticed after October 1, 2025, thus altering the established legal regime and determining the rights from which legal consequences will flow to federal employees. ECF 94 at 27; *Bennett*, 520 U.S. at 178; *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (courts are to take a "pragmatic" approach to applying the *Bennett* finality test).

In addition, the State Department has made the further final decision of *when* to implement these RIFs that OPM and OMB have authorized it to effectuate, and to do so on *very* short notice. That decision, likewise, marks the culmination of further decision-making from which legal consequences will flow to the affected federal employees.

## B. Plaintiffs Face Imminent and Irreparable Harm

As discussed above, AFGE and AFSA and the employees they represent face significant harm from the State Department's current scheme to implement layoffs on very short notice. *Supra* at 7-9. These actions will inflict myriad types of irreparable harm on federal employees, their families and their labor representatives. For example, federal employee members who will be terminated face irreparable injury from losing their wages and health benefits for themselves and their families, and in some cases by being forced to relocate. *See supra* at 7; *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health coverage). Damages are not available in APA cases, making this monetary harm irreparable. *See Pangea Legal Servs. v. U.S. Dep't of Homeland Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020). The further irreparable injury caused by these

separations from federal employment for this particular cohort of State Department civil service and foreign service employees includes the disruption, and indeed termination, of careers that have been years and even decades in the making.  Dinkelman Decl. ¶3; Willson Decl. ¶¶11, 16; Gliha Decl. ¶14. Employees will be forced into unemployment where jobs are not available.  *See, e.g.*, Brunsdale Decl. ¶11.  And the loss of income and benefits has particularly irreparable impacts on employees and their families who face difficult economic and personal circumstances including health issues.  *See* Willson Decl. ¶10.  For all the reasons this Court previously recognized the receipt of a RIF notice can impose irreparable harm, the imminent actual separation of employment poses even greater risk to these employees' health and well-being.  *See* ECF 94 at 38-40.

**C.    The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor**

The equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor a TRO.  Preserving constitutional and statutory rights "is always in the public interest."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir.2002)); *see also NTEU v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F.Supp.2d 56, 66 (D.D.C. 2004).  The severe threats to the public presented by the imminent State Department actions necessitate a temporary pause to protect the status quo for Plaintiffs and the employees they represent who are adversely impacted by these imminent separations.  By contrast, the government will save time and money spent on implementing RIFs and then potentially being later required to reverse and rescind those actions.  Moreover, as this Court has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  ECF 94 at 41 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and enter the accompanying proposed temporary restraining order and/or an order to show cause.

1

Respectfully submitted,

2

DATED: December 3, 2025

3

Stacey M. Leyton
Barbara J. Chisholm

4

Danielle E. Leonard
Alice X. Wang

5

Robin S. Tholin
Talia Stender

6

ALTSHULER BERZON LLP
177 Post St., Suite 300

7

San Francisco, CA 94108
Tel.: (415) 421-7151

8

Fax: (415) 362-8064
sleyton@altshulerberzon.com

9

bchisholm@altshulerberzon.com

10

dleonard@altshulerberzon.com
awang@altshulerberzon.com

11

rtholin@altshulerberzon.com
tstender@altshulerberzon.com

12

13

By: */s/ Danielle Leonard*

14

*Attorneys for All Plaintiffs*

15

16

Elena Goldstein (pro hac vice)
Jennie L. Kneedler (pro hac vice)

17

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553

18

Washington, DC 20043
Tel: (202) 322-1959

19

egoldstein@democracyforward.org
jkneedler@democracyforward.org

20

21

*Attorneys for All Plaintiffs*

22

Norman L. Eisen (pro hac vice)

23

Craig Becker (pro hac vice)
STATE DEMOCRACY DEFENDERS FUND

24

600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003

25

Tel: (202) 594-9958
Norman@democracydefenders.org

26

Craig@democracydefenders.org

27

*Attorneys for All Plaintiffs*

28

1

2
Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
3
EMPLOYEES, AFL-CIO
80 F Street, NW
4
Washington, D.C. 20001
Tel: (202) 639-6426
5
Sanghr@afge.org

6
*Attorneys for Plaintiffs American Federation of*
7
*Government Employees, AFL-CIO (AFGE) and AFGE*
*locals*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28