Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Alice X. Wang (SBN 335224)
Robin S. Tholin (SBN 344845)
Talia Stender (SBN 341654)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Case No. 3:25-cv-08302-SI <br><br> **MEMORANDUM OF PLAINTIFFS AFGE, AFSA, AND NFFE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND RELIEF PURSUANT TO 5 U.S.C. §705** |

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................2

    I.     The 2025 Government Shutdown and the Continuing Resolution.............................2

    II.    OPM and OMB Provide Direction to Agencies Contrary to Section 120..................3

    III.   Agencies Continue to Impose RIFs Notwithstanding Section 120(a).......................6

         A.     Department of State ........................................................................................6

         B.     Department of Education..................................................................................7

    IV.   Agencies Refuse to Rescind RIF Separations Notwithstanding Section 120(e).....................................................................................................................7

         A.     Department of State ........................................................................................7

         B.     Department of Defense....................................................................................8

         C.     GSA ................................................................................................................8

         D.     SBA ................................................................................................................9

    V.     The Imminent Harm of Implemented and Planned RIFs to Plaintiffs.......................9

    VI.   History of These Proceedings ................................................................................12

ARGUMENT ...............................................................................................................................13

    I.     This Court Should Enjoin Defendants' Actions Contrary to Section 120................13

         A.     Plaintiffs Are Likely to Succeed on the Merits ...........................................13

              1.     OPM and OMB Are Unlawfully Directing Agencies to Violate Both Section 120(a) and Section 120(e) ..............................13

              2.     The State and Education Departments' Imminent RIF Separations Will Violate Section 120 and the Constitution .............18

              3.     Agencies Have Violated Section 120(e) by Refusing to Rescind and Reinstate........................................................................20

              4.     The Challenged Actions Are Final For Purposes of the APA...........21

         B.     Defendants Have Caused and Will Continue to Cause Irreparable Harm ...........................................................................................................22

         C.     The Balance of Equities and Public Interest Strongly Support this Injunction ....................................................................................................23

    II.    The Proposed Injunction Is as Broad as Necessary to Prevent Harm .....................23

1

CONCLUSION ..................................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AFGE v. OPM*,
  2025 WL 2633791 (N.D. Cal. Sept. 12, 2025) ........................................................................... 5

*AFGE v. Trump*,
  139 F.4th 1020 (9th Cir. 2025) ................................................................................... 21, 22

*AFGE v. Trump*,
  784 F. Supp. 3d 1316 (N.D. Cal. 2025) .......................................................................... 5

*Andrus v. Glover Constr. Co.*,
  446 U.S. 608 (1980) ...................................................................................................... 15

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................................... 21

*Bond v. United States*,
  564 U.S. 211 (2011) ...................................................................................................... 23

*Canal Authority of Florida v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ........................................................................................ 25

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ........................................................................................ 22

*Eisinger v. Fed. Lab. Rels. Auth.*,
  218 F.3d 1097 (9th Cir. 2000) ...................................................................................... 13

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ......................................................................................... 24

*Fischer v. United States*,
  603 U.S. 480 (2024) ...................................................................................................... 14

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) ................................................................................. 22, 25

*Hillman v. Maretta*,
  569 U.S. 483 (2013) ...................................................................................................... 15

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ....................................................................................... 21

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 23

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ......................................................... 24, 25

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ............................................................... 23

*Mistretta v. United States*,
    488 U.S. 361 (1989) ........................................................................... 23

*New York v. Trump*,
    769 F. Supp. 3d 119 (D.R.I. 2025) ....................................................... 5

*NTEU v. U.S. Dep't of Treasury*,
    838 F. Supp. 631 (D.D.C. 1993) ......................................................... 23

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ..................................................................... 17, 19

*Oregon Council for Humans. v. United States DOGE Serv.*,
    794 F. Supp. 3d 840 (D. Or. 2025) ..................................................... 23

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ............................................................... 21

*Pangea Legal Servs. v. U.S. Dep't of Homeland Security*,
    512 F. Supp. 3d 966 (N.D. Cal. 2021) ................................................. 22

*Regents of the Univ. of Cal. v. Am. Broad. Cos.*,
    747 F.2d 511 (9th Cir. 1984) ......................................................... 24, 25

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
    316 F.2d 804 (9th Cir. 1963) ......................................................... 24, 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ........................................................................... 21

*United States v. Daas*,
    198 F.3d 1167 (9th Cir. 1999) ............................................................. 13

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) ....................................................... 17, 20

*United States v. Menasche*,
    348 U.S. 528 (1955) ........................................................................... 14

*Van Buren v. United States*,
    593 U.S. 374 (2021) ........................................................................... 16

*Williams v. Taylor*,
   529 U.S. 362 (2000) ......................................................................................... 14, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................ 13, 22

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024) .................................................................................. 23

**Federal Statutes**

5 U.S.C.
   § 551 ................................................................................................................... 21, 22
   § 704 ......................................................................................................................... 21
   § 705 ................................................................................................................ 1, 13, 24
   § 706 .............................................................................................................. 13,18, 22
   § 3501-3504 .......................................................................................................... 2, 14
   § 3502 ....................................................................................................................... 14

10 U.S.C.
   § 111 ........................................................................................................................... 8

Pub. L. No 119-37
   § 120 ................................................................................................................ *passim*

**Other Authorities**

5 C.F.R. § 351 .................................................................................................................. 3, 14

5 C.F.R. § 351.801 ............................................................................................................... 17

5 C.F.R. § 359 ........................................................................................................................ 3

Associated Press, *State Department Lays Off Over 1,300 Employees Under Trump
   Administration Plan* (July 11, 2025), https://apnews.com/article/layoffs-
   diplomats-state-department-trump-rubio-bfdb86767b7bd5b6570819d404a7782e ............... 17

Department of State, *FAQs for Employees Separated via a RIF Action* (Dec. 2,
   2025), https://www.state.gov/faqs-for-employees-separated-via-a-rif-action/
   (last accessed Dec. 9, 2025) ..................................................................................... 5

New York Times, *Fired Employees Say Government Won't Rehire Them After
   Shutdown* (Nov. 25, 2025),
   https://www.nytimes.com/2025/11/25/us/politics/gsa-fired-employees-
   shutdown.html .......................................................................................................... 4

OPM, *Overview of Reduction in Force* (March 2025), https://www.opm.gov/policy-
   data-oversight/workforce-restructuring/reductions-in-force-rif/rif-overview.pdf .................. 15

OPM, *Personnel Documentation: Guide to Processing Personnel Actions*,
    https://www.opm.gov/policy-data-oversight/data-analysis-
    documentation/personnel-documentation/#url=Personnel-Actions ..........................................4

OPM, *Workforce Reshaping Operations Handbook*, https://www.opm.gov/policy-
    data-oversight/workforce-restructuring/reductions-in-force-
    rif/workforce_reshaping.pdf ...................................................................................................4

# INTRODUCTION

On November 12, 2025, Congress enacted and the President signed into law legislation that ended the longest lapse in appropriations and shutdown of the federal government in U.S. history. That legislation contained mandatory and unambiguous provisions protecting federal employees against reductions-in-force ("RIFs") that the Administration had attempted, unlawfully, to impose, implement, and complete during the shutdown. Specifically, Section 120(a) prohibits federal agencies from further implementing any RIF between November 12, 2025 and January 30, 2026. And Section 120(e) declares that any RIF that was imposed, implemented, or executed during the shutdown period (Oct. 1 through Nov. 12, 2025) "shall have no force or effect," and mandates that agencies rescind such RIFs and reinstate and provide back pay to any separated employees.

