1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, et al.,<br><br>Defendants. | Case No. 25-cv-08302-SI<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND ENJOINING REDUCTIONS IN FORCE**<br><br>Re: Dkt. No. 130 |

On November 12, 2025, President Trump signed into law the continuing resolution that ended the longest government shutdown in United States history. Many federal employees whose jobs were on the chopping block took solace: the bill contained a provision that paused further federal agency layoffs through January 30, 2026, and ordered that those federal agency employees who had been laid off during the shutdown be reinstated.

Plaintiffs are labor unions representing federal workers. They come to this Court for an emergency order because some agencies have continued to move forward with layoffs (known formally as reductions in force, or "RIFs") and some agencies have not reinstated employees to their pre-shutdown jobs. For instance, some State Department employees—including foreign service officers stationed overseas who are normally entitled to 120-days' notice before a RIF—received emails on a Monday in early December stating they would be terminated that Friday. Dkt. No. 123-3 ("Dinkelman Decl.") ¶¶ 25-27. Small Business Administration employees who were terminated during the shutdown received letters on November 17, 2025, that their RIF notices were "formally rescind[ed]" and they were being reinstated, pursuant to the continuing resolution. Dkt. No. 130-4

("Ings Decl.") ¶ 10 & Ex. E; Dkt. No. 130-7 ("Nixon Decl.") ¶ 12 & Ex. F.  The next day, they received letters rescinding the rescission: they were told their RIF notices and terminations actually "remain[ed] in effect," with no further explanation.  Ings Decl. ¶ 11 & Ex. F; Nixon Decl. ¶ 13 & Ex. G.  Defendants take the position that the continuing resolution does not apply to RIF notices issued before the October 1, 2025 shutdown.

Plaintiffs make two main requests.  First, plaintiffs ask this Court to order defendants to pause any further implementation of RIFs through January 30, 2026.  This relief would apply to defendants U.S. Office of Management and Budget ("OMB"), U.S. Office of Personnel Management ("OPM"), U.S. Department of State ("State"), and U.S. Department of Education ("Education").  Second, plaintiffs ask this Court to order that RIFs effectuated between October 1 and November 12, 2025, be rescinded and that RIF'd employees be reinstated to their September 30, 2025 job status, with full back pay.  This relief would apply to OMB, OPM, State, Education, General Services Administration ("GSA"), and Small Business Administration ("SBA").[1]

This Order grants plaintiffs' motion for a preliminary injunction because, as explained further below, defendants' actions are contrary to the continuing resolution.  Defendants must do what the continuing resolution says.  They may not take any further steps to implement or carry out a RIF through January 30, 2026, regardless of when the RIF notice first issued.  They must also rescind RIF notices for the employees who were terminated between October 1, 2025 (when the shutdown started), and November 12, 2025 (the date of the continuing resolution), and return those employees to their September 30, 2025 job status, with full back pay.

## BACKGROUND

### I.    Factual Background

#### A.    The 2025 Government Shutdown and the Continuing Resolution

On October 1, 2025, Congress remained deadlocked over appropriations for discretionary

---

[1] Plaintiffs have withdrawn their request for relief as to the U.S. Department of Defense, given the agency's declaration that—as of December 12, 2025—it has rescinded RIFs at the Defense Technical Information Center "and is in the process of reinstating the 25 employees who were separated on October 4."  *See* Dkt. No. 134-1 ("Cogar Decl.") ¶ 6; Dkt. No. 137 ("Reply") at 1 n.1.

funding, and the federal government shut down.  Dkt. No. 92 ("SAC") ¶ 188.  On November 12, 2025, President Trump signed into law the Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026.  Pub. L. No. 119-37, 139 Stat. 495 (2025) (hereinafter, "Continuing Resolution").   The Continuing Resolution provided partial government funding through January 31, 2026, ending the government shutdown.

The Continuing Resolution contains Section 120, which provides in full:

> SEC. 120. (a) PROHIBITION.—Notwithstanding section 106(1), during the period between the date of enactment of this Act and the date specified in section 106(3) of this Act,[2] no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government.

> (b) APPLICABILITY.—The prohibition under subsection (a) shall apply to all civilian positions, whether permanent, temporary, fulltime, part-time, or intermittent, and without regard to the source of funding for such positions.

> (c) EXCEPTION.—The prohibition under subsection (a) shall not apply to—

> (1) voluntary separations or retirements;

> (2) actions necessary to comply with a court order; or

> (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to implement or maintain an orderly shutdown of government operations.

> (d) DEFINITIONS.—For purposes of this section, the term "reduction in force" means actions taken by an agency pursuant to section 3501 through 3504 of title 5, United States Code or section 3595 of such title, or any similar reduction of positions at any department, agency, or office of the Federal Government, unless such reduction has been provided for in this Act.

> (e) Notwithstanding section 106(1), any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect.

> (1) Any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025, without interruption. Such employees shall receive all pay to which they otherwise would have been entitled in the absence of receiving

---

[2] The date specified in Section 106(3) of the Continuing Resolution is January 30, 2026.

United States District Court
Northern District of California

such notice, including backpay in accordance with section 116 of this Act.

(2) Within 5 days of date of enactment of this Act, each Federal agency shall send notice to all affected employees and the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives of the withdrawal of the reduction in force notice and the affected employee's reinstatement, if applicable.

(3) Notices must include reinstatement date and the amount of back pay determined in paragraph (1), if applicable.

*Id.*, § 120.  The focus of plaintiffs' motion is on Section 120(a) and (e).

## B.    OPM and OMB Interpretations of Section 120

On November 12, 2025, defendant OPM issued a memorandum to all agencies which addressed Section 120 of the Continuing Resolution.  Dkt. No. 126 ("Suppl. Compl.") ¶ 251 & Ex. A.  OPM's memorandum instructs agencies that Section 120(e) applies only to RIFs issued between October 1 and November 12, 2025:

Additionally, Section 120(e) of the Continuing Appropriations Act of 2026 requires any agencies that issued Reduction in Force (RIF) notices between October 1, 2025 and November 12, 2025 to issue notices to rescind the RIF notices within 5 days. Agencies should issue those notices and confirm to OPM the rescissions have been issued at employ@opm.gov. OPM will provide additional guidance separately.

*Id.*, Ex. A at *1.  On November 13, 2025, OPM issued a further memorandum to all agencies, repeating its instruction that only RIF notices issued during the government shutdown must be reviewed and rescinded:

**Required Actions—**

- Agencies must immediately cease issuing RIF notices pursuant to 5 CFR parts 351 and 359 until January 31, 2026.