Unfortunately, since November 12, 2025, Defendants OMB and OPM have continued their pattern of disregard and defiance of the law, by instructing federal agencies to misinterpret Section 120 to cover only RIFs that were *initiated* during the shutdown period. Consistent with these instructions, Defendants the Departments of Defense, Education, and State ("DoD," "Education," and "State," respectively), the General Services Administration ("GSA"), and the Small Business Administration ("SBA") have violated Section 120 in two specific ways. First, the Departments of State and Education continue to threaten the imminent separation of employees via RIFs, notwithstanding Section 120(a). Second, DoD, State, GSA, and SBA have all refused to rescind separations they completed during the shutdown period, in violation of Section 120(e). With respect to the SBA, on November 17, 2025, the agency actually sent all affected employees a letter stating that their RIFs were rescinded in light of Section 120's requirements, but then on the very next day sent a further letter rescinding that notice without any explanation other than telling them that they should consider themselves still fired.

These unlawful actions have caused and will continue to cause federal employees represented by Plaintiffs American Federation of Government Employees ("AFGE"), American Foreign Service Association ("AFSA"), and National Federation of Federal Employees ("NFFE") irreparable harm, and all factors support a preliminary injunction and relief pursuant to 5 U.S.C. §705. Plaintiffs therefore respectfully request that the Court grant the relief set forth in the accompanying Proposed Order.

# BACKGROUND

## I.    The 2025 Government Shutdown and the Continuing Resolution

On November 10, 2025, the United States Senate passed H.R. 5371 (the "Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026," hereinafter the "Continuing Resolution" or "CR") to end the federal government shutdown that began on October 1, 2025.  On November 12, 2025, the United States House of Representatives passed the Senate's version of H.R. 5371.  The same day, President Trump signed the Continuing Resolution into law.  Pub. L. No 119-37, 139 Stat 495 (2025).

The CR provides partial government funding through January 31, 2026, allowing the shutdown of the government to end.  The CR contains Section 120, set out in full in Plaintiffs' motion for TRO, ECF 123-1 at 2-3, which contains the provisions at issue here.

First, Section 120(a) prohibits further actions implementing RIFs, stating that through January 30, 2026, "no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government."  Pub. L. No 119-37, §120(a).  "Reduction in force" is defined broadly, as "*actions* taken by an agency pursuant to section 3501 through 3504 of title 5, United States Code or section 3595 of such title, or any similar reduction of positions at any department, agency, or office of the Federal Government, unless such reduction has been provided for in this Act."  *Id.* §120(d) (emphasis added).  The Act contains only three exceptions: "(1) voluntary separations or retirements; (2) actions necessary to comply with a court order; or (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to implement or maintain an orderly shutdown of government operations."  *Id.* §120(c).

Second, Section 120(e) provides that "any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect."  *Id.* §120(e).  The CR expressly requires the following actions to unwind those now-void RIFs:

> (1) Any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025, without interruption. Such employees shall receive all pay to which they otherwise would have been

entitled in the absence of receiving such notice, including backpay in accordance with section 116 of this Act.

(2) Within 5 days of date of enactment of this Act, each Federal agency shall send notice to all affected employees and the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives of the withdrawal of the reduction in force notice and the affected employee's reinstatement, if applicable.

(3) Notices must include reinstatement date and the amount of back pay determined in paragraph (1), if applicable.

*Id.* Taken together, these provisions require that all covered federal employees be returned to the employed status they held on September 30, 2025, just before the prior congressional appropriations lapsed, and not be subject to further RIF-related actions through at least January 30, 2026.

## II.     OPM and OMB Provide Direction to Agencies Contrary to Section 120

On November 12 and 13, 2025, OPM issued two memoranda to federal agencies setting forth OPM's interpretation of Section 120.  Both memoranda instructed that Section 120 applies only to RIF *notices*.  ECF 126 (Supp. Compl.), Exs. A, B.  Specifically, under a section entitled "Required Actions," the November 13 memorandum directed:

Agencies must immediately cease *issuing RIF notices* pursuant to 5 CFR parts 351 and 359 until January 31, 2026.

Agencies must review all *RIF notices issued* between October 1, 2025, and November 12, 2025; rescind those notices; and restore each affected employee affected by a RIF notice issued between October 1, 2025 and November 12, 2025 to their September 30, 2025 employment status…

ECF 126, Ex. B at *2 (emphases added).  That memorandum further directs agencies to submit to OPM "confirmation that the agency has issued a notice to rescind any RIFs that were noticed between October 1, 2025 and November 12, 2025, no later than November 19, 2025."  *Id.* at *3.

These memoranda are significantly under-inclusive in their interpretation of CR Sections 120(a) and 120(e).  First, they direct only that agencies must cease issuing RIF *notices*, failing to acknowledge or give force to the prohibition on "initiat[ing], carry[ing] out, [or] implement[ing] … a reduction in force" under the statute.  Pub. L. No 119-37, §120(a).  Second, the memoranda instruct federal agencies to rescind only those RIFs issued since October 1, 2025 rather than "any reduction in force proposed, noticed, initiated, *executed*, *implemented*, or otherwise taken by an Executive Agency

between October 1, 2025, and the date of enactment," as required by the statute.  *Id.* §120(e) (emphasis added).  OPM's spokesperson issued a statement to the New York Times confirming this under-inclusive interpretation: "Congress was specific in the bill it wrote that it was concerned with RIF notices issued during the shutdown, not RIFs that were noticed before Oct. 1, 2025…. RIFs that were noticed before the shutdown but happened to have a separation date that fell later were not 'implemented or executed' during the shutdown, but rather before."[1]

At the time OPM issued these memos, it was aware that federal agencies had continued to implement (during the shutdown) RIF notices that had been issued to employees prior to October 1, 2025.[2]  OPM itself had instructed agencies that employees could be forced to work during the shutdown to implement previously issued RIFs (as previously challenged in this case as unlawful under the APA and contrary to the Antideficiency Act).  ECF 17-3, Ex. D at 9-10.  And OPM knew that the process for conducting RIFs is long and involved, including many steps between sending an initial RIF notice and finally separating an employee.  OPM's RIF instruction manual explains "[t]here are six phases to implementing a RIF," which occur over many months and require a "team" to implement.[3]  These phases include "Planning & Analysis," "Formal RIF Notice Period," "Placement & Appeals Process," and "Implementation & Transition (RIF Effective Date)."  *Id.*[4]  All of these stages involve substantial work by a team of agency human resources employees taking care of issues including the impact on health benefits, retirement, career transition and other matters.[5]

State was one of several federal agencies that had issued RIF notices to employees prior to the

---

[1] *See* https://www.nytimes.com/2025/11/25/us/politics/gsa-fired-employees-shutdown.html (Nov. 25, 2025).

[2] Some of these actions were enjoined by this Court.  ECF 56, 92, 109.  The further implementation of previously issued RIF notices was not enjoined by this Court's October 28 preliminary injunction unless the agency had reissued the notice during the shutdown, or if the RIFs did not impact agency components with employees represented by Plaintiffs.  ECF 92, 109.

[3] OPM, *Overview of Reduction in Force (RIF)*, ; OPM, *Workforce Reshaping Operations Handbook*, https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

[4] OPM provides agencies detailed instructions explaining the advance work that goes into any separation from employment, including preparation of the forms (SF-50s and others).  See OPM, *Personnel Documentation: Guide to Processing Personnel Actions*, https://www.opm.gov/policy-data-oversight/data-analysis-documentation/personnel-documentation/#url=Personnel-Actions.