- Agencies must review all RIF notices issued between October 1, 2025, and November 12, 2025; rescind those notices; and restore each affected employee affected by a RIF notice issued between October 1, 2025 and November 12, 2025 to their September 30, 2025 employment status….

*Id.* ¶ 253 & Ex. B at *2.

In addition, in emails sent to Foreign Service employees on December 1, 2025, defendant

State represented that OMB and the Department of Justice's Office of Legal Counsel ("OLC") had provided "formal written guidance"[3] that completing RIFs that were noticed prior to October 1, 2025, does not violate the Continuing Resolution or the Antideficiency Act.[4]  Suppl. Compl. ¶ 255; Dinkleman Decl. ¶ 25, Ex. K; Dkt. No. 130-10 ("Sheffler Decl.") ¶ 10, Ex. C.  The next day State repeated this position in a Frequently Asked Questions section on its website: "The Department – following formal guidance from the Office of Management and Budget and the Department of Justice Office of Legal Counsel – has determined that H.R. 5371 does not prohibit completing RIFs that were noticed prior to the lapse in appropriations."  Mot. at 5; U.S. Dep't of State, *FAQs for Employees Separated via a RIF Action* (Dec. 2, 2025) https://www.state.gov/faqs-for-employees-separated-via-a-rif-action/ [https://perma.cc/4NXW-V6SD].

### C.    Department of State RIFs

On July 11, 2025, State issued RIF notices to approximately 1,300 foreign service and civil service employees.  Suppl. Compl. ¶ 263; Dinkleman Decl. ¶ 10, Ex. A; Dkt. No. 123-5 ("Willson Decl.") ¶ 3; Mot. at 6.  These RIF notices provided separation dates in September for civil service employees and of November 10 for approximately 250 foreign service employees.  *Id*.  While many civil service employees were separated in September prior to the government shutdown, extensions of separation dates were granted to a small group who faced medical issues or recently had children.  Suppl. Compl. ¶¶ 263, 269; Willson Decl. ¶¶ 4-5.  The separation dates for some of these civil service employees were set to occur during the government shutdown, whereas other employees received later separation dates.  *Id*.

During the shutdown, State processed mandatory SF-50 paperwork and issued assessments

---

[3] Plaintiffs state that as of the filing of their motion for preliminary injunction, neither OMB nor OLC have made public this formal written guidance to the State Department.  Dkt. No. 130 ("Mot.") at 5 n.6.

[4] The Antideficiency Act prohibits all officers and employees of the federal government from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."  31 U.S.C. § 1341(a)(1)(A)-(B).  The Antideficiency Act is discussed in detail in this Court's prior order granting plaintiffs' motion for preliminary injunction.  Dkt. No. 94 at 6-7.

United States District Court
Northern District of California

1  of retirement eligibility in preparation for final separation of employees.  Willson Decl. ¶ 6, Exs. A-

2  B; Dinkleman Decl. ¶¶ 10-21.  On approximately November 10, 2025, RIF'd employees received a

3  message stating that their administrative leave would continue.  Dinkleman Decl. ¶ 23, Ex. J.  State

4  did not separate employees on the November 10 separation date.  *Id.* ¶ 22.  Many affected employees

5  received no further information from State about the status of their expired RIF notices or the impact

6  of the Continuing Resolution until December 1.  *Id.* ¶¶ 24-25.

7      On December 1 and 2, 2025, foreign service and civil service employees who had separation

8  dates during the government shutdown (or fast-approaching in December) received email

9  communications informing them that their separations would not be rescinded pursuant to the

10  Continuing Resolution because their RIFs were noticed prior to the government shutdown.  Suppl.

11  Compl. ¶ 270; Dinkleman Decl. ¶ 25, Ex. K; Sheffler Decl. ¶ 10, Ex. C; Willson Decl. ¶ 25, Exs. C,

12  E.  Some of these emails included a new December 5 separation date.  Suppl. Compl. ¶ 271.  On

13  December 4, 2025, this Court issued a temporary restraining order ("TRO") enjoining State's

14  impending separations until a hearing on the preliminary injunction could be held.  Dkt. No. 125.

15  State confirmed in its compliance declaration with the Court that, pursuant to the temporary

16  restraining order, separations of foreign service personnel planned for December 5 and of civil

17  service personnel planned for December 5, 8, and 17 were not effectuated.  Dkt. No. 129-1

18  ("Olowski Decl.") ¶ 10.[5]

19      Approximately eight civil service employees who were separated during the shutdown have

20  not been reinstated.  Mot. at 8.  These are employees who received extensions of their original

21  September 9, 2025 separation dates for reasons such as medical emergencies or childbirth.  *Id.*;

22  Schwarz Decl. ¶¶ 4-6; Sheffler Decl. ¶¶ 6-7.  For instance, one State employee whose September

23

24      [5] Defendants have subsequently filed a supplemental declaration acknowledging an error in
   the State Department's earlier declaration.  Dkt. No. 136.  The prior declaration stated that, after the
25  TRO, each impacted employee "received notice that 'The Department has rescinded your separation
   or involuntary retirement SF-50 and placed you back in administrative leave status.  We will be in
26  touch when we have further information to share."  Olowski Decl. ¶ 10(c).  Plaintiffs noted in their
   motion that the emails plaintiffs reviewed did not contain this statement.  Mot. at 12 n.10.
27      The State Department now acknowledges that the declaration was inaccurate and that the
   notice to employees following this Court's TRO stated, "Your administrative leave status has been
28  extended.  We will be in touch with you regarding your timeline when more information is available.
   Thank you."  Dkt. No. 136 ("Suppl. Olowski Decl.") ¶ 5.

separation was extended received a communication on October 20, 2025, that his separation was effective the day prior.  Sheffler Decl. ¶ 8.  The employee has not been reinstated.  *Id.* ¶ 2.

### D.    Department of Education RIFs

Also at issue are RIF notices defendant Department of Education issued to approximately 247 Office of Civil Rights ("OCR") employees in March and April 2025, subsequently renewed on October 14, 2025, with new separation dates in November 2025.  Suppl. Compl. ¶¶ 261-262; *see also* Dkt. No. 117-2 ("Clay Decl.") ¶¶ 17-19.  Education confirmed in a declaration that it has not rescinded these renewed RIF notices.[6]  Clay Decl. ¶ 19.  Defendants stated in a Status Report filed with the Court that these RIF notices were not rescinded because they "do not fall within the scope of the Continuing Resolution."  Dkt. No. 117 at 1.  Education's declaration also stated that "[t]he notice period for that RIF is tolled and the separation dates for those employees are stayed, pending clarification from this Court that the current [October 28, 2025] preliminary injunction does not encompass that pre-shutdown RIF."  Clay Decl. ¶ 19.  Education seeks to move forward with terminating these employees.