[5] *Workforce Reshaping Operations Handbook*, *supra*, at 13-15 ("Establishing the RIF Team").

shutdown, with implementation and execution dates falling within the shutdown time period.  ECF

123-3 ¶¶11-21, Ex. B-I.  On December 1, 2025, the State Department revealed for the first time that

OMB, along with the Department of Justice's Office of Legal Counsel ("OLC"), had provided State

with "formal written guidance" instructing (consistent with the OPM memoranda) that Section 120

allows agencies to complete RIFs that were noticed prior to the October 1, 2025 shutdown, even if

they were further implemented during the shutdown, including by effectuating the separation of

employees.  *Id*., Ex. K.[6]  State posted Frequently Asked Questions on its website repeating this

position: "The Department – following formal guidance from the Office of Management and Budget

and the Department of Justice Office of Legal Counsel – has determined that H.R. 5371 does not

prohibit completing RIFs that were noticed prior to the lapse in appropriations."[7]

These OPM and OMB instructions to federal agencies, like the prior OMB Lapse

Memorandum and OPM guidance telling agencies that RIFs could be implemented during the

shutdown and other OPM and OMB directives to federal agencies regarding federal employment (*see*

ECF 79-1 at 8-9), are directives regarding how agencies must interpret Section 120 of the CR and

apply it to their employees.  Notably, the November 13 OPM memorandum sets out "Required

Actions" that agencies "must" take.  ECF 126, Ex. B at *2.  These and other directives issued by

OPM and OMB are not permissive or suggestions, notwithstanding the use of the term "guidance" to

describe the documents.  *See, e.g*., *AFGE v. Trump*, 784 F. Supp. 3d 1316, 1352 (N.D. Cal. 2025)

(rejecting argument that Defendants "were merely providing guidance" and finding "[l]ike other

directives from the current administration, … the memo 'amounted to a command, not a

suggestion.'") (quoting *New York v. Trump*, 769 F. Supp. 3d 119, 136 (D.R.I. 2025)); *AFGE v. OPM*,

2025 WL 2633791, at *15-19 (N.D. Cal. Sept. 12, 2025) (finding that OPM directed terminations of

probationary employees despite argument that agency only provided "guidance").

---

[6] *See* OMB website, https://www.whitehouse.gov/omb/information-resources/guidance/memoranda/ (last accessed December 9, 2025); OLC website, https://www.justice.gov/olc/opinions (last accessed December 9, 2025).  As of the time of this filing, neither OMB nor OLC have made public this "formal guidance" provided to the State Department.

[7] *See* Department of State, FAQs for Employees Separated via a RIF Action (Dec. 2, 2025), https://www.state.gov/faqs-for-employees-separated-via-a-rif-action/ (last accessed Dec. 9, 2025).

**III.    Agencies Continue to Impose RIFs Notwithstanding Section 120(a)**

    **A.        Department of State**

As set forth in Plaintiffs' emergency TRO motion (ECF 123), on July 11, 2025, State issued RIF Notices to approximately 1,300 employees, with separation dates in September 2025 for the civil service and November 10, 2025 for the foreign service (after a mandatory 120-day notice period). ECF 123-5 ¶3; 123-3 ¶10.  Extensions of separation dates were granted to a small number of civil service employees who had recently given birth and/or faced medical issues.  ECF 123-5 ¶¶4-5.

During the shutdown, State continued to implement the stages of these RIFs in preparation for final separation of the employees, including by processing personnel paperwork in advance of the planned separations.  ECF 123-5 ¶6, Exs. A-B; ECF 123-3 ¶10.  For example, the Department took steps that included processing the mandatory SF-50 paperwork and issuing assessments of retirement eligibility and other personnel-related documents and communications for these to-be-separated employees.  ECF 123-5, Ex. B; ECF 123-3 ¶¶11-21, Exs. B-I.  However, the November 10 date came and went without State executing the RIF.  ECF 123-3 ¶22.  Instead, on or around November 10, affected employees received a message stating only that their administrative leave would continue.  *Id.* ¶23, Ex. J.  The RIF notices were not re-issued, and employees received nothing further from the State Department regarding the now-expired RIF notices until December 1, 2025.  *Id.* ¶¶24-25.

On December 1 and 2, 2025, State notified employees for the first time that they were not covered by the CR and would be separated from federal employment imminently, on December 5, 2025.  *Id.* ¶¶25, 27; ECF 123-5 ¶¶7-8.  The foreign service employees received an email notice that stated, in its entirety:

> Following formal written guidance from both the Office of Management and Budget and Department of Justice Office of Legal Counsel, the Department of State's Office of the Legal Adviser has determined that completing the reductions in force (RIFs) noticed prior to the lapse in appropriations does not violate the Antideficiency Act (ADA) or any other restriction within HR 5371.  Given this determination, the Department will finalize your separation or involuntary retirement on Friday, December 5.

ECF 123-3, Ex. K.  The civil service employees received a similar message, largely without a new separation date (although some were given a December 5 separation date).  ECF 123-5, Exs. C, E.

**B.      Department of Education**

This Court previously enjoined further implementation of RIFs by Education, including RIFs directed at employees of the Office of Civil Rights ("OCR").  ECF 56, 94, 109.  The enjoined RIFs included 136 employees who received RIF notices for the first time on October 10, 2025, and 247 employees who had been subject to previously enjoined and expired March and April 2025 RIF notices and received renewed RIF notices on October 14, with a new separation date in early November 2025.  *See* ECF 117-2.

Education did not execute the separations of the 247 OCR employees in early November in light of the preliminary injunction entered previously in this case (ECF 94).  On November 21, 2025, Education confirmed in a declaration filed with this Court that while it had rescinded the 136 October 10 notices pursuant to Section 120 of the CR, it did *not* rescind the October 14 renewed RIF notices to 247 employees.  ECF 117-2 ¶19.  Defendants stated: "the Department of Education has not rescinded the RIF notices issued to certain Office for Civil Rights employees in April, 2025, *as those RIFs do not fall within the scope of the Continuing Resolution*."  ECF 117 (emphasis added).

Education further confirmed that "[t]he notice period for that RIF is tolled and the separation dates for those employees are stayed, pending clarification from this Court that the current preliminary injunction does not encompass that pre-shutdown RIF."  ECF 117-2 ¶19.  Education has thus stated that the CR's protections exclude the 247 OCR employees and that they should be subject to final separation pending clarification on the scope of the prior preliminary injunction.[8]

**IV.      Agencies Refuse to Rescind RIF Separations Notwithstanding Section 120(e)**

Consistent with the OPM and OMB directives, multiple federal agencies have refused to rescind RIF separations executed during the shutdown period, on the ground that an initial RIF notice pre-dated the shutdown.

**A.      Department of State**

Besides threatening further RIF implementation (as addressed by this Court's TRO, ECF 125, and *supra* at 6), State implemented and executed RIFs to employees represented by AFGE by

---

[8] Education has recently indicated it considers these individuals "temporary" and continues to intend to implement the RIFs if not enjoined.  Schwartz Decl., Exs. A-C; *see* Lopez Decl. ¶19.

separating employees during the shutdown period.  Schwarz Decl. ¶¶ 4-6.  For approximately eight employees of which Plaintiffs are aware, State did not comply with the November 17, 2025 deadline imposed by Congress to rescind those RIF separations and reinstate the employees with backpay to their employed status as of September 30, 2025.  *Id.*

All of these employees are civil service employees who received RIF notices on July 11, 2025 with an initial separation date of September 9, 2025 and who received extensions of their separation dates for a variety of personal reasons (including medical emergencies and childbirth).  Sheffler Decl. ¶¶6-7.  State executed these employees' new separation dates in October and November 2025 during the shutdown.  For example, one State employee received a communication on October 21, 2025 stating that his separation was processed and effective the day before (October 20).  *Id.* ¶8.  State has not rescinded this, or any of the other RIFs executed during the shutdown period.  *Id.* ¶10.

## B.    Department of Defense[9]

On November 21, 2025, DoD confirmed in a declaration filed in this case that it had taken steps to implement two RIFs of employees represented by AFGE during the shutdown.  ECF 118-1.