### E.    GSA and SBA RIFs

Defendants General Services Administration and Small Business Administration issued RIF notices prior to the government shutdown with separation dates that fell during the shutdown.  Suppl. Compl. ¶¶ 276, 278.  Plaintiffs allege that each agency took steps to implement or execute those RIFs during the government shutdown.  *Id.*

GSA issued RIF notices to approximately 200 employees prior to October 1, 2025, with separation dates during the shutdown.[7]  Suppl. Compl. ¶ 276; Dkt. No. 130-11. ("Schwarz Decl.")

---

[6] Education also confirmed that, pursuant to Section 120 of the Continuing Resolution, it *has* rescinded 137 RIF notices issued to a different set of OCR employees on October 10, 2025.  Clay Decl. ¶¶ 14, 16.

[7] GSA did not provide information about these previously noticed RIFs to this Court in its declarations related to the October 28, 2025 preliminary injunction.  *See* Dkt. No. 62-21 ("Taylor Decl."); Dkt. No. 112-20 ("Helm Decl.").

¶ 17. These separations were executed on or about October 6, 2025. Schwarz Decl. ¶ 17.

SBA issued RIF notices to 73 employees on September 29, 2025, with a separation date of October 29, 2025. Suppl. Compl. ¶ 278; Schwarz Decl. ¶ 20; *see also* Dkt. No. 62-3 ("Serpa Decl.") ¶ 9. Those employees were separated on October 29, 2025, during the government shutdown. Suppl. Compl. ¶ 278; Dkt. No. 130-7 ("Nixon Decl.") ¶ 10; Dkt. No. 130-4 ("Ings Decl.") ¶ 8. On November 17, 2025, the SBA Chief Human Capital Officer sent a letter to these separated employees stating that their RIF notices were rescinded pursuant to the Continuing Resolution. Suppl. Compl. ¶ 279; Nixon Decl. ¶ 13, Ex. G; Ings Decl. ¶ 11, Ex. F. The next day, the same Chief Human Capital Officer sent these employees a further communication rescinding the recission, stating, "Notwithstanding any prior communication from the U.S. Small Business Administration, the September 29, 2025 RIF Notice and termination affecting your position remain in effect." Nixon Decl. ¶ 13, Ex. G; Ings Decl. ¶ 11, Ex. F; *see also* Suppl. Compl. ¶ 279.

GSA and SBA have not since rescinded these separations. Suppl. Compl. ¶¶ 274, 277, 281.

## II.     Procedural Background

The Court incorporates by reference the procedural background of the case provided in its October 28, 2025 order granting plaintiffs' motion for preliminary injunction enjoining shutdown-related RIFs. *See* Dkt. No. 94. To summarize, plaintiffs filed this lawsuit on September 30, 2025, the day before the government shut down, after OMB and OPM issued guidance authorizing federal agencies to conduct RIFs during the shutdown. Dkt. No. 1. On October 10, 2025, the shutdown RIFs began; federal agencies began laying off thousands of employees. After briefing and argument from both sides, the Court issued a temporary restraining order, followed by a preliminary injunction. Dkt. Nos. 56, 94. The preliminary injunction enjoined OMB, OPM, and numerous federal agency defendants from taking action to issue RIF notices or to administer or implement RIFs "during and because of the federal government shutdown" to federal employees in any program, project, or activity that included any bargaining unit or member represented by any union plaintiff. Dkt. No. 94 at 45-46.

On November 12, 2025, the shutdown ended with the passage of the Continuing Resolution.

On December 3, 2025, plaintiffs moved for a temporary restraining order as described above.  Dkt. Nos. 123, 125.  Also on December 3, 2025, plaintiffs sought leave to file a supplemental complaint to add allegations related to events that occurred after the shutdown ended and to add the American Foreign Service Association as a plaintiff.[8]  Dkt. No. 121.  The Court granted both motions on December 4, 2025.  Dkt. Nos. 124, 125.  The temporary restraining order paused RIFs at the State Department, after numerous employees whose RIF notices had expired received emails on December 1 that they would be terminated on December 5.  Dkt. No. 125.  The Court has now received briefing from both sides and held a hearing on the motion for a preliminary injunction on December 17, 2025.

## LEGAL STANDARD

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  In order to obtain a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20 (citations omitted).

Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks and citation omitted).  This formulation recognizes a sliding scale approach, where "a stronger showing of one element may offset a weaker showing of another."  *Id.* at 1131, 1134-35.

---

[8] The supplemental complaint supplements the Second Amended Complaint, filed October 28, 2025.  *See* Dkt. No. 92.

United States District Court
Northern District of California

**DISCUSSION**

**I.    Jurisdiction**

Before proceeding to the merits, the Court must ensure it has jurisdiction to hear this suit. Defendants argue that "Plaintiffs' claims are centered on the terms and conditions of federal employment, and thus must be channeled to agency adjudication in the MSPB [Merit Systems Protection Board] and FLRA [Federal Labor Relations Authority] under the CSRA [Civil Service Reform Act] and the FSLMRS [Federal Service Labor-Management Relations Statute], respectively, not in district court." Dkt. No. 134 ("Opp'n") at 9-10. Defendants also argue in a footnote that claims by foreign service employees are channeled to the Foreign Service Grievance Board under the Foreign Service Act. *Id.* at 10 n.2.

The parties, and this Court, have been down this road before. The Court incorporates and adopts its reasoning from the prior preliminary injunction order in this case. *See* Dkt. No. 94 at 18-20. The undersigned has now visited this question in this case—involving challenges to OMB and OPM's legal justification for agencies to conduct RIFs during the shutdown—and in an earlier, related case—involving the Executive's authority to conduct widespread RIFs and reorganizations across federal agencies without partnering with Congress. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 784 F. Supp. 3d 1316 (N.D. Cal. 2025), *stayed pending appeal*, 145 S. Ct. 2635, *vacated and remanded on other grounds*, 155 F.4th 1082 (9th Cir. 2025). As in those instances, and in another "very similar" case in this district involving the mass terminations of probationary employees, the heart of plaintiffs' claims lies not with the individual termination decisions themselves but with OMB and OPM's legal positions that purport to authorize and/or direct mass terminations at the federal agency level. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Office of Personnel Mgmt.*, --- F. Supp. 3d ---, No. 25-cv-1780-WHA, 2025 WL 2633791, at *10-11 (N.D. Cal. Sept. 12, 2025) [hereinafter, "*OPM*"] (citing *Am. Fed'n of Gov't Emps., ALF-CIO v. Trump*, 139 F.4th 1020, 1031 (9th Cir. 2025)) (finding jurisdiction to hear claims). These claims are not of the type that may properly be "channeled" to administrative adjudication. The Ninth Circuit, in other like cases, has agreed, and defendants fail to grapple with this circuit authority. *See Trump*, 139 F.4th at 1030-33; *see also Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Office of*

*Personnel Mgmt.*, No. 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (unpublished).