First, in August 2025, DoD issued RIF notices to employees in the Defense Technical Information Center with an original separation date of October 24, 2025.  DoD did not execute the RIF during the shutdown and extended the separation date to "January 31, 2026" (without issuing a new notice, after the prior date expired).  *Id.*  Second, on August 5, 2025, DoD issued RIF notices to employees in the Defense Contract Audit Agency with a separation date of October 4, 2025.  *Id.*  Those separations occurred during the shutdown on October 4, 2025, terminating those employees' federal employment.  *Id.*  DoD has not rescinded these separations.  *Id.*

## C.    GSA

Approximately 200 GSA employees received RIF notices prior to October 1, 2025 but with separation dates that fell during the shutdown period.  Schwarz Decl. ¶¶17-18.  Both AFGE and NFFE represent employees who received these RIFs. Garcia Decl. ¶4; Schwarz Decl. ¶¶16-17.

---

[9] Although the Department of Defense uses the name "Department of War" in certain ceremonial and public contexts, Plaintiffs use "Department of Defense" pursuant to controlling statutory authority. *See* Executive Order 14347; 10 U.S.C. §111(a).

GSA did not provide any information about these previously noticed RIFs to this Court in its compliance declarations related to the previous preliminary injunction, even when the RIFs were implemented or executed during the shutdown.  ECF 62-21, 112-20.  GSA implemented and executed those separations after October 1, 2025, and has not rescinded them.  Schwarz Decl. ¶¶18-19; Salcedo Decl. ¶10; Garcia Decl. ¶10; Nuez Decl. ¶19.

**D.    SBA**

On September 29, 2025, SBA issued RIF notices to approximately 73 employees, including AFGE-represented employees, with a separation date of October 29.  Schwarz Decl. ¶20; *see also* ECF 62-31 ¶9.  On October 29, 2025, during the shutdown, SBA further implemented and executed those RIFs, separating the employees from federal employment.  *See* Nixon Decl. ¶10; Ings Decl. ¶8.

On November 17, 2025, the SBA Chief Human Capital Officer sent a letter to previously separated employees titled "Rescission of Reduction in Force Notice."  That letter stated:

> *This letter is to formally rescind the Reduction in Force (RIF) notice dated 9/29/2025 per Public Law No: 119-37 - Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026.* You are being reinstated to your position of record with the Small Business Administration (SBA). You will receive all retroactive pay through Pay Period 22.

Nixon Decl. ¶12, Ex. F; Ings Decl. ¶10, Ex. E (emphasis added).  The next day, the same SBA Chief Human Capital Officer sent the same employees a further communication *retracting the rescission.* Nixon Decl. ¶13, Ex. G; Ings Decl. ¶11, Ex. F.  That letter stated: "*Notwithstanding any prior communication from the U.S. Small Business Administration, the September RIF Notice and termination affecting your position remain in effect.*"  *Id.* (emphasis added).  The letter provided no explanation of the reversal of position, or how this new position was consistent with the statute that SBA admitted, the prior day, required recission.  SBA has not since rescinded these separations.

**V.    The Imminent Harm of Implemented and Planned RIFs to Plaintiffs**

Plaintiffs AFGE and AFSA and the employees they represent at State and Education who are subject to these imminent actions will suffer irreparable harm if these separations are permitted to take place.  Employees will lose their income, health benefits, and other incidents of employment, causing severe irreparable harm to them and their families.  ECF 123-3 ¶¶29, 30; ECF 123-5 ¶¶10-11, 19.  Many of these employees will lose careers built over years or even decades as dedicated public

servants in federal employment.  *E.g.*, ECF 123-3 ¶3; ECF 123-5 ¶¶11, 16; ECF 123-4 ¶14; Asturias Decl. ¶18; Lopez Decl. ¶3.

For example, one AFSA member facing separation on December 5, 2025 has completed more than twenty years of service in the Department, repeatedly serving in high-threat positions and building a career as a distinguished diplomat.  ECF 123-4 ¶14.  He survived a terrorist bombing while stationed overseas in Jeddah.  *Id.* ¶3.  He is worried that his December 5 termination will essentially end his career because the specialized nature of his work does not translate easily to the private sector.  *Id.* ¶¶15, 16.  As he puts it, "I have lost the ability to continue serving American interests in critical regions where I built decades of expertise and relationships."  *Id.* ¶15.  On top of the end of his career, his family stands to lose 50% of its income because of his separation.  *Id.* ¶19.  He continues to suffer from bombing-related PTSD, and since receiving notification on December 2 that he would be separated days later, the symptoms of his PTSD have been exacerbated, and he has had trouble sleeping and been short of temper.  *Id.* ¶17.

For many of these employees, the imminent end of their employment means a sustained loss of income and benefits in a job market already flooded with unemployed former federal employees.  ECF 123-5 ¶11; Asturias Decl. ¶¶19-20; Konig Decl. ¶¶20.  For example, one AFGE member who gave birth only a few months ago is concerned that she will be unable to find another job in the human rights advocacy space because the federal government has also eliminated grants in that space and stigmatized such work as "DEI."  ECF 123-5 ¶¶13-14.  For others, who are stationed overseas and must remain there in light of their families or spouses, loss of their job will mean unemployment.  For example, one Foreign Service officer who is married to another Foreign Service Officer currently posted abroad has very limited job opportunities because of host-country laws, language requirements, and embassy restrictions.  ECF 123-2 ¶11.  Moreover, she had to give up one of the few job opportunities available to her: although she had applied for and conditionally accepted a position intended specifically for spouses of foreign service officers who are not employed by State, she later turned down the job under the belief that she was ineligible for the position because she would not be separated from State until the end of January, consistent with the CR.  *Id.* ¶¶12-13.  Instead, she suddenly received notice that she would be separated on December 5.  *Id.* ¶14.

The loss of health benefits will irreparably harm employees who are already experiencing or have family members experiencing medical issues.  In particular, the AFGE-represented employees at State who have yet to be separated are in that category because they were in the midst of health care and other circumstances that led to extensions of their prior separation dates.  ECF 123-5 ¶10.

The employees who were separated from employment during the shutdown have suffered and will continue to suffer these exact harms.  Employees at State, DoD, GSA, and SBA have lost income and health benefits as a result of the separations imposed during the shutdown.  *E.g.* Nixon Decl. ¶¶15-18; Ings Decl. ¶¶13-16; Garcia Decl. ¶15.  People have lost careers years or decades in the making, *e.g.*, Sheffler Decl. ¶4; Nuez Decl. ¶10, and face ongoing difficulty finding further work, *e.g.*, Sheffler Decl. ¶11; Garcia Decl. ¶13.  For example, one long-term SBA employee, who had built a career at the agency, has been struggling to pay for basic expenses and significant medical costs related to serious and potentially life-threatening health conditions, and has been forced to take seasonal retail work to make ends meet for her family during this holiday season, despite the health risks the job poses for her.  Nixon Decl. ¶¶15-21.  Another, a single mother who lost her longtime SBA position, is struggling to pay for basic living expenses, including food, rent, and utilities, and is facing eviction without her income (on top of the financial distress already caused by not being paid during the furlough), which is causing extreme stress and anxiety and an immediate impact on her son.  Ings Decl. ¶¶13-19.  Another longtime State employee is attempting to make do on his wife's public employee salary, credit cards and what little cushion they have, when 75% of her take home pay goes to their mortgage and they face other living expenses for themselves and their 15-month-old child.  Sheffler Decl. ¶¶12-14.  He has yet to be able to find another job in a market flooded with former State Department and other federal workers, notwithstanding months of searching.  *Id.* ¶11.  For many separated employees, the circumstances of their RIFs and struggles to find other employment are having ongoing and serious impacts on their and their family's mental and physical health, often exacerbated by a lapse in health insurance coverage after termination.  *E.g.*, *Id.* ¶¶14-19; Ings Decl. ¶¶18-19; Nixon Decl. ¶¶18-20; Nuez Decl. ¶13; Salcedo Decl. ¶¶13-15.