As before, the Court finds it has jurisdiction to hear plaintiffs' claims.

## II.    Standing

Plaintiffs in this case are now eleven labor organizations or their local affiliates representing federal employees.[9]  Three of the plaintiffs move for preliminary injunctive relief: AFGE, NFFE, and AFSA.

Federal courts may only hear a case if plaintiffs can show they have standing to sue.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016, *revised* May 24, 2016).  To establish standing, plaintiffs must show an injury, trace that injury to the defendants' conduct, and prove that courts can provide adequate redress for the injury.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury "must be concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted).  To be imminent, a threatened injury must be "certainly impending"— "allegations of possible future injury are not sufficient."  *Id.* (internal quotation marks, brackets, and citations omitted).  Plaintiffs cannot base standing on a theory of harm that "relies on a highly attenuated chain of possibilities."  *Id.* at 410.  The standing inquiry must be "rigorous" where the court faces claims that Congress or the executive branch has acted unconstitutionally.  *Id.* at 408.

Organizational plaintiffs such as trade unions or membership-based non-profit organizations have two paths to establish standing: standing where the organization has suffered injury in its own right, and representational/associational standing where the organization brings suit on behalf of its members.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024)

---

[9] In total, plaintiffs are the American Federation of Government Employees, AFL-CIO ("AFGE"); AFGE Local 1236; AFGE Local 3172; American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"); National Federation of Federal Employees ("NFFE"); Service Employees International Union, AFL-CIO ("SEIU"); National Association of Government Employees, Inc. ("NAGE"); National Treasury Employees Union ("NTEU"); International Federation of Professional and Technical Engineers ("IFPTE"); American Federation of Teachers ("AFT"); and American Foreign Service Association ("AFSA").

11

(Thomas, J., concurring). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Organizations without formal members may achieve associational standing if they are "the functional equivalent of a membership organization." *Fund Democracy, LLC v. SEC.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Hunt*, 432 U.S. at 342-45).

Defendants challenge standing as to AFSA. They argue that, pursuant to Executive Order No. 14251,[10] AFSA no longer has a collective bargaining agreement with State and is no longer the certified representative of affected State employees. *See* Opp'n at 14. The Court is not persuaded by defendants' argument. AFSA has filed declarations that, notwithstanding Executive Order 14251, they continue to represent and provide services to federal employees in bargaining units that are no longer recognized by the Executive Order and that their members continue to pay dues. Dinkelman Decl. ¶¶ 7-9; *see also* Dkt. No. 137-1 ¶¶ 2-5; Suppl. Compl. ¶¶ 247, 282-285. The President of AFSA has described the organizational injury AFSA will suffer in the form of weakened resources and representational strength if State's RIFs are allowed to proceed. Dkt. No. 130-12 ¶ 5. The Court likewise rejects defendants' argument that principles of comity counsel against a finding of standing. *See* Opp'n at 14-15. As plaintiffs point out, none of defendants' cases related to their comity argument implicate AFSA's standing. Reply at 11.

The Court finds the types of harms plaintiffs assert are both concrete and imminent and therefore sufficient to establish injury. Plaintiffs assert, and the Court finds they have, standing both on behalf of their dues-paying members and in their own right for injury the unions themselves suffer by defendants' challenged actions. *See* Suppl. Compl. ¶¶ 282-285. These harms are fairly traceable to defendants' actions and redressable by this Court. *See Lujan*, 504 U.S. at 560. As such,

---

[10] On March 27, 2025, President Trump issued Executive Order 14251, "Exclusions from Federal-Labor Management Relations Programs." Exec. Order No. 14251, 90 Fed. Reg. 14,553 (Mar. 27, 2025).

the Court is satisfied that union plaintiffs, including AFSA, have standing to pursue their claims.

### III.    Preliminary Injunction

The Court now proceeds to the *Winter* factors, examining whether plaintiffs have established they are likely to succeed on the merits, whether they are likely to suffer irreparable harm in the absence of preliminary relief, if the balance of equities tips in their favor, and whether an injunction is in the public interest. *See Winter*, 555 U.S. at 22.

### A.    Likelihood of Success on the Merits

Plaintiffs bring three supplemental claims related to the Continuing Resolution: Claim V, that the challenged actions are not in accordance with the law and exceed statutory authority, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (B), and (C); Claim VI, that the challenged actions are *ultra vires*; and Claim VII, that the challenged actions violate the Appropriations Clause of the Constitution.

The Court finds that plaintiffs are likely to succeed on the merits of all three of these supplemental claims. Because the success of the claims turns on the interpretation of Section 120 of the Continuing Resolution, the Court analyzes this law first.

#### 1.    Section 120(a)

Defendants argue that Section 120(a) only prohibits the "noticing" of new RIFs between November 12, 2025, and January 30, 2026, but that RIFs noticed prior to the shutdown may be allowed to play out now. Opp'n at 18-21. Plaintiffs argue that defendants Education and State, under guidance/direction from OMB and OPM, are violating Section 120(a) of the Continuing Resolution by taking steps to complete RIFs before January 31, 2026. Mot. at 13, 18. Plaintiffs read Section 120(a) to prohibit issuing or *implementing* RIFs from November 12, 2025, through January 30, 2026, regardless of when the RIF was first noticed. *Id.*

In interpreting Section 120(a), "we start where we always do: with the text of the statute." *VanBuren v. United States*, 593 U.S. 374, 381 (2021). Where a term is undefined in a statute, a

court should "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan Ltd.*, 566 U.S.
560, 566 (2012).  Courts "must 'give effect, if possible, to every clause and word of [the] statute.'"
*Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528,
538–39 (1955)).

Section 120(a) announces that, between November 12, 2025, and January 30, 2026: "no
federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force
. . . ." Pub. L. No. 119- 37, § 120(a).  The Court finds that the verb "implement" denotes taking
steps in ongoing RIF processes, not merely *initiating* new RIF notices, as defendants suggest.  *See,
e.g., Implement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/implement ("to
take steps to put into practice").  The verb "carry out" does the same.  *See, e.g.*, *Carry Out*, Merriam-
Webster, https://www.merriam-webster.com/dictionary/carry%20out ("to bring to a successful
issue: complete, accomplish").  These terms plainly encompass actions beyond the noticing of new
RIFs.  Section 120(a) prohibits spending federal funds on implementing all RIFs through January
30, 2026, including RIFs that were first noticed prior to the government shutdown.