Finally, each Plaintiff is a labor organization that has the core function of representing employees, including those in federal bargaining units, in collective bargaining and providing

counseling, advice, and representation to employees in the event of adverse employment actions. Schwarz Decl. ¶¶5, 9, 13-14, 16-17, 20, 27; Supp. Dinkelman Decl. ¶5.  Plaintiff unions have been and will be imminently prevented by implementation of these RIFs from exercising those core functions as employee representatives, and will be harmed in multiple other ways, including by the loss of dues income and bargaining power.  Schwarz Decl. ¶27; Supp. Dinkelman Decl. ¶5.

**VI.    History of These Proceedings**

Plaintiffs filed their Unopposed Motion for Leave to File a Supplemental Complaint on December 3, 2025 (ECF 121), in conjunction with a motion for a TRO seeking immediate relief in advance of the State Department separations planned for December 5, 2025 (ECF 123).  Plaintiffs sought the emergency TRO in light of the State Department's December 1-2, 2025 notices providing as little as three-days notice of imminent separation of employees on December 5.  Plaintiffs provided advance notice of the TRO motion to Defendants and were unable to negotiate a resolution that would avoid the need for the filing.  ECF 123-6 ¶¶2-3.  Defendants did not file a response.

This Court granted a TRO on December 4, 2025.  ECF 125.  The Court found Plaintiffs' claims regarding the violation of Section 120(a) likely to succeed, because:

> Section 120(a) prohibits federal agencies from issuing or **implementing** RIFs from November 12, 2025, through January 30, 2026. Nothing in the plain text of the statute limits Section 120(a) to apply only to those RIFs initiated during the government shutdown.

ECF 124 at 2:9-12 (emphasis in original).  The TRO enjoined and stayed OPM, OMB, and State from "taking any action to implement, carry out, or effectuate RIFs of employees of the Department of State, including any actions to separate employees from federal employment."  *Id.* at 3.

As further required by the TRO, Defendants filed declarations on December 8, 2025, stating that State complied with the TRO by holding off on implementing the separations.  ECF 129-1.  The Department sent affected employees an email informing them only that "Your administrative leave status has been extended."  Supp. Dinkelman Decl., Ex. A.[10]

---

[10] The emails reviewed by Plaintiffs do *not* state, as the State Department's compliance declaration represents, that "The Department has rescinded your separation or involuntary retirement SF-50 and placed you back in administrative leave status."  ECF 129-1.

**ARGUMENT**

**I.    This Court Should Enjoin Defendants' Actions Contrary to Section 120**

Plaintiffs have established all of the preliminary injunction factors.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* Fed. R. Civ. P. 65(a), (b)(3); 5 U.S.C. §705.

**A.    Plaintiffs Are Likely to Succeed on the Merits**

Section 120 both prohibits the further implementation of any RIFs through January 30, 2026 and requires the rescission of RIFs and reinstatement of employees who were separated during the shutdown.  Plaintiffs are likely to prevail on their claims regarding Sections 120(a) and (e).

**1.    OPM and OMB Are Unlawfully Directing Agencies to Violate Both Section 120(a) and Section 120(e)**

OPM and OMB's directives that Section 120 applies *only* to RIFs as to which the initial RIF notices were issued after October 1, 2025 are contrary to Section 120 of the Continuing Resolution and direct agencies to act in violation of the Appropriations Clause; violate the Administrative Procedure Act ("APA"), 5 U.S.C. §706 (2)(A), (B) and (C), and the Constitution; and are ultra vires.

a.  Section 120(a).  Section 120(a) prohibits the use of *any* federal funds "to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government," without qualification.  Pub. L. No 119-37, §120(a).  As this Court explained in issuing a TRO, "Section 120(a) prohibits federal agencies from issuing or **implementing** RIFs from November 12, 2025, through January 30, 2026.  Nothing in the plain text of the statute limits Section 120(a) to apply only to those RIFs initiated during the government shutdown."  ECF 125 at 2 (emphasis in original).

This Court's reasoning is correct:  "It is a well-recognized rule of statutory construction that '[t]he plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results.'"  *Eisinger v. Fed. Lab. Rels. Auth.*, 218 F.3d 1097, 1102 (9th Cir. 2000) (quoting *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999)).  There is no need to look further than the text of Section 120(a), which is not qualified or limited based on the timing of when a RIF was first issued.  To the contrary, Congress used the terms "implement" and "carry out," both of which encompass any steps taken to complete an action or process.  Pub. L. No

119-37, §120(a).  *See, e.g.*, *Implement*, Garner's Modern English Usage (4th ed. 2016) ("to carry out or put into effect; to take practical steps toward the fulfillment of"); *Carry Out*, Merriam-Webster, https://www.merriam-webster.com/dictionary/carryout ("to bring to a successful issue").[11]

Any interpretation limiting Section 120(a) to prohibit only newly noticed RIFs would render the words "carry out" and "implement" meaningless.  But courts "must 'give effect, if possible, to every clause and word of [the] statute.'"  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).  The only reading of the statute that gives these terms any independent meaning is that it covers any action taken to further any RIF, from initiation and notice through all implementation steps, including carrying out a final separation.  Although some overlap in the agency actions listed may remain (as between "carry out" and "implement," or "initiate" and "otherwise notice"), "'surplusage is nonetheless disfavored,' and our 'construction that creates substantially less of it is better than a construction that creates substantially more.'"  *Fischer v. United States*, 603 U.S. 480, 496 (2024) (citation omitted).

Moreover, the definition in Section 120(d) of "reduction in force" includes actions beyond sending the initial notice.  Congress defined "reduction in force" to broadly include "*actions* taken by an agency pursuant to section 3501 through 3504 of title 5, United States Code or section 3595 of such title, or any similar reduction of positions at any department, agency, or office of the Federal Government, unless such reduction has been provided for in this Act."  Pub. L. No 119-37, §120(d) (emphasis added).  The referenced statutes (Sections 3501-3504) relate broadly to the "release of competing employees in a reduction in force," not just to the initial notice of such reductions, *see, e.g.*, 5 U.S.C. §3502(a).  Similarly, OPM's regulations implementing the referenced statutes pertain to actions beyond issuance of a RIF notice, further illustrating that the notice is just one of the many steps required to implement a RIF.  *See generally* 5 C.F.R. part 351.  The plain and broad meaning of "reduction in force" is also consistent with OPM's published "Overview of Reduction in Force (RIF)," which sets out six different phases of the RIF process that distinguish between notice and

---

[11] If Congress meant this provision to apply only to newly issued RIFs, it could have stopped after "initiate" and there would have been no need to include the broader words "carry out" or "implement," as the issuance of new RIF notices would have already been prohibited.

implementation. *See supra* at 4. According to OPM, "Implementation & Transition (RIF Effective Date)," is Phase 5 of the RIF process, during which agencies "[o]fficially implement RIF separations, reassignments, and downgrades" and "[p]rovide final separation notices, benefits counseling, and exit processing."[12] OPM's own guidance thus acknowledges that "implementing" a RIF is distinct from issuing the RIF notice, and includes the processes needed for final separation of employees. Further, nowhere does the definition in Section 120(d) include a qualifier: it applies broadly to "any" RIF or reduction in positions at any agency, which in this case means *all* RIFs, and does not exclude RIFs where the agency issued the RIF notice prior to October 1, 2025. Thus, by broadly defining "reduction in force" to include all actions taken to effectuate the removal of positions, Section 120 prohibits any of the many steps that must occur to implement a RIF, from sending an initial RIF notice through separation of employees.