Defendants make much of Section 120(a)'s reference to "otherwise notice a reduction in
force," arguing that the term "otherwise" "necessarily cabins the previously listed verbs as only
prohibiting front-end administrative RIF actions." Opp'n at 19.  Defendants invoke two canons of
statutory construction to bolster their reading of Section 120(a): *noscitur a sociis* and the series-
qualifier canon.  *Id.* at 18-19.  The Court finds neither instructive here.

Defendants argue that, applying the canon of *noscitur a sociis*, the phrase "otherwise notice"
in Section 120(a) limits the preceding term "implement" to encompass only the initial "decision and
issuance" of RIFs, not later employee separation events.  Opp'n at 18.  Under the canon of *noscitur
a sociis*, "a word is 'given more precise content by the neighboring words with which it is
associated.'" *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quoting *United States v. Williams*,
553 U.S. 285, 294 (2008)).  However, the *nocistur a sociis* canon is "wisely applied where a word
is capable of many meanings." *McConnell v. United States*, 579 U.S. 550, 568-569 (2016); *see also
Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("Rules of statutory construction
are to be invoked as aids to the ascertainment of the meaning or application of words otherwise

obscure or doubtful.  They have no place . . . except in the domain of ambiguity.").  In *Fischer*, the Supreme Court interpreted the phrase "otherwise obstructs" in the context of an ambiguous criminal statute by applying the canon of *noscitur a sociis*.  *Id.* at 486.  Here, the terms of the statute are unambiguous, so it is not necessary to apply *nocistur a sociis* in the first place.  Moreover, the *Fischer* Court acknowledged that the term "otherwise" does not necessarily limit preceding terms to the meaning of the final term in a list.  *Id.* at 489 ("[D]epending on the context, the word 'otherwise' can—though not 'must'—refer to a crime that is similar to the listed examples in some respects but different in others.") (citations and internal quotation marks omitted).  Thus, the Court concludes that the term "otherwise" does not eviscerate the ordinary meaning of the preceding verbs listed in Section 120(a).

Second, defendants rely on the series-qualifier canon to argue that "or otherwise notice a reduction in force" limits the preceding terms "initiate," "carry out," and "implement" because the listed acts are separated by a comma.  Opp'n at 19.  The series-qualifier canon instructs that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."  *Potts v. Ctr. for Excellence in Higher Educ., Inc.,* 908 F.3d 610, 615 (10th Cir. 2018) (alteration in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)).  However, applying Section 120(a) to only those RIFs first "noticed" during the government shutdown would render the terms "implement" and "carry out" superfluous, and courts must give effect to every word of the statute when possible.  *See Taylor*, 529 U.S. at 404.

In oral argument, counsel for defendants stressed that "the word 'otherwise' has to have a purpose."  Defendants argued that "otherwise" in Section 120(a) must mean that the other verbs listed are all forms of "noticing" and that plaintiffs' reading of the statute would eliminate the word "otherwise" entirely.  Not so.  "Otherwise" broadens the word it refers to ("notice") to suggest *any type* of notice, not just "notice" as a narrow, legal term of art.  *See, e.g., Otherwise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/otherwise ("in a different way or manner").  Defendants' reading of "otherwise notice" would make the preceding terms—initiate, carry out, implement—all synonyms of "notice."  This reading is illogical.  And, as the *Fischer* Court

15

explained, "Congress would not go to the trouble of spelling out [a] list . . . if a neighboring term swallowed it up." 603 U.S. 480 at 490.

The Court further notes that Section 120 contains an "Exception" subsection, which provides express limitations for subsection (a). Section 120(c) states:

> EXCEPTION.—The prohibition under subsection (a) shall not apply to—
>
> > (1) voluntary separations or retirements;
> >
> > (2) actions necessary to comply with a court order; or
> >
> > (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to implement or maintain an orderly shutdown of government operations.

Pub. L. No. 119-37, § 120(c). Notably, subsection (c) contains no limitations based on when the RIF notice issued. It would make little sense for Congress to omit such a major exception to subsection (a)'s prohibition on further RIF action without specifying so in the list of enumerated exceptions.

Finally, the Court also rejects defendants' argument that the purpose of Section 120 was only to "halt and reverse" any RIF that was initiated because of or during the shutdown. Opp'n at 20. "'[T]he plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results.'" *Eisinger v. Fed. Lab. Rels. Auth.*, 218 F.3d 1097, 1102 (9th Cir. 2000) (quoting *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999)). Here, the plain meaning of the statute is clear, and the result is reasonable. Section 120(a) prohibits any use of federal funds to "implement" or "carry out" (not just to "notice") RIFs between November 12, 2025, and January 30, 2026.

Accordingly, plaintiffs have shown a likelihood of success on their claim that OPM and OMB's guidance, and State and Education's actions to separate employees pursuant to RIF notices issued earlier in the year, are contrary to Section 120(a) of the Continuing Resolution.

## 2.    Section 120(e)

Plaintiffs next argue that defendants State, GSA, and SBA violate Section 120(e) of the

1    Continuing Resolution by failing to rescind RIFs executed during the shutdown and to restore those

2    terminated employees to their September 30, 2025 employment status. Mot. at 20-21.[11]  Plaintiffs

3    also challenge Education's failure to rescind the RIFs that were re-noticed to 247 OCR employees

4    on October 14, 2025, although these employees have not yet been formally terminated. Much like

5    their arguments as to Section 120(a), defendants contend that Section 120(e) only invalidates RIFs

6    *initiated during* the government shutdown, not RIFs initiated before and unconnected to the lapse

7    in appropriations. Opp'n at 16. Here, too, defendants emphasize the word "otherwise" in Section

8    120(e) and the series-qualifier canon. *Id.* at 16-17.

9        The Court finds defendants' narrow reading of Section 120(e) lacking for many of the same

10    reasons discussed above as to Section 120(a). The text of Section 120(e) is clear: "*any* reduction in

11    force proposed, noticed, initiated, *executed*, *implemented*, or otherwise taken by an Executive

12    Agency between October 1, 2025, and the date of enactment, shall have no force or effect." Pub. L.

13    No 119- 37, § 120(e) (emphases added). The statute continues: "*Any* employee who received notice

14    of being subject to *such* a reduction in force shall have that notice rescinded and be returned to

15    employment status as of September 30, 2025, without interruption." *Id.* § 120(e)(1) (emphases

16    added). Again, courts must give effect to all terms in a statute. *Taylor*, 529 U.S. at 404.