Finally, the text and structure of the remainder of Section 120 confirm that 120(a) prohibits any "actions" to implement RIFs through January 30, 2026—regardless of when any RIFs were noticed. Section 120(c) provides for only three enumerated exceptions to Section 120(a): "(1) voluntary separations or retirements; (2) actions necessary to comply with a court order; or (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to implement or maintain an orderly shutdown of government operations." Pub. L. No 119-37, §120(c). While adopting these exceptions, Congress did not exempt any of the many existing (and highly publicized) RIFs that had been noticed prior to the October 1, 2025 shutdown. "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–617 (1980)). And, as discussed *infra* at 16-17, Section 120(e) provides further support for this plain meaning of Section 120(a): neither is limited to RIFs issued only after the shutdown began.

    b. Section 120(e). OPM and OMB's directives that Section 120(e) applies only to RIFs *noticed* between October 1, 2025 and November 12, 2025 are contrary to the provision's express language.

---

[12] https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-overview.pdf

In interpreting Section 120(e), "we start where we always do: with the text of the statute." *Van Buren v. United States*, 593 U.S. 374, 381 (2021).  The text is clear: "*any* reduction in force proposed, noticed, initiated, *executed*, *implemented*, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect."  Pub. L. No 119-37, §120(e) (emphases added).  This language expressly refers not only to RIFs proposed, initiated, or noticed during the shutdown, but also to any RIF "executed" or "implemented" after October 1. Restricting the application of Section 120(e) to RIFs "noticed" during the shutdown would render every other term in the subsection meaningless.  Again, courts must give effect to all the terms Congress chose to include in the statute.  *Williams*, 529 U.S. at 404.

Where Congress wanted to create exceptions (as in Section 120(c)), it did so, and Congress did not exempt RIFs already in progress at the time of the shutdown from this provision.  Indeed, by its own terms this provision applies retroactively without regard to the then-current status of any covered RIF, the timing of any already-issued RIF, or whether employees have already been separated—*all* these RIFs are without "force or effect."

The further provisions of Section 120(e) provide specific instruction to agencies regarding the steps necessary to effectuate the nullification of all of these RIFs, and confirm the breadth of these provisions.  First, Section 120(e)(1) requires that "[a]ny employee who received notice of being subject to *such a reduction in force* shall have that notice rescinded," where "such a reduction in force" refers back to the full list of RIFs "proposed, noticed, initiated, executed, implemented, or otherwise taken" during the shutdown.  Had Congress intended to limit this recission to notices issued during the shutdown, it could have restricted the application of subsection 120(e)(1) to employees who "received notice *after October 1, 2025* of being subject to such a reduction in force." But it did not.  Next, Congress recognized that this provision would apply to employees that had already been separated, requiring that any such employees be "returned to employment status as of September 30, 2025, without interruption" and with backpay.  Pub. L. No 119-37, §120(e)(1).  As a practical matter, the employees who had been separated during the shutdown by the time Congress

1    ended the shutdown on November 12, 2025 were those, like at State and SBA, who had been given

2    RIF notices prior to October 1.[13]

3       Finally, the context supports an expansive interpretation that does not limit or qualify the

4    broad list of terms Congress set forth in Section 120(e).  At the time the CR was enacted, many

5    highly publicized RIFs had been announced and noticed (including by State) before the shutdown

6    began.[14]  And Section 120(e) on its face requires recission of RIFs and reinstatement where agencies

7    "implemented" RIFs during the shutdown by "completing" a RIF noticed prior to October 1.

8       c. <u>The Appropriations Clause.</u>  OPM and OMB's directives authorizing implementation of

9    RIFs that were initially noticed prior to October 1 also directs agencies to violate the Constitution.

10   Under the Appropriations Clause, "[n]o Money shall be drawn from the Treasury, but in

11   Consequence of Appropriations made by Law."  U.S. Const. art. I, §9, cl. 7.  "The Clause has a

12   'fundamental and comprehensive purpose ... to assure that public funds will be spent according to the

13   letter of the difficult judgments reached by Congress as to the common good and not according to the

14   individual favor of Government agents.'"  *United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir.

15   2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990)).  The

16   Appropriations Clause allows Congress to restrict the use of funds for certain purposes, regardless of

17   whether those purposes are otherwise lawful.  *Office of Pers. Mgmt.*, 496 U.S. at 425 ("Any exercise

18   of a power granted by the Constitution to one of the other branches of Government is limited by a

19   valid reservation of congressional control over funds in the Treasury.").  As Defendants explained in

20   a prior preliminary injunction hearing in this very case, "if [Congress] includes an appropriation rider

21   that specifically says, 'No funds may be used by this agency to carry out X, Y, Z,' I think we would

22   all agree that is a program that the Government cannot statutorily carry out."  ECF 97 at 8.  That

23   is precisely what Congress has done here, in enacting Section 120(a).  *See supra* at 13-15.  But OPM

24

25   ───────────────

26   [13] The RIF regulations (and some agency-specific statutes and bargaining agreements) require at
     least 60 days' notice (which OPM is allowed to reduce in limited circumstances, *see* 5 C.F.R.
     §351.801).  If Section 120(e) were intended to cover *only* those RIFs issued during the shutdown,
     there would be little practical need for this reinstatement requirement.

27   [14] *E.g.*, Associated Press, *State Department Lays Off Over 1,300 Employees Under Trump
     Administration Plan* (July 11, 2025), https://apnews.com/article/layoffs-diplomats-state-department-
28   trump-rubio-bfdb86767b7bd5b6570819d404a7782e.

and OMB have now instructed agencies that they may nevertheless carry out the very action Congress has prohibited.

* * *

OMB and OPM have no authority to direct other agencies to apply a misinterpretation of, and to violate, federal law or the Appropriations Clause. For all of these reasons, OMB and OPM's actions therefore violate the APA because they are inconsistent with law in violation of 5 U.S.C. §706(2)(A), are contrary to the Constitution in violation of 5 U.S.C. §706(2)(B), and exceed statutory authority in violation of 5 U.S.C. §706(2)(C), and they are *ultra vires*.

### 2. The State and Education Departments' Imminent RIF Separations Will Violate Section 120 and the Constitution

For largely the same reasons that OPM and OMB's directives are contrary to statute and the Constitution, any actions by State or Education to take the further steps they have threatened to take in order to complete previously noticed RIFs, up to and including by separating those employees, will violate the APA and Appropriations Clause.

Prior to this Court's TRO, State issued notices on December 1, 2025 to employees represented by AFSA and AFGE stating that it was "completing the reductions in force" it had previously noticed, and that "the Department will finalize your separation or involuntary retirement on Friday, December 5." ECF 123-5, Ex. E; ECF 123-3, Ex. K. The only reason the State did not complete those RIFs was this Court's TRO, and the actions remain imminent once that TRO expires. Likewise, Education previously noticed the separation of 247 OCR employees in early November, and has only tolled those separations in light of the prior injunction in this case (ECF 94). Education has taken the position that these separations are not prohibited by Section 120, and that it is still seeking to execute them. ECF 118-1.[15] These planned actions violate both Sections 120(a) *and* (e).

First, State and Education's terminations "implement" and "carry out" RIFs after November 12, 2025, which Section 120(a) prohibits. There is no possible mechanism by which these employees can be separated from federal employment that does not involve the expenditure of time and

---

[15] Defendants indicate they wish to seek (although have not yet sought) "clarification" as to whether this Court's prior injunction (ECF 94) applies to these OCR separations. Such clarification is unnecessary in light of the plain application of Section 120(a) prohibiting these separations.

resources by agency staff, and therefore, the federal funds prohibited by Section 120(a).  For all the same reasons explained above, Section 120(a)'s prohibition is not limited to issuing or implementing new RIFs, and these agencies can no more escape the broad scope of Section 120(a) than can OPM and OMB.