17        The Court agrees with plaintiffs that limiting Section 120(e) to only those RIFs first

18    "noticed" during the government shutdown would render the terms "implemented" and "executed"

19    meaningless. The Court incorporates its discussion of the term "implemented" from Section 120(a)

20    above.  As to "execute," defendants maintain that the term means "operationalizing an

21    administrative action" and therefore denotes only "the front-end administrative mechanics of a RIF."

22    Opp'n at 17. But defendants have cherry-picked an uncommon definition from a longer list. The

23    ordinary definition of "execute" denotes completion of an action, not initiation. *See, e.g., Execute*,

24    Merriam-Webster,  https://www.merriam-webster.com/dictionary/execute ("to carry (something)

25    out fully: to put (something) completely into effect").

26

27        [11] Plaintiffs also argue that OPM and OMB violated Section 12(e) by directing agencies to
      review and rescind only those RIFs that were first noticed during the government shutdown. Mot.
28    at 15-16.

United States District Court
Northern District of California

The Court is likewise unpersuaded by defendants' unsupported contention that RIFs are "effectively self-executing" once notice is issued. Opp'n at 17-18. Defendants argue that once a RIF is noticed, it essentially completes itself, without further action (such as action by Human Resources) on the agency's part. But the record makes clear that where an agency notices a RIF and then takes no further action, no formal separation occurs. *See* Gilha Decl. ¶¶ 8-9; Dkt. No. 130-9 ("Salcedo Decl.") ¶¶ 9-10; Dkt. No. 130-3 ("Garcia Decl.") ¶ 9. And, as plaintiffs highlight, OPM and OMB's own RIF guidance contradicts defendants' current position; the guidance explains the various phases of a RIF, from "Identification of Competitive Areas and Levels" to "Formal RIF Notice Period" to "RIF Implementation and Separation." Memorandum from U.S. Office of Mgmt. & Budget and U.S. Office of Personnel Mgmt. to Heads of Executive Departments and Agencies 7 (Feb. 26, 2025), https://www.opm.gov/chcoc/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf [https://perma.cc/R8U5-F5TA]. "Separation" is a distinct step in the RIF timeline that must be done in order for the RIF to be complete.

The Court concludes that plaintiffs are likely to succeed on their claim that defendants State, Education, GSA, and SBA's failure to rescind RIFs that were executed, implemented, or re-noticed during the shutdown is contrary to Section 120(e) of the Continuing Resolution.

### 3.    Supplemental Claims

Having concluded above that defendants' interpretation of Section 120(a) and (e) is likely unlawful, it follows that plaintiffs are likely to succeed on the merits of their supplemental claims alleging that defendants' actions violate the APA, are *ultra vires*, and violate the Appropriations Clause of the Constitution. In their opposition brief, defendants focus on the righteousness of their interpretation of Section 120 but do not otherwise challenge the merits of the supplemental claims, acknowledging that the claims are contingent upon the interpretation of Section 120. *See* Opp'n at 20-21 & n.6.

"The APA instructs a reviewing court to 'hold unlawful and set aside' agency actions that are contrary to any law, 'not merely those laws that the agency itself is charged with administering.'"

*New York v. Kennedy*, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *15 (D.R.I. July 1, 2025) (quoting 5 U.S.C. § 706(2)(A); *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003)). The term "agency action" under the APA "includes . . . failure to act[.]"  *See* 5 U.S.C. § 551(13). OMB and OPM's guidance to agencies regarding the interpretation of Section 120 of the Continuing Resolution constitutes final agency action reviewable under the APA.  At the agency level, State, Education, GSA, and SBA's decisions to execute the RIFs and/or not reinstate RIF'd employees (as most egregiously illustrated by SBA's sudden about-face telling RIF'd employees that their RIF rescissions were rescinded) also constitute final agency actions.  These RIFs represent the culmination of each agency's decisionmaking process regarding whether and whom to RIF, and nothing about the RIF notices or terminations indicates the decisions are tentative or interlocutory. Because the OMB and OPM guidance are contrary to the Continuing Resolution, as are State/Education/GSA/SBA's decisions to move forward with terminations and to refuse to reinstate RIF'd employees, the Court finds plaintiffs likely to succeed on Claim V, violation of the APA, 5 U.S.C. § 706(2)(A), (B), and (C).

For the same reasons, plaintiffs are also likely to succeed on their *ultra vires* claim, Claim VI.  *Cf. Trump*, 139 F.4th at 1039 (where appellate court found likelihood of success on *ultra vires* claim and government did not contest the merits of plaintiffs' APA claims, "it straightforwardly follows that the actions violate the APA").

Finally, and for the same reasons, plaintiffs are likely to succeed on Claim VII, which alleges that defendants OPM, OMB, Education, State, GSA, and SBA have violated the Appropriations Clause of the Constitution. The Appropriations Clause provides, in relevant part, "No money shall be drawn from the treasury, but in consequence of appropriations made by law . . . ."  U.S. Const. Art. I, § 9, cl. 7.  "The Clause prevents the Executive Branch from 'even inadvertently obligating the government to pay money without statutory authority.'"  *Sierra Club v. Trump*, 929 F.3d 670, 707 (9th Cir. 2019) (quoting *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.)).  Here, the statute at issue contains an express "prohibition" that—between November 12, 2025, and January 30, 2026—"no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force . . . ."  Pub. L. No. 119- 37, § 120(a).

In their brief, defendants acknowledge that plaintiffs' Appropriations Clause claim hinges on the interpretation of Section 120(a). Opp'n at 21 n.6. Because defendants' reading of Section 120(a) is at odds with the plain language of the statute, the Court finds plaintiffs are likely to succeed on the merits of their claim under the Appropriations Clause.

### B.      Irreparable Harm

The Court already determined that plaintiffs have a concrete injury to establish standing but must next consider whether plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20, 22. Plaintiffs argue that plaintiff members subject to RIFs face irreparable harms, including loss of income, loss of healthcare, mental and physical issues, and the unceremonious termination of decades-long careers. Mot. at 22-23.