Second, the RIFs at issue were implemented during the shutdown and are therefore null and void, and any pre-existing RIF notices must be rescinded under Section 120(e).  Both Departments continued to take action to "implement" these particular RIFs during the shutdown, in anticipation of and preparation for separating these employees from service once their notice period ran.  As the November 10, 2025 separation date approached for the foreign service during the shutdown, State took numerous steps to further implement the RIF, including by sending employees materials related to their impending separations, such as SF-50 personnel forms.  ECF 123-3 ¶¶11-21.  Likewise, State processed the separations of the AFGE-represented employees.  ECF 124-5 ¶6.  And Education reissued notices to OCR employees on October 14, 2025, implementing new separation dates.  *See* Lopez Decl. ¶¶8-9; Konig Decl. ¶¶12-13.

After the shutdown ended, neither State nor Education complied with Section 120(e) by rescinding the prior RIF notices for RIFs that it had continued to implement during the shutdown; instead, the agencies are trying to move forward to effectuate these RIFs.  And if Plaintiffs are correct that Section 120(e) renders these RIFs null and void and requires rescission, then any attempt to impose a new separation date also necessarily would require issuing a *new* RIF notice (which, even under Defendants' interpretation, would be prohibited by Section 120(a)).  Section 120 does not permit agencies to avoid the application of either provision by holding RIFs in abeyance and then implementing them several weeks later than planned, with—in the case of State—four days' notice to employees of their final separation date.  *See* ECF 123-1; 123-3.

Finally, State and Education's actions to implement RIFs violate the Appropriations Clause, for all the same reasons previously explained.  The Constitution's "straightforward and explicit command ... means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of Pers. Mgmt.*, 496 U.S. at 424.  Where an agency spends money for a purpose prohibited by an appropriations rider, it is "drawing funds from the

Treasury without authorization by statute and thus violating the Appropriations Clause." *McIntosh*, 833 F.3d at 1175; *see id.* at 1172-73 (allowing defendants to seek to enjoin expenditure of funds on their criminal prosecutions where expenditure barred by an appropriations rider). The agencies' prior and future actions to plan for and determine final separation dates, prepare paperwork, address any individual mistakes or questions that arise, reassign work to other employees, and more all require drawing on federal funds. Those actions violate the Appropriations Clause.

> **3.** **Agencies Have Violated Section 120(e) by Refusing to Rescind and Reinstate**

State, DoD, GSA, and SBA each have refused to reinstate employees who were separated pursuant to RIFs during the shutdown period in violation of Section 120(e). These actions are contrary to law and exceed statutory authority, and so violate the APA.

Specifically, on various dates after October 1, 2025, State completed the RIFs of civil service employees to whom it previously granted an extension of their separation date. *See* Sheffler Decl. ¶8. These separations "implement[ed]" and "execute[d]" a RIF during the shutdown. Likewise, DoD completed RIFs during the shutdown by separating employees of the Defense Contract Audit Agency on October 4, 2025. ECF 118-1. These separations also "implement[ed]" and "execute[d]" a RIF during the shutdown. GSA separated approximately 200 people during the shutdown, and SBA separated roughly 80 people during the shutdown; these RIFs were also "implement[ed]" and "execute[d]" during the shutdown. All of these actions are void under, and subject to, Section 120(e)'s mandatory rescission, reinstatement, and backpay requirements. Remarkably, SBA admitted as much on November 17 in a letter to every affected employee (in which it "formally rescind[ed] the Reduction in Force (RIF) notice dated 9/29/2025 per Public Law No: 119-37 - Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026"), only to reverse course the next day, without explanation. *See supra* at 9.

For the reasons discussed *supra* at 16-17, these agency decisions flagrantly violate Section 120(e) and Congress's mandate that any RIF "executed" or "implemented" during the government shutdown has "no force or effect." The defendant agencies are required by law to rescind these RIFs and reinstate employees to the positions they held on September 30, 2025, and to provide notice to each employee and to Congress of such actions five days after the enactment of the CR. State, DoD,

and GSA failed to take any of these actions for the employees whose RIFs are at issue here (and SBA did rescind, and then immediately retracted that action). Each agency's failure to take action mandated by statute is reviewable under the APA, *see* 5 U.S.C. §551(13), and is contrary to law.

**4.    The Challenged Actions Are Final For Purposes of the APA**

The OPM and OMB memoranda and defendant agencies' decisions to imminently separate employees (State and Education) and to refuse to rescind RIFs (State, SBA, GSA, DoD) are "final agency action" and thus reviewable under the APA. 5 U.S.C. §704. To be final, an "action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv*., 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 991 (9th Cir. 2025). Both factors are established here.

As both the Ninth Circuit and this Court have recently held in several cases, OMB and OPM's instructions to other agencies satisfy this "pragmatic and flexible" finality standard, *Oregon Nat. Desert Ass'n*, 465 F.3d at 982, when they make conclusive, final decisions of law or review and approve other agency plans. *See, e.g.*, ECF 94 at 26-27; *AFGE v. Trump*, 139 F.4th 1020, 1039 (9th Cir. 2025). OPM's November 12 and 13 memoranda to all federal agencies and the OMB's "formal written guidance" to the State Department "mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178; 5 U.S.C. §704. Those directives set out OMB and OPM's interpretations and instructions to agencies regarding the meaning of statutory authority and specifically direct agencies that Section 120 applies only to RIFs noticed after October 1, 2025. And notably, the November 13 OPM memorandum sets out "Required Actions" that agencies "must" take to comply with OPM's interpretation of the CR. ECF 126, Ex. B at *2. These directives thus alter the established legal regime and determine rights from which legal consequences will flow to federal employees. ECF 94 at 27; *Bennett*, 520 U.S. at 178; *see also U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 599 (2016) (courts take "pragmatic" approach to applying *Bennett* finality test).

In addition, the individual agencies have made further final decisions. State decided *when* to implement the RIFs that OPM and OMB authorized it to effectuate. Education made a final decision

to issue RIF notices to OCR employees and is seeking to effectuate those separations. State, DoD, GSA, and SBA all likewise took final action by failing to rescind the separation of employees that occurred during the shutdown by the CR's deadline. "[A]gency action" as defined in the APA expressly includes "failure to act." 5 U.S.C. §551(13); *see also* 5 U.S.C. §706(1) (reviewing court shall "compel agency action unlawfully withheld"). These agency actions to implement RIFs and to withhold recission of RIFs mark the culmination of further decision-making from which legal consequences flow to the affected federal employees.

### B.    Defendants Have Caused and Will Continue to Cause Irreparable Harm

Plaintiffs AFGE, AFSA, and NFFE and the employees they represent will suffer "likely" irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20, 22. In the context of similar RIFs, the Ninth Circuit has explained that "it is obvious that 'back pay' is far from an adequate remedy…. It cannot account for harms resulting from loss of income in the interim or for gaps in health-and childcare that accompany job loss." *AFGE*, 139 F.4th at 1040; *see also Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health coverage). As this Court likewise explained in this case, Plaintiffs' members subject to RIFs and separation from federal employment "face loss of income, loss of healthcare, and possible relocation from their homes, all constituting irreparable harm if they do not receive immediate injunctive relief. *See* [*AFGE*], 139 F.4th at 1040." ECF 56 at 4-5; *see also* ECF 94 at 38-40. Damages are unavailable in APA cases, making this monetary harm irreparable. *See Pangea Legal Servs. v. U.S. Dep't of Homeland Security*, 512 F. Supp. 3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020). Those harms are ongoing, including where separations have already occurred. *See, e.g.*, Sheffler Decl. ¶¶10-19; Ings Decl. ¶¶8, 12-19; Nixon Decl. ¶¶14-21; Garcia Decl. ¶¶11-13; Salcedo Decl. ¶¶12-15.