Defendants argue that the employment-related harms plaintiffs assert are generally not irreparable. Opp'n at 8 (citing *Sampson v. Murray*, 415 U.S. 61, 88-91 (1974)). In *Sampson*, the Supreme Court considered whether to enjoin the dismissal of an individual employee and determined that the plaintiff had not made a sufficient showing of irreparable harm "in this type of case," even though the plaintiff would suffer at least a temporary loss of income. 415 U.S. at 63, 89-90, 92. The *Sampson* Court also recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. Defendants argue that, even crediting the Court's prior ruling that *Sampson* would except shutdown-related RIFs, such a carve-out would be inapplicable to many of the RIFs at issue here, which were not initiated during or because of the government shutdown. Opp'n at 9.

The Court agrees with plaintiffs that the evidence they put forth in their declarations shows irreparable harm. Rather than repeat the analysis, the Court incorporates its reasoning from the prior preliminary injunction order. *See* Dkt. No. 94 at 38-39. As it did previously, the Court finds that what is at stake is more than the potential or temporary loss of income of one individual employee.

In particular, the loss of health insurance coverage poses a risk that cannot be retroactively repaired through backpay. A RIF'd employee and her son are currently without health insurance

United States District Court
Northern District of California

because the COBRA payments were unaffordable.  Ings Decl. ¶ 16.  Some of the RIF'd employees found out after the fact that their health benefits had already terminated.  *See, e.g.*, Nixon Decl. ¶ 15 (RIF'd SBA employee received paperwork that health coverage would continue until December 2, but doctor said coverage lapsed November 1); Garcia Decl. ¶ 10 (RIF'd GSA employee received notice on October 29 that health benefits had terminated October 18).  Other affected employees describe being in treatment for cancer, having chronic medical conditions, and foregoing treatment for themselves and their babies due to lack of insurance coverage.  Brunsdale Decl. ¶ 15; Sheffler Decl. ¶¶ 7, 14-17; Nixon Decl. ¶ 18.

In a related case challenging large-scale RIFs and reorganizations of federal agencies, the Ninth Circuit agreed with this Court that federal agency employees facing job loss due to widespread RIFs would suffer an irreparable injury in the absence of an injunction.  *See Trump*, 139 F.4th at 1040.  In addition to stressing the "very substantial downstream impact" that mass RIFs would have, the appeals court found that back pay "cannot account for harms resulting from loss of income in the interim or for gaps in health- and childcare that accompany job loss." *Id.*  As the Ninth Circuit has noted, "[l]ack of timely access to health care poses serious health risks," especially for individuals with chronic health conditions.  *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008).

The declarations also describe employees' challenges in a difficult job market or re-starting careers after decades in government service.  Sheffler Decl. ¶ 11; Garcia Decl. ¶ 13; Ings Decl. ¶ 17.  A RIF'd State employee who served with the Foreign Service for 23 years was forced into early retirement at 48 years old and now fears he will not be able to find another job with his specialized skillset and will have to live on retirement income of only 50% his salary.  Gilha Decl. ¶¶ 3, 5-6, 19.  Further, his sudden job loss has exacerbated his service-connected PTSD caused by a terrorist bombing he survived in Jeddah, Saudia Arabia.  *Id.* ¶ 17.  A RIF'd employee who worked at the State Department for 13 years has applied to 100 jobs over the past few months and consulted with a career coach but remains unemployed.  Sheffler Decl. ¶ 11.  These and other similar stories demonstrate the harms RIF'd workers face – none of which can be sufficiently remedied by back pay.

1    In sum, the Court finds plaintiffs have established irreparable harm.

2

3    **C.    Balance of Interests**

4        The last two factors—assessing the harm to the opposing party and weighing the public

5    interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435

6    (2009).  The Court must "balance the competing claims of injury and must consider the effect on

7    each party of the granting or withholding of the requested relief … pay[ing] particular regard for the

8    public consequences . . . ." *Winter*, 555 U.S. at 24.  In the context of this case, the Court considers

9    whether halting impending terminations through January 30, 2026, and rescinding terminations

10   effectuated during the government shutdown harms defendants more than it benefits plaintiffs.

11       Defendants argue that the requested preliminary injunction would irreparably harm the

12   government by preventing agencies from implementing the President's policy determination that

13   agencies should operate more efficiently and optimize their workforces.  Opp'n at 21.  Moreover,

14   the government argues that a preliminary injunction would require agencies to retain employees that

15   otherwise would have been discharged and rescind RIF notices for employees already separated,

16   allegedly costing the government millions of dollars each week.  *Id.* at 21-22. Defendants also

17   contend that the district court's exercise of jurisdiction will have a disruptive effect on the

18   administrative processes established by the government to handle federal employment disputes.  *Id.*

19   at 22.

20       The Court is not persuaded by defendants' arguments because "the government does not

21   'suffer by a temporary preservation of the status quo.'"  *See Trump*, 139 F.4th at 1030 (quoting *Am.*

22   *Fed'n of Gov't Emps., AFL-CIO v. Trump*, 782 F. Supp. 3d 793, 827 (N.D. Cal. 2025)).  The

23   temporary nature of the injunction here is even more accentuated, where the Continuing

24   Resolution's pause on RIFs goes only through January 30, 2026.  Granting relief as ordered below

25   would serve the public interest because "[t]here is generally no public interest in the perpetuation of

26   unlawful agency action.  To the contrary, there is substantial public interest in having governmental

27   agencies abide by the federal laws that govern their existence and operations."  *See League of*

28   *Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and

*United States District Court*
*Northern District of California*

22

citations omitted).

### D.     Scope of Remedy and Order

Plaintiffs request that the Court enjoin defendants OMB, OPM, State, and Education from any further action to implement RIFs, including formally separating employees, through at least January 30, 2026.  Mot. at 23-24.  Plaintiffs further request that the Court order defendants OMB, OPM, State, Education, GSA, and SBA to rescind RIFs that were effectuated (or, for Education, RIFs that were re-noticed) between October 1 and November 12, 2025, and that employees who were terminated between those dates be reinstated to their September 30, 2025 job status, with full back pay.  *Id.* at 24.  Defendants raise several objections to the scope of plaintiffs' requested relief.

Defendants argue that plaintiffs' motion should be denied because it seeks what amounts to "final relief" that plaintiffs would win at the end of this lawsuit, in the form of a mandatory injunction, rather than "preliminary relief" designed to preserve the status quo.  Opp'n at 22-24.  Courts distinguish between two types of injunctions: "A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal quotation marks and alteration omitted) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-89 (9th Cir. 2009)).  Mandatory injunctions are "particularly disfavored."  *Marlyn Nutraceuticals*, 571 F.3d at 879 (citations omitted).  "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."  *Id.* (internal quotation marks and citation omitted).