Many of the impacted employees face further irreparable injury caused by these separations including the disruption, and indeed termination, of careers that have been years and even decades in the making. *E.g.* ECF 123-3 ¶3; ECF 123-5 ¶¶11, 16; ECF 123-4 ¶14; Nixon Decl. ¶¶2-3; Konig Decl. ¶4; Nuez Decl. ¶3. Employees have been and will be forced into unemployment where jobs are unavailable. *See, e.g.*, ECF 123-2 ¶11; Sheffler Decl. ¶¶11; Ings Decl. ¶17; Garcia Decl. ¶13. And

1    the loss of income and benefits has particularly irreparable impacts on employees and their families

2    who face difficult economic and personal circumstances, including health issues.  *See* ECF 123-5

3    ¶10; Sheffler Decl. ¶¶12-19; Ings Decl. ¶¶13-19; Nixon Decl. ¶¶16-21; Salcedo Decl. ¶¶13-14.

4         **C.    The Balance of Equities and Public Interest Strongly Support this Injunction**

5              The equities and public interest, which merge when the government is a party, *Wolford v.*

6    *Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor a preliminary injunction.  The severe threats

7    to Plaintiffs and the public presented by the challenged actions necessitate a preliminary injunction to

8    prevent immediate harm and allow resolution before further harm occurs that cannot be remedied.

9              Moreover, preserving constitutional and statutory rights "is always in the public interest."

10   *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted); *see also NTEU v. U.S.*

11   *Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993).  The public interest strongly supports

12   enjoining Defendants from spending funds in violation of an express statutory prohibition.  "The

13   structural principles secured by the separation of powers protect the individual as well" as protecting

14   Congress and the constitutional structure.  *Bond v. United States*, 564 U.S. 211, 222 (2011); *see also*

15   *Mistretta v. United States*, 488 U.S. 361, 380 (1989) ("[T]he separation of governmental powers into

16   three coordinate Branches is essential to the preservation of liberty.").

17             As to the imminent RIFs, an injunction will save the government the time and money that

18   would be required to implement separations and address post-RIF benefits questions, possible errors,

19   and other issues that arise, only to be potentially required to reverse and rescind those actions later.

20   And any burden that Defendants may face in complying with the express statutory obligation to

21   rescind already implemented RIFs is far outweighed by the need for Defendants to comply with the

22   law.  As this Court has explained, "[t]here is generally no public interest in the perpetuation of

23   unlawful agency action.  To the contrary, there is substantial public interest in having governmental

24   agencies abide by the federal laws that govern their existence and operations."  ECF 94 at 41 (quoting

25   *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also, e.g.*, *Oregon*

26   *Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840, 893 (D. Or. 2025) (same).

27   **II.    The Proposed Injunction Is as Broad as Necessary to Prevent Harm**

28             As set forth in the accompanying Motion and Proposed Order, Plaintiffs seek a preliminary

injunction and relief pursuant to 5 U.S.C. §705 that, first, protects federal employees from actions implementing RIFs as prohibited by the CR through at least January 30, 2026.  This relief will prevent imminent irreparable harm to State and Education employees who face threatened separation dates after November 12, 2025 in violation of Section 120(a).  The requested injunction will prevent irreparable injury by maintaining the status quo pending resolution of Plaintiffs' claims regarding the application of Section 120(a).  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 878–79 (9th Cir. 2009) (injunction "prohibit[ing] a party from taking action [] preserves the status quo pending a determination of the action on the merits") (cleaned up).

Second, the proposed injunction will enforce Section 120(e), which expressly requires rescission of any RIFs implemented between October 1 and November 12, 2025 and reinstatement of any employees separated during that time.  This Court has the authority to issue preliminary injunctive relief requiring Defendants to take affirmative actions as necessary to prevent irreparable harm, including (but not limited to) actions that reset the status quo back to the "last, uncontested status which preceded the pending controversy."  *Regents of the Univ. of Cal. v. Am. Broad. Cos.,* 747 F.2d 511, 514 (9th Cir. 1984); *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684-85 (9th Cir. 2023) (court may return parties to status "before the controversy arose"); *Marlyn Nutraceuticals*, 571 F.3d at 879 (federal courts may order a recall of a product sold in violation of trademark).

The relief requested from Defendants DoD, State, GSA and SBA precisely tracks Section 120(e)'s requirements and uses the language of the statute:

> 1) Any RIF "noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025" and November 12, 2025, shall "have no force or effect";

> 2) Any employee that was separated from federal employment by the Departments of Defense, and State, GSA or SBA pursuant to a RIF on any date between October 1, 2025 and November 12, 2025 shall "be returned to employment status as of September 30, 2025, without interruption," and "shall receive all pay to which they otherwise would have been entitled in the absence of receiving such notice, including backpay in accordance with section 116 of this Act;"

> 3) "Within five days" of the date of the order, the Departments of Defense, and State, GSA or SBA shall send notice to any employee separated from federal employment pursuant to a RIF

on any date between October 1, 2025 and November 12, 2025 and the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives "of the withdrawal of the reduction in force notice and the affected employee's reinstatement." Those "[n]otices must include reinstatement date and the amount of back pay."

*See* Proposed Order, filed herewith. By enacting Section 120(e), Congress specifically directed agencies that had taken steps to implement RIFs during the shutdown to take actions to restore the employment status of any separated employees to their status immediately prior to the shutdown.

To the extent Defendants may argue that their actions terminating employees, prior to the enactment of the CR but after the filing of this lawsuit, somehow established the status quo, they would be mistaken because the lawfulness of these RIFs was already contested.[16] In any event, the Court's authority to issue the requested injunction rescinding the separations does not depend on whether that would alter the status quo. The Ninth Circuit quoted the following with approval:

> It must not be thought ... that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury.... The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Golden Gate Rest. Ass'n*, 512 F.3d at 1116 (quoting *Canal Authority of Florida v. Callaway,* 489 F.2d 567, 576 (5th Cir. 1974)); *see also Marlyn Nutraceuticals*, 571 F.3d at 879 (court may order affirmative preliminary relief that alters status quo); *Tanner Motor Livery,* 316 F.2d 804 at 809 (observing that the principle that a preliminary injunction should preserve the status quo is "not to be understood as ... [a] hard and fast rule[], to be rigidly applied to every case regardless of its peculiar facts"). Thus, regardless of how the status quo is defined, the scope of this relief is appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion and order the preliminary injunctive relief set forth in the accompanying proposed order.

---

[16] These RIFs were challenged as unlawful in at least two lawsuits, including the operative complaint in this case, which alleged agencies violated the Antideficiency Act by using staff to implement the RIFs during a shutdown (ECF 92), and the still-pending *AFGE v. Trump* case in which RIFs for purposes of agency reorganization are also challenged as illegal. Case No. 3:25-cv-03698-SI, Docket No. 100. The "last, *uncontested* status" prior to any legal dispute regarding these RIFs is that the employees were employed. *Regents*, 747 F.2d at 514 (emphasis added).

Dated: December 9, 2025                    Respectfully submitted,


Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Alice X. Wang
Robin S. Tholin
Talia Stender
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

By: */s/ Danielle Leonard*

*Attorneys for All Plaintiffs*

Elena Goldstein (pro hac vice)
Jennie Kneedler (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 322-1959
egoldstein@democracyforward.org

*Attorneys for All Plaintiffs*

Norman L. Eisen (pro hac vice)
Craig Becker (pro hac vice)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@democracydefenders.org
Craig@democracydefenders.org

*Attorneys for All Plaintiffs*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO

80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and
AFGE locals*


Yvette M. Piacsek (pro hac vice)
NATIONAL FEDERATION OF FEDERAL
EMPLOYEES, IAM, AFL-CIO
1225 New York Ave. N.W., Suite 450
Washington, D.C. 20005
Tel: (202)216-4428
ypiacsek@nffe.org

*Attorneys for Plaintiff National Federation of
Federal Employees, IAM, AFL-CIO*