Previously in this case, when granting a preliminary injunction to pause further RIFs during the government shutdown, this Court declined plaintiffs' request to order that the RIF notices be rescinded.  Dkt. No. 94 at 44.  The situation now presented is significantly different, where Congress has instructed that RIFs that were executed or implemented between October 1 and November 12, 2025 "shall have no force or effect" and that the employees "who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status

United States District Court
Northern District of California

as of September 30, 2025." *See* Pub. L. No. 119- 37, § 120(e).  Even assuming defendants are correct that what plaintiffs seek is a mandatory injunction, the Court finds this is one of those rare cases where "the facts and law clearly favor the moving party" and such relief is appropriate, in light of Congress's clear instruction that employees shall "be returned to employment status[.]"  *See id.* § 120(e)(1); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citations omitted).  Were the Court to wait until the end of this lawsuit to order compliance with Section 120(e), irreparable harm would come to some of plaintiffs' members, as explained above, and the relief they seek would likely be unavailable.  Recently, Judge Alsup of this district declined to order reinstatement of wrongfully terminated probationary employees, despite the plaintiffs prevailing on summary judgment, because "too much water has now passed under the bridge" and "[t]he terminated probationary employees have moved on with their lives and found new jobs."  *OPM*, 2025 WL 2633791, at *20.  The Court declines defendants' invitation that rescission of RIF notices and reinstatement under Section 120(e) should not occur until this lawsuit ends.

The Court will, however, build a five-day period (until December 23, as stated below) into the injunction as to rescissions and reinstatement while defendants consider whether to appeal. Defendants have asked for a minimum seven-day stay, but the Court finds five days is appropriate and sufficient, given the upcoming holidays.  Five days also comports with the language of the Continuing Resolution, which says that notice of the withdrawal of RIF notices and of the affected employee's reinstatement should have occurred within five days of enactment of the law.  *See* Pub. L. No. 119- 37, § 120(e)(2).

Defendants also request that any injunctive relief be accompanied by a bond in an amount "commensurate to the salaries and benefits the government must pay to employees it would prefer to separate from service or who have been reinstated."  Opp'n at 25.  Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The district court retains discretion "as to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted).  Given the public

24

1    interest at stake in this dispute, the Court will impose a de minimis bond. *See Johnson*, 572 F.3d at

2    1086. The Court orders plaintiffs to post a nominal bond of $10 total (not per plaintiff) by no later

3    than **December 26, 2025.**

4         Accordingly, the Court hereby ORDERS that a preliminary injunction be granted as follows.

5

6

7                                    **PRELIMINARY INJUNCTION**

8         Pursuant to this Court's authority including but not limited to Rule 65 of the Federal Rules

9    of Civil Procedure and the authority to "issue all necessary and appropriate process to postpone the

10   effective date of an agency action or to preserve status or rights," 5 U.S.C. § 705, IT IS HEREBY

11   ORDERED that:

12        1.      Defendants OMB, OPM, Education and State, their agency heads named in their

13   official capacities as Defendants in this lawsuit, their officers, agents, servants, employees, and

14   attorneys, and all persons acting by, through, under, or in concert with these Defendants, shall refrain

15   from taking any action to implement, carry out, or effectuate reductions in force ("RIFs") of

16   employees of Education and State, including any actions to separate employees from federal

17   employment, through at least January 30, 2026.

18        2.      Defendants OMB, OPM, Education and State, their agency heads named in their

19   official capacities as Defendants in this lawsuit, are further ordered to give individual notice of this

20   injunction to all employees of Education and State who were previously sent any communication

21   informing them of a RIF or an intent to complete a RIF after November 12, 2025. Such notice shall

22   be sent by both e-mail and U.S. mail, and shall include the following information:

23             The U.S. District Court for the Northern District of California has
24             approved this message. No agency, including the Department of
               [State/Education], may separate employees by implementing a
25             reduction-in-force (RIF) prior to January 30, 2026, in light of the
               enactment in law on November 12, 2025 of Section 120(a) of H.R.
26             5371, the Continuing Appropriations, Agriculture, Legislative
               Branch, Military Construction and Veterans Affairs, and Extensions
27             Act, 2026.

28

United States District Court
Northern District of California

3.      Defendants OMB, OPM, State, Education, the General Services Administration ("GSA"), and the Small Business Administration ("SBA"), their agency heads named in their official capacities as Defendants in this lawsuit, their officers, agents, servants, employees, and attorneys, and all persons acting by, through, under, or in concert with these Defendants, shall comply with Section 120(e) of Public Law No. 119-37 by rescinding RIFs that were implemented or executed between October 1 and November 12, 2025,[12] and are further ordered that:

a.      Any RIF "noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025" and November 12, 2025, "shall have no force or effect."[13]

b.      Any RIF notice that has been issued to any employee subject to "such" a RIF under subsection 3(a) of this Order must be rescinded;

c.      Any employee who was separated from federal employment by State, GSA, or SBA pursuant to a RIF on any date between October 1, 2025 and November 12, 2025 shall "be returned to employment status as of September 30, 2025, without interruption," and "shall receive all pay to which they otherwise would have been entitled in the absence of receiving such notice, including backpay in accordance with section 116 of" Public Law No. 119-37.

d.      Absent a contrary ruling from a higher court, by no later than **December 23, 2025,** State, Education, GSA and SBA shall send notice:

1) to any employee covered by subsection 3(b) of this Order of the "withdrawal of the reduction in force notice";

2) to any employee covered by subsection 3(c) of this Order "of the withdrawal of the reduction in force notice and the affected employee's reinstatement" and such "[n]otices must include reinstatement date and the amount of back pay"; and

---

[12] This includes the RIFs for Education's Office of Civil Rights that were re-noticed on October 14, 2025.

[13] All quotations in paragraph 3 are from Section 120(e) of Public Law No. 119-37.

United States District Court
Northern District of California

3) to the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives of these actions.

4.    By December 29, 2025, each enjoined Defendant shall file a declaration(s) verifying that the Defendant has complied with the Order and the steps taken to do so.

## CONCLUSION

For the reasons stated above, the Court GRANTS plaintiffs' motion for a preliminary injunction.  A preliminary injunction is immediately in effect, as stated above.  Defendants' request for a stay of the injunction is denied.[14]

Plaintiffs shall post a bond of $10 total (not per plaintiff) by no later than December 26, 2025.

The Court sets a status conference for January 23, 2026, at 3:00 p.m. over Zoom videoconference.

**IT IS SO ORDERED**.

Dated: December 17, 2025

SUSAN ILLSTON
United States District Judge

___

[14] This Order builds in a timeframe before notifications will be sent to employees regarding rescissions and reinstatement, to allow the government to determine whether to seek a stay from the appellate court, making an additional administrative stay unnecessary.